**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, <br><br> Plaintiff, <br><br> v. <br><br> BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; CONOCOPHILLIPS COMPANY; CONOCOPHILLIPS; PHILLIPS 66 COMPANY; PHILLIPS 66; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL OIL PRODUCTS COMPANY LLC; SHELL PLC; SHELL USA, INC.; and AMERICAN PETROLEUM INSTITUTE, <br><br> Defendants. | Civil Action No. <br><br> **NOTICE OF REMOVAL** <br><br> [Removal from the Circuit Court of Cook County, County Department, Chancery Division, Case No. 2024CH01024] <br><br> Action Filed: March 27, 2024 |

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Circuit Court of Cook County, Illinois, Chancery Division, Case No. 2024CH01024, to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446. All other defendants that have been properly joined and served (collectively with the Chevron Parties, "Defendants") have consented to this Notice of Removal.

This Court has original federal question jurisdiction pursuant to the Federal Officer

Removal Statute, 28 U.S.C. § 1442. Removal is also proper under 28 U.S.C. §§ 1331 and 1441(a), because the action necessarily arises under federal law. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................1

II.     TIMELINESS OF REMOVAL .........................................................................4

III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL.......................5

IV.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER
        REMOVAL STATUTE ......................................................................................8

        A.      The Courts Construe The Federal Officer Removal Statute Broadly In Favor
                Of Removal.............................................................................................9

        B.      Defendants Satisfy All Elements Of The Federal Officer Removal Statute........11

                1.      Defendants "Acted Under" Federal Officers and Agencies ....................12

                        a.      Defendants Acted Under Federal Officers During World
                                War II And The Korean War.......................................................15

                        b.      Defendants Acted Under Federal Officers By Supplying
                                Highly Specialized Fuels For Military Use ................................23

                        c.      Defendants Acted Under Federal Officers By Operating The
                                Elk Hills Reserve "In the Employ" Of The U.S. Navy ..............30

                        d.      Defendants Acted Under Federal Officers By Constructing,
                                Operating, And Managing Government Petroleum
                                Production Facilities ..................................................................38

                        e.      Defendants Have Acted Under Federal Officers By
                                Developing Mineral Resources On The Outer Continental
                                Shelf For Decades.....................................................................41

                        f.      Defendants Acted Under Federal Officers By Developing
                                Mineral Resources On Federal Lands .........................................56

                        g.      Defendants Acted Under Federal Officers By Supplying
                                And Managing The Strategic Petroleum Reserve ......................58

                        h.      Defendants Acted Under Federal Officers By Constructing
                                Pipelines For Oil Transportation................................................62

                2.      Defendants' Activities Are Related To Plaintiff's Claims......................65

                3.      Defendants Have Colorable Federal Defenses .......................................71

V.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS
      NECESSARILY ARISE UNDER FEDERAL LAW......................................................75

VI.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER.........................84

I.     **INTRODUCTION**

1.      For over a century, United States policy has expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  It is not an accident that the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.  In fact, for vital security and economic reasons, every Administration since that of Franklin D. Roosevelt has taken active steps to increase U.S. oil production, including from Defendants.  While the alleged risks of global climate change have increased focus on alternative sources of energy, petroleum remains the backbone of United States energy policy.

2.      Now, however, Plaintiff asks the court to find that this same petroleum production and use contributes to, among other things, an unlawful "public nuisance" under Illinois state law.  Invoking various theories, the Complaint seeks to hold Defendants liable as companies that have "extracted," "sold," and "promote[d]" fossil fuel products.   Exhibit 1 to Notice of Removal ("Compl."), ¶¶ 3, 4; *see also id.* ¶ 13.   Plaintiff seeks "[c]ompensatory damages," penalties, disgorgement, and "equitable relief, including abatement of the nuisances complained of."  *Id.* at 184, Request for Relief.  Plaintiff also seeks to "enjoin[] Defendants from further acts constituting" the alleged nuisance of global climate change.  *Id.* at 169, 170.

3.      Plaintiff's claims depend on Defendants' production, promotion and/or sale of oil and gas that create greenhouse gas emissions when combusted by end users.  Because Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions, Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, promoted, sold, marketed, or used in Chicago, or even Illinois.  Plaintiff's claims expressly target Defendants' nationwide and *global* activities.   In fact, Plaintiff's claims sweep even more broadly—they depend on the activities of billions of oil and gas consumers, including not only

1

entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, individual households, and state and local governments around the world—including the City of Chicago itself.

4.     The scope of Plaintiff's theory is breathtaking—it seeks to regulate the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, including sales to the federal government.  Because Plaintiff challenges the extraction, sale, and consumption of fossil fuels over the past several decades, *see, e.g.*, Compl. ¶¶ 1, 4, 34, the Complaint necessarily calls into question longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of energy resources on the United States' outer continental shelf lands, mineral extraction on federal lands (which has produced billions of dollars in revenue for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels and the appropriate response to the problem of global climate change.  Likewise, the Complaint implicates numerous actions that have been taken under the direction and supervision of the federal government, including by Defendants, aimed at ensuring the Nation's national defense and energy and economic security.

5.     The federal and international issues and implications of Plaintiff's Complaint and requests for relief demand resolution by a federal court under federal law.  The determination of how best to address *global* climate change, and the balancing of the costs and benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation.  As the Ninth Circuit recently explained, "any effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and

legislative branches." *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020). A patchwork of fifty different state-law attempts to regulate this necessarily global issue would be unworkable and is precluded under our federal constitutional system. *See North Carolina ex. rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010) ("If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern."); *see also Illinois v. City of Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984) ("*Milwaukee III*") ("For a number of different states to have independent and plenary regulatory authority over a single discharge [of pollutants] would lead to chaotic confrontation between sovereign states."). Moreover, the inherently global nature of climate change means that any effort to regulate this issue through state law would infringe upon the federal government's exclusive authority to conduct the nation's foreign policy.

6.     Although these questions of federal jurisdiction have been considered by other federal courts in the context of similar climate change suits in other States, this suit is the first to be brought within the Seventh Circuit. As such, these important questions present issues of first impression for this circuit.

7.     At bottom, this case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses and relies upon every day. Oil and gas power our national defense; keep our homes, offices, factories, hospitals and other essential facilities illuminated, heated, cooled, and ventilated; and transport people and products, including virtually every consumer good—from food to medicine to clothing—across the nation and around the world. The national energy policy necessarily reflects a balance between fueling our everyday activities, being prepared to defend national interests wherever they are threatened, and

environmental concerns. By means of this lawsuit, Plaintiff seeks to upset that balance, overturn decades of federal energy policy, penalize actions taken at the behest of the federal government, and threaten the reliable, affordable supply of energy on which this country, and the world, depends. But "the basic scheme of the Constitution . . . demands" that federal law (not state law) serve as the exclusive source of governing law for such inherently interstate and international policy matters. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"). Accordingly, and because Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production of oil and gas under the direction, supervision, and control of federal officers, Plaintiff's action should be heard in this federal forum.

## II.     TIMELINESS OF REMOVAL

8.      Plaintiff filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court of Cook County, Illinois, Chancery Division, Case No. 2024CH01024, on February 20, 2024. A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit 1 to this Notice of Removal.

9.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b). Chevron Corporation was served on February 28, 2024. Declaration of Joshua D. Dick ("Dick Decl."), ¶ 2. The consent of the other Defendants is not required because removal does not proceed "solely under section 1441(a)." 28 U.S.C. § 1446(b)(2)(A). The Chevron Parties remove this action to federal court on several bases, including 28 U.S.C. § 1442(a)(1). Nevertheless, all properly joined and served Defendants have consented to removal. Dick Decl. ¶ 3. Consent is not required from any Defendant that has not

been served. *See* 28 U.S.C. § 1446(b)(2)(A).[1]

## III.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

10.   Plaintiff brings claims against Defendants seeking damages and equitable relief for "climate change impacts" it claims to have suffered or allegedly will suffer, such as sea level rise, extreme weather, and other natural phenomena. *See, e.g.*, Compl. ¶¶ 10, 39, 214. Plaintiff asserts the following claims: strict products liability for failure to warn, negligent products liability for failure to warn, negligence, public nuisance, private nuisance, nuisance in violation of the Municipal Code of Chicago ("MCC"), civil conspiracy, unjust enrichment, consumer fraud in violation of the MCC, misrepresentations in violation of the MCC, and recovery of city costs of providing services in violation of the MCC. *Id.* ¶¶ 258–416. In addition to compensatory damages, Plaintiff seeks "[d]isgorgement of profits," fines and "[p]enalties and recovery for injury or loss sustained as the result of a practice prohibited" by the MCC, and equitable relief, including abatement of the alleged nuisances. *Id.* at 184, Request for Relief. Plaintiff also requests that the Court enjoin Defendants from "further acts constituting" a nuisance and order Defendants to "immediately undertake the necessary action" to abate the alleged nuisance as well as enjoin Defendants from "engaging in the deceptive and unfair acts and practices" alleged by Plaintiff. *Id.* at 170–71, 179.

---

[1]   In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process. A number of Defendants contend that personal jurisdiction in Illinois is lacking over them, and these Defendants intend to preserve that defense and move to dismiss for lack of personal jurisdiction at the appropriate time. *See, e.g.*, *Prod. Components, Inc. v. Regency Door and Hardware, Inc.*, 568 F. Supp. 651, 655 (S.D. Ind. 1983) ("Nor does removal of an action from state to federal court result in a waiver of the defense of lack of personal jurisdiction"); *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive objection to personal jurisdiction).

11.     The Complaint makes clear that Plaintiff seeks to regulate global energy policy and production.  Plaintiff's claims center on Defendants' worldwide "extract[ion]" and sale of oil and natural gas that Plaintiff alleges has led to a "substantial[]" "increase[]" in "[f]ossil fuel emissions." Compl. ¶ 4.  While Plaintiff purports to challenge certain alleged misrepresentations related to climate change, its theory of liability and requested relief is far broader and is necessarily based on carbon emissions.  Under Plaintiff's theory of relief, alleged misrepresentations matter for Plaintiff's tort claims only insofar as they purportedly led to a marginal increase in greenhouse gas emissions that allegedly have caused Plaintiff's harms.  If Plaintiff's tort claims were based *solely* on misrepresentations, the requested relief sought would look much different.  But Plaintiff instead seeks damages for the alleged effects of global climate change allegedly due to increased greenhouse gas emissions.  Accordingly, Plaintiff's theory of liability necessarily depends on proof that Defendants' conduct led to increased production, sale, and consumption of oil and gas that in turn produced increased emissions and thus led to Plaintiff's climate-change-induced injuries.

12.     For purposes of meeting the jurisdictional requirements for removal only, the Chevron Parties submit that removal is proper on at least two independent and alternative grounds.[2]

13.     *First*, Defendants are authorized to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  The Chevron parties and multiple Defendants: (1) were "acting under" a federal officer or agency; (2) have claims against them that relate to acts under color of federal office; and (3) assert colorable federal defenses.  *See, e.g.*, *Baker v. Atl. Richfield*

---

[2]     As noted, the Chevron Parties deny that any Illinois court has personal jurisdiction over them, and they further deny any liability as to Plaintiff's claims.  The Chevron Parties expressly reserve all rights in this regard.

*Co.*, 962 F.3d 937, 941–47 (7th Cir. 2020); *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461, 469 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998); *Illinois ex rel. Raoul v. 3M Co.*, ___ F. Supp. 3d ___, 2023 WL 6160610, at *2–6 (C.D. Ill. Sept. 21, 2023) (citing *Baker*).  Despite Plaintiff's purported disclaimer of injuries arising on federal property and through the provision of products to the government, *see* Compl. ¶ 11 n.6, the Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial activities under the direction, supervision and control of federal officers—contributed to the *global* greenhouse gas emissions that Plaintiff claims caused its alleged injuries.  *See, e.g.*, Compl. ¶¶ 28–40.

14.    *Second*, Plaintiff's claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs of the United States.  *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *AEP*, 564 U.S. at 421–23.  Federal law applies in those few areas of the law that so implicate uniquely federal interests that "borrowing the law of a particular State would be inappropriate."  *AEP*, 564 U.S. at 422; *see also Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331].");  *City of New York v. Chevron Corp.*, 993 F.3d 81, 95 (2d Cir. 2021).  Because this action necessarily arises under federal law, it is removable under 28 U.S.C. §§ 1331 and 1441(a).  *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*") (explaining that it is "well settled" that section 1331's "grant of 'jurisdiction will support claims

founded upon federal common law as well as those of a statutory origin.'" (quoting *Milwaukee I*, 406 U.S. at 100)).

15.    The Chevron Parties will address each of these grounds in additional detail below.[3]

## IV.    THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

16.    The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must show: (1) that it "act[ed] under a federal officer or agency"; (2) that the suit is "connected or associated[] with acts under color of federal office"; and (3) that it has a "colorable federal defense." *Baker*, 962 F.3d at 942–45 (cleaned up); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291 (5th Cir. 2020) (en banc); *Def. Ass'n of Philadelphia*, 790 F.3d at 467.[4] So long as federal officer jurisdiction can be exercised as to one claim against one Defendant, the entire action is properly removed. *See also Baker*, 962 F.3d at 945 ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case."); 28 U.S.C. §§ 1442(a), 1367. Defendants easily meet these criteria.

---

[3]    Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice. *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal). Indeed, the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal. *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969). Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

[4]    The defendant must also be "a person within the meaning of the statute," which includes corporations. *Baker*, 962 F.3d at 941.

A.  **The Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal**

17.    "[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Def. Ass'n of Philadelphia*, 790 F.3d at 467.  The Supreme Court has emphasized that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Courts have repeatedly affirmed that "removal rights under section 1442 are much broader than those under" the general removal statute. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).  At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945.  A federal court must "credit the defendant's theory of the case," *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014), and "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466; *see also id.* at 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory.").  Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated.  *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"); *Baker*, 962 F.3d at 947 (noting that "[a]t this point," "we are concerned with who makes the ultimate determination, not what that determination will be") (cleaned up).  In *Acker*, for example, the Supreme Court "credit[ed] the [defendants'] theory of the case for purposes of [all] elements of [the] jurisdictional inquiry and conclude[d] that the [defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'"  527 U.S. at 432.

9

18.     Where both the plaintiffs and the defendants have "reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as the theory is "plausible." *Baker*, 962 F.3d at 941, 947.   Here, Defendants' theory is more than plausible and should be credited by this Court.

19.     Plaintiff alleges its injuries arise from global climate change, a phenomenon that arises from all of Defendants' production and sales activities (as well as activities of innumerable other sources).   The alleged injuries cannot arise from any speech untethered to any oil and gas production.   In the Complaint, Plaintiff alleges that greenhouse gas emissions caused by billions of consumers' use of fossil fuels allegedly resulted in Plaintiff's purported harms.   Plaintiff's claims thus implicate all of Defendants' oil and gas production, including production undertaken under the federal government's control.

20.     For purposes of removal, Plaintiff need not allege that *all* of Defendants' actions give rise to federal jurisdiction, only that *some* of them do.   *Baker*, 962 F.3d at 945 (rejecting district court's reasoning that "removing defendant must operate under government orders for most of the relevant time frame").   That standard is met here.   In *County Board of Arlington County, Virginia v. Express Scripts Pharmacy, Inc.*, for example, the Fourth Circuit held that the defendants' provision of opioids pursuant to Department of Defense ("DOD") contracts was sufficient to establish federal officer removal jurisdiction, even though the complaint there sought relief for opioid sales more generally and "did not even mention the distribution of opioids to veterans, the DOD contract, or the operation of the [military pharmacy]."   996 F.3d 243, 256 (4th Cir. 2021) ("*Arlington*").   So too here.   Plaintiff's claims encompass harm from every greenhouse gas emission, just as the plaintiff in *Arlington* targeted "every opioid prescription" filled by the defendants there.   *Id.* at 257.

**B.** **Defendants Satisfy All Elements Of The Federal Officer Removal Statute**

21.     Defendants satisfy all three elements of the federal officer removal statute.

22.     First, Defendants have acted under federal officers and agencies by repeatedly performing critical and necessary functions for the U.S. military to further the national defense and pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal objectives under federal direction, supervision, and control. Defendants have acted under federal officers and agencies in numerous ways, including by: (1) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (2) producing and supplying large quantities of highly specialized, noncommercial-grade fuels for U.S. military use that conformed (and still conform) to unique military specifications; (3) operating the Elk Hills reserve "in the employ" of the U.S. Navy; (4) building, operating, and managing government petroleum production facilities; (5) developing mineral resources on the outer continental shelf ("OCS") through highly technical leases that were overseen and managed by federal supervisors; (6) developing mineral resources on federal lands through specialized leases that were overseen and managed by federal supervisors; (7) supplying fuel for and managing the Strategic Petroleum Reserve; and (8) constructing pipelines for oil transportation at the direction and control of the federal government.

23.     Second, Plaintiff's action is "connected or associated" "with [these] acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also id.* at 944–45 (Defendants do "not need to allege 'that the complained-of conduct *itself* was at the behest of a federal agency'"; "'[i]t is sufficient . . . that the allegations are directed at the relationship' between the [Defendants] and the federal government." (quoting *Def. Ass'n of Philadelphia*, 790 F.3d at 470)). Plaintiff has brought suit against Defendants for the downstream effects of all global combustion of oil and gas and the resulting emissions of greenhouse gases,

which necessarily includes the combustion of products created for and at the direction of the federal government.

24.     Third, Defendants have several "colorable federal defenses," including the government-contractor defense, preemption, federal immunity, commerce clause defenses, due process, the foreign affairs doctrine, and the First Amendment.

### 1.     Defendants "Acted Under" Federal Officers and Agencies

25.     Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades. It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports." 42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production."). As Professor Mark Wilson, a professor of history at the University of North Carolina, has explained in declarations submitted in similar climate change cases: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil supplies and expand the production of petroleum products, in order to meet military needs and enhance national security." Dick Decl. Ex. 1 ("Wilson Decl.") ¶ 1.

26.     Defendants "acted under" federal officers and agencies because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production. Defendants also "acted under" federal officers and agencies because they engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" by performing a job the government would otherwise have to perform itself—whether by producing oil under government directives in wartime, producing specialized fuel for the military, developing mineral resources on

the OCS and federal land, constructing pipelines under federal direction, or more. *Watson*, 551 U.S. at 151–52, 154; *see also id.* at 147 (defendant must be "acting under" any "officer" *or* "agency"); *St. Charles Surgical Hosp., LLC v. Louisiana Health Serv. & Indem. Co.*, 990 F.3d 447, 454–55 (5th Cir. 2021) ("In order to satisfy the 'acting under' requirement, a removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive. . . . Instead, the 'acting under' inquiry examines the *relationship* between the removing party and relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor.").

27.     As noted, both the Supreme Court and the Seventh Circuit have made clear that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Watson*, 551 U.S. at 147; *see also Baker*, 962 F.3d at 941–43. "Acting under" can encompass a broad range of relationships, including "contract" or "payment," "employer/employee," and "principal/agent." *Watson*, 551 U.S. at 156; *see also, e.g.*, *Doe v. UPMC*, 2020 WL 5742685 at *3 (W.D. Pa. Sept. 25, 2020). Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong. *Baker*, 962 F.3d at 942.

28.     *Baker* confirms that Defendants here meet the "acting under" requirement. In that case, residents of a housing complex sued nearby chemical manufacturing companies for alleged contamination of soil with hazardous substances like lead and arsenic. 962 F.3d at 939–40. The chemical companies removed the case to federal court on the grounds that, during World War II, "the United States government directed them to produce certain materials [including lead] for the military, supervised distribution of these goods, and controlled their ultimate usage." *Id.* The

13

Seventh Circuit held that the companies made an adequate threshold showing for removal under the federal officer removal statute, because the companies: (1) acted under federal authority by "provid[ing] the federal government with materials that it needed to stay in the fight at home and abroad;" and (2) were "under contract with the United States Military itself for the procurement of" the materials, without which "the government would have had to manufacture the relevant items on its own." *Id.* at 942. The government's "detailed specifications" for production of the materials, the "'compulsion to provide the product to the government's specifications,'" and the "continuous federal supervision" all supplied "the necessary relationship" between the companies and the government. *Id.* at 943 (quoting *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998)). In other words, *Baker* was "not simply a case of compliance, but of *assistance*." *Id.* at 942 (emphasis in original). And, as discussed in detail below, here the relationship between Defendants and the federal government extended far beyond the relationship at issue in *Baker*.

29. For decades—including during World War II, the Korean War, and the Cold War—Defendants have acted under the direction, supervision, or control of federal officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy. Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims connected to this "special relationship" be heard in federal court. *Baker*, 962 F.3d at 941–42 ("The crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government."). The federal government has required and promoted the production of oil and gas for decades to meet the U.S. military and national economy needs, even as the public and the world increasingly recognized and understood the potential link between greenhouse gas emissions and global climate change.

Indeed, the federal "government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana*, 947 F.3d at 1167. For example, the Office of Fossil Energy states that the government seeks to "promote[] U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[5]

30. Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for the national defense and economic well-being. Each of the examples provided below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government. Any one of them alone is sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which Plaintiff now seeks to disrupt.[6]

      **a.    Defendants Acted Under Federal Officers During World War II And The Korean War**

31. World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it. *See* Dick Decl. Ex. 4 (Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 4 (Nov. 28, 1945)) ("Our overseas forces required

---

[5] U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

[6] The examples provided in this section, and other sections, of this Notice of Removal are meant only to provide illustrative examples. These examples are not an exhaustive collection of the factual bases that support the grounds for removal asserted herein. Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together. In both essentiality and quantity, oil has become the greatest of all munitions."); Dick Decl. Ex. 2 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949)) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security."). As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for airplanes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity. Avgas, for example, has been described as "the most critically needed refinery product during World War II," and "essential to the United States' war effort." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"). The government created agencies to control the petroleum industry, including Defendants, to build refineries, direct the production of certain petroleum products, and manage scarce resources for the war effort. "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory." Dick Decl. Ex. 3, at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)) (emphases added).

32. In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, 2021 WL 5545961 (5th Cir. June 18, 2021) (alteration and omissions in original). President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the

> supply of petroleum and its products will be accommodated to the
> needs of the Nation and the national defense program ... One of the
> essential requirements ... which must be made the basis of our
> petroleum defense policy ... is the development and utilization with
> maximum efficiency of our petroleum resources and our facilities,
> present and future, for making petroleum and petroleum products
> available, adequately and continuously, in the proper forms, at the
> proper places, and at reasonable prices to meet military and civilian
> needs.

*Id.* The Office of Petroleum Coordinator promptly began "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

33.     In 1942, for example, President Roosevelt established several *agencies* to oversee wartime production by the petroleum industry, including Defendants.[7]   Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.   The PAW centralized the government's petroleum-related activities.  It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and enter into contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  Dick Decl. Ex. 4 at 6; *see also Shell I*, 294 F.3d at 1049 (discussing federal control of petroleum production).  The "PAW told the refiners what to make, how much of it to make, and what quality."  *Shell II*, 751 F.3d at 1286 (quoting John W.

---

[7]   The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941-1945, at 219 (1946)); *see also* Dick Decl. Ex. 4 at 11 ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Dick Decl. Ex. 5 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available."). In the days after the attack on Pearl Harbor, the Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*." *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

34.     The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for oil production. Dick Decl. Ex. 6 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War*, 1941-1945 (1946)) at 171, 177–78, 184. As Professor Wilson explains: "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." Wilson Decl. ¶ 11. Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines." *Id.*

35.     The PAW's directives to Defendants were often coercive. The PAW would "get

18

the results" it desired—namely the effective facilitation of petroleum for the war effort—and if "[it] can't get them by cooperation, then [it] will have to get them some other way."[8] The PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[9] In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.

36.     The court in *Exxon Mobil Corp. v. United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under federal law: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry." 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, 2021 WL 5545961 (5th Cir. June 18, 2021). The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction. *Id.* at *11, *see also* *12 ("J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that companies that weren't making essential war materials were simply not able to run their refineries." (internal quotation marks omitted)). In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8. Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas,

---

[8] Dick Decl. Ex. 7 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[9] Dick Decl. Ex. 8 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

synthetic rubber, and other war materials." *Id.* at \*14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under direct contract with the Army Ordnance Department. *See also id.* at \*13; Harold Nockolds, *The Engineers* 28 (1949).

37. The controls placed on the production of petroleum during World War II extended through the Korean War. *See Exxon Mobil*, 2020 WL 5573048 at \*15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products"). For example, the United States government authorized the full development of its own energy resources by directing large-scale oil production at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron Corporation's predecessor, Standard Oil of California, under contract with the U.S. Navy. *See infra* ¶¶ 58–76.

38. At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA"). The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[10] As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Wilson Decl. ¶ 28.

39. The government also invoked the DPA immediately after the 1973 Oil Embargo to

---

[10] *See* Dick Decl. Ex. 9, at 122 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)). *See also Exxon Mobil Corp.*, 2020 WL 5573048, at \*15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

address immediate and critical petroleum shortages by the military.[11]  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[12]  The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries[13]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[14]

40.    The DOD is the United States' single largest consumer of energy, and one of the world's largest users of petroleum fuel.  *See* Dick Decl. Ex. 10; Lengyel, Colonel, USAF, Gregory J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007), http://military-gospel.tygae.org.za/pdf/2007-08_USAF-B_DoD-EnergyStrat-OldDogNewTricks-LengyelCol.pdf.  For more than a century, petroleum "products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military

---

[11]  *See* Dick Decl. Ex. 11 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[12]  Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[13]  The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Dick Decl. Ex. 12 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)).  Dick Decl. Ex. 13 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[14]  *See* Dick Decl. Ex. 13.

machines." *Exxon Mobil Corp.*, 2020 WL 5573048, at \*31 (emphasis added); *see also id.* at \*47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). In fiscal year 2019 alone, the DOD purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[15]

41.     As two former Chairmen of the Joint Chiefs of Staff have explained in amicus briefs submitted in other climate change-related cases, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." Dick Decl. Ex. 14, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)); *see also* Dick Deck. Ex. 15, at 7–8, 20–23 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullion, in Support of Defendants-Appellants, *City and Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022) (No. 21-15313)) (similar). "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." Wilson Decl. ¶ 2. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.*

42.     The extent of the federal government's wartime control over Defendants far exceeds that presented in *Baker*, in which the Seventh Circuit found that the "acting under" requirement was satisfied in the context of the federal government's "detailed specifications," "compulsion," and "continuous federal supervision" over the manufacturing defendants during

---

[15]   Dick Decl. Ex. 10 (Def. Logistics Agency Fact Book).

World War II.  962 F.3d at 943.

        **b.**    **Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use**

      43.    Many of the Defendants have continuously produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts for the last eighty years.  The federal officer removal "acting under" prong precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."  *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).  Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense capabilities," Dick Decl. Ex. 16.  As in *Baker* or *Arlington*, these specialized fuels have "detailed federal specifications" pursuant to government contracts and must be produced "in accordance with those specifications."  *Baker*, 962 F.3d at 940–41, 43; *see also Arlington*, 996 F.3d at 252 (similar); *Winters*, 149 F.3d at 400 (noting "the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and holding "the defendants acted pursuant to federal direction").

      44.    During World War II, the federal government asserted substantial control over Defendants, directing the development and production of avgas.[16]  Because, as noted, avgas was "'the most critically needed refinery product' during World War II and was essential to the United States' war effort," *Shell II,* , 751 F.3d at 1285, the United States government "exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.*, 2020 WL 5573048, at *1.  It did so to maximize production of

---

[16]  During the war, approximately 80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Dick Decl. Ex. 6, at 1, 169.

fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002) ("*Shell I*"). This is like the federal government's conduct in *Baker*, mandating defendant manufacturers to produce "critical wartime commodities" according to strict regulations, "direct[ing] nearly every aspect of [the] production process" at one site and controlling the "operation," "plans," "designs," and "schedules" at another. 962 F.3d at 940–41.

45.     To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements. U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities and, as such, must be available on specification, on demand, on time, every time. In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat." Dick Decl. Ex. 17 (emphasis added). "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. Defendants Shell USA, Inc. (f/k/a Shell Oil Company), BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[17] DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the

---

[17] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels. Several other Defendants have also produced (and continue to produce) these critical products for the U.S. military.

46. For example, during the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[18] Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[19] Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[20] Under the OXCART program, Shell Oil Company also

---

[18] *See* Dick Decl. Ex. 18, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 (1992)), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level. Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 19 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 20 (Ben Rich & Leo Janos, Skunk Works 127, 205 (1994)).

[19] Dick Decl. Ex. 21 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 22 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

[20] Dick Decl. Ex. 23 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in

"tested" "refinery procedures" to ensure fuels were "up to standard."[21] In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Dick Decl. Ex. 23 ("This work is under the technical direction of Colonel H. Wilson."), and helped the government to produce an essential item that it needed for national defense purposes and would otherwise have had to produce itself, *see Watson*, 551 U.S. at 153.

47. As another example, from at least 2010 to 2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with the DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel. *See* Dick Decl. Exs. 30–38. The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems." *See* Dick Decl. Ex. 39, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 40 at 5, 11, §§ 3.1, 6.1.

48. Similarly, BP entities have contracted with the DLA to provide a significant quantity of specialized military fuels over decades. For example, BP entities contracted with the DLA to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use in the years 2016 to 2020 *alone*. Dick Decl. Ex. 41, at 6. Since 2016, BP entities entered into

---

Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex. 24 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)); *id.* Ex. 25 (CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 26 (CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 27 (CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963)); *id.* Ex. 28 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962)).

[21] Dick Decl. Ex. 29 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76. DLA required that the fuels contain specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI"), and, for F-76 fuels, lubricity improver additives ("LIA"). *See generally id.* Such additives are essential to support the high performance of the military engines they fuel.

49. The DOD exerted significant control over the BP entities' actions in fulfilling these contracts, seeking to ensure that these unique fuels (1) ignite, but do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[22]

50. To meet its unique operational needs, the DOD required that the BP entities supply each fuel in accordance with highly specialized, DOD-mandated specifications. As one would expect when dealing with highly specialized military equipment, these fuel contracts are far more specialized and prescriptive than contractual requirements for fuel intended for consumer-type vehicles. Like the contracts in *Arlington*, the contracts for these specialized fuels established "how [Defendants] must operate" and fixed "[p]ricing, . . . shipping, payment, and many other specifications." *Arlington*, 996 F.3d at 252.

51. In particular, the contract specifications require express amounts of "military

---

[22] Dick Decl. Ex. 42 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 43, tbl. 1, 2–9 (Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4–6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

unique additives that are required by military weapon systems," such as SDA, FSII, and CI/LI.[23] "[T]his [additive] requirement is unique to military aircraft and engine designs,"[24] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently.

52.    The DOD *required* the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[25]

53.    The DOD *required* the BP entities to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[26]

---

[23]  Dick Decl. Ex. 39, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)). Several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J.  Dick Decl. Ex. 41, at 4; *id.* 44 (MIL-DTL-83133J specs).

[24]  *Id.* at 10.

[25]  Dick Decl. Ex. 42 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 43 at 28, 35 (Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel*, ARWAL-TR-85-2076), at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge."), https://apps.dtic.mil/dtic/tr/fulltext/u2/b100948.pdf.

[26]  Dick Decl. Ex. 45 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 42 § 1.4.1.1; *id.* Ex. 43, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 46 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft.  When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

54.     The DOD *required* the BP entities to use CI/LI to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[27]

55.     In addition, the DOD specifications required the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.[28]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[29]

56.     If the fuels did not conform to the exact specifications, the DOD retained and exerted control over the BP entities by requiring them to either repair or replace the products at no increase in contract price.

57.     The DOD's detailed specifications for the makeup of the military jet fuels—which, according to Plaintiff, is a contributing cause of climate change and Plaintiff's asserted harms—and "the compulsion to provide the product to the government's specifications" demonstrate the

---

[27]  Dick Decl. Ex. 47 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 42 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 43, at 28, 30, 38–39 (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 48 (MIL-PRF-32490 (LIA) specs).

[28]  Dick Decl. Ex. 39, at 6 (MIL-DTL-83133E); *id.* Ex. 43, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels); *id.* Exs. 44, 49–52 (the JP-5 specs (MIL-DTL-5624W); the NATO-76 specs (MIL-DTL-16884N and -16884P); and Def Stan 091-91 (Jet A-1) Issue 9 specs).

[29]  Dick Decl. Ex. 39, at f76 (MIL-DTL-83133E); *see also id.* Ex. 53 (ASTM D1655-20 Jet A specs).

necessary "acted under" special relationship between Defendants and the government in each of these examples. *See Baker*, 962 F.3d at 943. These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction, *see Baker*, 962 F.3d at 943.

> c. **Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy**

58. Defendants have played an essential role in assisting the federal government with meeting its petroleum needs to power the nation's economy and the U.S. military to ensure national security. The connection between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships. President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910: "As not only the largest owner of oil lands, but as a propsective [sic] large consumer of oil by reason of the increasing use of fuel oil by the Navy, the Federal Government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."[30] This national security concern led to the September 2, 1912, Executive Order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies. Dick Decl. Ex. 55.

59. At the turn of the twentieth century, government lands in the Western United States were being rapidly turned over to private owners. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal-burning to oil-burning. In response to arguments that the government should preserve oil for naval

---

[30] Dick Decl. Ex. 54 (Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy, 64th Cong. 761 (1915)).

purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order. The establishment of the Reserve, however, was expressly made subject to preexisting private ownership. There are approximately 46,000 acres within the Reserve, and Standard Oil of California ("Standard Oil") (Chevron's predecessor) owned approximately one-fifth of that land and the Navy owned the remainder. The Standard Oil lands were not in one block, but were checker-boarded throughout the Reserve.[31]

60. "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[32] "Congressional intent [was] to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[33] In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes. Before World War II, Standard Oil and the Navy developed an understanding that neither would drill additional wells or produce oil inside the Reserve without providing six months' notice to the other. *See United States v. Standard Oil Co. of California*, 545 F.2d 624, 627 (9th Cir. 1976). In doing so, Standard Oil agreed to maintain the Reserve for national security purposes. The maintenance of the Reserve itself under

---

[31] The history of Elk Hills is recounted in *United States v. Standard Oil Co. of California*, 545 F.2d 624 (9th Cir. 1976).

[32] Dick Decl. Ex. 56 U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[33] Dick Decl. Ex. 57 (U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) ("GAO Report"), https://www.gao.gov/assets/220/210337.pdf).

the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[34]  Standard Oil's efforts originally ensured that the Reserve was ready to produce oil for the U.S. war efforts in World War II.

61.  World War II marked a new phase.  "Shortly after the entrance of the United States into World War II, it became apparent that additional crude oil production would be required on the West Coast."[35]  Standard Oil and the Navy thus began negotiations for production on the Reserve.  On March 21, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[36]

62.  The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944.  The UPC "govern[ed] the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve."  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  It provided that the Elk Hills Reserve "was to be operated as a single property (a unit) and granted the Navy, subject to the provisions of the contract, *absolute control* over (1) the time and rate of exploration and development and (2) the quantity and rate of production."[37]  The UPC shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve.  *See* Dick Decl. Ex. 58 (Statement of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, Hearing on Amendment Proposed to Unit Plan Contract Governing Development and Operation

---

[34]  *See generally* GAO Report.

[35]  *Id.* at 14.

[36]  *Id.*

[37]  *Id.* at 15 (emphasis added).

of Naval Reserve Petroleum No. 1 (Elk Hills), U.S. House of Representatives, Committee on Naval Affairs, at 3737–38 (Sept. 9, 1946)) ("It must be recognized that although Navy and Standard entered into a unit-plan contract . . . the interests of each are conflicting.  It is to Navy's interest to conserve as much oil as possible in the ground . . . [and] it is to Standard's interests to produce its oil as rapidly as is consistent with maintaining a balance between economical production and greatest ultimate recovery.  The conflict of interest between Navy and Standard Oil was decided in Navy's favor upon the execution of the unit-plan contract, for absolute control over the time, manner, and rate of production is vested in the Secretary of the Navy subject to the control of Congress.").

63.     The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[38]  *See* Dick Decl. Ex. 58 (Statements of Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, Hearing Records at 3693–94) ("[The] agreement between Navy and Standard . . . placed the control of production from both Standard and Navy lands under the absolute control of the Secretary of the Navy.").

64.     Specifically, the UPC provided that "[the] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[39]

65.     The UPC also provided that "[the] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate

---

[38]   Dick Decl. Ex. 59, Recitals § 6(d)(i) (emphases added).

[39]   *Id.* § 3(a) (emphasis added).

of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[40]

66.     Under the UPC, "all exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[41]  In the event of disagreement, such matter shall be referred "to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard."[42]

67.     The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard Oil was entitled to receive, or increase the rate of production.[43]

68.     Standard Oil (and later Chevron) could participate in an Operating Committee, which was responsible for production decisions, such as the number, design, and location of wells and facilities.  Both the Navy and Standard Oil had an equal vote on the Committee, but in the event of a tie the Secretary of the Navy held the tiebreaker.[44]

69.     Critically, the federal government had to decide who would operate its portion of the Reserve—the Navy, a private contractor, or someone else.  The "*Navy chose to operate the*

---

[40]  *Id.* § 4(a) (emphasis added).

[41]  *Id.* § 3(b)(4).

[42]  *Id.* § 9(a).

[43]  *Id.* §§ 4(b), 5(d)(1).

[44]  *See* GAO Report at 15.

*reserve through a contractor rather than with its own personnel*" and opened the contract to

competitive bidding.[45]  Standard Oil "bid for the operator's contract in 1944, was awarded the

contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[46]  Although the

Navy could have developed the resources on the Reserve itself, it decided to use a third-party

contractor to maximize production as quickly as possible.  This is reflected in government

documents explaining the decision to hire Standard Oil to operate the Reserve, which also noted

that Standard Oil offered to perform the work without making a profit:

> A substantial increase in production at the earliest possible date was
> urgently requested by the Joint Chiefs of Staff to meet the critical
> need for petroleum on the West Coast to supply the armed forces in
> the Pacific theatre. . . .  The Standard Oil Company of California
> was chosen as operator because it was the only large company
> capable of furnishing the facilities for such a development program
> and partially because it was the largest private owner of lands in the
> Reserve.  The Navy has expressed its appreciation of the patriotism
> of the Standard Oil Company in undertaking such a project at cost
> with no profit to be received by the Company.[47]

70.     The Operating Agreement provided that "OPERATOR *[Standard Oil] is in the*

*employ of the Navy Department* and is responsible to the Secretary thereof."  *See* Dick Decl. Ex.

61, at 3 (emphasis added).  Standard's Oil's operation and production at Elk Hills for the Navy

were subject to substantial supervision by Navy officers; and naval officers directed Standard Oil

to conduct operations to further national policy.  For example, "[s]hortly after the unit plan contract

was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve]

at a level of 65,000 B/D [barrels per day] to address fuel shortages and World War II military

---

[45]  *Id.* (emphasis added).

[46]  *Id.*

[47]  *See* Dick Decl. Ex. 60, at 1 (Elk Hills Historical Documents).

needs."[48] Production reached this "peak of 65,000 barrels per day in 1945."[49] As another example, in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary [of] the Navy." *See* Dick Decl. Ex. 62, at 3.

71.    Standard Oil's operation and production at Elk Hills for the Navy were subject to substantial and continued oversight and inspections by Navy officers. The Operating Agreement between the U.S. Navy and Standard Oil directs that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof through the Officer in Charge and the Director, Naval Petroleum and Oil Shale Reserves."[50] In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[51]

72.    Accordingly, for at least 31 years, Standard Oil operated Elk Hills under the "subjection, guidance or control" of federal Navy officers. *Watson*, 551 U.S. at 151; *see id.* at 153–54 (noting that removal was proper where company "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war"). At a

---

[48]    GAO Report at 15.

[49]    GAO Fact Sheet at 3.

[50]    *See* Dick Decl. Ex. 61 (Contract No. NOd-9930).

[51]    *See* Dick Decl. Ex. 62 at 3–4.

minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

73.     After the OPEC oil embargo in 1973–74, Congress authorized preliminary activity to develop Elk Hills and other National Reserves to their full economic potential.     *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-245 (1974).  In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves.  The President has requested that every effort be made to increase domestic production of petroleum, and Standard is focusing its attention on this objective.[52]

74.     A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*."[53]  Congress directed production at Elk Hills to be significant.  Indeed, Commander Roger Martin, the naval officer in charge of the facility, explained: "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]."[54]  Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually.

75.     In 1977, Congress transferred the Navy's interests and management obligations to

---

[52]  *See* Dick Decl. Ex. 63 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[53]  Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976) (emphasis added); *see also* Dick Decl. Ex. 64.

[54]  Dick Decl. Ex. 64.

DOE, and Chevron continued its interest in the joint operation until 1997, when the Reserve was sold. From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[55]

76.     Although other prime contractors operated Elk Hills for the Navy following 1975, Standard Oil and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[56] Under the Navy's direction and control, Chevron conducted exploration and production on the Reserve to fulfill the government's demand for significant production from the Reserve. Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

### d.     Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities

77.     Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities. During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*." Wilson Decl. ¶ 14 (emphasis added). "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . to comply with urgent government orders." *Id.* ¶ 15. These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within

---

[55]   *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[56]   *See* Dick Decl. Ex. 65, at 192–93 (History of Naval Petroleum Reserve No. 1) (describing the June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day).

industrial facilities.  *Id.* ¶ 19.  Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945.  *Id.*  Several other Defendants or their predecessors operated similar production equipment and facilities for the government.  *Id.* ¶ 20.  *Arlington* confirmed that courts "have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government.*"  996 F.3d at 251–52 (emphasis in original).

78.    Defendants built plants and manufactured war products for the Allied effort.  For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period.  The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . .  Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas."  Dick Decl. Ex. 66; *see also* Wilson Decl. ¶ 23.

79.    In addition, the government's need for highly specialized fuels, discussed *supra* Section IV.B.1.b., necessitated changes to Defendants' refining equipment and operations.[57]  And the impacts of the government's particular fuel specifications on Defendants' operations were

---

[57] *See* Dick Decl. Ex. 67 at 40 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)) ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine.").

typically long-lasting.[58]  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.[59]

80.     The federal government entered into contracts with predecessors or affiliates of Defendants Chevron, Shell USA, Inc., and ExxonMobil, to obtain "vast quantities of avgas."[60] These contracts provided federal officers with the power to direct the operations of Defendants. For example, the government's contract with Shell USA, Inc.'s predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."  *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 at JA002, JA027 (emphases added).  To maximize production of this critical product, the "Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts."  *Shell II*, 751 F.3d at 1287 (internal citations omitted).  At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war."  *Id.*

81.     With respect to Exxon Mobil's affiliates, the government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use

---

[58]  Dick Decl. Ex. 68 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[59]  *See* Dick Decl. Ex. 69 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[60]  Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.

   e. **Defendants Have Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf For Decades**

82.     Defendants also acted under federal officers by producing oil and gas pursuant to the federal mineral exploitation and production regime created by the Outer Continental Shelf Lands Act ("OCSLA"). Congress enacted OCSLA in 1953 to govern the "exploration, development, [and] production of minerals" in the OCS, which includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. § 1349(b)(1); *see also* 43 U.S.C. §§ 1301, 1331. OCSLA provides for federal control over the OCS to ensure the "expeditious and orderly development" of what Congress recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Declaration of Professor Tyler Priest, Dick Decl. Ex. 70 ("Priest Decl.") ¶ 19. "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1954), 30 C.F.R. § 250.11, 2656) (emphases added). In fact, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20. As in *Arlington*, Defendants "are required to comply with all of these contractual requirements along with the statutes, regulations and policy manuals governing" their operations. 996 F.3d at 252.

83.     Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See* Priest Decl. ¶ 19. Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id.* ¶ 20. The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).[61] As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

84.     In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conductor casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24 (citations omitted). Professor Priest observes that through these OCS

---

[61]   The federal government uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes. *See* Dick Decl. Ex. 71 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added). A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material term of the lease contract. *See* Dick Decl. Ex. 72 (Commercial Lease – Texas Association of Realtors, Form TAR-2101). This would be akin to a commercial rental lease providing that the landlord has sole discretion to specify the rent owed.

Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25. These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *E.g.*, *id.* ¶¶ 28, 32.

85. During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[62] Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. The United States increasingly turned to foreign countries, particularly in the Middle East, for oil. The amount of oil that the United States imported grew from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[63] By April 1973, President Nixon warned Congress of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[64]

86. To avert a national energy crisis, President Nixon ordered a dramatic increase in possible production on the OCS:

---

[62] Dick Decl. Ex. 73, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

[63] Dick Decl. Ex. 74, at 591 (Yergin, *The Prize*).

[64] Dick Decl. Ex. 75 (Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html).

> Approximately half of the oil and gas resources in this country are
> located on public lands, primarily on the Outer Continental Shelf
> [OCS]. The speed at which we can increase our domestic energy
> production will depend in large measure on how rapidly these
> resources can be developed. I am therefore directing the Secretary
> of the Interior to take steps which would triple the annual acreage
> leased on the Outer Continental Shelf by 1979, beginning with
> expanded sales in 1974 in the Gulf of Mexico and including areas
> beyond 200 meters in depth under conditions consistent with my
> oceans policy statement of May, 1970.[65]

87. Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis. The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[66] The government called upon the oil and gas industry, including Defendants, to address this shortage. The nation's energy woes continued to mount in the mid-to-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976 to 1977, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[67] Yet the nation's dependency on imported oil continued to increase. By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[68] The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

---

[65] *Id.*

[66] U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false.

[67] *Id.*

[68] *Id.* at tbl. IV-1.

88.     In 1973, President Nixon established the goal of energy independence for the U.S. by 1980. President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[69] President Nixon explained:

> Let me conclude by restating our overall objective. It can be summed up in one word that best characterizes this Nation and its essential nature. That word is "independence." From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence. In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . . What I have called Project Independence 1980 is a series of plans and goals set to [e]nsure that by the end of this decade, Americans will not have to rely on any source of energy beyond our own.[70]

89.     In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s. Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[71] Congress

---

[69]  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view=image;q1=to+increase+the+acreage.

[70]  Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image. After the Arab Oil Embargo, there was immense public pressure for Washington to "do something"— to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies. Dick Decl. Ex. 74, at 660 (Yergin, *The Prize*). *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/.

[71]  43 U.S.C. § 1802 (1) & (2); *see California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C.

expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(2).

90.     During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS: "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the [OCS]. . . . The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies. The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[72]  The proposal to create a government agency to develop the OCS was ultimately rejected. Instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government. Dick Decl. Ex. 76; Priest Decl. ¶¶ 55–56.

91.     This was not the only proposal at the time to create a national oil company. *See* Priest Decl. ¶¶ 52–53; Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Dick Decl. Ex. 76. Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands

---

Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

[72]   *See* Dick Decl. Ex. 77 (121 Cong. Rec. S903-11 (1975)).

46

in sufficient quantities to mitigate such shortage and hardship.'" Priest Decl. ¶ 53. Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority." 121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975). Representative Harris explained: "The creation of a quasi-public corporation such as Ampower can and should perform these functions on public lands" to "[e]nsure that the public's oil and gas is developed in the public interest." Dick Decl. Ex. 76, 9275–76. These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control. *See* Priest Decl. ¶ 55.

92.    It is significant that Congress considered creating a national oil corporation to develop the federally owned oil and gas resources located on the OCS, as many other countries seeking to exploit their domestic petroleum resources have done. Ultimately, Congress decided that the best and most efficient way to meet its enumerated national public policy goals and objectives was to contract with private energy companies, including many of the Defendants here, to produce federally owned oil and gas from these federal lands. The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests.[73] This program thus required private companies to "perform[] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform," making removal appropriate. *Watson*, 551 U.S. at 154.

93.    One of the Federal Energy Administration's first undertakings in 1974 was to

---

[73]    *See* Dick Decl. Ex. 77 (Cong. Rec. S903-11 (Jan. 27, 1975)).

47

propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[74] This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

94. Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible. In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."[75] The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[76]

95. The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[77] The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities

---

[74] Dick Decl. Ex. 78, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

[75] Dick Decl. Ex. 79, at 254 (H.R. Rep. No. 94-1084 (1976)).

[76] Dick Decl. Ex. 80, at 53 (H.R. Rep. No. 95-590 (1977)).

[77] *See id.* (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

48

"which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a)–(e). Since 1978, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[78]

96.      In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production. Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995). And in the 2000s, the Bush Administration opened approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[79]

97.      As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time." Priest Decl. ¶ 7(1) (emphasis added). The development of the OCS was a "political and policy-driven project to incorporate ocean space and the OCS into the nation's public lands and manage OCS resources in the long-

---

[78]  *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

[79]  The White House, *Fact Sheet: Tax Relief and Health Care Act of 2006* (Dec. 20, 2006), https://georgewbush-whitehouse.archives.gov/news/releases/2006/12/text/20061220.html.

term interest of U.S. energy security." *Id.* The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.* The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18. But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests in the production of these federally owned resources and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.* ¶ 7(2). "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration. *See* Priest Decl. ¶ 79. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

98. The leases require Defendants to maximize the ultimate recovery of the hydrocarbons from the leased area; require that drilling take place in accordance with a government approved exploration plan, development and production plan, or development operations coordination document as well as approval conditions; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[80] The U.S. Bureau of Ocean Energy Management ("BOEM") maintains oversight over the lessees as they operate on

---

[80] *See generally* Dick Decl. Exs. 59, 71, 81, 82; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

federal land. Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[81] Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[82]

99. Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[83] At all stages—from exploration, to preparation for developing and producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies. The relevant agency must then find, complete, and approve these plans before any such work can begin. BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

100. The federal government retains the right to control a lessee's rate of production on

---

[81] *See* Offshore Oil and Gas Development: Legal Framework at 11–13.

[82] Dick Decl. Ex. 81 § 10 (emphases added).

[83] *See, e.g.*, 30 C.F.R. §§ 250.101–115, 250.130–146, 250.168–295, 250.400–463 (BSEE) & 550.101–147 (BOEM).

the OCS from its lease.[84]  In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[85]  This requirement has existed since 1974,[86] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[87]

101.    Through these federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. §181 *et seq.* ("MLA"), discussed below, are an exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Dick Decl. Ex. 71 § 3.  But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.  Nor may a federal lessee assign its lease to another person without express government approval.   30  U.S.C.  § 187;  43  C.F.R.  § 3106  (onshore  leases);  30  C.F.R. §§ 556.701(a), 556.800 (OCS leases).

102.    The United States controls federal mineral lessees like Defendants in other ways.

---

[84]   *See* Dick Decl. Ex. 81 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[85]   30 C.F.R. § 250.1159.

[86]   *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[87]   75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

An OCS lessee does not have an absolute right to develop and produce; rather, it has priority over other parties to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984). The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[88] The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The government reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind.[89] The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[90]

103. Through federal leases, the government balances economic development with environmental considerations. The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[91] The Secretary may also suspend production from an OCS lease "if there is a threat of

---

[88] Dick Decl. Ex. 81 § 14; Dick Decl. Ex. 71 § 15(d); *see* 43 U.S.C. § 1341(b).

[89] 43 U.S.C. § 1353(a)(2). The United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 43 U.S.C. § 1341(f).

[90] *Id.* In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners). Dick Decl. Ex. 71 § 15(c); *see* 43 U.S.C. § 1337(b)(7).

[91] 43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[92]

104.    As these statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf.   Through these leases, the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.   Without these federal leases on federal lands, the federal government would itself have to undertake these activities.   Indeed, it is the kind of "special relationship" that supports federal officer removal.   *Watson*, 551 U.S. at 157.

105.    Authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.   The EIS approving each five-year leasing program details the national need for oil and gas and how the leasing program meets those needs.[93]

106.    These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS to further the national interest, not merely the commercial interests of the lessees.   In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.   The U.S. Treasury averages more than $10 billion per year from OCS bonuses, rental payments, and

---

[92]   43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[93]   *See, e.g.*, 2012–2017 EIS.

royalties. In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the 2012-2017 EIS concluded that such alternatives would not meet the federal government's purpose or needs because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[94]

107. The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of the Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[95] Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for action . . . as it leaves a void in planning for national energy needs."[96]

108. In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department reached nearly one billion barrels. Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[97] The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government. Moreover, the activities of lessees

---

[94] *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[95] 43 U.S.C. § 1344(a)–(e).

[96] U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

[97] *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

(including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS to achieve the federal government's policy objectives. If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself to implement Congress's directives regarding production of oil and gas from the OCS.

109. The federal government's control over oil and gas production is thus fundamentally different from situations in which a highly regulated private party "simply compl[ies] with the law" and is outside the scope of the federal officer removal statute. *Watson*, 551 U.S. at 152. Plaintiff's claims seek to punish Defendants for activities conducted under the close supervision of the federal government that effectuate national energy policy and support the national defense. Plaintiff's claims thus implicate precisely the type of "special relationship" that supports federal officer removal. *Id.* at 157.

### f. Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands

110. Defendants also acted under the direction, supervision and control of the federal government in developing mineral resources on federal lands onshore. The Interior Department's Bureau of Land Management ("BLM") leases, similar to OCS leases, provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[98]

111. The federal government maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration

---

[98] Dick Decl. Ex. 82 § 4 (emphasis added).

(government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[99] "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Dick Decl. Ex. 83.

112.    For onshore leases, the Secretary of the Interior may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[100] BLM leases also provide that "Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly."[101] In addition, the Secretary may compel a lessee to offer a percentage of lease production to "small refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).[102]

113.    As with OCS leases, the federal government also reserves the authority in BLM leases to determine the value of production for purposes of determining how much royalty a lessee owes.[103] A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract. *See* Dick Decl. Ex. 72 (Commercial Lease – Texas Association of Realtors, Form TAR-2101). This would be akin to a commercial lease providing that the landlord has sole discretion to specify the rent owed.

---

[99]    *Id.*

[100]    30 U.S.C. § 192.

[101]    Dick Decl. Ex. 82 § 10.

[102]    43 USC § 1353(b).

[103]    *See* Dick Decl. Ex. 82 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

114. Through federal leases, the government balances economic development with environmental considerations. The Secretary of the Interior may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[104] The Secretary may also direct or grant suspensions of operations.[105] BLM onshore leases also require the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[106]

115. The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court. 30 U.S.C. § 184(d), (h). The government has the right to obtain "prompt access" to facilities and records. *See* 30 U.S.C. § 1713. And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 30 U.S.C. § 181.

116. As discussed with respect to OCS leases, *supra* Section IV.B.1.e., a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees. These are activities that the federal government would itself have to undertake without Defendants and thus removal is proper. *Watson*, 551 U.S. at 157.

g. **Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve**

117. In response to the oil embargoes of the 1970s, Congress created the Strategic Petroleum Reserve ("SPR") in the Energy Policy Conservation Act of 1975, Pub. L. No. 94-163,

---

[104] 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[105] *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[106] Dick Decl. Ex. 82 § 6.

89 Stat. 871, to protect the country's energy security. The SPR was a "stockpile of government-owned petroleum managed by the DOE [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[107] Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

118. The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982. It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions." Dick Decl. Ex. 84 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

119. Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." For example, after the September 11, 2001 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the DOE and the Department of the Interior."[108] From 1999 through December 2009, the U.S. government's

---

[107] *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

[108] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001),

"primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[109] During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[110]

120.    The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[111]    The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[112]    The government also contracted with those Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve.  *See,*

---

https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[109]  U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited May 25, 2021).

[110]  Dick Decl. Ex. 85 (U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18, 37 (2011) ("SPR 2010 Report")); *see id.* at 39 (Table 13).

[111]  *See, e.g.*, Dick Decl. Ex. 86 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[112]  *See, e.g.*, Dick Decl. Ex. 87 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. on Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm.

*e.g.*, Dick Decl. Ex. 88, at 19.

121.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell USA, Inc. affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown."[113]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[114]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[115]  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[116]

122.    The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[117]  The United States has exercised

---

[113] *See* SPR 2010 Report at 16.

[114] *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[115] U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018*, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

[116] *See* Dick Decl. Ex. 85 (SPR 2010 Report) at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[117] *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under

this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.[118] Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are part of the causal chain leading to Plaintiff's alleged injuries—were subject to federal government direction, control, and supervision.[119]

### h. Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation

123. Defendants also acted under the federal government as agents in constructing and operating pipelines to transport oil for national defense purposes. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[120]

124. "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware

---

the international energy program.").

[118] *See* Dick Decl. Ex. 89 U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited May 25, 2021); Dick Decl. Ex. 90, at 17, 18, 21.

[119] *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Oct. 23, 2020).

[120] Dick Decl. Ex. 91, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[121] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[122]

125. Federal officers exerted operational control over the Inch Lines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158. The government also required approval and set the salaries of all personnel that WEP employed. *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini. The sales price was cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

126. Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants. The government

---

[121] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc. and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Dick Decl. Ex. 92 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1–2 (Aug. 28, 1947)); *id.* Ex. 6, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* (1946)).

[122] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[123] The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Dick Decl. Ex. 93, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

127. The government controlled all oil WEP moved through the pipelines on its behalf.[124] During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."[125] The Inch Lines *were built for a single purpose, to meet a great*

---

[123] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

[124] 8 Fed. Reg. at 1069, 1555.1 § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

[125] Dick Decl. Ex. 6, at 104–05, 108.

*war emergency. . . .* [T]hey helped to win a war that would have taken much longer to win without them." Dick Decl. Ex. 4 at 17 (emphasis added). Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities. *Watson*, 551 U.S. at 154.[126]

### 2. Defendants' Activities Are Related To Plaintiff's Claims

128. Plaintiff's claims are "for or relating to" acts Defendants performed under color of federal office. 28 U.S.C. § 1442(a)(1). To meet this prong, there need only be "connect[ion] or associat[ion] with acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also Def. Ass'n of Philadelphia*, 790 F.3d at 471. Indeed, the Seventh Circuit recently affirmed that Congress has abandoned the former (and narrower) requirement of a "causal connection," under which defendants previously were required to "demonstrate that the acts for which they were being sued occurred at least in part because of what they were asked to do by the Government." *Baker*, 962 F.3d at 943 (emphasis omitted). The Removal Clarification Act of 2011 altered this standard by inserting the words "or relating to" into the statute, which intentionally "broaden[ed] the universe of acts that enable Federal officers to

---

[126] The federal government has taken a number of other actions to promote the domestic production of oil and gas to protect important state interests. These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L. No. 93-275, 88 Stat. 96 (1974). The FEA congressional report published stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small. For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico." Dick Decl. Ex. 78, at 1012 (H.R. Doc. No. 93-406). The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power." *Id.* More recent administrations have continued to promote the development of oil and gas on the OCS. For example, the Energy Policy Act of 2005 sought, among other things, "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques." Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

remove to Federal court." *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).

129.    Even before the Removal Clarification Act, the Supreme Court had "never utilized a rigid causation standard for removal," and a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred at least in part '*because of* what they were asked to do by the Government.'" *Baker*, 962 F.3d at 943–44 (quoting *Def. Ass'n of Philadelphia*, 790 F.3d at 471). "'[T]he statute [did] not require that the [lawsuit] must be for the very acts which the [defendant] admits to have been done . . . under federal authority. It is enough that [the] acts . . . constitute the basis . . . of the state [lawsuit].'" *Baker*, 962 F.3d at 944 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)). The Removal Clarification Act then "'broadened federal officer removal to actions . . . *connected* or *associated*[] with acts under color of federal office.'" *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292).

130.    It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency." *Baker*, 962 F.3d at 944. The plaintiff's *lawsuit* must simply be connected or associated with acts under color of federal office. It is "sufficient" if Plaintiff's "allegations are directed at the relationship between the [Defendants] and the federal government," for at least *some* of the time frame relevant to Plaintiff's claims. *Id.* at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016).

131.    Again, *Baker* is directly on point. There, the Seventh Circuit held that removal under the federal officer removal statute was proper where certain chemicals underlying plaintiff's purported pollution-based harms had, at times, been in materials that were "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders

66

"setting aside" a portion of the defendants' products for the government's own use. *Baker*, 962 F.3d at 940–41, 945.[127] The defendants did not need to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather, it was "enough for the present purposes of removal that *at least some* of the pollution arose from the federal acts." *Id.* at 945 (emphasis added). To the extent there were "questions" about whether the alleged pollution flowed from defendants' activities under federal direction, "those are *merits questions* that a federal court should decide." *Id.* at 944. *See also, e.g.*, *Def. Ass'n of Philadelphia*, 790 F.3d at 471–72 ("for or relating to" element satisfied because conduct "related to" acts done under federal supervision, even though no specific conduct at issue in the suit was directed by the government).

132.    In *Papp*, likewise, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and the plaintiffs' alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings. 842 F.3d at 813.

133.    Most recently, in *Arlington*, the Fourth Circuit held that nuisance claims premised on defendants' distribution of opioids were sufficiently "related to" defendants' federally directed distribution of opioids, even though the plaintiffs' allegations did not reference any federal distribution, which was just a subset of the distribution at issue. 996 F.3d at 256–57.

134.    Here, numerous federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action, especially when construed "in the light most favorable to the"

---

[127] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper even under causal standard, where the plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

135. Plaintiff alleges that Defendants' production and sale of oil and gas—which necessarily includes production and sales under the direction, supervision and control of federal officers described above—led to the combustion of these oil and gas products, which led to the release of greenhouse gases by end users, also including the federal government. Critically, the oil and gas upon which Plaintiff bases its claims include the *very same* oil and gas that Defendants extracted and produced under the direction, supervision, and control of the federal government. Moreover, the federal government directed, supervised, and controlled Defendants' production, sale, and distribution of oil and gas to help it accomplish critical domestic and foreign policy objectives.

136. Accordingly, Plaintiff seeks to hold Defendants liable for the activities Defendants performed in the implementation of federal policy initiatives under federal direction, supervision, and control of federal officers. Their claims "necessarily include[] activity that is directly connected to . . . DOD contract[s]." *Arlington*, 996 F.3d at 257. Such a close association is more than enough to satisfy the nexus element of the federal officer removal statute, which requires only that the plaintiff's action be "connected or associated" "with acts under color of federal office." *Baker*, 962 F.3d at 943 (quoting *Latiolais*, 951 F.3d at 292) (emphasis omitted); *see also Def. Ass'n of Philadelphia*, 790 F.3d at 474. At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia*, 790 F.3d at 474, a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas

pursuant to federal contracts and specifications, and Plaintiff's attempt to impose liability on Defendants for that very same conduct. *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

137. Plaintiff's allegations regarding Defendants' alleged misrepresentations and "deception" do not preclude removability. As explained above, Plaintiff's claims, as pleaded, depend on the theory that Defendants' alleged misrepresentations resulted in the increased production, sale, and use of oil and gas, thereby producing increased global emissions that allegedly exacerbated climate change and thus Plaintiff's alleged injuries. *See, e.g.*, Compl. ¶¶ 1, 4, 13. Because Defendants have acted under the direction, supervision, and control of federal officers in producing oil and gas for decades, Plaintiff's lawsuit is "connected or associated, with [Defendants'] acts under color of federal office." *Baker*, 962 F.3d at 943.

138. Similarly, Plaintiff's attempt to disclaim "injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government" cannot defeat removal, because the government-related emissions are inextricable from other emissions. Compl. ¶ 11 n.6. Courts consistently reject attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiff's claims. In *Baker*, for example, the plaintiffs attempted to assert that their action did not pertain to manufacturing activities by one defendant that acted under federal direction in an obvious attempt to evade federal officer removal. *See* 962 F.3d at 945 n.3. The Seventh Circuit decisively rejected this gambit, holding that, when the plaintiffs allege that certain manufacturing "waste streams" "harmed them," they cannot "have it both ways" by "purport[ing] to disclaim" that their lawsuit challenged a defendant's similar actions "for the government." *Id.* Plaintiffs' attempted disclaimer was "just another example of a difficult

causation question that a federal court should be the one to resolve." *Id.* Likewise, here, greenhouse gas emissions attributable to Defendants' production of oil and gas under the direction of the federal government have precisely the same alleged impact on Plaintiff as do emissions from any other source. *See e.g.*, Compl. ¶¶ 1, 4, 9; *AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted 'become well mixed in the atmosphere'; emissions in New Jersey may contribute no more to flooding in New York than emissions in China.") (citation omitted); *see also, e.g.*, *Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) (in failure-to-warn suit with attempted disclaimer, holding that "[plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable," and plaintiffs were "clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense"); *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels).

139.    Moreover, the disclaimer is meaningless because, as the Supreme Court has recognized, greenhouse gases cannot be traced to any particular source or any particular jurisdiction; "once emitted[, they] 'become well mixed in the atmosphere.'" *See AEP*, 564 U.S. at 422 (quoting 74 Fed. Reg. 66514, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 15, 2009)); *see also* Compl. ¶ 33–38. Plaintiff's claims are thus based on *global* emissions that are impossible to trace to any particular source. Accordingly, Plaintiff has no basis on which to attempt to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

140.    For similar reasons, the Western District of Michigan recently rejected an attempt

70

by a group of plaintiffs to avoid federal officer removal that went even further than Plaintiff's disclaimer attempts here. Plaintiffs in *Nessel v. Chemguard, Inc.* alleged injuries caused by environmental contamination from certain firefighting agents that were sold for both military and civilian purposes. 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021). Plaintiffs attempted to avoid removal with respect to civilian production and sales by *filing two separate complaints*— one for injuries resulting from chemicals produced for the military, and one for the commercially produced versions of those same agents. The court concluded that it had federal officer removal jurisdiction over both complaints because plaintiffs did not establish that injuries from commercial chemicals and military chemicals "will be distinguishable." *Id.* at *3. Plaintiff here does not even try to separate its claims and injuries into two separate complaints—rather, Plaintiff flatly asserts that its injuries are caused by the cumulative production and combustion of *all* oil and gas production for decades. *See, e.g.*, Compl. ¶ 4; *see also Nessel*, 2021 WL 744683, at *3 ("Plaintiffs' artful pleading does not obviate the facts on the ground" demonstrating that "Defendants were at least plausibly acting under color of federal office during the relevant timeframe.").

### 3. Defendants Have Colorable Federal Defenses

141. Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and federal immunity, *see Campbell-Ewald v. Gomez*, 577 U.S. 153, 166–69 (2016). Defendants satisfy all elements of the government-contractor defense, which precludes liability related to alleged defects in military equipment when: (1) the United States approved reasonably precise specifications for that equipment; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle*, 487 U.S. at 512. This defense allows government contractors, like

71

Defendants here, to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract. *Id.* at 511–12.

142. *Boyle* is analogous. In *Boyle*, the Supreme Court applied a federal common-law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)). Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

143. *Baker* also confirms the viability of Defendants' government contractor defense where, as here, defendants provided "critical wartime supplies" to the federal government as "dictated" by the federal government according to its "detailed specifications." 962 F.3d at 946–47. "[A]ll that the defense requires," the Seventh Circuit explained, is that the contractor supplied products for government use in conformity with "the government's 'reasonably precise specifications.'" *Id.* at 946 (quoting *Boyle*, 487 U.S. at 512). As discussed in detail above, Defendants have done, and continue to do, exactly that.

144. Plaintiff's claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, the Supremacy Clause, *id.* art. VI, cl. 2, the Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see United States v. Pink*, 315 U.S. 203, 230–31 (1942).

145. For example, although Plaintiff purports to plead state-law claims, state law cannot constitutionally apply here and thus is preempted. As the U.S. Supreme Court has long made clear, the federal Constitution's structure generally precludes States from using their own laws to resolve disputes caused by out-of-state and international conduct. Thus, in cases involving "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations," "our federal system does not permit the controversy to be resolved under state law" "because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). Consistent with this principle, the Supreme Court has repeatedly recognized that one State cannot apply its own law to claims that "'deal with air and water in their ambient or interstate aspects'"; in that context, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 421–22 (citation omitted). Every federal court to consider the question has held that plaintiffs cannot rely on state law to obtain relief for the alleged consequences of global climate change. *See, e.g.*, *City of New York*, 993 F.3d 81. The Constitution bars the application of state law here to avoid subjecting the same interstate and worldwide emissions to adjudication under conflicting state laws, and thus preempts the state-law causes of action Plaintiff asserts.

146. Moreover, Plaintiff's claims are preempted by the federal Clean Air Act. In an analogous matter more than thirty years ago, the U.S. Supreme Court held that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[] the balance of public and private interests so carefully addressed by the Act." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). The preemptive scope of the Clean Air Act is materially identical to that of the Clean Water Act. *See, e.g.*, *Cooper*, 615 F.3d at 304 (applying *Ouellette*'s reasoning to the Clean Air Act based on the two statutes' similar

73

structure). The "Clean Air Act entrusts such complex balancing" of total permissible nationwide greenhouse gas emissions "to [the] EPA." *AEP*, 564 U.S. at 427. The Clean Air Act thus precludes Plaintiff's attempt to use Illinois law to obtain damages for injuries allegedly caused by innumerable worldwide sources of greenhouse gas emissions. *See State of Delaware v. BP Am., Inc.*, 2024 WL 98888, at *24 (Del. Super. Ct. Jan. 9, 2024) (holding in a materially identical case that "seeking damages for injuries resulting from out-of-state or global greenhouse, are pre-empted by the CAA" and "beyond the limits of [state] common law").

147. The relief Plaintiff seeks would also have the practical effect of imposing liability for conduct far outside the borders of Illinois—and the United States. But imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct, namely the release of greenhouse gas emissions, would constitute "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A "State cannot," consistent with due process, "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 409, 421 (2003); *see also BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 573 (1996). Moreover, such extraterritorial liability for conduct lawful in other States would exceed "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory,'" a principle that respects the vital "role territory and sovereign boundaries play in our federal system." *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1156 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

148. The foreign affairs doctrine also precludes exercises of state law and state-law causes of action that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)); *Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or

provisions of a treaty or of an international compact or agreement."). Plaintiff's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations.

149. And, finally, to the extent Plaintiff's claims target Defendants' statements, they are barred by the First Amendment. In the Complaint, Plaintiff alleges that Defendants "oppos[ed] GHG emission-reduction initiatives," "disseminated" information to "government," and sought to "prevent U.S. adoption" of the Kyoto Protocol. Compl. ¶¶ 23, 92, 114. As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001) ("*Noerr–Pennington* immunity . . . applies to . . . state common law claims."). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("[T]he holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit.").

150. These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Baker*, 962 F.3d at 947 (noting that a case may "present[] complex issues, but the propriety of removal does not depend on the answers") (cleaned up). Accordingly, removal under Section 1442 is proper.

## V. THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW

151. This action is removable because, as a matter of federal constitutional law and

structure, Plaintiff's claims necessarily arise under federal, not state, law. Under our federal constitutional system, state law cannot be used to resolve claims seeking redress for injuries allegedly caused by out-of-state and international emissions. The issues presented by the Complaint are thus exclusively federal in nature, and state law has no role to play. As the Supreme Court has repeatedly confirmed: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103). Claims resulting from greenhouse gas emissions, like Plaintiff's, "must be brought under federal common law." *City of New York*, 993 F.3d at 95. And under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *Nat'l Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100). Because Plaintiff's claims necessarily arise under federal law, this Court has federal-question jurisdiction and removal is proper.[128]

152. As relevant here, a claim that "arise[s] under federal common law . . . is a permissible basis for jurisdiction based on a federal question" under Section 1331's grant of such jurisdiction. *Treiber & Straub, Inc. v. U.P.S., Inc*., 474 F.3d 379, 383 (7th Cir. 2007); *see also Milwaukee I*, 406 U.S. at 100 ("a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law"); *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("[I]f federal common law governs a case, that case [is] within the subject matter jurisdiction of the federal courts.").

---

[128] Because claims for interstate and international pollution are "exclusively the province of federal law," Plaintiff's claims are also completely preempted by federal law and removable on that basis. *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 670 (1974).

153.    Federal common law governs when "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Texas Indus., Inc.*, 451 U.S. at 640.  Claims for interstate or international pollution implicate "uniquely federal interests" and must be subject to uniform federal law as a matter of fundamental constitutional structure.  In our federal system, each State may make law within its own borders, but no State may "impos[e] its regulatory policies on the entire Nation," *see Gore*, 517 U.S. at 585, or dictate our "relationships with other members of the international community," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). Federal law therefore must govern inherently interstate or international matters to the exclusion of state law, because "the basic scheme of the Constitution so demands."  *AEP*, 564 U.S. at 421.

154.    The Supreme Court has confirmed repeatedly that when, as here, "we deal with air and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *see also, e.g.*, *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'").  Indeed, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution."  *City of New York*, 993 F.3d at 91.  Because federal law governs to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used."  *Milwaukee II*, 451 U.S. at 313 n.7; *see also Milwaukee I*, 406 U.S. at 105 n.6, 107 n.9 (noting that the "basic interests of federalism . . . demand[]" that "the varying common law of the individual States" cannot govern disputes involving interstate air and water); *City of New York*, 993 F.3d at 98.  The Supreme Court put the point succinctly in *International Paper Co. v. Ouellette*, observing that "interstate . . . pollution is a matter of federal, *not state*, law."  479 U.S. at 488 (emphasis added).  "[S]ome areas involving

'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . *regardless* of whether Congress has shown any intent to preempt the area." *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74, 78 (4th Cir. 1993) (emphasis added). This is one such area.

155. Under the applicable two-step approach, courts must engage in a two-step analysis: (1) determine for jurisdictional purposes whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, determine the substance of the federal law and decide whether the plaintiff has stated a viable federal claim. *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999) (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) ("*Standard Oil*")). As the Third Circuit has explained, "the power of federal courts to craft federal rules of decision is established in cases in which a federal common law rule is 'necessary to protect uniquely federal interests,' such as federal proprietary interests, federal interests in international law and to resolve conflicts among the states." *McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc.*, 124 F.3d 471, 480 (3d Cir. 1997) (internal citations omitted). That principle controls here. Notably, the *Standard Oil* two-step analysis makes clear that the threshold question of whether a claim arises under federal law does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.

156. Although Plaintiff purports to style its nuisance and other claims as arising under state law, the inherently federal nature of the claims stated on the face of the Complaint controls.[129]

---

[129] *See* 14C Wright *et al.*, Fed. Prac. & Proc. Juris. § 3722.1 (rev. 4th ed.) ("[A] plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference to any federal law when the plaintiff's claim is necessarily federal."); *accord, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (noting courts will "determine whether the real nature

It is well-settled that the question of whether a case arises under state or federal law is a question of subject matter jurisdiction that the federal court must resolve for itself, subject to its "unflagging obligation" to exercise such jurisdiction where it does exist.[130]  A federal court would contravene this fundamental obligation were it to treat as controlling a complaint's characterization of a plaintiff's claims as state-law claims where, as here, the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution and, therefore, necessarily arise under federal law.

157.    Adhering to the "two-part approach" first articulated in *Standard Oil*, the First Circuit in *Swiss American* recognized the key distinction between the "source question and the substance question."  191 F.3d at 43, 45.  The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state."  *Id.* at 43.  The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule."  *Id.*  Whether a claim "arises under" federal law "turns on the resolution of the source question."  *Id.* at 44.  Only that first question—which law applies—is relevant to the removal question, and it must be resolved by a federal court.  *Id.* at 44–45.  As the

---

of the claim is federal, regardless of plaintiffs' characterization"); *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (in determining whether "a federal question is presented on the face of the Plaintiffs' properly pleaded complaint . . . [a] plaintiff's lack of reference . . . to federal law is not controlling" (citing *N. Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978)); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997) (same).

[130]  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have "the 'virtually unflagging obligation' . . . to exercise the jurisdiction given them"); *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415 (1964) ("When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.") (quoting *Wilcox v. Consolidated Gas Co.*, 212 U.S. 19, 40 (1909)); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not").

Supreme Court explained, this "choice-of-law task is a federal task for federal courts." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973).

158. Because Plaintiff alleges that climate change occurs as the result of undifferentiated, cumulative emissions from sources across the world over an extended period of time, *see, e.g.*, Compl. ¶¶ 4, 28–39, any judgment as to the reasonableness of particular emissions or their alleged causal contribution to the overall phenomenon of climate change inherently requires an evaluation at an interstate and, indeed, international level, *see AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (internal quotation marks omitted); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[ ] with the accumulation of emissions in California and the rest of the world.'"). Thus, even assuming state tort law may address local source emissions within Illinois, those emissions are not the basis of Plaintiff's claims, nor could they be. Plaintiff seeks to impose liability under state tort law for Defendants' alleged contributions to *global* climate change, based on *global* production and sales, which would require an overarching consideration of *all* the emissions traceable to the extraction and sale of Defendants' products in each of the States, and in the approximately 195 countries of the world. Plaintiff does not seek damages from Defendants as a result of their *intrastate* activity. Plaintiff did not even attempt to disclaim oil and gas sales and their attendant emissions to the extent they occurred outside Illinois or internationally. Nor could it under its theory of causation and injury. Just as Plaintiff cannot exclude emissions resulting from sales to the federal government, it cannot distinguish the effect of emissions originating inside or outside the forum. As in *City of New York*, "[a]rtful pleading

cannot transform the [County]'s complaint into anything other than a suit over global greenhouse gas emissions." 993 F.3d at 91.

159.   Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, state law claims concerning climate change directly implicate uniquely federal interests as "the immense and complicated problem of global warming requires a comprehensive solution." *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 475 (S.D.N.Y. 2018), *aff'd*, 993 F.3d 81. As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. "Global warming presents a uniquely international problem of national concern" that has been addressed with "numerous federal statutory regimes and international treaties" governing greenhouse gas emissions. *City of New York*, 993 F.3d at 85–86. "It is therefore not well-suited to the application of state law." *Id.*; *AEP*, 564 U.S. at 422 (explaining that in cases involving greenhouse gas emissions "borrowing the law of a particular State would be inappropriate").

160.   Plaintiff's claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *Pink*, 315 U.S. at 233 ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international

nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Sabbatino*, 376 U.S. at 425 (noting that issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 353 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and . . . states have very little authority in this area.").

161.    As is evident from Plaintiff's repeated use of the term "*global* warming," the causes of Plaintiff's alleged injuries are not confined to particular sources, cities, counties, or even States, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See* Compl. ¶ 35, Figure 2 (describing "[g]lobal" $CO_2$ emissions from various sources); *see also, e.g., Massachusetts v. EPA*, 549 U.S. 497, 509, 523–24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions reduction targets did not apply to "heavily polluting nations such as China and India," and the EPA's determination that the predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *accord* Dick Decl. Ex. 94 (Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Accord (June 1, 2017), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (statement by President Trump announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions)); Dick Decl. Ex. 95 (Executive Order signed by

President Biden rejoining the Paris Climate Accord).

162.   For example, the federal balancing of interests is evident in the Clinton Administration Commerce Department's report on whether oil imports threaten national security by hindering the development of domestic sources of oil and gas.[131]   Despite the Commerce Department's conclusion that petroleum imports do threaten to impair the national security, it recommended that the President not take action to restrict imports because this could increase the price of oil and gas, and "low oil prices contributed to a reduction in inflation, a rise in real disposable income, and an increase in the Gross Domestic Product."  Rather than increasing the cost of oil and gas, the investigation recommended the Administration rely on existing programs "to increase domestic energy production" by increasing natural gas production and supporting "research, design, and development to promote the use of advanced technologies to recover more oil and gas from existing reservoirs without environmental degradation."[132]

163.   As the United States explained as amicus in a similar case, "federal law and policy has long declared that fossil 'fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports.'"  Brief of the United States as Amicus Curiae at 10, *City of Oakland v. BP p.l.c*, No. 18-16663 (9th Cir. Aug. 3, 2020) (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

164.   The Complaint itself demonstrates that the unbounded nature of greenhouse gas

---

[131]   Dick Decl. Ex. 96 ("The Effect on the National Security of Imports of Crude Oil and the Refined Petroleum Products: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended," U.S. Department of Commerce, Bureau of Export Administration (November 1999)).

[132]   *Id*. at ES-10.

emissions, diversity of sources, and the magnitude of the alleged attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶ 90(e) (United Nations Earth Summit), ¶ 114 (Kyoto Protocol). But these are complex policy-balancing problems, on a necessarily national scale, and without fixed "right answers." As the Supreme Court put it in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *AEP*, 564 U.S. at 427. As a "question[] of national or international policy," the question of how to address greenhouse gas emissions (which underlies Plaintiff's claims and its requested relief) involves inherently federal concerns and can be resolved only by application of federal law. *See id*.

165. Because federal common law governs this "transboundary pollution" and climate change suit regardless of how Plaintiff *labeled* its claims, this action is within this Court's original jurisdiction. *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997).

## VI. THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

166. Based on the allegations in the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1442, and 1367(a). Accordingly, removal of this action is proper under 28 U.S.C. §§ 1441(a) and 1446.

167. The United States District Court for the Northern District of Illinois is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Circuit Court of Cook County. *See* 28 U.S.C. § 1441(a).

168. All defendants that have been properly joined and served have consented to the

removal of the action, *see* Dick Decl. ¶ 3, and there is no requirement that any party not properly joined and served consent. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *see also, e.g.*, *Romashko v. Avco Corp.*, 553 F. Supp. 391, 392 (N.D. Ill. 1983).[133] Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 to this Notice of Removal. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action. Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court of Cook County, pursuant to 28 U.S.C. § 1446(d).

169. Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court of Cook County, Chancery Division.

Respectfully submitted,

Dated: March 27, 2024

By: */s/ Patricia Brown Holmes*
Patricia Brown Holmes

RILEY SAFER HOLMES & CANCILA LLP
Patricia Brown Holmes
Ronald S. Safer
Lauren E. Jaffe
Christopher L. Schaeffer
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
pholmes@rshc-law.com

---

[133] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442. *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

rsafer@rshc-law.com
ljaffe@rshc-law.com
cschaeffer@rshc-law.com
docketdept@rshc-law.com

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
  tboutrous@gibsondunn.com
William E. Thomson, *pro hac vice forthcoming*
  wthomason@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
  jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

Thomas G. Hungar, *pro hac vice forthcoming*
  thungar@gibsondunn.com
1050 Connecticut Ave., N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Andrea E. Smith, *pro hac vice forthcoming*
  aesmith@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

SUSMAN GODFREY L.L.P.
Erica W. Harris, *pro hac vice forthcoming*
  eharris@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
Facsimile: 713.654.6666

STERN, KILCULLEN & RUFOLO, LLC

Herbert J. Stern, *pro hac vice forthcoming*
  hstern@sgklaw.com
Joel M. Silverstein, *pro hac vice forthcoming*
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Defendants*
*Chevron Corporation and Chevron U.S.A. Inc.*