# EXHIBIT 1

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

*C S C*

---

**Department of State: Division of Corporations**

Allowable Characters

| HOME | | Entity Details |
|------|--|----------------|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | Incorporation Date / | **4/29/2005** |
|--|--|--|--|
| File Number: | **3963043** | Formation Date: | (mm/dd/yyyy) |

Entity Name: **CHEVRON CORPORATION**

| Entity Kind: | **Corporation** | Entity Type: | **General** |
|--|--|--|--|
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **CORPORATION SERVICE COMPANY** | | |
|--|--|--|--|
| Address: | **251 LITTLE FALLS DRIVE** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **302-636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

---

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

Hearing Date: No hearing scheduled. This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.
Location: <<CourtRoomNumber>>                                           Forms are free at ilcourts.info/forms.
Judge: Calendar, 3

| STATE OF ILLINOIS, CIRCUIT COURT | SUMMONS | For Court Use Only |
|---|---|---|
| Cook ▼ COUNTY | | **FILED**<br>2/21/2024 1:15 PM<br>IRIS Y. MARTINEZ<br>CIRCUIT CLERK<br>COOK COUNTY, IL<br>2024CH01024<br>Calendar, 3<br>26497894 |

| **Instructions ▼** | |
|---|---|
| Enter above the county name where the case was filed. | City of Chicago<br>**Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | v. |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | **Defendants / Respondents** *(First, middle, last name)*<br>BP P.L.C., et al. |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

**2024 CH 01024**

**Case Number**

---

## IMPORTANT: You have been sued.

- Read all documents attached to this Summons.

- You MUST file an official document with the court within the time stated on this Summons called an *Appearance* and a document called an *Answer/Response*. If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an Application for Waiver of Court Fees.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at illinoislegalaid.org. All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

---

### Plaintiff/Petitioner:

**Do not use this form** in these types of cases:

- All criminal cases
- Eviction
- Small Claims
- Divorce
- Order of protection
- Paternity
- Stalking no contact orders
- Civil no contact orders
- Adult guardianship
- Detinue
- Foreclosure
- Administrative review cases

For eviction, small claims, divorce, and orders of protection, use the forms available at ilcourts.info/forms. If your case is a detinue, visit illinoislegalaid.org for help.

**If you are suing more than 1 Defendant/Respondent,** attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

| | |
|---|---|
| In **1a**, enter the name and address of the first Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here. | **1.**   **Defendant/Respondent's address and service information:**<br><br>   a.   Defendant/Respondent's primary address/information for service:<br>   Name *(First, Middle, Last)*:   BP P.L.C.<br>   Registered Agent's name, if any: _____<br>   Street Address, Unit #:   1 St. James's Square<br>   City, State, ZIP:   London, United Kingdom, SW1Y 4PD<br>   Telephone: _____   Email: _____ |
| In **1b**, enter a second address for the first Defendant/ Respondent, if you have one. | b.   If you have more than one address where Defendant/Respondent might be found, list that here:<br>   Name *(First, Middle, Last)*: _____<br>   Street Address, Unit #: _____<br>   City, State, ZIP: _____<br>   Telephone: _____   Email: _____ |
| In **1c**, check how you are sending your documents to this Defendant/ Respondent. | c.   Method of service on Defendant/Respondent:<br>   ☐ Sheriff         ☐ Sheriff outside Illinois: _____<br>                                            *County & State*<br>   ☑ Special process server      ☐ Licensed private detective |
| Check here if you are serving more than 1 Defendant/ Respondent. Attach an *Additional Defendant/ Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached. | ☑   **I am serving more than 1 Defendant/Respondent.**<br><br>   I have attached   14   *Additional Defendant/Respondent Address*<br>                    *Number*<br>   *and Service Information* forms. |
| In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property. | **2.**   **Information about the lawsuit:**<br><br>   a.   Amount claimed:   $ _____<br>   ☐ b.   I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession). |
| In **3**, enter your complete address, telephone number, and email address, if you have one. | **3.**   **Contact information for the Plaintiff/Petitioner:**<br>   Name *(First, Middle, Last)*: Daniel R. Flynn<br>   Street Address, Unit #:   Ten North LaSalle Street, Sixth Floor<br>   City, State, ZIP:   Chicago, IL 60606<br>   Telephone:   (312) 214-7900      Email:   dflynn@dicellolevitt.com |
| | **GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties. |
| **Important information for the person getting this form** | You have been sued. Read all of the documents attached to this *Summons*. To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms. |
| Check **4a** or **4b**. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**. | **4.**   **Instructions for person receiving this *Summons* (Defendant):**<br><br>   ☑ a.   To respond to this *Summons,* you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service*) by e-filing or at:<br>   Address:   50 W. Washington, Room 802, Chancery Division<br>   City, State, ZIP:   Chicago, Illinois 60602 |

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

In **4a**, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.*

In **4b**, fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website. All of this information is available from the Circuit Clerk.

☐ b.  Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
      *Date*           *Time*                *Courtroom*

**In-person at:**

_____
*Courthouse Address*     *City*        *State*     *ZIP*

OR

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

By telephone: _____
                 *Call-in number for telephone remote appearance*

By video conference: _____
                       *Video conference website*

_____
*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
                   *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
    *Website*

| STOP! | |
|---|---|
| The Circuit Clerk will fill in this section. | **Witness this Date:** _____ |
| | **Clerk of the Court:** 2/21/2024 1:15 PM IRIS Y. MARTINEZ |

---

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**
- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 40 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____

*(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| STATE OF ILLINOIS, CIRCUIT COURT | PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | For Court Use Only |
|---|---|---|
| Cook ▼ COUNTY | | |

| Instructions | | |
|---|---|---|
| Enter above the county name where the case was filed. | City of Chicago<br>**Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter your name as Plaintiff/Petitioner. | | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v.<br><br>Please see attachment<br>**Defendant / Respondent** *(First, middle, last name)* | 2024 CH 01024<br>**Case Number** |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | |

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

**My name is** _____ **and I state**
*First, Middle, Last*

☐ **I served the *Summons* and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**
*First, Middle, Last*

    ☐ Personally on the Defendant/Respondent:
        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____  Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____

    ☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____
    And left it with: _____
                    *First, Middle, Last*
        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____  Race: _____
    and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on this date: _____

    ☐ On the Corporation's agent, _____
                                 *First, Middle, Last*
        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____  Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____

FILED DATE: 2/21/2024 1:15 PM  2024CH01024

☐ **I was not able to serve the** *Summons* **and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

2.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

3.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

**By:**

Under the Code of Civil Procedure, <u>735 ILCS 5/1-109</u>, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

_____

*Signature by:*
☐ Sheriff
☐ Sheriff outside Illinois:

_____
*County and State*
☐ Special process server
☐ Licensed private detective

**FEES**
Service and Return: $ _____
Miles _____ $ _____
Total $ 0.00

_____
*Print Name*

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

FILED DATE: 2/21/2024 1:15 PM 2024CH01024

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 3

This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts. Forms are free at
ilcourts.info/forms.

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION FOR SUMMONS | FILED *For Court Use* 2/21/2024 1:15 PM IRIS Y. MARTINEZ CIRCUIT CLERK COOK COUNTY, IL 2024CH01024 Calendar, 3 26497894 |
|---|---|---|

Cook ▼ COUNTY

**Instructions**

Enter above the county name where the case was filed.

Enter your name as Plaintiff/Petitioner.

Below "Defendants/ Respondents," enter the names of all people you are suing.

Enter the Case Number given by the Circuit Clerk.

*(side text, vertical):* FILED DATE: 2/21/2024 1:15 PM   2024CH01024

**Plaintiff / Petitioner** *(First, middle, last name)*

Chicago of Chicago

v.

**Defendants / Respondents** *(First, middle, last name)*

BP P.L.C., et al.

2024 CH 01024

**Case Number**

☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)*

In **1a**, enter the name and address of the next Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

In **1b**, enter a second address for this Defendant/ Respondent if you have one.

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

1. **Next Defendant/Respondent's address and service information:**

   a. Defendant/Respondent's primary address/information for service:
   Name *(First, Middle, Last):*   Chevron Corporation
   Registered Agent's name, if any:  Corporation Service Company
   Street Address, Unit #:   251 Little Falls Drive
   City, State, ZIP:  Wilmington, Delaware 19808
   Telephone:  (302) 636-5401     Email:

   b. If you have more than one address where Defendant/Respondent might be found, list that here:
   Name *(First, Middle, Last):*
   Street Address, Unit #:
   City, State, ZIP:
   Telephone:     Email:

   c. Method of service on Defendant/Respondent:
   ☐ Sheriff        ☐ Sheriff outside Illinois: _____
   *County & State*
   ☑ Special process server      ☐ Licensed private detective

SU-S 1503.3                     Page 1 of 1                     (05/23)

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

| | |
|---|---|
| In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response*.<br><br>In 4b, fill out:<br>• The court date and time the clerk gave you.<br>• The courtroom and address of the court building.<br>• The call-in or video information for remote appearances (if applicable).<br>• The clerk's phone number and website. All of this information is available from the Circuit Clerk. | ☐ **b.** **Attend court:**<br>On: _____ at _____ ☐ a.m. ☐ p.m. in _____<br>    *Date*      *Time*      *Courtroom*<br>**In-person at:**<br><br>_____ _____ _____ _____<br>*Courthouse Address*   *City*   *State*   *ZIP*<br>**OR**<br>**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):<br>    By telephone: _____<br>        *Call-in number for telephone remote appearance*<br>    By video conference: _____<br>        *Video conference website*<br><br>_____<br>*Video conference log-in information (meeting ID, password, etc.)*<br><br>Call the Circuit Clerk at: _____ or visit their website<br>        *Circuit Clerk's phone number*<br>at: _____ to find out more about how to do this.<br>    *Website* |

| | |
|---|---|
| **STOP!**<br>The Circuit Clerk will fill in this section. | **Witness this Date:** _____<br><br>**Clerk of the Court:** 2/21/2024 1:15 PM IRIS Y. MARTINEZ<br>_____ |

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**

- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 40 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

Date of Service: _____
        *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

Enter the Case Number given by the Circuit Clerk: 2024 CH 01024

**This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.**
**Forms are free at ilcourts.info/forms.**

| STATE OF ILLINOIS, CIRCUIT COURT | PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | *For Court Use Only* |
|---|---|---|
| Cook _____ COUNTY | | |

| **Instructions** | | |
|---|---|---|
| Enter above the county name where the case was filed. | City of Chicago | |
| | **Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter your name as Plaintiff/Petitioner. | | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v.<br><br>Please see attachment | |
| | **Defendant / Respondent** *(First, middle, last name)* | 2024 CH 01024 |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | **Case Number** |

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

My name is _____ and I state
    *First, Middle, Last*

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent

_____ as follows:
*First, Middle, Last*

☐   Personally on the Defendant/Respondent:
    ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____ Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____

☐   On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____
    And left it with: _____
        *First, Middle, Last*
    ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____ Race: _____
    and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on this date: _____

☐   On the Corporation's agent, _____
                    *First, Middle, Last*
    ☐ Male   ☐ Female   ☐ Non-Binary    Approx. Age: _____ Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

FILED DATE: 2/21/2024 1:15 PM   2024CH01024

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____

*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____

   _____
   _____
   _____

2. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____

   _____
   _____
   _____

3. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____

   _____
   _____
   _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

**By:**                                          **FEES**

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

_____              Service and Return: $ _____
*Signature by:*  ☐ Sheriff            Miles _____   $ _____
                ☐ Sheriff outside Illinois:   Total         $ 0.00

_____
*County and State*
☐ Special process server
☐ Licensed private detective

_____
*Print Name*

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 3

## ATTACHMENT TO SUMMONS

FILED
2/21/2024 1:30 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01024
Calendar, 3
26498415

### Full List of Named Parties:

CITY OF CHICAGO,

    *Plaintiff,*

v.

BP P.L.C., BP AMERICA INC., BP PRODUCTS NORTH AMERICA INC., CHEVRON CORPORATION, CHEVRON U.S.A. INC., CONOCOPHILLIPS COMPANY, CONOCOPHILLIPS, PHILLIPS 66 COMPANY, PHILLIPS 66, EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, SHELL OIL PRODUCTS COMPANY LLC, SHELL PLC, SHELL USA INC., and AMERICAN PETROLEUM INSTITUTE,

    *Defendants.*

FILED DATE: 2/21/2024 1:30 PM   2024CH01024

Hearing Date: 6/20/2024 9:30 AM
Location: Court Room 2402
Judge: Price Walker, Allen

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| CITY OF CHICAGO,<br><br>*Plaintiff,*<br><br>v.<br><br>BP P.L.C.;<br>BP AMERICA INC.;<br>BP PRODUCTS NORTH AMERICA INC.;<br>CHEVRON CORPORATION;<br>CHEVRON U.S.A. INC.;<br>CONOCOPHILLIPS COMPANY;<br>CONOCOPHILLIPS;<br>PHILLIPS 66 COMPANY;<br>PHILLIPS 66;<br>EXXON MOBIL CORPORATION;<br>EXXONMOBIL OIL CORPORATION;<br>SHELL OIL PRODUCTS COMPANY LLC;<br>SHELL PLC;<br>SHELL USA, INC.; and<br>AMERICAN PETROLEUM INSTITUTE,<br><br>*Defendants.* | Case No.  **2024CH01024** |

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

**TABLE OF CONTENTS**

COMPLAINT AND DEMAND FOR JURY TRIAL ...................................................................... 1

I.    INTRODUCTION .............................................................................................................. 1

II.    PARTIES ........................................................................................................................... 5

   A.  Relevant Non-Parties: Defendants' Agents/Front Groups ............................................. 32

III.   JURISDICTION AND VENUE ...................................................................................... 33

IV.  FACTUAL ALLEGATIONS ........................................................................................... 36

   A.  Defendants Are Substantially Responsible for Causing and Accelerating Climate Change. ........................................................................................................................................ 36

   B.  Defendants Went to Great Lengths to Understand the Dangers Associated with Fossil Fuel Products, and Either Knew or Should Have Known of Those Dangers. ........................ 43

   C.  Defendants Did Not Disclose Known Harms Associated with the Intended Use of Fossil Fuel Products, and Instead Affirmatively Concealed Those Harms by Engaging in a Campaign of Deception to Increase the Use of Those Products. .......................................... 65

   D.  Defendants Could Have Chosen to Facilitate, and Be Part of, a Lower-Carbon Future, but Instead Chose Corporate Profits and Continued Deception. ........................................... 92

   E.  Defendants' Internal Actions Demonstrate Their Awareness of the Impacts of Climate Change and Their Intent to Continue to Profit from the Unabated Use of Fossil Fuel Products. .................................................................................................................................... 93

   F.  Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis. ................................................................................... 95

   G.  Defendants Continue to Deceive Chicago Consumers Through Misleading Advertisements That Portray Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change ................................................................... 103

   H.  Defendants' Concealments and Misrepresentations Regarding the Dangers of Fossil Fuel Products Encouraged Continued Use of Fossil Fuels and Discouraged Concerted Action on Greenhouse Gas Emissions ................................................................................... 132

   I.  The Effects of Defendants' Deceit Are Ongoing ......................................................... 134

   J.  The City Has Suffered, Is Suffering, and Will Continue to Suffer Injuries from Defendants' Wrongful Conduct. ......................................................................................... 136

CAUSES OF ACTION ........................................................................................................... 149

COUNT I STRICT PRODUCTS LIABILITY – FAILURE TO WARN (Against Fossil Fuel Defendants) ............................................................................................................................ 149

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

COUNT II NEGLIGENT PRODUCTS LIABILITY – FAILURE TO WARN (Against Fossil Fuel Defendants)................................................................................................. 155

COUNT III NEGLIGENCE (Against All Defendants) ........................................... 160

COUNT IV PUBLIC NUISANCE (Against All Defendants) .................................. 163

COUNT V PRIVATE NUISANCE  (Against All Defendants)................................... 166

COUNT VI NUISANCE VIOLATIONS OF MCC § 7-28-030 (Against All Defendants)........ 170

COUNT VII CIVIL CONSPIRACY  (Against All Defendants) ................................. 171

COUNT VII UNJUST ENRICHMENT (Against All Defendants) ........................... 173

COUNT IX CONSUMER FRAUD—MISLEADING, UNFAIR, AND DECEPTIVE PRACTICES IN VIOLATION OF MCC § 2-25-090 (Against All Defendants) ...................... 176

COUNT X MISREPRESENTATIONS IN CONNECTION WITH SALE OR ADVERTISEMENT OF MERCHANDISE IN VIOLATION OF MCC §§ 4-276-470, *et seq.* (Against All Defendants) ........................................................................................... 180

COUNT XI RECOVERY OF CITY COSTS OF PROVIDING SERVICES IN VIOLATION OF MCC § 1-20-020 (Against All Defendants)............................................................. 183

REQUEST FOR RELIEF ....................................................................................... 184

JURY TRIAL DEMANDED ................................................................................... 185

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff City of Chicago ("Chicago" or the "City") brings this action against Defendants BP p.l.c., BP America Inc., and BP Products North America Inc. (collectively, "BP"); Chevron Corporation and Chevron U.S.A. Inc. (collectively, "Chevron"); ConocoPhillips Company, ConocoPhillips, Phillips 66 Company, and Phillips 66 (collectively, "ConocoPhillips"); Exxon Mobil Corporation and ExxonMobil Oil Corporation (collectively, "ExxonMobil"); Shell Oil Products Company LLC, Shell plc, and Shell USA, Inc. (collectively, "Shell"); and the American Petroleum Institute ("API") (collectively, "Defendants").

## I.    INTRODUCTION

1.      For decades, the fossil fuel industry has misled consumers and the public about climate change. Since at least the 1950s, its own scientists have consistently concluded that fossil fuels produce carbon dioxide and other greenhouse gas pollution that can have catastrophic consequences for the planet and its people. The industry took these internal scientific findings seriously, investing heavily to protect its own assets and infrastructure from rising seas, stronger storms, and other climate change impacts. Rather than warn consumers and the public, fossil fuel companies and their surrogates mounted a disinformation campaign to discredit the scientific consensus on climate change; create doubt in the minds of consumers, the media, teachers, and the public about the climate change impacts of burning fossil fuels; and delay the energy economy's transition to a lower-carbon future. This successful climate deception campaign had the purpose and effect of inflating and sustaining the market for fossil fuels, which—in turn—drove up greenhouse gas emissions, accelerated global warming, and brought about devastating climate change impacts to the City of Chicago.

2.      Major members of the fossil fuel industry have known for decades that fossil fuels—their chief products—are the primary cause of climate change and that, if unabated, climate

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

change could result in catastrophic impacts, including droughts, flooding, and severe weather events that would impose enormous harms on cities such as Chicago. Despite this knowledge, these corporations and their trade associations have embarked on tobacco-industry-style campaigns to deceive and mislead the public about the damaging nature of their fossil fuel products.

3. Defendants (save for API) (collectively "Fossil Fuel Defendants") are large companies in the fossil fuel industry, which advertise, promote, and sell oil, coal, and natural gas products (collectively, "fossil fuel products"). Each Defendant funded, staffed, organized, and otherwise supported efforts to deceive the public and consumers—in and outside of Chicago—about the role of fossil fuel products in causing the global climate crisis.

4. The rate at which Fossil Fuel Defendants have extracted and sold fossil fuel products has exploded since the Second World War, as have carbon dioxide ("$CO_2$") and other emissions from those products. Fossil fuel emissions—especially $CO_2$—are far and away the dominant driver of global warming.[1] The substantial majority of all anthropogenic greenhouse gas emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[2] About three-quarters of all industrial $CO_2$ emissions in history have occurred since

---

[1] *See Summary for Policymakers in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report*, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE ("IPCC"), at 4-9 (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf.

[2] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 THE ANTHROPOCENE REV. 81, 81 (2015).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

the 1960s,[3] and more than half have occurred since the late 1980s.[4] The annual rate of $CO_2$ emissions caused by fossil fuels has increased substantially since 1990.[5]

5.      Defendants' awareness of the negative impacts of fossil fuel consumption almost exactly tracks the onset of the Great Acceleration. Defendants have known since at least the 1950s that fossil fuels produce carbon dioxide and other greenhouse gas ("GHG") pollution that would warm the planet and change our climate. Defendants' own scientists knew as early as the 1950s that these climate impacts would be catastrophic, and that there was only a narrow window of time in which action could be taken before the consequences became catastrophic.

6.      Rather than warn of these tremendous harms, however, Defendants mounted a disinformation campaign beginning as early as the 1970s to discredit the burgeoning scientific consensus on climate change; deny their own knowledge of climate change-related threats; create doubt in the minds of consumers, the media, teachers, and the public about the reality and consequences of burning fossil fuels; and delay the necessary transition to a lower-carbon future.

7.      Defendants have further deceived customers and the public by misrepresenting the climate impacts of their products sold in the City. In a bid to reassure consumers that purchasing these products is good for the planet, Defendants advertise them as "cleaner," "emissions-reducing," and the like, while failing to disclose their harmful effects on the climate. This strategy comes straight out of the advertising playbook of Big Tobacco, which deceptively promoted "low tar" and "light" cigarettes as healthier smoking options, when they knew that any use of cigarettes

---

[3] R.J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 BIOGEOSCIENCES 1845, 1851 (2012).

[4] *Id.*

[5] *Global Carbon Budget 2021*, GLOBAL CARBON PROJECT (2021), https://www.globalcarbonproject.org/global/images/carbonbudget/Infographic_Emissions2021.pdf.

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

was harmful. Defendants also falsely present themselves as corporate leaders in the fight against climate change, claiming to invest substantially in low-emission technologies and zero-emission energy sources, while their business continues to be overwhelmingly focused on fossil fuel production and sales.

8. Defendant API is the oil and gas industry's largest trade association. API, along with Fossil Fuel Defendants, have known for decades about the relationship between fossil fuel products and the catastrophic impacts of climate change. And like other Defendants, API has spread its own deceptive advertising. Additionally, API has long served as a hub both for Defendants to share their knowledge about the link between fossil fuel products and climate change impacts, and for Defendants' climate deception campaign. Indeed, much of Defendants' climate deception campaign was planned, coordinated, and supported by API.

9. Defendants misrepresented and concealed the hazards of fossil fuel products to deceive consumers and the public about the consequences of everyday use of fossil fuel products. Defendants' climate deception campaign, and aggressive promotion of the use of fossil fuel products while knowing the dangers associated with them, had the purpose and effect of unduly and substantially inflating and sustaining the market for fossil fuels. Defendants' tortious and deceptive conduct, both individually and collectively, drove fossil fuel consumption and delayed the transition to a lower-carbon future. This caused an enormous, foreseeable, and avoidable increase in anthropogenic GHG emissions and accelerated global warming, bringing devastating consequences to the City and its people.

10. While Defendants have promoted and profited from their deceptive conduct, the City and its residents have spent, and will continue to spend, substantial sums to recover from the effects of climate change. The climate change impacts that Chicago has faced and will continue to

4

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

face – including more frequent and intense storms, flooding, droughts, extreme heat events, and shoreline erosion – are felt throughout every part of the City, and disproportionately in low-income communities and communities that have historically experienced racial, social, health, and economic inequities. These effects of climate change require large investments to protect the City's people, infrastructure, environment, and natural areas.

11.     Defendants' misconduct has resulted in tremendous harm to people, property, and the environment in the City. Chicagoans and their families, communities, and small businesses should not have to bear the costs of climate change alone. The companies that have profited from the deception campaign designed to drive profits at the expense of Chicagoans must be made to mitigate the harms they have brought upon the City. This lawsuit seeks to hold those companies accountable for the lies they have told and the damage they have caused.[6]

## II.    <u>PARTIES</u>

12.     Plaintiff City of Chicago is a municipal corporation and a home-rule unit organized and existing under the laws of the State of Illinois.

13.     Defendants include some of the largest oil and gas companies in the world, and a national oil and gas industry trade association. The fossil fuels produced by the defendant companies (and promoted by the defendant trade association) are individually and collectively responsible for the emission of billions of tons of greenhouse gases and attendant harms to the City.

14.     When this Complaint references an act or omission of Defendants, unless specifically attributed or otherwise stated, such references mean that the officers, directors, agents,

---

[6] Plaintiff hereby disclaims injuries arising on federal property and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. Plaintiff seeks no recovery or relief attributable to these injuries.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

employees, or representatives of Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

15.     **BP Entities: BP p.l.c.; BP America Inc.; and BP Products North America Inc.**

a.      Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company registered in England and Wales, with its principal place of business in London, England. BP p.l.c. consists of three main operating segments: (1) exploration and production, (2) refining and marketing, and (3) gas power and renewables. BP p.l.c. is the ultimate parent company of numerous subsidiaries, including Atlantic Richfield Company, referred to collectively herein as the "BP Group," which explore for and extract oil and gas worldwide; refine oil into fossil fuel products such as gasoline; and market and sell oil, fuel, other refined petroleum products and natural gas worldwide. BP p.l.c.'s subsidiaries explore for oil and natural gas under a wide range of licensing and other contractual agreements. BP p.l.c. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum Company, British Petroleum Company p.l.c., BP Amoco p.l.c., Amoco Corporation, and Atlantic Richfield Company.

b.      BP p.l.c. controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. BP p.l.c. is the ultimate decision-maker with respect to fundamental decisions about the BP Group's core business, *e.g.*, the level of fossil fuel production companywide, including production among BP p.l.c.'s subsidiaries. BP p.l.c.'s 2022 Annual Report summarizes the company's "Strategic progress," including on offshore projects in the Gulf of Mexico, Brazil, and Angola, as well as

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

acquisitions and sales of various oil and gas operations. In 2016 to 2017, BP p.l.c. reported that it brought online 13 major exploration and production projects, contributing to a 12 percent increase in the BP Group's overall fossil fuel product production. These projects were carried out by BP p.l.c.'s subsidiaries.

        c.     BP p.l.c. controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions, and climate change resulting from the company's fossil fuel products, as well as communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. BP p.l.c. makes fossil fuel production decisions for the entire BP Group based on factors including climate change. BP p.l.c.'s Board of Directors is the highest decision-making body within the company, with direct responsibility for the BP Group's climate change policy. BP p.l.c.'s chief executive is responsible for maintaining the BP Group's system of internal control that governs the BP Group's business conduct. BP p.l.c.'s senior leadership directly oversees a "carbon steering group," which manages climate change-related matters and consists of two committees—both overseen directly by the Board of Directors—that focus on climate change-related investments.

        d.     Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Delaware, with its headquarters and principal place of business in Houston, Texas. BP America Inc. consists of numerous divisions and affiliates in all aspects of fossil fuel production, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, marketing, and sale of crude oil, natural gas, and petroleum products. BP America

Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

e.     Defendant **BP Products North America Inc.** is a wholly-owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is a vertically integrated energy and petrochemical company incorporated in the State of Maryland, with its headquarters and principal place of business in Chicago, Illinois, and has been registered to do business in Illinois since 1956.[7] BP Products North America, Inc. explores, develops, refines, and markets oil and natural gas and other fossil fuel products, including gasoline, kerosene, fuel oils, and lubricants.[8]

f.     BP Products North America Inc. operates retail gasoline stations in the State of Illinois and throughout the United States,[9] and, "[u]nder an exclusive license from its parent

---

[7] BP Products North America Inc. has confirmed that it is an Illinois citizen. *See Cline v. BP Prods. N. Am. Inc.*, No. 23-856, Dkt. 1 at 8 (E.D. La. Mar. 8, 2023) ("BP Products North America Inc., individually and as successor in interest to Amoco Oil Company and The American Oil Company, is incorporated in the State of Maryland, with its principal place of business in Illinois. BP Products North America Inc. is therefore (and was at the time of filing of the state court action) a citizen of Maryland and Illinois for purposes of federal diversity jurisdiction."); *see also Heath v. BP Prods. N. Am., Inc.*, No. 13-4741, Dkt. 50 ¶ 3 (N.D. Ill. Sept. 27, 2013) ("Diversity of citizenship fails in this case as Plaintiff and Defendant BP PRODUCTS NORTH AMERICA INC. and BP PIPELINES (NORTH AMERICA) INC. are both citizens of Illinois.").

[8] *BP Products North America Settlement*, U.S. ENVT'L. PROT. AGENCY (Sept. 30, 2010) https://www.epa.gov/enforcement/bp-north-america-settlement ("BP Products North America, Inc. engages in the exploration, development, production, refining, and marketing of oil and natural gas.").

[9] *BP Expands Mobility and Convenience Network Completing the Purchase of Leading Travel Center Operator, TravelCenters of America*, BP (May 15, 2023),

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

company BP p.l.c., located in London, United Kingdom, BP Products [North America] markets a variety of automotive products, including, among other things, gasoline, and related goods and services through automotive service stations and convenience stores in Illinois and throughout the United States on its own and through authorized sub-licensees."[10]

g.     BP Products North America Inc. recently stated that it "is a longtime supplier of motor fuel in the Midwest, including in Chicagoland. [BP Products North America Inc.] refines motor fuel and markets it to the public through BP-branded and Amoco-branded stations located all across the Chicago area. There are more than 400 BP-branded retail motor fuel stations in the State of Illinois alone."[11]

h.     BP Products North America Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Air BP, Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Sohio Oil Company; Standard Oil of Ohio (SOHIO); Standard Oil (Indiana); and Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

i.     Defendants BP p.l.c., BP America Inc., and BP Products North America Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

---

https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-expands-mobility-and-convenience-network-completing-the-purchase-of-leading-travel-center-operator-travelcenters-of-america.html.

[10] *BP Prods. N. Am. Inc. v. Sandhu Petroleum, Inc.*, No. 05-586, Dkt. 1 ¶ 7 (N.D. Ill. Feb. 1, 2005).

[11] *BP Prods. N. Am. Inc. v. 4401 Inc.*, No. 2021 CH 02246, Am. Compl. ¶ 7 (Ill. Cir. Ct. July 27, 2021); *see also Diamond v. BP Prods. N. Am. Inc.*, Case No. 10-471, Dkt. 52 at 2 (N.D. Ill. Aug. 20, 2010) (BP Products North America Inc. "market[s] motor fuel through retail outlets in the Chicago area").

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

j.      The City's claims against BP arise out of and are related to the acts and omissions of BP in the City of Chicago and BP's actions elsewhere that caused and will cause injuries in the City.

k.      BP has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including injuries to the City. BP's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and BP's affirmative promotion of its fossil fuel products as safe despite knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of BP's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of BP's fossil fuel products in Chicago, thereby resulting in the City's injuries.

l.      Over the last several decades and continuing to the present day, BP spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products.[12] Since at least 1988 and continuing to the present day, BP has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *Newsweek*; *The New York Times*; *Sports Illustrated*, *Time*; *The Wall Street Journal*;

---

[12] *See 4401 Inc.*, No. 2021 CH 02246, Am. Compl. ¶ 12 (stating in a Chicago filing that BP Products North America "has spent many hundreds of millions of dollars promoting and advertising its goods and services under the BP name and mark.").

and *The Washington Post*. BP has acknowledged the widespread impact of its marketing techniques "in the Chicago market where it has worked to establish and maintain brand awareness and goodwill."[13] As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of BP's fossil fuel products and climate change, and/or misrepresenting BP's products and BP itself as environmentally friendly.

m.    Significant quantities of BP's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities BP derives and has derived substantial revenue.

n.    BP conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products. Its "retail presence includes over 750 bp, Amoco-, Thorntons- and TravelCenters of America-branded sites" in Illinois.[14] There are 208 BP- and Amoco-branded petroleum stations in Chicago alone.

o.    BP also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Castrol brand name.

p.    BP markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[15]

q.    Further, BP promotes its products in Chicago and Illinois by regularly updating and actively promoting its "BPme Rewards" app and rewards program, which encourages

---

[13] *Id.* ¶ 26.

[14] *Illinois*, BP, https://permanent.link/to/bpinchicago/whereweoperate (last visited Dec. 6, 2023).

[15] *bp in Illinois*, BP, https://permanent.link/to/bpinchicago/illinois (last visited Dec. 6, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchase.

r.      By the company's own description, "bp has a rich, proud history in Chicago dating back more than a century. Over the years, its investments have made the company part of the [C]ity's cultural fabric."[16] The Aon Center was built as the Standard Oil Building in Chicago and was subsequently renamed the Amoco Building.[17] BP claims to "support[] nearly 7,000 jobs across Illinois," including at least 3,100 BP employees, and has invested $740 million through vendors in the State.[18] Additionally, "[s]ince 2012, bp has contributed more than $11 million in research at the University of Illinois at Urbana – Champaign including student-led technology projects."[19]

s.      Many of BP's corporate level decisions—including its decisions surrounding the transportation, distribution, promotion, and marketing of fossil fuels—take place in Chicago.[20] "Chicago is also home to the US headquarters of Air bp, one of the world's leading suppliers of aviation fuel products and services,"[21] and as discussed below, BP's greenwashing campaign included statements about its aviation fuel products.

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* ("Chicago is the headquarters for control centers in Oklahoma and Washington that manage more than 4,200 miles of pipelines within the US.").

[21] *Id.*

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

16.     **<u>Chevron Entities</u>: Chevron Corporation and Chevron U.S.A. Inc.**

    a.     Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal place of business in San Ramon, California.

    b.     Chevron Corporation operates through a web of United States and international subsidiaries at all levels of the fossil fuel supply chain. Chevron Corporation and its subsidiaries' operations include, but are not limited to, exploration, development, production, storage, transportation, and marketing of crude oil and natural gas; refining crude oil into petroleum products and marketing those products; and manufacturing and marketing commodity petrochemicals, plastics for industrial uses, and fuel and lubricant additives.

    c.     Chevron Corporation controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Chevron Corporation determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products.

    d.     Chevron Corporation controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Overall accountability for climate change within Chevron Corporation lies with Chevron Corporation's Board of Directors and Executive Committee.

    e.     Defendant **Chevron U.S.A. Inc.** is a Pennsylvania corporation with its principal place of business located in San Ramon, California. Chevron U.S.A. Inc. is registered to do business in Illinois, since 1954. Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron

Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, did or does business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

       f.     Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

       g.     The City's claims against Chevron arise out of and are related to the acts and omissions of Chevron in Chicago and elsewhere that caused and will cause injuries in Chicago.

       h.     Chevron has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Chevron's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Chevron's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Chevron's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Chevron's fossil fuel products in Chicago, thereby resulting in the City's injuries.

       i.     Over the last several decades and continuing to the present day, Chevron spent millions of dollars on radio, television, online, social media, and outdoor advertisements in

the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, Chevron has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *National Geographic*; *The New York Times*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Chevron's fossil fuel products and climate change, and/or misrepresenting Chevron's products or Chevron itself as environmentally friendly.

        j.      Significant quantities of Chevron's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago, from which activities Chevron derives and has derived substantial revenue.

        k.      Chevron conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations, at which locations it promotes, advertises, and sells its fossil fuel products under its various brand names, including Chevron, Texaco, and other brand names.

        l.      Chevron also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Starplex/Delo, IsoClean, Techron, and Havoline brand names. Chevron markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[22] Further, Chevron promotes its products in Chicago and Illinois by regularly updating

---

[22] *Where to Buy*, CHEVRON LUBRICANTS, https://www.chevronlubricants.com/en_us/home/where-to-buy/find-a-retailer.html (last visited Nov. 15, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

and actively promoting its "Chevron Texaco Rewards" app and rewards program, which encourages customers to buy fuel at its stations in exchange for rewards on fuel purchases.

m.    Chevron operates the Seneca biorefinery in Seneca, Illinois,[23] as well as the Danville biodiesel refinery in Danville, Illinois.[24]

n.    Chevron Energy Solutions has an office in Oak Brook, Illinois.

17.    **ConocoPhillips Entities: ConocoPhillips; ConocoPhillips Company; Phillips 66 Company; and Phillips 66**

a.    Defendant **ConocoPhillips** is a multinational energy company incorporated in Delaware, with its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that execute ConocoPhillips's fundamental decisions related to all aspects of fossil fuel production, including exploration, extraction, production, manufacture, transport, and marketing.

b.    ConocoPhillips controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. ConocoPhillips determines whether and to what extent its corporate holdings market, produce, and/or distribute fossil fuel products. ConocoPhillips's most recent annual report to the Securities and Exchange Commission ("SEC") subsumes the operations of ConocoPhillips's subsidiaries. In ConocoPhillips's Form 10-K filed with the SEC for Fiscal Year 2022, the company represents that its value—for which ConocoPhillips maintains ultimate responsibility—is a function of its decisions directing subsidiaries to develop crude oil, bitumen, natural gas, and natural gas liquids

---

[23] *Seneca, IL*, CHEVRON, https://www.regi.com/services/find-fuels/seneca-il (last visited Nov. 15, 2023).

[24] *Danville, IL*, CHEVRON, https://www.regi.com/services/find-fuels/danville-il (last visited Nov. 15, 2023).

from ConocoPhillips's reserves into fossil fuel products and to explore for and replace those reserves with more fossil fuels: "Unless we successfully develop resources, the scope of our business will decline, resulting in an adverse impact to our business. . . . If we are not successful in replacing the resources we produce with good prospects for future organic development or through acquisitions, our business will decline."[25]

        c.      ConocoPhillips optimizes the ConocoPhillips group's oil and gas portfolio to fit ConocoPhillips's strategic plan. For example, ConocoPhillips' 10-K in 2022 summaries the "continued development of onshore assets" in the United States and new exploration activities in Alaska, Canada, the North Sea, and elsewhere.[26] Similarly, in November 2016, ConocoPhillips announced a plan to generate five to eight billion dollars of proceeds over two years by optimizing its business portfolio, including its fossil fuel product business, to focus on low cost-of-supply fossil fuel production projects that strategically fit its development plans.

        d.      ConocoPhillips controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. For instance, ConocoPhillips's Board of Directors has the highest level of direct responsibility for climate change policy within the company. ConocoPhillips has developed and purportedly implements a corporate Climate Change Action Plan to govern climate change decision-making across all entities in the ConocoPhillips group.

---

[25] ConocoPhillips, Annual Report (Form 10-K) (Feb. 16, 2023).
[26] *Id.*

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

e.      Defendant **ConocoPhillips Company** is a wholly-owned subsidiary of ConocoPhillips that acts on ConocoPhillips' behalf and is subject to ConocoPhillips' control. ConocoPhillips Company is incorporated in Delaware, with its principal place of business in Houston, Texas. ConocoPhillips Company was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Phillips Petroleum Company.

f.      Defendant **Phillips 66 Company** is a wholly-owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and is subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware, with its principal place of business in Houston, Texas. Phillips 66 Company had been registered to do business since 1964 under a different name, Phillips Chemical Company, which was a wholly-owned subsidiary of the Phillips Petroleum Company. Phillips Chemical Company changed its name to Phillips 66 Company in 1985, and that iteration of Phillips 66 Company was terminated in 1991. Phillips 66 Company was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Phillips Petroleum Company; Phillips Chemical Company; Conoco, Inc.; Tosco Corporation; and Tosco Refining Co.

g.      Defendant **Phillips 66** is a multinational energy and petrochemical company incorporated in Delaware, with its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips.

h.      Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company, as well as their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "ConocoPhillips."

18

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

i.  The City's claims against ConocoPhillips arise out of and are related to the acts and omissions of ConocoPhillips in Chicago and elsewhere that caused and will cause injuries in Chicago.

j.  ConocoPhillips has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. ConocoPhillips's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and ConocoPhillips's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of ConocoPhillips's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of ConocoPhillips's fossil fuel products in Chicago, thereby resulting in the City's injuries.

k.  Over the last several decades and continuing to the present day, ConocoPhillips spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, ConocoPhillips has advertised in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Life*; *National Geographic*; *Newsweek*; *The New York Times*; *People*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements,

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

misrepresentations, and/or material omissions obfuscating the connection between the production and use of ConocoPhillips's fossil fuel products and climate change, and/or misrepresenting ConocoPhillips's products or ConocoPhillips itself as environmentally friendly.

l.      Significant quantities of ConocoPhillips' fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities ConocoPhillips derives and has derived substantial revenue.

m.      ConocoPhillips conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products under its various brand names, including Conoco, Phillips 66, and other brands. There are 191 such gas stations in Illinois, including in and around Chicago.

n.      ConocoPhillips also markets and sells other fossil fuel products, including engine lubricant and motor oils, to Chicago and Illinois consumers under its Phillips 66, Kendall, and Red Line brand names.

o.      ConocoPhillips markets and advertises its fossil fuel products in Chicago to its residents by maintaining interactive websites available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[27] Further, ConocoPhillips promotes its products in Chicago and Illinois by regularly updating and actively promoting its "KickBack Rewards" and "Phillips 66 Credit Card Rewards Program,"

---

[27] *Station Finder*, CONOCO, https://www.conoco.com/station-finder/ (last visited Nov. 15, 2023); *Station Finder*, PHILLIPS 66, https://www.phillips66gas.com/station-finder/ (last visited Nov. 15, 2023); *Find a Distributor*, PHILLIPS 66, https://phillips66lubricants.com/find-distributor/ (last visited Nov. 15, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases.

   p.   Phillips 66 operates the Wood River Refinery in Roxana, Illinois, which is in Southern Illinois.[28] This is the largest refinery in Illinois, and it processes 356,000 barrels of crude oil per day.

   18.   **Exxon Entities: Exxon Mobil Corporation and ExxonMobil Oil Corporation**

   a.   Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Irving, Texas. Exxon Mobil Corporation is a multinational, vertically integrated energy and chemical company and one of the largest publicly traded international oil and gas companies in the world. Exxon Mobil Corporation was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Standard Oil Company of New Jersey; and Mobil Corporation.

   b.   Exxon Mobil Corporation controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Exxon Mobil Corporation's 2022 Form 10-K filed with the SEC represents that its success, including its "ability to mitigate risk and provide attractive returns to shareholders, depends on [its] ability to successfully manage [its] overall portfolio, including diversification among types and locations of [its] projects, products produced, and strategies to divest assets."[29] Exxon Mobil Corporation determines whether and to what extent its subsidiaries market, produce,

---

[28] *Wood River Refinery*, PHILLIPS 66, https://www.phillips66.com/refining/wood-river-refinery/ (last visited Nov. 15, 2023).

[29] Exxon Mobil Corp., Annual Report Form (10-K) (Feb. 22, 2023).

and/or distribute fossil fuel products. For example, on October 11, 2023, Exxon Mobil Corporation announced its acquisition of Pioneer Natural Resources in a press release that referred to the corporate family generally as "ExxonMobil."[30]

c. Exxon Mobil Corporation controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Exxon Mobil Corporation's Board holds the highest level of direct responsibility for climate change policy within the company. Exxon Mobil Corporation's Chairman of the Board and Chief Executive Officer, its President, and the other members of its Management Committee have been actively engaged in discussions relating to GHG emissions and the risks of climate change on an ongoing basis. Exxon Mobil Corporation requires its subsidiaries, when seeking funding for capital investments, to provide estimates of project costs related to GHG emissions.

d. Defendant **ExxonMobil Oil Corporation** is a wholly-owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation with its headquarters in Irving, Texas. ExxonMobil Oil Corporation was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Mobil Oil Corporation.

---

[30] *ExxonMobil announces merger with Pioneer Natural Resources in an all-stock transaction*, EXXONMOBIL (Oct. 11, 2023), https://corporate.exxonmobil.com/news/news-releases/2023/1011_exxonmobil-announces-merger-with-pioneer-natural-resources-in-an-all-stock-transaction.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

e.      Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

f.      Exxon consists of numerous divisions and affiliates in all areas of the fossil fuel industry, including exploration for and production of crude oil and natural gas; manufacture of petroleum products; and transportation, promotion, marketing, and sale of crude oil, natural gas, and petroleum products. Exxon is also a major manufacturer and marketer of commodity petrochemical products.

g.      Exxon has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Exxon's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Exxon's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Exxon's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Exxon's fossil fuel products in Chicago, thereby resulting in the City's injuries.

h.      Over the past several decades and continuing to the present day, Exxon spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1972, and continuing to the



FILED DATE: 2/20/2024 12:34 PM   2024CH01024

present day, Exxon has advertised its fossil fuel products in print publications circulated widely to Chicago consumers, including but not limited to: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Ebony*; *Life*; *National Geographic*; *The New York Times*; *People*; *Sports Illustrated*; *Time*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions designed to hide the connection between the production and use of Exxon's fossil fuel products and climate change, and/or misrepresenting Exxon's products or Exxon itself as environmentally friendly.

     i.    Significant quantities of Exxon's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities Exxon derives and has derived substantial revenue.

     j.    Exxon conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products. There are 54 Exxon- and Mobil-branded gas stations in Chicago, and 463 throughout Illinois.

     k.    Exxon also markets and sells other fossil fuel products, including engine lubricants and motor oils, to Chicago and Illinois consumers under its Mobil 1 brand name.

     l.    Exxon markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[31] Further, Exxon promotes its products in Chicago and Illinois by regularly updating and actively

---

[31] *Find a Gas Station Near Me*, EXXON MOBIL, https://www.exxon.com/en/find-station (last visited Nov. 15, 2023); *Stores Nearby Selling Mobil 1 and Mobil Motor Oil*, MOBIL, https://www.mobil.com/en/lubricants/where-to-buy/motor-oil-product-locator (last visited Nov. 15, 2023).





FILED DATE: 2/20/2024 12:34 PM    2024CH01024

promoting its "Exxon Mobil Rewards+" app and rewards program, which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases.

19.    **Shell Entities: Shell Oil Products Company LLC; Shell plc; and Shell USA, Inc.**

a.    Defendant **Shell Oil Products Company LLC** is a wholly-owned subsidiary of Shell USA, Inc., that acts on Shell USA, Inc.'s behalf and is subject to Shell USA, Inc.'s control. Shell Oil Products Company LLC is incorporated in Delaware, with its principal place of business in Houston, Texas, and has been registered to do business in Illinois since 2001. Shell Oil Products Company LLC was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Shell Oil Products Company, which was a Delaware corporation that converted to a limited liability company in 2001.

b.    Defendant **Shell plc** (formerly Royal Dutch Shell PLC) is a vertically integrated multinational energy and petrochemical company. Shell plc is incorporated in England and Wales, with its headquarters and principal place of business in The Hague, Netherlands. Shell plc is the ultimate parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of fossil fuel production, including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

c.    Shell plc controls and has controlled company-wide decisions about the quantity and extent of fossil fuel production and sales, including those of its subsidiaries. Shell plc's Board of Directors determines whether and to what extent Shell subsidiary holdings around the globe produce Shell-branded fossil fuel products.





FILED DATE: 2/20/2024 12:34 PM    2024CH01024

d.      Shell plc controls and has controlled company-wide decisions, including those of its subsidiaries, related to marketing, advertising, GHG emissions and climate change resulting from the company's fossil fuel products, and communications strategies concerning climate change and the link between fossil fuel use and climate-related impacts on the environment and humans. Overall accountability for climate change within the Shell Group lies with Shell plc's Chief Executive Officer and Executive Committee. For instance, at least as early as 1988, Shell plc, through its predecessors and subsidiaries, was researching company-wide carbon dioxide ("$CO_2$") emissions and concluded that the Shell Group accounted for four percent of the $CO_2$ emitted worldwide from combustion, and that climatic changes could compel the Shell Group, as controlled by Shell plc, to examine the possibilities of expanding and contracting its business accordingly.

e.      Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a wholly-owned subsidiary of Shell plc that acts on Shell plc's behalf and is subject to Shell plc's control. Shell USA, Inc. is incorporated in Delaware, with its principal place of business in Houston, Texas. Shell USA, Inc. has been registered to do business in California since 1949. Shell USA, Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Shell Oil Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company, L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

f.      Defendants Shell plc, Shell USA, Inc., Shell Oil Products Company LLC, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Shell."

26



FILED DATE: 2/20/2024 12:34 PM    2024CH01024

g.      Shell has purposefully directed its tortious conduct toward Chicago by distributing, marketing, advertising, promoting, and supplying its fossil fuel products in Chicago, with knowledge that the intended use of those products for combustion has caused and will continue to cause climate change-related harms in Chicago, including the City's injuries. Shell's statements in Chicago, in Illinois, and elsewhere made in furtherance of its campaign of deception about and denial of climate change, and Shell's affirmative promotion of its fossil fuel products as safe with knowledge of how the intended use of those products would cause climate change-related harms, were designed to conceal these harms and mislead consumers and the public, including the City and its residents, about the serious adverse consequences that would result from continued use of Shell's products. That conduct was purposefully directed to reach and influence the City and its residents to continue the unabated use of Shell's fossil fuel products in Chicago, thereby resulting in the City's injuries.

h.      Over the last several decades and continuing to the present day, Shell spent millions of dollars on radio, television, online, social media, and outdoor advertisements in the Chicago market related to its fossil fuel products. Since at least 1970, and continuing to the present day, Shell has advertised its fossil fuel products in print publications circulated widely to Chicago consumers, including but not limited to the following: *The Chicago Tribune*; *The Chicago Sun-Times*; *The Atlantic*; *Ebony*; *The Economist*; *Life*; *National Geographic*; *Newsweek*; *The New York Times*; *Sports Illustrated*; *Time Magazine*; *The Wall Street Journal*; and *The Washington Post*. As further detailed herein, these include advertisements containing false or misleading statements, misrepresentations, and/or material omissions obfuscating the connection between the production and use of Shell's fossil fuel products and climate change, and/or misrepresenting Shell's products or Shell itself as environmentally friendly.

i.      Significant quantities of Shell's fossil fuel products are or have been transported, traded, distributed, promoted, marketed, manufactured, sold, and/or consumed in Chicago and in Illinois, from which activities Shell derives and has derived substantial revenue.

j.      Shell conducts and controls, either directly or through franchise agreements, retail fossil fuel sales at gas station locations throughout Chicago and Illinois, at which locations it promotes, advertises, and sells its fossil fuel products. There are 89 Shell-branded gas stations in Chicago, and 637 throughout Illinois.

k.      Shell also markets and sells other fossil fuel products, including engine lubricants and motor oils, to Chicago and Illinois customers under its Penzoil brand name.

l.      Shell markets and advertises its fossil fuel products in Chicago to its residents by maintaining an interactive website available to prospective customers by which it directs the City's residents to its nearby retail service stations and/or lubricant distributors.[32] Further, Shell promotes its products in Chicago and Illinois by regularly updating and actively promoting its "Fuel Rewards Program," which encourages customers to buy fuel at its stations in Chicago and Illinois in exchange for rewards on fuel purchases. Shell offers a proprietary credit card known as the "Shell Fuel Rewards Card," which allows consumers in Chicago and in Illinois to pay for gasoline and other products at Shell-branded service stations, and which encourages consumers to use Shell-branded gas stations by offering various rewards, including discounts on gasoline purchases. Shell further maintains a smartphone application known as the "Shell US App" that offers Chicago and Illinois consumers a cashless payment method for gasoline and other products at Shell-branded service stations. Chicago and Illinois consumers can also receive

---

[32] *Gas Station Near Me*, SHELL, https://www.shell.us/motorist/gas-station-near-me.html (last visited Nov. 15, 2023); *Retail Locations & Oil Change Near Me*, PENNZOIL, https://www.pennzoil.com/en_us/oil-change-retail-locations.html (last visited Nov. 15, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

rewards, including discounts on gasoline purchases, by registering their personal identifying information in the Shell US App and using the application to identify and activate gas pumps at Shell service stations during a purchase.

m.    Shell was the original operator of the Wood River refinery in Roxana, Illinois (now operated by Phillips 66), and ran the refinery for over 80 years.[33]

20.    **American Petroleum Institute**

a.    Defendant American Petroleum Institute, referred to herein as API, is a nonprofit corporation based in the District of Columbia. API was created in 1919 to represent the American oil and gas industry as a whole. With more than 600 members, API is the country's largest oil trade association. API's purpose is to advance its members' collective business interests, which include increasing consumer consumption of oil and gas for the financial profit of oil and gas companies, including the Fossil Fuel Defendants. Among other functions, API also coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members.

b.    Acting on behalf of and under the supervision and control of the Fossil Fuel Defendants, API has, since at least 1988, participated in and led several coalitions, front groups, and organizations that have promoted disinformation about the climate impacts of fossil fuel products to consumers—including, but not limited to, the Global Climate Coalition, Partnership for a Better Energy Future, Coalition for American Jobs, Alliance for Energy and Economic Growth, and Alliance for Climate Strategies. These front groups were formed to promote climate disinformation and advocacy from a purportedly objective source, when in fact these groups were

---

[33] *Post-Shell at the Wood River Refinery*, MADISON CNTY. HISTORICAL SOCIETY (2017), https://madcohistory.org/online-exhibits/wood-river-refinerys-first-100-years/post-shell-at-the-wood-river-refinery/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

financed and controlled by the Fossil Fuel Defendants and other oil and gas companies. The Fossil Fuel Defendants have benefited from the spread of this disinformation because, among other things, it has ensured a thriving consumer market for oil and gas, resulting in substantial profits for the Fossil Fuel Defendants.

        c.     API's mission includes increasing consumers' consumption of oil and gas for the financial benefit of the Fossil Fuel Defendants and other oil and gas companies. In effect, API acts and has acted as a marketing arm for its member companies, including the Fossil Fuel Defendants. Over the last several decades, API has spent millions of dollars on television, newspaper, radio, social media, and internet advertisements in the Chicago and Illinois markets.

        d.     Member companies participate in API strategy, governance, and operation through their membership dues and by contributing company officers and other personnel to API boards, committees, and task forces. The Fossil Fuel Defendants have collectively steered the policies and trade practices of API through membership, Executive Committee roles, and/or providing budgetary funding for API. The Fossil Fuel Defendants have used their control over and involvement in API to develop and execute a long-term advertising and communications campaign centered on climate change denialism. The goal of the campaign was to influence consumer demand for the Fossil Fuel Defendants' fossil fuel products. The Fossil Fuel Defendants directly controlled, supervised, and participated in API's misleading messaging regarding climate change.

        e.     In addition to national promotional campaigns circulated in Chicago, API has also targeted Chicago and Illinois consumers directly by creating and disseminating misleading advertisements that distinctly promote consumption of fossil fuel products in Chicago and Illinois. API has run numerous press releases within Illinois touting the direct and indirect benefits to Illinois of the oil and gas industries' operations in Chicago, in Illinois, and elsewhere in the United

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

States.[34] The reports, sponsored by API, on which API bases its claims, do not mention climate change at all, nor do the reports mention any of the direct and indirect harms to Chicago caused by the production, marketing, sale, and use of API members' fossil fuel products.

    f.  API hosts various events in Chicago. For instance, in 2022, API sponsored the "2022 Spring Refining and Equipment Standards Meeting" held in Chicago. Likewise, in November 2023, API sponsored the 2023 API/AFPM Fall Operating Practices Symposium and Roundtable in Chicago.[35]

    g.  All of the Fossil Fuel Defendants and/or their predecessors-in-interest have been key API members and have closely coordinated their tortious conduct with API at all times relevant to this Complaint. All of the Fossil Fuel Defendants are currently members of API. Executives from Exxon, Shell, Chevron, ConocoPhillips, and BP have served on the API Executive Committee and/or as API Chairman, essentially serving as corporate officers. For example, Exxon's CEO served on API's Executive Committee for 15 of the 25 years between 1991 and 2016 (specifically, 1991, 1996-1997, 2001, and 2005-2016). BP's CEO served as API's Chairman in 1988, 1989, and 1998. Chevron's CEO served as API Chairman in 1994, 1995, 2003, and 2012. Executives from ConocoPhillips also served as members of API's Board of Directors at various times. Shell's President served on API's Executive Committee from 2005 to 2006. ConocoPhillips Chairman and CEO Ryan Lance was API Board President from 2016 to 2018, and Exxon President and CEO Darren Woods was API Board President from 2018 to 2020. In 2020,

---

[34] *See, e.g., Energy Works: The people of Illinois are part of the oil and natural gas industry*, API (2015), https://www.api.org/~/media/files/policy/jobs/energyworks/energyworks_illinois-api.pdf.

[35] *2023 API/AMPF Fall Operating Practices Symposium*, API (2023), https://events.api.org/2023-api-afpm-fall-operating-practices-symposium-and-roundtable/#:~:text=The%202023%20API%2FAFPM%20Fall,the%20lessons%20learned%20from%20facility.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

API elected Phillips 66 Chairman and CEO Greg Garland to serve a two-year term as its Board President. In 2022, API elected Chevron CEO and Chairman Mike Wirth to succeed Mr. Garland as Board Chairman.

        h.        Relevant information was shared among API and the Fossil Fuel Defendants and the Fossil Fuel Defendants' predecessors-in-interest through the following: (1) API's distribution of information to its members, and/or (2) participation of the Fossil Fuel Defendants' officers and other personnel, and those of the Fossil Fuel Defendants' predecessors-in-interest, on API boards, committees, and task forces.

        i.        The City's claims against API arise out of and are related to the acts and omissions of API in Chicago, in Illinois, and elsewhere that caused and will cause injuries in Chicago.

**A.      Relevant Non-Parties: Defendants' Agents/Front Groups**

21.      As detailed below, each Fossil Fuel Defendant had actual knowledge, or should have known, that its fossil fuel products were hazardous in that the intended use of the fossil fuel products for combustion would substantially contribute to climate change and result in harms to the City. The Fossil Fuel Defendants obtained knowledge of the hazards of their products independently and through their membership and involvement in trade associations such as API.

22.      The Fossil Fuel Defendants and API employed, financed, and participated in several industry-created front groups to serve their mission of flooding the markets with climate change disinformation and denialism. These organizations, acting on behalf of and under the supervision and control of the Fossil Fuel Defendants, assisted the deception campaign by implementing public advertising and outreach campaigns to discredit climate science and funding scientists to cast doubt upon climate science and upon the extent to which climate change is caused by human activity. In sum, the Fossil Fuel Defendants, through their front groups, engaged in a

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

significant marketing campaign that misrepresented and concealed the dangers of their fossil fuel products with the aim of protecting or enhancing sales of these products to consumers, including consumers in Chicago and in Illinois. Defendants actively supervised, facilitated, consented to, and/or directly participated in the misleading messaging of these front groups, from which the Fossil Fuel Defendants profited significantly, including in the form of increased sales in Chicago and Illinois.

23.     **The Global Climate Coalition ("GCC")** was an industry group formed to preserve and expand consumer demand for fossil fuels by publicly casting doubt on climate science and opposing GHG emission-reduction initiatives. GCC was founded in 1989 in reaction to the first meeting of the Intergovernmental Panel on Climate Change ("IPCC"), the United Nations body for assessing the science related to climate change, and to NASA scientist James Hansen's presentation to the Senate Committee on Energy and Natural Resources, in which Mr. Hansen emphasized that climate change was already happening and would lead to dire consequences if left unaddressed. GCC disbanded in or around 2001. Founding members included API, Shell Oil Company (currently, Shell); Texaco, Inc. (currently, Chevron); Amoco (currently, BP); ARCO (owned by BP at the time); and Phillips Petroleum Company (currently, ConocoPhillips). Tom Lambrix, director of government relations for Phillips Petroleum, was chairman of GCC.

**III.     JURISDICTION AND VENUE**

24.     This Court has jurisdiction over this action pursuant to the Illinois Constitution, art. VI § 9. This Court has personal jurisdiction over Defendants because they transacted business; committed tortious acts; owned, used, or possessed real property; made or performed contracts or promises; acquired ownership, possession, or control of assets or things of value; performed corporate duties; and/or were organized or had their principal places of businesses in Illinois, including in Cook County. 735 ILCS 5/2-209.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

25.     Jurisdiction is proper over each resident Defendant because they are incorporated or have their principal place of business in Illinois.

26.     Additionally, jurisdiction is proper over each non-resident Defendant for the following reasons:

a.      With respect to its subsidiaries, each non-resident Fossil Fuel Defendant parent controls and has controlled decisions about the quantity and extent of its fossil fuel production and sales; determines whether and to what extent to market, produce, and/or distribute its fossil fuel products; and controls and has controlled decisions related to its marketing and advertising, specifically communications strategies concerning climate change and the link between fossil fuel use and impacts on the environment. Each non-resident Fossil Fuel Defendant parent has the power to direct and control its non-resident subsidiaries named here. Thus, each subsidiary is the agent of its parent. As agents, the subsidiaries of each non-resident Fossil Fuel Defendant conducted activities in Chicago and Illinois at the direction and for the benefit of its parent company. Specifically, the subsidiaries furthered each parent company's campaign of deception and denial through misrepresentations, omissions, and affirmative promotion of the company's fossil fuel products as safe with knowledge of the climate change-related harms that would result from the intended use of those products, all of which resulted in climate change-related injuries in Chicago and increased sales to the parent company. Therefore, the subsidiaries' jurisdictional activities are properly attributed to each parent company and serve as a basis to assert jurisdiction over each of the non-resident Fossil Fuel Defendant parent companies.

b.      Through their various agreements with dealers, franchises, or otherwise, the Fossil Fuel Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respectively

34

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

branded gas stations in Chicago and in Illinois, including point-of-sale advertising and marketing. The Fossil Fuel Defendants dictate which grades and formulations of their gasoline may be sold at their respectively branded stations.

       c.     The Fossil Fuel Defendants, by and through API and other organizations like GCC, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to engage in massive campaigns to promote continued and increased use of their fossil fuel products, which they knew would result in injuries to the City. Through their own actions and through their membership and participation in climate denialist front groups, API and each Fossil Fuel Defendant were and are members of this conspiracy. Defendants committed substantial acts to further the conspiracy in Chicago and Illinois by making affirmative misrepresentations to Chicago and Illinois consumers, as well as misleading them by omission, about the existence, causes, and effects of global warming; and by affirmatively promoting the Fossil Fuel Defendants' fossil fuel products as safe, with knowledge of the disastrous impacts that would result from the intended use of those products. A substantial effect of this conspiracy has also and will also occur in Chicago, as the City has suffered and will continue to suffer injuries from Defendants' wrongful conduct, including but not limited to the following: extreme heat, severe droughts, massive storms, flooding, increased seasonal temperatures, negative impacts on Lake Michigan, coastal erosion, damage to ecosystems and habitat, biodiversity disruption, public health injuries, and other social and economic consequences of these environmental changes. Defendants knew or should have known—based on information provided to them from their internal research divisions, affiliates, trade associations, and industry groups—that their actions in

Chicago, Illinois, and elsewhere would result in these injuries in and to the City. Finally, the climate effects described herein are direct and foreseeable results of Defendants' conduct in furtherance of the conspiracy.

27.     Venue for this action is proper in the Circuit Court of Cook County because any Defendant resides in Cook County, and because some part of the transactions out of which the causes of action arose occurred in Cook County. 735 ILCS 5/2-101.

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants Are Substantially Responsible for Causing and Accelerating Climate Change.

28.     The earth's atmosphere is warming, sea level is rising, snow and ice cover is diminishing, oceans are warming and acidifying, and hydrologic systems have been altered, among other rapidly accelerating changes to our climate. These changes are directly harming people's health, lives, lifestyles, and livelihoods, including in Chicago.

29.     In the geological short term, ocean and land surface temperatures have increased at a rapid pace during the late 20th and early 21st centuries:

a.     2023 was the hottest year on record by globally averaged surface temperatures, exceeding mid-20th century mean ocean and land surface temperatures by approximately 2.12° F. Each month in 2023 was hotter by globally averaged surface temperatures than those respective months in any previous year. June, July, August, September, October, November, and December 2023 were all the hottest average surface temperatures for those months.[36]

---

[36] NOAA National Center for Environmental Information, NOAA, Annual 2023 Global Climate Report (Jan. 2024), https://www.ncei.noaa.gov/access/monitoring/monthly-report/global/202313.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

b.   The second hottest year on record by globally averaged surface temperatures was 2016, and the third hottest was 2020.[37]

c.   The ten hottest years on record by globally averaged surface temperature have all occurred since 2014.[38]

30.   The average global surface and ocean temperature in 2023 was approximately 2.12° F warmer than the 20th century baseline, which is the greatest positive anomaly observed since at least 1850.[39] The increase in hotter temperatures and more frequent positive anomalies during the Great Acceleration is occurring both globally and locally, including in Chicago. The graph below shows the increase in global land and ocean temperature anomalies since 1850, as measured against the 1901–2000 global average temperature.[40]



**Figure 1: NOAA Global Land and Ocean Temperatures[41]**

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *See id.*

[41] *Id.*

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

31.    According to the IPCC, the evidence that humans are causing this warming of the Earth is unequivocal.[42]

32.    Greenhouse gas emissions caused by human activities are the most significant driver of climate change and ocean acidification.[43] Over the past couple of decades, those emission rates have exceeded those predicted under previous "worst case" global emissions scenarios. The severity of the continuing impacts of climate change on Chicago will depend on the success of mitigation and adaptation efforts in the City and on the reduction of fossil fuel consumption.[44]

33.    Greenhouse gases are largely byproducts of human combustion of fossil fuels to produce energy and use of fossil fuels to create petrochemical products. While there are several greenhouse gases contributing to climate change, $CO_2$ is the primary greenhouse gas emitted as a result of human activities.

34.    Prior to World War II, most anthropogenic $CO_2$ emissions were caused by land-use practices, such as forestry and agriculture, which altered the ability of the land and global biosphere to absorb $CO_2$ from the atmosphere. The impacts of such activities on Earth's climate were relatively minor. Since that time, however, both the annual rate and total volume of anthropogenic $CO_2$ emissions have increased enormously following the dramatic rise of the combustion of oil, gas, and coal, in particular in the transportation industry and in the stationary energy market.

---

[42] *Climate Change 2021: The Physical Science Basis*, THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, at v, 4, 41, 63, 150, 425, 506 (2021), https://report.ipcc.ch/ar6/wg1/IPCC_AR6_WGI_FullReport.pdf.

[43] *Id.* at 41.

[44] *See Climate Action Plan for the Chicago Region Appendix G: Climate Risk And Vulnerability Assessment*, METROPOLITAN MAYORS CAUCUS & NOAA, at 95-108 (Dec. 2016) https://mayorscaucus.org/wp-content/uploads/2021/06/RegionalCAP_primary_and_appendices_062321-02.pdf

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

35.     The graph below illustrates that fossil fuel emissions are the dominant source of increases in atmospheric $CO_2$ since the mid-twentieth century:



**Figure 2: Annual Global Emissions, 1850–2020[45]**

36.     This acceleration of fossil fuel emissions has led to a correspondingly sharp rise in atmospheric concentration of $CO_2$. Since 1960, the concentration of $CO_2$ in the atmosphere has spiked from under 320 parts per million ("ppm") to approximately 423 ppm.[46] The concentration of atmospheric $CO_2$ has also been accelerating. From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 0.9 ppm per year; over the last five years, it has increased by approximately 2.4 ppm per year.[47]

---

[45] *Global Carbon Budget 2021*, GLOBAL CARBON PROJECT, at 83 (Nov. 4, 2021), https://www.globalcarbonproject.org/carbonbudget/archive/2021/GCP_CarbonBudget_2021.pdf.

[46] *Trends in Atmospheric Carbon Dioxide: Full Record*, GLOBAL MONITORING LABORATORY, https://gml.noaa.gov/ccgg/trends/mlo.html (last visited Nov. 15, 2023).

[47] *Trends in Atmospheric Carbon Dioxide: Growth Rate*, GLOBAL MONITORING LABORATORY https://gml.noaa.gov/ccgg/trends/gr.html (last visited Nov. 15, 2023).

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

37.     Figure 3 indicates the tight nexus between the sharp increase in emissions from the combustion of fossil fuels and the steep rise of atmospheric concentrations of $CO_2$.



**Figure 3: Atmospheric $CO_2$ Concentration and Annual Emissions[48]**

38.     Because of the increased burning of fossil fuel products, concentrations of greenhouse gases in the atmosphere are now at an unprecedented level, one not seen in at least three million years.[49]

39.     As greenhouse gases accumulate in the atmosphere, the Earth radiates less energy back to space. This accumulation and associated disruption of the Earth's energy balance have a myriad of environmental and physical consequences, including, but not limited to, the following:

        a.      Warming of the Earth's average surface temperature, both locally and globally, and increased frequency and intensity of heat waves. To date, global average surface

---

[48] Rebecca Lindsey, *Climate Change: Atmospheric Carbon Dioxide*, CLIMATE.GOV (May 12, 2023), https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide.

[49] *More CO2 than ever before in 3 million years, shows unprecedented computer simulation*, SCIENCE DAILY (Apr. 3, 2019), https://www.sciencedaily.com/releases/2019/04/190403155436.htm.

temperatures have risen approximately 1.09°C (1.96°F) above preindustrial temperatures; temperatures in particular locations have risen more.

b.    Changes to the global climate generally, bringing about longer droughts and dry periods interspersed with fewer and more severe periods of precipitation, and associated impacts to the quantity and quality of water resources available to both human and ecological systems.

c.    Increased frequency and intensity of extreme weather events due to increases in evaporation, evapotranspiration, and precipitation, a consequence of the warming atmosphere's increased ability to hold moisture.

d.    Adverse impacts on human health associated with extreme weather, extreme heat, worsening air quality, and vector-borne illnesses.

e.    Flooding and inundation of land and infrastructure, increased erosion, higher wave run-up and tides, increased frequency and severity of storm surges, saltwater intrusion, and other impacts of higher sea levels.

f.    Sea level rise, due to the thermal expansion of warming ocean waters and runoff from melting glaciers and ice sheets.

g.    Ocean acidification, primarily due to the increased uptake of atmospheric carbon dioxide by the oceans.

h.    Changes to terrestrial and marine ecosystems, and consequent impacts on the populations and ranges of flora and fauna.

40.    Chicago specifically has seen environmental and physical consequences, including winters warming by almost four degrees since 1980, winter ice coverage decreasing on Lake

41

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

Michigan and smaller lakes in the area, several major heat waves, shifts in the water cycle including less snow and earlier snowmelt, and heavy rainfall events occurring twice as frequently.

41.    As further discussed below, these consequences of Defendants' tortious and deceptive conduct and its exacerbation of the climate crisis are already impacting Chicago, its communities, its people's health, and its natural resources, and these impacts will continue to increase in severity. Absent Defendants' tortious and deceptive conduct and resultant contributions to global warming, these harmful effects would have been far less extreme than those currently occurring. Similarly, future harmful effects would also have been far less detrimental—or would have been avoided entirely.[50]

42.    From at least 1965 until the present, Defendants unduly inflated the market for fossil fuel products by aggressively promoting the use of these products while knowing their associated dangers, and by misrepresenting and concealing the hazards of those products to deceive consumers and the public about the consequences of everyday use of fossil fuel products. Consequently, substantially more anthropogenic greenhouse gases have been emitted into the environment than would have been emitted absent Defendants' tortious and deceptive conduct.

43.    By quantifying GHG pollution attributable to the Fossil Fuel Defendants' products and conduct, climatic and environmental responses to those emissions are also calculable and can be attributed to the Fossil Fuel Defendants both on an individual and an aggregate basis.[51]

---

[50] *See, e.g.*, Peter U. Clark et al., *Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change*, 6 NATURE CLIMATE CHANGE 360, 365 (2016) ("Our modelling suggests that the human carbon footprint of about [470 billion tons] by 2000 . . . has already committed Earth to a [global mean sea level] rise of ~1.7m (range of 1.2 to 2.2 m).").

[51] *See* Richard Heede, *Tracing anthropogenic carbon dioxide and methane emissions to fossil fuel and cement producers, 1854–2010*, 122 CLIMATIC CHANGE 229 (2013), https://link.springer.com/article/10.1007/s10584-013-0986-y.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

44.     Defendants' tortious, deceptive, and unconscionable conduct, as alleged herein, caused a substantial portion of the global atmospheric GHG concentrations, and the past, ongoing, and future disruptions to the environment—and consequent injuries to Chicago, its communities, and its resources—associated therewith.

45.     Defendants, individually and collectively, have substantially and measurably contributed to Chicago's climate crisis-related injuries.

46.     Defendants have known for decades that fossil fuels—their chief products—are the primary cause of climate change and that, if unabated, climate change could result in catastrophic impacts, including droughts, flooding, and severe weather events that would impose enormous harms on cities such as Chicago. Despite this knowledge, these corporations and their trade associations have embarked on tobacco-industry-style campaigns to deceive and mislead the public about the damaging nature of their fossil fuel products. These campaigns initially took the form of denial of the reality of climate change or attempts to cast the science surrounding these issues as uncertain or subject to reasonable debate. Later, these campaigns transformed in part to falsely suggest that continued consumption of Defendants' products is consonant with mitigating climate change.

**B.     Defendants Went to Great Lengths to Understand the Dangers Associated with Fossil Fuel Products, and Either Knew or Should Have Known of Those Dangers.**

47.     Defendants have known about the potential warming effects of GHG emissions since as early as the 1950s, and they developed a sophisticated understanding of climate change that far exceeded the knowledge of the general public. Although it was concealed at the time, the

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

industry's knowledge was uncovered in 2015 by journalists at *Inside Climate News* and the *Los Angeles Times*, among others.[52]

48.     In 1954, geochemist Harrison Brown and his colleagues at the California Institute of Technology wrote to API, informing the trade association of their finding that fossil fuels had caused atmospheric carbon dioxide levels to increase by about five percent since 1840.[53] API continued to fund the scientists for various research projects and measurements of carbon dioxide, but the results were never published.[54] In 1957, H.R. Brannon of Humble Oil Company (a predecessor-in-interest to Exxon) measured an increase in atmospheric carbon dioxide attributable to fossil fuels, similar to—and in agreement with—that measured by Harrison Brown.[55]

49.     In 1959, API organized an oil industry celebration in New York City.[56] High-level oil industry executives were in attendance, and one of the keynote speakers was the nuclear physicist, Edward Teller. Mr. Teller warned the industry that "a temperature rise corresponding to a 10 percent increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll

[52] *See, e.g.*, Neela Banerjee et al., *Exxon's Own Research Confirmed Fossil Fuels' Role in Global Warming Decades Ago*, INSIDE CLIMATE NEWS (Sept. 16, 2015), https://insideclimatenews.org/news/16092015/exxons-own-research-confirmed-fossil-fuels-role-in-global-warming/; Katie Jennings et al., *How Exxon went from leader to skeptic on climate change research*, L.A. TIMES (Oct. 23, 2015), https://graphics.latimes.com/exxon-research; Sarah Jerving et al., *What Exxon knew about the Earth's melting Arctic*, L.A. TIMES (Oct. 9, 2015), https://graphics.latimes.com/exxon-arctic/; Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While It Fought Regulations*, L.A. TIMES (Dec. 31, 2015), https://graphics.latimes.com/oil-operations.

[53] Benjamin Franta, *Early oil industry knowledge of* $CO_2$ *and global warming*, 8 NATURE CLIMATE CHANGE 1024, 1024 (2018).

[54] *Id.*

[55] *Id.*; H. R. Brannon, Jr. et al., *Radiocarbon evidence on the dilution of atmospheric and oceanic carbon from fossil fuels*, 38 AM. GEOPHYSICAL UNION TRANSACTIONS 643, 644-46 (1957).

[56] *See* Allan Nevins & Robert G. Dunlop, *Energy and Man: A Symposium* (1960); *see also* Franta, *supra* note 53, at 1024.

the coastal cities." Mr. Teller added that since "a considerable percentage of the human race lives in coastal regions, [he] think[s] that this chemical contamination is more serious than most people tend to believe."[57] Following his speech, Mr. Teller was asked to "summarize briefly the danger from increased carbon dioxide content in the atmosphere in this century." He responded that "there is a possibility the icecaps will start melting and the level of the oceans will begin to rise."[58]

50.    "In 1962, Marion King Hubbert, Chief Geology Consultant at Shell and former director of its research labs, produced a book-length report on the earth's Energy Resources for a committee of the National Academy of Sciences. The report, which draws heavily upon a 1956 analysis [Mr.] Hubbert prepared for [API], demonstrates Shell's profound understanding of the earth's energy balance, including the differences in the reflection of long- and short-wave solar radiation back into space, the role of global atmospheric temperatures in driving global weather, and the intrinsic and delicate natural balance between the heat energy absorbed by plants through photosynthesis with the equivalent energy released by plant matter through natural decay."[59]

51.    In 1965, the president of API, Frank Ikard, addressed leaders of the petroleum industry at the trade association's annual meeting. Mr. Ikard relayed the findings of a recent report to industry leaders, saying, "[o]ne of the most important predictions of the report is that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas at such a rate that by the year 2000 the heat balance will be so modified as possibly to cause marked changes in climate beyond local or even national efforts," and quoting the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an

---

[57] Edward Teller, *Energy Patterns of the Future, in Energy and Man: A Symposium*, at 58 (1960).

[58] *Id.* at 70.

[59] *A Crack in the Shell: New Documents Expose a Hidden Climate History (April 2018)*, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW (2018), https://www.ciel.org/reports/a-crack-in-the-shell/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."[60]

52.     Thus, at least by 1965, Defendants and their predecessors-in-interest were aware that the scientific community had found that fossil fuel products, if their use continued to grow, would cause global warming by the end of the century, and that such global warming would have wide-ranging and costly consequences.

53.     In 1968, API received a report from the Stanford Research Institute, which it had hired to assess the state of research on environmental pollutants, including carbon dioxide.[61] The assessment stated: "Significant temperature changes are almost certain to occur by the year 2000, and . . . there seems to be no doubt that the potential damage to our environment could be severe." The scientists warned of "melting of the Antarctic ice cap" and informed API that "[p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the atmosphere." What was missing, the scientists said, was work on "air pollution technology and . . . systems in which $CO_2$ emissions would be brought under control."[62]

54.     In 1969, the Stanford Research Institute delivered a supplemental report on air pollution to API, projecting with alarming particularity that atmospheric $CO_2$ concentrations would reach 370 ppm by 2000.[63] This projection turned out to almost exactly match the actual $CO_2$

---

[60] Frank Ikard, *Proceedings 1965: Meeting the Challenges of 1966*, AM. PETROLEUM INST., at 13 (1965) https://www.documentcloud.org/documents/5348130-1965-API-Proceedings.

[61] E. Robinson & R.C. Robbins, *Sources, abundance, and fate of atmospheric pollutants*, SMOKE & FUMES, at 109-10 (1968) https://www.smokeandfumes.org/documents/document16 (last visited Nov. 15, 2023).

[62] *Id.* at 108, 112.

[63] *Id.* at 3.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

concentrations measured in 2000 of 369.64 ppm.[64] The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere."[65] By virtue of their membership and participation in API at that time, the Fossil Fuel Defendants received or should have received the Stanford Research Institute reports, and thus were on notice of the conclusions in those reports.[66]

55.     Continuing through the 1970s and beyond, Defendants continued to devote resources to understanding the role that GHG emissions play in creating global climate change, and they continued to share what they found among themselves.

56.     Among other Defendants, "Shell was actively supporting research that clearly underscored the dangers posed by burning its fossil fuel products from the mid-1970s."[67]

57.     In 1977, James Black of Exxon gave a presentation to Exxon executives on the "greenhouse effect," which was summarized in an internal memo the following year. Mr. Black reported that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and that doubling atmospheric carbon dioxide would, according to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C over most of the earth," with two to three times as much warming at the poles.[68] Mr. Black

---

[64]    *Global Mean $CO_2$ Mixing Ratios (ppm): Observations*, NASA, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt (last visited Nov. 15, 2023).

[65] Robinson & Robbins, *supra* note 61, at 19.

[66] Abstracts of the Stanford Research Institute studies were included in a 1972 API status report to its members. *See Environmental Research: A Status Report*, AM. PETROLEUM INST., at 103 (Jan. 1972) http://files.eric.ed.gov/fulltext/ED066339.pdf.

[67] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, DESMOG (Mar. 31, 2023), https://www.desmog.com/2023/03/31/lost-decade-how-shell-downplayed-early-warnings-over-climate-change/.

[68] J.F. Black, *Memo to F.G. Turpin on Greenhouse Effect for Exxon Corporation Management Committee*, Exxon Research and Engineering Co. re The Greenhouse Effect, EXXON RESEARCH AND ENGINEERING CO., at 2, 23 (June 6, 1978)

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

reported that the impacts of global warming would include "more rainfall," which would "benefit some areas and would harm others," and that "[s]ome countries would benefit, but others could have their agricultural output reduced or destroyed." "Even those nations which are favored, however, would be damaged for a while since their agricultural and industrial patterns have been established on the basis of the present climate." Finally, Mr. Black reported that "[p]resent thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."[69] The figure below, reproduced from Black's memo, illustrates Exxon's understanding of the timescale and magnitude of global warming that its products would cause.



**Figure 4: Future Global Warming Predicted Internally by Exxon in 1978[70]**

https://www.documentcloud.org/documents/2805568-1978-Exxon-Presentation-on-Greenhouse-Effect.

[69] *Id.* at 2.

[70] *Id.* at 26 (The company predicted global warming of 1°C to 3°C by 2050, with 10°C warming in polar regions. The difference between the lower dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring).

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

58.     In 1979, an internal Exxon memorandum stated, "The most widely held theory [about the increase in $CO_2$ concentration in the atmosphere] is that: The increase is due to fossil fuel combustion; [i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface; [and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050. . . . The potential problem is great and urgent." The memo added that, if limits were not placed on fossil fuel production, the following would occur:

> Noticeable temperature changes would occur around 2010 as the [$CO_2$] concentration reaches 400 ppm. Significant climatic changes occur around 2035 when the concentration approaches 500 ppm. A doubling of the pre-industrial concentration [*i.e.*, 580 ppm] occurs around 2050. The doubling would bring about dramatic changes in the world's environment[.][71]

59.     The memo highlighted that there was "no practical means" to capture and store carbon emissions and so "dramatic changes in patterns of energy use would be required" to avoid environmental damage. Significantly, in order to limit $CO_2$ emissions to avoid these harms, fossil fuel emissions would have to peak in the 1990s and alternative energies must be rapidly deployed. Eighty percent of fossil fuel resources would remain undeveloped, thus "coal and possibly other fossil fuel resources could not be utilized to an appreciable extent." Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[72]

60.     Those projections proved remarkably accurate. Annual average atmospheric $CO_2$ concentrations surpassed 400 ppm in 2015 for the first time in millions of years.[73] Limiting the $CO_2$ concentration in the atmosphere to 440 ppm, or a 50 percent increase over preindustrial levels,

---

[71] W.L. Ferrall, *Memo to Dr. R.L. Hirsch on Controlling $CO_2$ Concentration in the Atmosphere*, EXXON RESEARCH AND ENGINEERING CO., at 1-2, 5 (Oct. 16, 1979) https://www.industrydocuments.ucsf.edu/docs/mqwl0228.

[72] *Id.*

[73] Nicola Jones, *How the World Passed a Carbon Threshold and Why It Matters*, YALE ENV'T 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

which the Exxon memo said was "assumed to be a relatively safe level for the environment," would require fossil fuel emissions to peak in the 1990s and non-fossil energy systems to be rapidly deployed. Eighty percent of fossil fuel resources, the memo calculated, would have to be left in the ground to avoid doubling atmospheric $CO_2$ concentrations. Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[74]

61.     But instead of heeding these dire and repeated warnings, in November 1979, according to internal correspondence, Exxon urged "a very aggressive defensive program in . . . atmospheric science and climate because there [wa]s a good probability that legislation affecting [its] business w[ould] be passed."[75] It urged an expanded research effort to "influence possible legislation on environmental controls" and suggested the formation of a "small task force" to evaluate a potential program in $CO_2$ and climate, acid rain, carcinogens, fine particulates, and other pollution issues caused by fossil fuels.[76]

62.     In 1979, API and its members, including the Fossil Fuel Defendants, convened a Task Force to monitor and share cutting-edge climate research among members of the oil industry. This Climate and Energy Task Force (hereinafter referred to as "$CO_2$ Task Force") included senior scientists and engineers from nearly every major U.S. and multinational oil and gas company—including Exxon, Mobil, Amoco, Phillips, Texaco, Shell, and Standard Oil of Ohio, as well as Standard Oil of California and Gulf Oil, the predecessors to Chevron—and was charged with monitoring research, evaluating the implications of emerging science for the petroleum and gas

---

[74] Ferrall, *supra* note 71 at 3, 6-7.

[75] Henry Shaw, *Memo from H. Shaw to H.N. Weinberg Regarding Research in Atmospheric Science,* at 2 (Nov. 19, 1979).

[76] *Id.* at 1-2.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

industries, and identifying where potential reductions in GHG emissions from Defendants' fossil fuel products could be made.[77]

63.     In 1979, a paper prepared by API for the $CO_2$ Task Force asserted that $CO_2$ concentrations were rising, and predicted that, although global warming would occur, it would likely go undetected until approximately the year 2000 because its effects were being temporarily masked by a natural cooling trend, which would revert to a warming trend around 1990, adding to the warming caused by $CO_2$.[78]

64.     In 1980, at the invitation of the $CO_2$ Task Force, climate expert J. Laurman delivered to API members a presentation providing a "complete technical discussion" of global warming caused by fossil fuels, including "the scientific basis and technical evidence of $CO_2$ buildup, impact on society, methods of modeling and their consequences, uncertainties, policy implications, and conclusions that can be drawn from present knowledge."[79] Mr. Laurman informed the $CO_2$ Task Force of the "scientific consensus on the potential for large future climatic response to increased $CO_2$ levels" and that there was "strong empirical evidence that [the carbon dioxide] rise [was] caused by anthropogenic release of $CO_2$, mainly from fossil fuel burning."[80] According to Mr. Laurman, unless fossil fuel production and use were controlled, atmospheric

---

[77] Neela Banerjee, *Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too*, INSIDE CLIMATE NEWS (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco/.

[78] R.J. Campion, *Memorandum from RJ Campion to J.T. Burgess Regarding the API's Background Paper on $CO_2$ Effects* (Sept. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

[79] J. J. Nelson, *Letter to AQ-9 Task Force regarding The $CO_2$ Problem; Addressing Research Agenda Development*, at 2 (Mar. 18, 1980) https://www.industrydocuments.ucsf.edu/docs/gffl0228.

[80] *Id.* at 9-10 (full capitalization in original removed).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

carbon dioxide would be twice preindustrial levels by 2038, using a three percent per annum growth of atmospheric release rate, with "likely impacts" along the following trajectory:

> 1°C RISE (2005): BARELY NOTICEABLE
>
> 2.5°C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG REGIONAL DEPENDENCE
>
> 5°C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS

Mr. Laurman warned the $CO_2$ Task Force that global warming of 2.5°C would "bring[] world economic growth to a halt." The minutes of the meeting, which were distributed to the entire $CO_2$ Task Force, show that one of the Task Force's goals was "to help develop ground rules for . . . the cleanup of fuels as they relate to $CO_2$ creation," and the Task Force discussed potential research into the market and technical requirements for a worldwide "energy source changeover" away from fossil fuels.[81]

     65.    In 1980, Imperial Oil Limited, an Exxon subsidiary, reported to managers and staff at affiliated Esso and Exxon companies that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere, and that "[t]echnology exist[ed] to remove $CO_2$ from stack gases but removal of only 50 [percent] of the $CO_2$ would double the cost of power generation."[82]

     66.    In December 1980, an Exxon manager distributed a memorandum on the "$CO_2$ Greenhouse Effect" attributing future buildup of carbon dioxide to fossil fuel use, and explaining that internal calculations indicated that atmospheric carbon dioxide could double by around 2060, "most likely" resulting in global warming of approximately $3.0 \pm 1.5$°C.[83] Calculations predicting

---

[81] *Id.* at 1, 13.

[82] Imperial Oil Ltd., *Review of Environmental Protection Activities for 1978–1979*, at 2 (Aug. 6, 1980)    http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/.

[83] Henry Shaw & P. P. McCall, *Memorandum to T.K. Kett on Exxon Research and Engineering Company's Technological Forecast: $CO_2$ Greenhouse Effect*, at 3 (Dec. 18, 1980)

a lower temperature increase, such as 0.25°C, were "not held in high regard by the scientific community[.]" The memo also reported that such global warming would cause "increased rainfall[] and increased evaporation," which would have a "dramatic impact on soil moisture, and in turn, on agriculture" and other "serious global problems[.]" The memo called for "society" to pay the bill, estimating that some adaptive measures would cost no more than "a few percent" of Gross National Product.[84] Henry Shaw also reported that Exxon had studied various responses for avoiding or reducing a carbon dioxide build-up, including "stopping all fossil fuel combustion at the 1980 rate" and "investigat[ing] the market penetration of non-fossil fuel technologies." The memo estimated that such non-fossil energy technologies "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."[85] The memo included the figure below, which illustrates both the global warming anticipated by Exxon and the company's understanding that significant global warming would occur:

---

https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.

[84] *Id.* at 3-5.

[85] *Id.* at 5-6.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 5: Future Global Warming Predicted Internally by Exxon in 1980[86]**

67.    In February 1981, Exxon's Contract Research Office prepared and distributed a "Scoping Study on $CO_2$" to the leadership of Exxon Research and Engineering Company.[87] The study reviewed Exxon's carbon dioxide research and considered whether to expand its research on carbon dioxide or global warming further. It recommended against expanding those research areas because Exxon's current research programs were sufficient for achieving the company's goals of closely monitoring federal research, building credibility and public relations value, and developing in-house expertise regarding $CO_2$ and global warming, and noted that Exxon employees were actively monitoring and keeping the company apprised of outside research developments,

---

[86] *Id.* at 12. The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3°C warming by the end of the century.

[87] G.H. Long, *Letter to P.J. Lucchesi et al. Regarding Atmospheric CO Scoping Study*, EXXON RESEARCH AND ENGINEERING CO. (Feb. 5, 1981), https://www.industrydocuments.ucsf.edu/docs/yxfl0228.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

including those on climate modeling and "$CO_2$-induced effects." In discussing "options for reducing $CO_2$ build-up in the atmosphere," the study noted that although capturing $CO_2$ from flue gases (*i.e.*, exhaust gas produced by combustion) was technologically possible, the cost was high, and "energy conservation or shifting to renewable energy sources[] represent[ed] the only options that might make sense."[88]

68.     Thus, by 1981, Exxon and other fossil fuel companies were actively monitoring all aspects of $CO_2$ and global warming research, and Exxon had recognized that a shift away from fossil fuels and towards renewable energy sources would be necessary to avoid a large $CO_2$ build-up in the atmosphere and resultant global warming.

69.     An Exxon scientist warned colleagues in a 1981 internal memorandum that "future developments in global data gathering and analysis, along with advances in climate modeling, may provide strong evidence for a delayed $CO_2$ effect of a truly substantial magnitude," and that under certain circumstances it would be "very likely that we will unambiguously recognize the threat by the year 2000."[89] The memo expressed concern about the potential effects of unabated $CO_2$ emissions from Defendants' fossil fuel products, saying, "it is distinctly possible that [Exxon Planning Division's] scenario will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the world's population)."[90]

70.     In 1981, Exxon stated its position on the growth of carbon dioxide in the atmosphere. According to Exxon, growing fossil fuel consumption would lead atmospheric $CO_2$

---

[88] *Id.*

[89] R.W. Cohen, *Memorandum to W. Glass on Possible Emission Consequences of Fossil Fuel Consumption* (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

[90] *Id.*

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

levels to double, and doubling $CO_2$ levels would lead to a global average temperature rise of 3°C. This would cause "[m]ajor shifts in rainfall/agriculture" and "polar ice may melt."[91]

71.    In 1982, another report prepared for API by climate scientists recognized that the atmospheric $CO_2$ concentration had risen significantly compared to the concentration at the beginning of the industrial revolution. It went further, warning that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."[92] Exxon's own modeling research confirmed this.[93] In a 1982 internal memorandum, Exxon's Corporate Research and Science Laboratories acknowledged a consensus "that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$°C [$5.4 \pm 2.7$ °F]" as well as "unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate[.]"[94]

72.    Also in 1982, Exxon's Environmental Affairs Manager distributed a primer on climate change to Exxon management; it was "restricted to Exxon personnel and not [to be]

---

[91] Henry Shaw, *CO2 Position Statement*, INSIDE CLIMATE NEWS (May 15, 1981) (footnote omitted), https://insideclimatenews.org/documents/exxon-position-co2-1981.

[92] *Climate Models and CO2 Warming: A Selective Review and Summary*, AM. PETROLEUM INST., at 4 (Mar. 1982), https://www.climatefiles.com/trade-group/american-petroleum-institute/api-climate-models-and-co2-warming-a-selective-review-and-summary/.

[93] *See* Roger W. Cohen, *Memorandum to A.M. Natkin Summarizing Climate Modeling and CO2 Greenhouse Effect Research*, EXXON RESEARCH AND ENGINEERING CO. (Sept. 2, 1982), https://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research/.

[94] *Id.* at 1.

distributed externally."[95] The primer explained the science behind climate change, confirmed fossil fuel combustion as a primary anthropogenic contributor to global warming, and estimated a $CO_2$ doubling by 2090 with a "Most Probable Temperature Increase" of more than 2°C over the 1979 level, as shown in the figure on the following page.[96] The report also warned that "disturbances in the existing global water distribution balance would have dramatic impact on soil moisture, and in turn, on agriculture," and that the American Midwest would become much drier. It further warned of "potentially catastrophic effects that must be considered[.]"[97] It concluded that "[a]ll biological systems are likely to be affected," and "the most severe economic effects could be on agriculture."[98]

---

[95] M.B. Glaser, *Memorandum to R.W. Cohen et al. re CO₂ "Greenhouse" Effect*, EXXON RESEARCH AND ENGINEERING CO., at 1 (Nov. 12, 1982), https://insideclimatenews.org/wp-content/uploads/2015/09/1982-Exxon-Primer-on-CO2-Greenhouse-Effect.pdf.

[96] *Id.* at 1, 7.

[97] *Id.* at 11.

[98] *Id.* at 14.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 6: Exxon's Internal Prediction of Future CO2 Increase and
Global Warming from 1982[99]**

73.     The report recommended studying "soil erosion, salinization, or the collapse of

irrigation systems" in order to understand how society might be affected and might respond to

global warming, as well as "[h]ealth effects" and "stress associated with climate related famine or

migration[.]"[100] The report estimated that undertaking "[s]ome adaptive measures" (but not all of

---

[99] *Id.* at 7. The company predicted a doubling of atmospheric carbon dioxide concentrations above
preindustrial levels by around 2090 (left curve), with a temperature increase of more than 2° Cover
the 1979 level (right curve).

[100] *Id.* at 14.

58

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

them) would cost "a few percent of the gross national product estimated in the middle of the next century" (gross national product was $25,640 billion in 2022).[101] To avoid such impacts, the report discussed a scientific analysis which studied energy alternatives and requirements for introducing them into widespread use, and which recommended that "vigorous development of non-fossil energy sources be initiated as soon as possible."[102] The primer also noted that the analysis indicated that other greenhouse gases related to fossil fuel production, such as methane (which is a more powerful GHG than $CO_2$), "may significantly contribute to a global warming," and that concerns over $CO_2$ would be reduced if fossil fuel use were decreased due to "high price, scarcity, [or] unavailability."[103] "Mitigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion," the primer stated.[104] The primer was widely distributed to Exxon leadership.

74.    In September 1982, the Director of Exxon's Theoretical and Mathematical Sciences Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology to summarize Exxon's internal research on climate modeling.[105] Mr. Cohen reported:

> [O]ver the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$. The consensus is that a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ °C .... The temperature rise is predicted to be distributed nonuniformly over the earth, with above-average temperature elevations in the polar regions and relatively small increases near the equator. There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere. The time required for doubling of atmospheric $CO_2$ depends on future world consumption of fossil fuels. Current projections indicate that doubling will occur sometime in the latter half of the 21st century. The models predict that $CO_2$ climate

---

[101]    *Id.; see also Gross National Product*, FED. RESERVE BANK OF ST. LOUIS https://fred.stlouisfed.org/series/GNPA (last visited Nov. 15, 2023).

[102]    Glaser, *supra* note 95 at 18.

[103]    *Id.* at 18, 29.

[104]    *Id.* at 2.

[105]    Cohen, *supra* note 89.

changes should be observable well before doubling. It is generally believed that the first $CO_2$-induced temperature increase will not be observable until around the year 2000.

Mr. Cohen described Exxon's own climate modeling experiments, reporting that they produced "a global averaged temperature increase that falls well within the range of the scientific consensus," which were "consistent with the published predictions of more complex climate models," and were "also in agreement with estimates of the global temperature distribution during a certain prehistoric period when the earth was much warmer than today." "In summary," Mr. Cohen wrote, "the results of our research are in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."

75.     Throughout the early 1980s, at Exxon's direction, Exxon climate scientist Henry Shaw forecasted emissions of $CO_2$ from fossil fuel use. Those estimates were incorporated into Exxon's twenty-first century energy projections and were distributed among Exxon's various divisions. Mr. Shaw's conclusions included an expectation that atmospheric $CO_2$ concentrations would double in 2090 per the Exxon model, with an attendant 2.3–5.6°F average global temperature increase.[106]

76.     During the 1980s, many Defendants formed their own research units focused on climate modeling. API, including the API $CO_2$ Task Force, provided a forum for the Fossil Fuel Defendants to share their research efforts and corroborate their findings related to anthropogenic GHG emissions.[107]

---

[106] Neela Banerjee, *More Exxon Documents Show How Much It Knew About Climate 35 Years Ago*, INSIDE CLIMATE NEWS (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-executives-engage-and-warming-forecast/.

[107] Banerjee, *supra* note 77.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

77. In 1987, Shell published an internal "brief for companies of the Royal Dutch/Shell Group," which includes its U.S. based subsidiaries, titled "Air pollution: an oil industry perspective," in which the company described the greenhouse effect, occurring "largely as a result of the burning of fossil fuels and deforestation."[108] And it acknowledged the "concern that further increases in carbon dioxide levels could cause climatic changes, notably a rise in overall temperature, having major environmental, social and economic consequences."[109]

78. In 1988, the Shell Greenhouse Effect Working Group issued a confidential internal report, "The Greenhouse Effect," which acknowledged global warming's anthropogenic nature: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect." The authors also noted the burning of fossil fuels as a primary driver of $CO_2$ buildup and warned that warming could "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." They further pointed to the potential for "direct operational consequences" of sea level rise on "offshore installations, coastal facilities and operations (*e.g.*, platforms, harbors, refineries, depots)."[110]

79. The Shell report noted that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The authors mentioned the need to consider policy changes, noting that "the potential implications for the world are . . . so large that policy options need to be considered much earlier,"

---

[108] Shell Briefing Service, *Air pollution: an oil industry perspective* 4 (1987), https://www.documentcloud.org/documents/24359057-shell-briefing-service-air-pollution-an-oil-industry-perspective-nr1-1987.

[109] *Id.* at 5.

[110] *The Greenhouse Effect*, SHELL INTERNATIONALE PETROLEUM, at 1, 27 (May 1988) https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[111]

80.    Shell wrote a confidential report in 1989 that modeled $CO_2$ emissions under "SUSTAINABLE WORLD" and "GLOBAL MERCANTILISM" scenarios. The report noted that "SUSTAINABLE WORLD will not prevent the problem arising, but it could mitigate the problem," and predicted that "GLOBAL MERCANTILISM" would "most dramatically change[]" agricultural patterns and "disrupt[] eco-systems."[112] It also predicted effects on humanity: "The potential refugee problem in GLOBAL MERCANTILISM could be unprecedented. . . . Conflicts would abound. Civilisation could prove a fragile thing. The logic of SUSTAINABLE WORLD is a society choosing to channel some investments into environmental maintenance against this contingency."[113]

81.    Shell even predicted in 1989, in its confidential scenario planning, that minimizing emissions to prevent global warming would in turn spur innovation necessary to mitigate climate change. It stated that conditions surrounding emissions reduction "foster[] R&D, aiding innovation necessary to meet environmental standards." Shell predicted that under this scenario, there would be innovation in structural materials to support "energy conservation and transport efficiency," and advances in lubricants would support "efficiency rather than performance."[114]

---

[111] *Id.* at 1, 6.

[112] *Id.* at 35-36.

[113] Shell, SCENARIOS: 1989–2010: CHALLENGE AND RESPONSE, at 35-36 (1989), https://www.documentcloud.org/documents/23735737-1989-oct-confidential-shell-group-planning-scenarios-1989-2010-challenge-and-response-disc-climate-refugees-and-shift-to-non-fossil-fuels.

[114] *See* Shell UK, UK SCENARIOS 1989 (Nov. 1989), https://embed.documentcloud.org/documents/24359062-snippets-of-confidential-shell-uk-november-1989-scenarios.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

82.     In 1991, a researcher for Exxon's subsidiary Imperial Oil stated to an audience of engineers that greenhouse gases were rising "due to the burning of fossil fuels. . . . Nobody disputes this fact."[115]

83.     Also in 1991, BP released a short film called "The Earth – What Makes Weather?" In it, a narrator states: "Our . . . dependence on carbon-based fuels is now a cause for concern. When coal, oil or gas are burned, they release carbon dioxide and other reactive gases." The narrator then went on to explain:

> As the earth gives off heat, carbon dioxide, together with water vapor, absorbs and radiates it back, acting like a blanket. . . . If world population growth is matched by energy consumption, even more carbon dioxide will be released, making this greenhouse effect even stronger. An overall increase in temperature of even a few degrees could disrupt our climate with devastating consequences. If the oceans got warmer and the ice sheets began to melt, sea levels would rise, encroaching on coastal lowlands. From warmer seas, more water would evaporate, making storms and the havoc they cause more frequent. . . . Catastrophic floods could become commonplace, and low-lying countries like Bangladesh would be defenseless against them. Too much water or too little. Away from the coasts we could see a return to the conditions which devastated America's Midwest in the 1930s. Global warming could repeat on a more disastrous scale the dustbowl phenomenon which virtually destroyed farming on the Great Plains. . . . The threat of such climatic change is now one of our most urgent concerns.[116]

The film was not widely distributed.

84.     The fossil fuel industry was at the forefront of carbon dioxide research for much of the latter half of the twentieth century. It worked with many of the field's top researchers to produce exceptionally sophisticated studies and models. For instance, in the mid-1990s, Shell began developing and employing scenarios to plan how the company could respond to various

---

[115] Sara Jerving et al., *Special Report: What Exxon Knew About Global Warming's Impact on the Arctic*, L.A. TIMES (Oct. 10, 2015, 12:00 AM PT), https://www.latimes.com/business/la-na-adv-exxon-arctic-20151011-story.html.

[116] Vatan Hüzeir, *BP Knew the Truth About Climate Change 30 Years Ago*, FOLLOW THE MONEY (May 26, 2020), https://www.ftm.nl/artikelen/bp-video-climate-change-1990-engels; *see also This Earth – What Makes Weather?*, BP VIDEO LIBRARY (Jan. 1, 1991), https://www.bpvideolibrary.com/record/463.

global forces in the future. In one scenario, published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the US. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry, or the government. After all, two successive IPCC reports since 1995 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[117]

85. Fossil fuel companies did not just consider climate change impacts in scenarios; they also incorporated those impacts in their on-the-ground planning. In the mid-1990s, Exxon, Shell, and Imperial Oil (Exxon) jointly undertook the Sable Offshore Energy Project in Nova Scotia. The project's own Environmental Impact Statement declared, "The impact of a global warming sea-level rise may be particularly significant in Nova Scotia. The long-term tide gauge records at a number of locations along the N.S. coast have shown sea level has been rising over the past century. . . . For the design of coastal and offshore structures, an estimated rise in water level, due to global warming, of 0.5 m [1.64 feet] may be assumed for the proposed project life (25 years)."[118]

86. Climate change research conducted by Defendants and their industry associations frequently acknowledged uncertainties in their climate modeling. Those uncertainties, however,

---

[117] *Group Scenarios 1998–2020*, at 115, 118 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html.

[118] *Sable Project Development Plan: Environmental Impact Statement*, EXXONMOBIL, at 4-77 (Feb. 1996), https://web.archive.org/web/20151106083051/http://soep.com/about-the-project/development-plan-application/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

were largely with respect to the magnitude and timing of climate impacts resulting from fossil fuel consumption, not with respect to whether significant changes would eventually occur. Defendants' researchers and the researchers at their industry associations harbored little doubt that climate change was occurring and that fossil fuel products were, and are, the primary cause.

87.     Despite the overwhelming information about the threats to people and the planet posed by the continued unabated use of their fossil fuel products, the Fossil Fuel Defendants failed to act as they reasonably should have to avoid or mitigate those dire adverse impacts. The Fossil Fuel Defendants instead undertook affirmative efforts to promote their fossil fuel products as safe and cast doubt in the public's mind about the burgeoning scientific consensus on climate change, as described below. This was an abdication of the Fossil Fuel Defendants' responsibility to consumers and the public, including the City, to act on their knowledge of the reasonably foreseeable hazards of unabated production and consumption of their fossil fuel products.

**C.      Defendants Did Not Disclose Known Harms Associated with the Intended Use of Fossil Fuel Products, and Instead Affirmatively Concealed Those Harms by Engaging in a Campaign of Deception to Increase the Use of Those Products.**

88.     By 1988, Defendants had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, specifically those emitted from the use of fossil fuel products, in causing climate change and its cascading impacts, including disruptions to the hydrologic cycle, extreme precipitation, extreme drought, increasing temperatures, and associated consequences for human communities and the environment.

89.     On notice that their products were causing global climate change and dire effects on the planet, Defendants faced the decision whether to take steps to limit the damage that the use of fossil fuel products was causing and would continue to cause Earth's inhabitants, including the people of Chicago. Before or thereafter, Defendants could and reasonably should have taken any number of steps to mitigate the damage caused by the use of fossil fuel products. Their own

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

comments reveal an awareness of what steps should have been taken. In particular, Defendants should have warned civil society and Chicago consumers of the dangers known to Defendants of the unabated use of fossil fuel products, and they could and should have taken reasonable steps to limit the greenhouse gases emitted by use of fossil fuel products. Instead, the actions necessary to mitigate the significant climate harms to the City were wrongfully delayed by Defendants' deception. Simply put, Defendants should have issued warnings commensurate with their own understanding of the risks posed by the expected and intended uses of fossil fuel products.

90.    Not only did Defendants fail to issue any warnings, but several key events during the period between 1988 and 1992 prompted them to change their tactics from general research and internal discussion on climate change to a public campaign aimed at deceiving consumers and the public, including the inhabitants of Chicago. These key events included the following:

a.    In 1988, National Aeronautics and Space Administration ("NASA") scientists confirmed that human activities were contributing to global warming. On June 23, 1988, NASA scientist James Hansen's presentation of this information to Congress engendered significant news coverage and publicity for the announcement, including coverage on the front page of *The New York Times*.[119]

b.    On July 28, 1988, Senator Robert Stafford and four bipartisan co-sponsors introduced S. 2666, "The Global Environmental Protection Act," to regulate $CO_2$ and other greenhouse gases. Three more bipartisan bills to significantly reduce $CO_2$ pollution were introduced over the following ten weeks, and in August, U.S. Presidential candidate George H.W. Bush pledged that his presidency would combat the greenhouse effect with "the White House

---

[119] *See* Peter C. Frumhoff et al., *The climate responsibilities of industrial carbon producers* 132 CLIMATIC CHANGE 157, 161 (2015), http://dx.doi.org/10.1007/s10584-015-1472-5.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

effect."[120] Political will in the United States to reduce anthropogenic GHG emissions and mitigate the harms associated with Defendants' fossil fuel products was gaining momentum.

      c.     In December 1988, the United Nations formed the IPCC, a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts.

      d.     In 1990, the IPCC published its First Assessment Report on anthropogenic climate change,[121] which concluded that (1) "there is a natural greenhouse effect which already keeps the Earth warmer than it would otherwise be," and (2) that

> emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases: carbon dioxide, methane, chlorofluorocarbons (CFCs) and nitrous oxide. These increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface. The main greenhouse gas, water vapour, will increase in response to global warming and further enhance it.[122]

The IPCC reconfirmed those conclusions in a 1992 supplement to the First Assessment Report.[123]

      e.     The United Nations held the 1992 Earth Summit in Rio de Janeiro, Brazil, a major, newsworthy gathering of over 170 world governments, of which more than 100 sent their heads of state. The Summit resulted in the United Nations Framework Convention on Climate Change, an international environmental treaty providing protocols for future negotiations aimed at

---

[120] *The White House and the Greenhouse*, N.Y. TIMES (May 9, 1989), http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html.

[121] *See Reports*, IPCC, https://www.ipcc.ch/reports/ (last visited Nov. 15, 2023).

[122] J.T. Houghton et al., *Climate Change: The IPCC Scientific Assessment*, IPPC (1990) https://www.ipcc.ch/report/ar1/wg1/.

[123] *Climate Change: The 1990 and 1992 IPCC Assessments*, THE INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, at 52 (1992) https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.

"stabiliz[ing] greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."[124]

91.    Defendants' campaign of deception focused on concealing, discrediting, and/or misrepresenting information that tended to support restricting the use of fossil fuels and transitioning society to a lower-carbon future, which would thereby decrease demand for the Fossil Fuel Defendants' products. The campaign enabled the Fossil Fuel Defendants to continue their business practice of exploiting fossil fuel reserves and concurrently externalize the social and environmental costs of their fossil fuel products. Those activities ran counter to Defendants' own prior recognition that the science of anthropogenic climate change was clear, and that action was needed to avoid or mitigate dire consequences to the planet and to communities like Chicago's.

92.    The Fossil Fuel Defendants—both on their own and jointly through industry and front groups such as API and the GCC—funded, conceived, planned, and carried out a sustained and widespread campaign of denial and disinformation about the existence of climate change and their products' contribution to it. The campaign included a long-term pattern of direct misrepresentations and material omissions, as well as a plan to influence consumers indirectly by affecting public opinion through the dissemination of misleading information to the press, government, and academia. Although the Fossil Fuel Defendants were competitors in the marketplace, they combined and collaborated with each other and with API on this public campaign to misdirect and stifle public knowledge in order to increase sales and protect profits. This effort included promoting hazardous fossil fuel products through advertising campaigns that failed to warn of the existential risks associated with the use of those products and that were

---

[124] *United Nations Framework Convention on Climate Change*, UNITED NATIONS, at 4 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

designed to influence consumers to continue using the Fossil Fuel Defendants' fossil fuel products, irrespective of those products' damage to communities, like that of Chicago, and the environment.

93.     In a secretly-recorded video from 2021, an Exxon executive stated:

> Did we aggressively fight against some of the science? Yes.
> Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.
> We were looking out for our investments. We were looking out for our shareholders."[125]

94.     For example, in 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon was "providing leadership through API in developing the petroleum industry position" on "the greenhouse effect."[126] He then went on to describe the "Exxon Position," which included two important messaging tenets, among others: (1) "[e]mphasiz[ing] the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse effect"; and (2) "[r]esist[ing] the overstatement and sensationalization of potential Greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[127]

95.     Reflecting on his time as an Exxon consultant in the 1980s, Professor Martin Hoffert, a former New York University physicist who researched climate change, expressed regret over Exxon's "climate science denial program campaign" in his sworn testimony before Congress:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated $CO_2$ is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly

---

[125] Jeff Brady, *Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push*, NPR (July 1, 2021, 11:37 AM ET), https://www.npr.org/2021/07/01/1012138741/exxon-lobbyist-caught-on-video-talks-about-undermining-bidens-climate-push.

[126] Joseph M: Carlson, *Memorandum re The Greenhouse Effect*, at 7 (Aug. 3, 1988) https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.

[127] *Id.* at 7-8.

distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[128]

96.     "Shell shaped a series of influential industry-backed publications that downplayed or omitted key risks; emphasized scientific uncertainties; and pushed for more fossil fuels, particularly coal."[129] In 1992, Shell put out a publication for wide external distribution on what it called the "Basic Scientific Facts" of the "Potential Augmented Greenhouse Effect," in which it downplayed the scientific consensus by referring to the "relatively few established scientific fundamentals." It also misleadingly suggested that a "particular cause" of global warming was "difficult" to identify, despite having identified the use of their products as a significant contributor in the previous decade.[130] For example, in 1985, a Shell UK environmental scientist published an article laying out the scientific fact that "[b]urning of fossil fuels which have taken millions of years to form has effectively upset the balance [of the Carbon Cycle] leading to an increase in $CO_2$ in the atmosphere."[131]

---

[128] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change: Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Civil Rights and Civil Liberties*, 116th Cong., 1st Sess., at 7-8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant), https://www.congress.gov/event/116th-congress/house-event/110126.

[129] Matthew Green, *Lost Decade: How Shell Downplayed Early Warnings Over Climate Change*, DESMOG (Mar. 31, 2023, 21:00 PDT), https://www.desmog.com/2023/03/31/lost-decade-how-shell-downplayed-early-warnings-over-climate-change/.

[130] *See* Jan Kuyper, *Shell Group Planning, Business Environment Occasional Paper, Potential Augmented Greenhouse Effect: Basic Scientific Facts* (Sept. 1992), https://www.documentcloud.org/documents/24359060-1992-internal-shell-group-planning-report-potential-augmented-greenhouse-effect-and-depletion-of-the-ozone-layer.

[131] T.G. Wilkinson, *Why and How to Control Energy Pollution: Can Harmonisation Work?*, 8 CONSERVATION & RECYCLING 7, 19 (1985), https://www.documentcloud.org/documents/24359067-1985-03-why-and-how-to-control-energy-pollution-by-tg-wilkinson-shell.

97.     A 1994 Shell report entitled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects" by Royal Dutch Shell's Peter Langcake stands in stark contrast to the company's 1988 report on the same topic. Whereas before the authors had recommended consideration of policy solutions early on, Mr. Langcake warned of the potentially dramatic "economic effects of ill-advised policy measures." While the report recognized the IPCC conclusions as the mainstream view, Mr. Langcake still emphasized scientific uncertainty, noting, for example, that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural climate variability, which is still largely unpredictable." The Shell position is stated clearly in the report: "Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets."[132] Shell published further reports in 1995 titled "Is Climate Change Occurring Already?" and "Climate of Concern," both of which emphasized uncertainty surrounding the greenhouse effect that Shell's own internal analyses had rejected.[133]

98.     In 1996, Exxon released a publication called "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." In the publication's preface, Exxon CEO Lee Raymond inaccurately stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand the climate system." The publication described the greenhouse effect as "unquestionably real and definitely a

---

[132] P. Langcake, *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects*, SHELL INTERNATIONALE PETROLEUM, at 1, 9, 14 (updated Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511.

[133] *A Crack in the Shell: New Documents Expose a Hidden Climate History*, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW, at 10-11 (2018), https://www.ciel.org/wp-content/uploads/2018/04/A-Crack-in-the-Shell-April-2018.pdf.

good thing," while ignoring the severe consequences that would result from the influence of the increased $CO_2$ concentration on the Earth's climate. Instead, it characterized the greenhouse effect as simply "what makes the earth's atmosphere livable." Directly contradicting Exxon's own internal knowledge and peer-reviewed science, the publication ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods of time" rather than to the anthropogenic emissions that Exxon itself and other scientists had confirmed were responsible. The publication also falsely challenged the computer models that projected the future impacts of unabated fossil fuel product consumption, including those developed by Exxon's own employees, as having been "proved to be inaccurate." The publication contradicted the numerous reports prepared by and circulated among Exxon's staff, and by API, stating that "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the U.S., so a slightly warmer climate would be more healthful." Mr. Raymond concluded his preface by attacking advocates for limiting the use of his company's fossil fuel products as "drawing on bad science, faulty logic or unrealistic assumptions"—despite the important role that Exxon's own scientists had played in compiling those same scientific underpinnings.[134]

99.    API published an extensive report in the same year warning against concern over $CO_2$ buildup and any need to curb consumption. The introduction stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil."[135] The authors discouraged the further development of certain alternative energy sources, writing that

---

[134] *Global Warming: Who's Right?*, EXXON CORP., at 3, 5-7, (1996) https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html.

[135] Sally Gentille et al., *Reinventing Energy: Making the Right Choices*, AM. PETROLEUM INST., at 2, 11, 63, 79, (1996) https://www.documentcloud.org/documents/4224133-Reinventing-Energy.

72

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"government agencies have advocated the increased use of ethanol and the electric car, without the facts to support the assertion that either is superior to existing fuels and technologies" and that "[p]olicies that mandate replacing oil with specific alternative fuel technologies freeze progress at the current level of technology, and reduce the chance that innovation will develop better solutions."[136] The paper also denied the human connection to climate change, by falsely stating that "no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms."[137] The report's message was false but clear: "facts don't support the arguments for restraining oil use."[138]

100.    In a speech presented at the World Petroleum Congress in Beijing in 1997 at which many of the Defendants were present, Exxon CEO Lee Raymond reiterated those views. This time, he presented a false dichotomy between stable energy markets and abatement of the marketing, promotion, and sale of fossil fuel products Defendants knew to be hazardous. He stated:

> [S]ome people . . . argue that we should drastically curtail our use of fossil fuels for environmental reasons . . . my belief [is] that such proposals are neither prudent nor practical. With no readily available economic alternatives on the horizon, fossil fuels will continue to supply most of the world's and this region's energy for the foreseeable future.
>
> . . . .
>
> Governments also need to provide a stable investment climate . . . . They should avoid the temptation to intervene in energy markets in ways that give advantage to one competitor over another—or one fuel over another.
>
> . . . .
>
> We also have to keep in mind that most of the greenhouse effect comes from natural sources . . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the

---

[136] *Id.* at 2, 11.

[137] *Id.* at 63.

[138] *Id.* at 79.

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.

. . . .

[L]et's agree there's a lot we really don't know about how climate will change in the 21st century and beyond . . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. . . . It's bad public policy to impose very costly regulations and restrictions when their need has yet to be proven.[139]

101.    Imperial Oil (Exxon) CEO Robert Peterson falsely denied the established connection between the Fossil Fuel Defendants' fossil fuel products and anthropogenic climate change in an essay in the Summer 1998 issue of Imperial Oil's magazine, "Imperial Oil Review":

[Climate change] has absolutely nothing to do with pollution and air quality. Carbon dioxide is not a pollutant but an essential ingredient of life on this planet. . . . [T]he question of whether or not the trapping of "greenhouse" gases will result in the planet's getting warmer . . . has no connection whatsoever with our day-to-day weather.

. . . .

There is absolutely no agreement among climatologists on whether or not the planet is getting warmer or, if it is, on whether the warming is the result of man-made factors or natural variations in the climate. . . . I feel very safe in saying that the view that burning fossil fuels will result in global climate change remains an unproved hypothesis.[140]

102.    Mobil (Exxon) paid for a series of "advertorials," advertisements located in the editorial section of *The New York Times* and meant to look like editorials rather than paid advertisements. Many of those advertorials communicated doubt about the reality and severity of

---

[139] Lee R. Raymond, *Energy – Key to growth and a better environment for Asia-Pacific nations*, WORLD PETROLEUM CONGRESS (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.

[140] Robert Peterson, *A Cleaner Canada*, IMPERIAL OIL REV., at 29 (1998) https://www.documentcloud.org/documents/6555577-1998-Robert-PetersonA-Cleaner-Canada-Imperial.html.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

human-caused climate change, even as industry scientists contemporaneously reiterated that climate change was real, serious, and caused by human activity. The advertisements addressed various aspects of the public discussion of climate change and sought to undermine the justifications for tackling GHG emissions as unsettled science. The 1997 advertorial on the following page argued that economic analysis of emissions restrictions was faulty and inconclusive and therefore provided a justification for delaying action on climate change.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024



# When facts
## don't square with the theory, throw out the facts

That seems to characterize the administration's attitude on two of its own studies which show that international efforts to curb global warming could spark a big run-up in energy prices.

For months, the administration—playing its cards close to the vest—has promised to provide details of the emission reduction plan it will put on the table at the climate change meeting in Kyoto, Japan, later this year. It also promised to evaluate the economics of that policy and measure its impact. Those results are important because the proposals submitted by other countries thus far would be disruptive and costly to the U.S. economy.

Yet, when the results from its own economic models were finally generated, the administration started distancing itself from the findings and models that produced them. The administration's top economic adviser said that economic models can't provide a "definitive answer" on the impact of controlling emissions. The effort, she said, was "futile." At best, the models can only provide a "range of potential impacts."

Frankly, we're puzzled. The White House has promised to lay the economic facts before the public. Yet, the administration's top advisor said such an analysis won't be based on models and it will "preclude...detailed numbers." If you don't provide numbers and don't rely on models, what kind of rigorous economic examination can Congress and the public expect?

We're also puzzled by ambivalence over models. The administration downplays the utility of economic models to forecast cost impacts 10–15 years from now, yet its negotiators accept as gospel the 50–100-year predictions of global warming that have been generated by climate models—many of which have been criticized as seriously flawed.

The second study, conducted by Argonne National Laboratory under a contract with the Energy Department, examined what would

happen if the U.S. had to commit to higher energy prices under the emission reduction plans that several nations had advanced last year. Such increases, the report concluded, would result in "significant reductions in output and employment" in six industries—aluminum, cement, chemical, paper and pulp, petroleum refining and steel.

Hit hardest, the study noted, would be the chemical industry, with estimates that up to 30 percent of U.S. chemical manufacturing capacity would move offshore to developing countries. Job losses could amount to some 200,000 in that industry, with another 100,000 in the steel sector. And despite the substantial loss of U.S. jobs and manufacturing capacity, the net emission reduction could be insignificant since developing countries will not be bound by the emission targets of a global warming treaty.

Downplaying Argonne's findings, the Energy Department noted that the study used outdated energy prices (mid-1996), didn't reflect the gains that would come from international emissions trading and failed to factor in the benefits of accelerated developments in energy efficiency and low-carbon technologies.

What it failed to mention is just what these new technologies are and when we can expect their benefits to kick in. As for emissions trading, many economists have theorized about the role they could play in reducing emissions, but few have grappled with the practicality of implementing and policing such a scheme.

We applaud the goals the U.S. wants to achieve in these upcoming negotiations—namely, that a final agreement must be "flexible, cost-effective, realistic, achievable and ultimately global in scope." But until we see the details of the administration's policy, we are concerned that plans are being developed in the absence of rigorous economic analysis. Too much is at stake to simply ignore facts that don't square with preconceived theories.



**Mobil** The energy to make a difference.

http://www.mobil.com

© 1997 Mobil Corporation

**Figure 7: 1997 Mobil Advertorial[141]**

---

[141] *When Facts Don't Square with the Theory, Throw Out the Facts*, N.Y. TIMES (Aug. 14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

103.    Mobil ran the following advertorial in *The New York Times* in 1993:

# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it—paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists—65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, *The Heated Debate* (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon—and its impact on the economy—are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.



**Figure 8: 1997 Mobil Advertorial**

104.    The advertorial quotes Fred Singer, a physicist who tobacco companies funded to promote his claim that second-hand smoke did not cause cancer.

105. The advertisement also presents Robert C. Balling as another neutral scientific expert. Yet five years after Mobil ran this advertorial, Mr. Balling acknowledged that he had received $408,000 in funding from the fossil fuel industry, including from ExxonMobil.[142]

106. The advertorial misleadingly portrays the "Heidelberg Appeal" as evidence that there was insufficient scientific data for action on climate change. In fact, the Heidelberg Appeal did not discuss climate change or the validity of scientific reasoning or evidence showing that climate change is happening, is human-caused, and will cause severe environmental damage.[143]

107. Many other Exxon and Mobil advertorials falsely or misleadingly characterized the state of climate science research to the readership of *The New York Times*'s op-ed page. A sample of misleading or outright untruthful statements in paid advertisements that resembled op-eds includes the following:

> "We don't know enough about the factors that affect global warming and the degree to which—if any—that man-made emissions (namely, carbon dioxide) contribute to increases in Earth's temperature."[144]
>
> "[G]reenhouse-gas emissions, which have a warming effect, are offset by another combustion product—particulates—which leads to cooling."[145]
>
> "Even after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming."[146]

---

[142] *Determination 18*,. Minn. News Council (Apr. 16, 1998), http://www.mtn.org/~newscncl/complaints/hearings/det_118.html.

[143] *Heidelberg Appeal*, DESMOG, desmog.com/heidelberg-appeal/ (last visited Nov. 16, 2023).

[144] *Climate change: a prudent approach*, N.Y. TIMES (Nov. 13, 1997) https://www.documentcloud.org/documents/705548-mob-nyt-1997-11-13-climateprudentapproach.html.

[145] *Less heat, more light on climate change*, N.Y. TIMES (July 18, 1996) https://www.documentcloud.org/documents/705544-mob-nyt-1996-jul-18-lessheatmorelight.html.

[146] *Climate change: where we come out*, N.Y. TIMES (Nov. 20, 1997) https://www.documentcloud.org/documents/705549-mob-nyt-1997-11-20-ccwherewecomeout.html (emphasis in original).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"[I]t is impossible for scientists to attribute the recent small surface temperature increase to human causes."[147]

108.    A quantitative analysis of Exxon's climate communications between 1989 and 2004 found that, while 83 percent of the company's peer-reviewed papers and 80 percent of its internal documents acknowledged the reality and human origins of climate change, 81 percent of its advertorials communicated doubt about those conclusions.[148] Based on this "statistically significant" discrepancy between internal and external communications, the authors concluded that "ExxonMobil misled the public."[149]

109.    The Fossil Fuel Defendants' public campaign of deception was accomplished individually, through API, and through various other trade associations and front groups. This campaign was mounted in order to allow Fossil Fuel Defendants to continue wrongfully promoting and marketing their fossil fuel products, despite their own knowledge and the growing national and international scientific consensus about the hazards of doing so.

110.    One of the key organizations formed by the Fossil Fuel Defendants to coordinate the fossil fuel industry's response to the world's growing awareness of climate change was the International Petroleum Industry Environmental Conservation Association ("IPIECA"). In 1988, IPIECA formed a "Working Group on Global Climate Change" chaired by Duane LeVine, Exxon's manager for science and strategy development. The Working Group also included Brian Flannery from Exxon, Leonard Bernstein from Mobil, Terry Yosie from API, and representatives

---

[147]    *Unsettled    Science*,    N.Y.    TIMES,    (Mar.    23,    2000), https://www.documentcloud.org/documents/705605-xom-nyt-2000-3-23-unsettledscience.

[148] Geoffrey Supran & Naomi Oreskes, *Addendum to 'Assessing ExxonMobil's climate change communications (1977–2014)'*, 12 ENV'T RSCH. LETTERS 084019, at 8 (2020) https://iopscience.iop.org/article/10.1088/1748-9326/aa815f/pdf.

[149] *Id.* at 15.

from BP, Shell, and Texaco (Chevron). In 1990, the Working Group sent a strategy memo created by Mr. LeVine to IPIECA member companies. This memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in climate science, call for further research, and promote industry-friendly policies that would leave the fossil fuel business intact.[150]

111.    In 1991, the Information Council for the Environment ("ICE"), whose members included Defendants, launched a national climate change science denial campaign with full-page newspaper advertisements, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. The campaign's top strategy was to "[r]eposition global warming as theory (not fact)." Its target audiences included younger, lower-income women who "are likely to be 'green' consumers, to believe the earth is warming, and to think the problem is serious . . . These women are good targets for magazine advertisements.[151]

112.    The campaign planned to "use a spokesman from the scientific community" based on consumer research that found "technical and expert sources have the highest credibility among a broad range of members of the public."[152]

113.    The following images are examples of ICE-funded print advertisements challenging the validity of climate science and intended to obscure the scientific consensus on anthropogenic climate change.[153]

---

[150] Christopher Bonneuil et al., *Early warnings and emerging accountability: Total's responses to global warming, 1971-2021*, 71 GLOBAL ENV'T. CHANGE 102386, at 5 (2021) https://www.sciencedirect.com/science/article/pii/S0959378021001655.

[151] *Climate Deception Dossier*, INFORMATION COUNCIL FOR THE ENV'T (May 15, 1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

[152] *Id.*

[153] *Id.* at 47-49.

80

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 9: Information Council for the Environment Advertisements**

114. The GCC, on behalf of the Fossil Fuel Defendants and other fossil fuel companies, also funded deceptive advertising campaigns and distributed misleading material to generate public uncertainty around the climate debate, seeking to prevent U.S. adoption of a 1997 international agreement to limit and reduce GHG emissions known as the Kyoto Protocol and thereby inflate the market for fossil fuels, despite the leading role that the U.S. had played in negotiating the Protocol.[154] The GCC's position on climate change contradicted decades of its members' internal scientific reports by asserting that natural trends, not human combustion of fossil fuels, were responsible for rising global temperatures:

> The GCC believes that the preponderance of the evidence indicates that most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is an anthropogenic component to this

---

[154] Robert J. Brulle, *Advocating inaction: a historical analysis of the Global Climate Coalition*, ENV'T POLITICS, at 2, 13-14 (2022) https://cssn.org/wp-content/uploads/2022/04/GCC-Paper.pdf (Mr. Brulle notes in particular the effectiveness of the GCC in opposing the Kyoto protocol: "In one final compliment, the GCC's effectiveness was acknowledged in a meeting with White House staff on 21 June 2001. The talking points for that meeting noted that 'POTUS rejected Kyoto, in part, based on input from you.'").

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend.[155]

115.    The GCC's promotion of overt climate change skepticism also contravened its internal assessment that such theories lacked scientific support. Despite an internal primer acknowledging that various "contrarian theories" (*i.e.*, climate change skepticism) "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change,"[156] the GCC excluded this section from the publicly released version of the backgrounder,[157] and instead funded and promoted some of those same contrarian theories. Between 1989 and 1998, the GCC spent $13 million on advertisements as part of a campaign to obfuscate the facts and the science relating to climate change and undermine the public's trust in climate scientists.[158] Ultimately, the GCC's efforts "created an influential discourse of climate skepticism in the U.S. that continues to be an influential political current."[159]

116.    For example, in a 1994 report, the GCC stated that "observations have not yet confirmed evidence of global warming that can be attributed to human activities," and that "[t]he

---

[155] *Global Climate Coalition: An Overview*, GLOBAL CLIMATE COALITION, at 2 (1996) https://www.documentcloud.org/documents/5453339-1996-GCC-Overview-and-Reports.

[156] Gregory J. Dana, *GLOBAL CLIMTE COALITION (GCC) – Primer on Climate Change Science – Final Draft*, ASSOC. OF INT'L AUTO. MFRS. (Jan. 18, 1996) http://www.webcitation.org/6FyqHawb9 (providing a "Primer on Climate Change Science" developed by the GCC).

[157] *See* Gregory J. Dana, *GLOBAL CLIMATE COALITION (GCC) – Science and Technology Assessment Committee (STAC) Meeting – February 15, 1996 – Summary*, ASSOC. OF INT'L AUTO. MFRS., at 7 (Feb. 27, 1996) https://www.documentcloud.org/documents/5631461-AIAM-050835.html ("Most suggestions [at the STAC meeting] had been to drop the 'contrarian' part. This idea was accepted and that portion of the paper will be dropped.").

[158] Wendy E. Franz, *Science, skeptics and non-state actors in the greenhouse*, BELFER CENTER FOR SCIENCE & INT'L AFFAIRS, at 13 (Sept. 1998) https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[159] Marten Boon, *A Climate of Change? The Oil Industry and Decarbonization in Historical Perspective*, 93 BUS. HISTORY REV. 101, 110 (2019).

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

claim that serious impacts from climate change have occurred or will occur in the future simply has not been proven," so "there is no basis for the design of effective policy actions that would eliminate the potential for climate change."[160] In 1995, the GCC published a booklet called "Climate Change: Your Passport to the Facts," which stated, "While many warnings have reached the popular press about the consequences of a potential man-made warming of the Earth's atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous warming will actually occur."[161]

117.   In 1997, William O'Keefe, chairman of the GCC and executive vice president of API, made the following false statement in a *Washington Post* op-ed: "Climate scientists don't say that burning oil, gas, and coal is steadily warming the earth."[162] This statement contradicted the established scientific consensus as well as Defendants' own knowledge. Yet Defendants did nothing to correct the public record, and instead continued to fund the GCC's anti-scientific climate skepticism.

118.   In addition to publicly spreading false and misleading information about the climate science consensus, the GCC also sought to undermine credible climate science from within the IPCC. After becoming a reviewer of IPCC's Second Assessment Report in 1996, the GCC used its position to accuse the lead author of a key chapter in the Report of modifying the chapter's conclusions. The GCC claimed that the author, climatologist Ben Santer, had engaged in

---

[160] *Issues and Options: Potential Global Climate Change*, GLOBAL CLIMATE COALITION, at preface, 43 (Apr. 1994) https://www.documentcloud.org/documents/5628164-Potential-Global-Climate-Change-Issues-and-Options.

[161] *Climate Change: Your Passport to the Facts*, GLOBAL CLIMATE COALITION (1995) https://www.documentcloud.org/documents/5628109-Climate-Change-Your-Passport-to-the-Facts.

[162] William F. O'Keefe, *A Climate Policy*, WASH. POST (July 5, 1997), https://www.washingtonpost.com/archive/opinions/1997/07/05/a-climate-policy/6a11899a-c020-4d59-a185-b0e7eebf19cc/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"scientific cleansing" that "understate[d] uncertainties about climate change causes and effects . . . to increase the apparent scientific support for attribution of changes to climate to human activities."[163] The GCC also arranged to spread the accusation among legislators, reporters, and scientists, and similar accusations were published in a *Wall Street Journal* op-ed.[164] This effort "was widely perceived to be an attempt on the part of the GCC to undermine the credibility of the IPCC."[165]

119.    In the late 1990s, Defendants shifted away from openly denying anthropogenic warming and toward peddling a subtler form of climate change skepticism. Defendants became alarmed by the enormous legal judgments the tobacco industry then faced as a result of decades spent publicly denying the health risks of smoking cigarettes; a Shell employee explained that the company "didn't want to fall into the same trap as the tobacco companies who have become trapped in all their lies."[166] Defendants began to shift their communications strategy, claiming they had accepted climate science all along.[167] Several large fossil fuel companies, including BP and Shell, left the GCC (although all the Fossil Fuel Defendants remained members of API).[168] At this point in time, Defendants publicly claimed to accept the reality of anthropogenic climate change, while insisting that the costs of climate action were unacceptably high in light of the yet-unresolved uncertainties in climate science—especially around the severity and timeframe of future climate

---

[163] Franz, *supra* note 158, at 14.

[164] NAOMI ORESKES & ERIK M. CONWAY, MERCHANTS OF DOUBT: HOW A HANDFUL OF SCIENTISTS OBSCURED THE TRUTH ON ISSUES FROM TOBACCO SMOKE TO GLOBAL WARMING, 207 (Bloomsbury Press, 1st ed. 2011); *see also* S. Fred Singer, *Climate Change and Consensus*, 271 SCIENCE 581 (Feb. 2, 1996); Frederick Seitz, *A Major Deception on Global Warming*, THE WALL STREET J. (June 12, 1996, 12:01 AM ET) https://www.wsj.com/articles/SB834512411338954000.

[165] Franz, *supra* note 158, at 15.

[166] NATHANIEL RICH, LOSING EARTH: A RECENT HISTORY, 186 (MCD 1st ed., 2020).

[167] Bonneuil, *supra* note 150, at 6.

[168] *Id.*

impacts. Reflecting this new strategy, API Executive Vice President (and GCC chairman) William O'Keefe announced in November 1998 that "[w]e are committed to being part of the solution to the climate risk and to active participation in the debate to forge a clear, defensible policy." "[T]he debate is not about action or inaction," Mr. O'Keefe wrote, "but what set of actions is consistent with our state of knowledge and economic well-being."[169] Rather than publicly deny the need to address climate change, Defendants' new communications strategy sought to forestall policy actions that might decrease consumption of fossil fuel products.

120.    Despite their public about-face, Defendants surreptitiously continued to organize and fund programs designed to deceive the public about the weight and veracity of the climate science consensus. In 1998, API convened a Global Climate Science Communications Team ("GCSCT") whose members included Exxon's senior environmental lobbyist, an API public relations representative, and a federal relations representative from Chevron. There were no climate scientists on the GCSCT. Steve Milloy and his organization, The Advancement of Sound Science Coalition ("TASSC"), were founding members of the GCSCT. TASSC was an organization created by the tobacco industry to give the impression of a "grassroots" movement, which aimed to sow uncertainty by discrediting the scientific link between exposure to second-hand cigarette smoke and increased rates of cancer and heart disease. Philip Morris had launched TASSC on the advice of its public relations firm, which advised Philip Morris that the tobacco company itself would not be a credible voice on the issue of smoking and public health. TASSC also became a front group for the fossil fuel industry, using the same tactics it had honed while operating on behalf of tobacco companies to spread doubt about climate science.

---

[169] *API: U.S. oil industry recognizes climate change risk*, OIL & GAS J. (Nov. 2, 1998) https://www.ogj.com/home/article/17225896/api-us-oil-industry-recognizes-climate-change-risk.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

121. The GCSCT continued Defendants' efforts to deceive the public about the dangers of fossil fuel use by launching a campaign in 1998 to convince the public that the scientific basis for climate change was in doubt. The GCSCT "developed an action plan to inform the American public that science does not support the precipitous actions Kyoto would dictate [*i.e.*, reducing use of fossil fuels]." The multi-million-dollar, multi-year "Global Climate Science Communications Action Plan" sought, among other things, to do the following: (a) "[d]evelop and implement a national media relations program to inform the media about uncertainties in climate science"; (b) "to generate national, regional and local media coverage on the scientific uncertainties"; (c) "[d]evelop a global climate science information kit for media including peer-reviewed papers that undercut the 'conventional wisdom' on climate science"; (d) "[p]roduce . . . a steady stream of op-ed columns"; and (e) "[d]evelop and implement a direct outreach program to inform and educate members of Congress, state officials, . . . and school teachers/students about uncertainties in climate science" to "begin to erect a barrier against further efforts to impose Kyoto [Protocol]-like measures in the future."[170]

122. Exxon, Chevron, and API directed and contributed to the development of the plan, which plainly set forth the criteria by which the contributors would know when their efforts to manufacture doubt had been successful. "Victory," they wrote, "will be achieved when . . . average citizens 'understand' (recognize) uncertainties in climate science" and "recognition of uncertainties becomes part of the 'conventional wisdom.'"[171] In other words, the plan was part of

---

[170] Joe Walker, *Draft Global Climate Science Communications Plan*, at 4-9 (Apr. 3, 1998) https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[171] *Id.* at 4.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

Defendants' goal to use disinformation to plant doubt about the reality of climate change in an effort to maintain consumer demand for their fossil fuel products and their large profits.

123.    Soon after, API distributed a memo to its members illuminating API's and the Fossil Fuel Defendants' concern over the potential regulation of their fossil fuel products: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as 'strategic.'"[172] The API memo stressed many of the strategies that Defendants collectively utilized to combat the perception of fossil fuel products as hazardous. These strategies included the following:

    a.    Influencing the tenor of the climate change "debate" as a means to establish that greenhouse gas reduction policies like the Kyoto Protocol were not necessary to responsibly address climate change;

    b.    Maintaining strong working relationships between government regulators and communications-oriented organizations like the GCC, the Heartland Institute, and other groups carrying Defendants' message minimizing the hazards of the unabated use of fossil fuel products and opposing regulation thereof; and

    c.    Presenting Defendants' positions on climate change in domestic and international forums, including by presenting an "alternative" to the IPCC.

124.    In furtherance of the strategies described in these memoranda, Defendants made misleading statements about climate change, the relationship between climate change and fossil fuel products, and the urgency of the problem. Defendants made these statements in public fora and in advertisements published in newspapers and other media with substantial circulation in

---

[172] *Allegations of Political Interference with Government Climate Change Science: Hearing Before the Comm. on Oversight and Government Reform*, 110th Cong. 324 (Mar. 19, 2007) (statement of Philip A. Cooney), https://www.govinfo.gov/content/pkg/CHRG-110hhrg37415/html/CHRG-110hhrg37415.htm).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

Chicago, including national publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*.

125.    Another key strategy in Defendants' efforts to discredit the scientific consensus on climate change as well as the IPCC itself was to fund scientists who held fringe opinions. Those scientists obtained part or all of their research budget from the Fossil Fuel Defendants, either directly or through Fossil Fuel Defendant-funded organizations like API,[173] but frequently failed to disclose their funding sources.[174] Defendants intended for the research of scientists they funded to be distributed to and relied on by consumers when buying Fossil Fuel Defendants' products, including by consumers in Chicago.

126.    One such scientist, Dr. Wei-Hock ("Willie") Soon, received over $1.2 million from the fossil fuel industry, including Exxon and API. Dr. Soon did not disclose these funding sources on at least eleven published papers. "Dr. Soon, in correspondence with his corporate funders, described many of his scientific papers as 'deliverables' that he completed in exchange for their money."[175] Dr. Soon also took the highly unusual approach of contractually agreeing to allow donors to review his research before publication, and his housing institution, the Smithsonian Institute, agreed not to disclose the funding arrangement without prior permission from his fossil

---

[173] *See e.g.*, Willie Soon & Sallie Baliunas, *Proxy climatic and environmental changes of the past 1000 Years*, 23 CLIMATE RSCH. 89, 105 (2003), https://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[174] William Allman, *Climate Change Researcher Received Funds From Fossil Fuel Industry*, SMITHSONIAN MAG. (Feb. 26, 2015), https://www.smithsonianmag.com/smithsonianmag/smithsonian-climate-change-scientist-180954380/.

[175] Justin Gillis & John Schwarz, *Deeper Ties to Corporate Cash for Doubtful Climate Researcher*, THE N.Y. TIMES (Feb. 21, 2015), https://www.nytimes.com/2015/02/22/us/ties-to-corporate-cash-for-climate-change-researcher-Wei-Hock-Soon.html.

fuel donors.[176] This Defendant-funded research includes articles in scientific journals accusing the IPCC of overstating the negative environmental effects of carbon dioxide emissions and arguing that the sun is responsible for recent climate trends.

127.    Creating a false perception of disagreement in the scientific community (despite the consensus previously acknowledged within the industry) has evidently disrupted vital channels of communication between scientists and the public. A 2007 Yale University-Gallup poll found that while 71 percent of Americans personally believed global warming was happening, only 48 percent believed that there was a consensus among the scientific community, and 40 percent believed, falsely, that there was substantial disagreement among scientists over whether global warming was occurring.[177] Eight years later, a 2015 Yale-George Mason University poll found that "[o]nly about one in ten Americans understands that nearly all climate scientists (over 90 [percent]) are convinced that human-caused global warming is happening, and just half . . . believe a majority do."[178] Further, it found that 33 percent of Americans believe that climate change is mostly due to natural changes in the environment, in stark contrast to the 97 percent of peer-reviewed climate science papers that acknowledge that global warming is happening and at least partly human-caused.[179] The lack of progress, and indeed the regression, in the public's understanding of climate science over this period—during which Defendants professed to accept

---

[176] Kathy Mulvey et al., *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Disinformation*, UNION OF CONCERNED SCIENTISTS, at 6-9 (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf.

[177] *American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N (July 31, 2007), https://climatecommunication.yale.edu/publications/american-opinions-on-global-warming/.

[178] Anthony Leiserowitz et al., *Climate Change in the American Mind*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N (Oct. 2015), https://climatecommunication.yale.edu/wp-content/uploads/2015/11/Climate-Change-American-Mind-October-20151.pdf.

[179] *Id.*

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

the conclusions of mainstream climate science—demonstrates the success of Defendants' deception campaign in thwarting the dissemination of accurate scientific information to the public regarding the effects of the use of fossil fuels.

128.    Defendants have funded dozens of think tanks and front groups promoting climate change denial. These organizations include the Competitive Enterprise Institute, the Heartland Institute, Frontiers of Freedom, Committee for a Constructive Tomorrow, and the Heritage Foundation. According to the Union of Concerned Scientists, from 1998 to 2017, Exxon spent over $36 million funding numerous organizations misrepresenting the scientific consensus that fossil fuel products were causing climate change, sea level rise, and injuries to Chicago, among other communities.[180] Several Defendants have been linked to other groups that undermine the scientific basis linking fossil fuel products to climate change and sea level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

129.    Phillip Cooney, an attorney at API from 1996 to 2001, testified at a 2007 Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized fossil fuels' role in climate change.[181]

130.    In 2007, Exxon publicly reported: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in

---

[180] *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations*, UNION OF CONCERNED SCIENTISTS (2017), https://www.ucsusa.org/sites/default/files/attach/2019/ExxonMobil-Worldwide-Giving-1998-2017.pdf.

[181] *Allegations of Political Interference with Government Climate Change Science: Hearing Before the Comm. on Oversight and Government Reform*, 110th Cong. 324 (Mar. 19, 2007) (statement of Philip A. Cooney), https://www.govinfo.gov/content/pkg/CHRG-110hhrg37415/html/CHRG-110hhrg37415.htm).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

an environmentally responsible manner."[182] While Exxon acknowledged that funding climate denial was affecting the public debate on climate change, Exxon did not keep its promise to stop. Exxon continued to support groups denying climate science in 2008 and beyond.

131.    Beginning in 2015, journalists began to uncover mounting evidence of Defendants' campaign of deception. In September 2015, journalists at *Inside Climate News* reported that, as far back as the 1970s, Exxon had sophisticated knowledge of the causes and consequences of climate change and of the role its products played in contributing to climate change.[183]

132.    Between October and December 2015, several journalists at the Energy and Environment Reporting Project at Columbia University's Graduate School of Journalism and the *Los Angeles Times* also exposed the fact that, as far back as the 1970s, Exxon and other members of the fossil fuel industry had superior knowledge of the causes and consequences of climate change and the role their products played in causing it.[184]

133.    In November 2017, the Center for International Environmental Law issued a report revealing that Defendants, including API, had superior knowledge of the causes and consequences of climate change and the role fossil fuel products played in causing it as early as the 1970s.[185]

---

[182]    *2007 Corporate Citizenship Report*, EXXONMOBIL, at 41 (2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.

[183]    Neela Banerjee et al., *Exxon: The Road Not Taken*, INSIDE CLIMATE NEWS, https://insideclimatenews.org/project/exxon-the-road-not-taken/ (last visited Dec. 6, 2023).

[184]    The Los Angeles Times published a series of three articles between October and December 2015. *See* Jennings et al., *supra* note 52; Jerving et al., *supra* note 115; Lieberman & Rust, *supra* note 52.

[185]    Carol Muffett & Steven Feit, *Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, CENTER FOR INT'L ENV'T L. (2017), https://www.ciel.org/reports/smoke-and-fumes.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

134.    In September 2023, the *Wall Street Journal* reported that Exxon worked "behind closed doors" to sow public doubt about climate change. The article was based on "documents reviewed by the Journal, which haven't been previously reported."[186]

**D.    Defendants Could Have Chosen to Facilitate, and Be Part of, a Lower-Carbon Future, but Instead Chose Corporate Profits and Continued Deception.**

135.    Defendants could have chosen a different path. They could have refrained from undermining the global effort to mitigate the impacts of GHG emissions, or even contributed to it by, for example, delineating practical technical strategies, policy goals, and regulatory structures that would have allowed them to continue their business ventures while reducing GHG emissions and supporting a transition to a lower-carbon future. Instead, Defendants devoted significant efforts to deceiving consumers, including in Chicago, and the public about the existential hazards of burning fossil fuels—all with the purpose and effect of perpetuating and inflating usage of fossil fuels and delaying the advent of alternative energy sources not based on fossil fuels.

136.    As a result of Defendants' tortious, deceptive, and misleading conduct, consumers of Defendants' fossil fuel products and the public in Chicago as elsewhere, have been deliberately and unnecessarily deceived about the following: the role of fossil fuel products in causing global warming, sea level rise, disruptions to the hydrologic cycle, more extreme precipitation, heat waves, droughts, and other consequences of the climate crisis; the acceleration of global warming since the mid-twentieth century; and the fact that continued increases in fossil fuel consumption create increasingly severe environmental threats and increasingly significant economic costs for Chicago and other communities. Consumers and the public in Chicago and elsewhere have also been deceived about the depth and breadth of the state of the scientific evidence on anthropogenic

---

[186] Christopher M. Matthews & Collin Eaton, *Inside Exxon's Strategy to Downplay Climate Change*, THE WALL STREET J. (Sept. 14, 2023, 5:30 AM ET), https://www.wsj.com/business/energy-oil/exxon-climate-change-documents-e2e9e6af.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

climate change, and, in particular, about the strength of the scientific consensus regarding the role of fossil fuels in causing both climate change and a wide range of potentially destructive impacts.

137.    Defendants' deception also significantly delayed the transition to alternative energy sources that could have prevented some of the worst impacts of climate change in Chicago and elsewhere. By sowing doubt about the future consequences of unrestricted fossil fuel consumption, Defendants' deception campaign successfully forestalled development and dissemination of alternative fuels, as well as legislation supporting a broad-based transition to alternative energy sources. This delay led to emission of huge amounts of avoidable greenhouse gases, thereby ensuring that the damage caused by climate change will be substantially more severe than if Defendants had acted in a manner commensurate with their internal knowledge of climate risks.

### E.    Defendants' Internal Actions Demonstrate Their Awareness of the Impacts of Climate Change and Their Intent to Continue to Profit from the Unabated Use of Fossil Fuel Products.

138.    In contrast to their public-facing efforts challenging the validity of the scientific consensus about anthropogenic climate change, the Fossil Fuel Defendants' acts and omissions since the 1970s—including taking expensive actions to protect their own investments from the impacts of climate change—have evinced their clear understanding of the realities of climate change and its likely consequences. These actions have included making multi-billion-dollar infrastructure investments for their own operations, including, among others, the following: raising offshore oil platforms to protect against sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; and developing technology and infrastructure to extract, store, and transport fossil fuels in a warming Arctic environment.[187]

---

[187] Lieberman & Rust, *supra* note 52.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

139.     For example, oil and gas reserves in the Arctic that were not previously reachable due to sea ice are becoming increasingly reachable as sea ice thins and melts due to climate change.[188] In 1973, Exxon obtained a patent for a cargo vessel, such as a tank ship, capable of breaking through sea ice for use in Arctic operations[189] and for an oil tanker[190] designed for Arctic operations.

140.     In 1974, Texaco (Chevron) obtained a patent for a mobile Arctic drilling platform designed to withstand significant interference from lateral ice masses.[191]

141.     Shell obtained a patent for an Arctic offshore platform adapted for conducting operations in the Beaufort Sea in 1984.[192]

142.     In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for a natural gas platform planned for construction in the North Sea to account for anticipated sea level rise. Those design changes added substantial costs to the project.[193]

    a.     In 1979, Norske Shell was approved by Norwegian oil and gas regulators to operate a portion of the Troll oil and gas field.

---

[188] James Henderson & Julia Loe, *The Prospects and Challenges for Arctic Oil Development*, OXFORD INST. FOR ENERGY STUDIES, at 1 (Nov. 2014) https://www.oxfordenergy.org/publications/the-prospects-and-challenges-for-arctic-oil-development/.

[189] Icebreaking Cargo Vessel, U.S. Patent No. 3,727,571 (filed July 7, 1971) (issued Apr. 17, 1973), https://www.google.com/patents/US3727571.

[190] Tanker Vessel, U.S. Patent No. 3,745,960 (filed May 6, 1971) (issued July 17, 1973), https://www.google.com/patents/US3745960.

[191] Mobile, Arctic Drilling and Production Platform, U.S. Patent No. 3,793,840 (filed Oct. 18, 1971) (issued Feb. 26, 1974), https://www.google.com/patents/US3793840.

[192] Arctic offshore platform, U.S. Patent No. 4,427,320 (filed Feb. 19, 1982) (issued Jan. 24, 1984), https://www.google.com/patents/US4427320.

[193] *Greenhouse Effect: Shell Anticipates A Sea Change*, THE N.Y. TIMES (Dec. 20, 1989), https://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html; Lieberman & Rust, *supra* note 52.

b.  In 1986, the Norwegian parliament granted Norske Shell authority to complete the first development phase of the Troll field gas deposits, and Norske Shell began designing the "Troll A" gas platform, with the intent to begin operation of the platform in approximately 1995. Based on the very large size of the gas deposits in the Troll field, the Troll A platform was projected to operate for approximately 70 years.

c.  The platform was originally designed to stand approximately 100 feet above sea level—the height necessary to stay above the waves in a once-in-a-century-strength storm.

d.  In 1989, Shell engineers revised their plans to increase the above-water height of the platform by three to six feet in order to account for higher anticipated average sea levels and increased storm intensities due to global warming over the platform's 70-year operational life.[194]

e.  Shell projected that the additional three to six feet of above-water construction would increase the cost of the Troll A platform by tens of millions of dollars.

**F. Defendants' Actions Have Exacerbated the Costs of Adapting to and Mitigating the Adverse Impacts of the Climate Crisis.**

143. As GHG pollution accumulates in the atmosphere, some of which (namely $CO_2$) does not dissipate for potentially thousands of years, climate changes and consequent adverse environmental changes compound, and their frequencies and magnitudes increase. As those adverse environmental changes compound, and their frequencies and magnitudes increase, so too do the physical, environmental, economic, and social injuries resulting therefrom.

144. Delayed societal development and adoption of alternative energy sources and related efforts to curb anthropogenic GHG emissions have therefore increased environmental

---

[194] *Id.*

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

harms and increased the magnitude and cost to address harms, including to Chicago, that have already occurred or are locked in as a result of historical emissions.

145.    Therefore, Defendants' campaign to obscure the science of climate change to protect and expand the use of fossil fuels greatly increased and continues to increase the injuries suffered by Chicago and its residents. Had concerted action to reduce GHG emissions begun earlier, the subsequent impacts of climate change could have been avoided or mitigated.

146.    Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued, could penetrate half of a competitive energy market in approximately 50 years.[195] This internal estimate was based on extensive modeling within the academic community, including research conducted by the Massachusetts Institute of Technology's David Rose, which concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Mr. Rose's conclusions, stating they were "based on reasonable assumptions."[196] But instead of pursuing a clean energy transition or warning the public about the dangers of burning fossil fuels, Defendants chose to deceive consumers, including those in Chicago, to preserve Fossil Fuel Defendants' profits and assets. As a result, much time has been lost in which consumers could have done much to mitigate the climate crisis in Chicago.

147.    The costs of inaction on anthropogenic climate change and its adverse environmental effects were not lost on Defendants. In a 1997 speech by John Browne, Group Chief

---

[195] Henry Shaw, *Memorandum to T.K. Kett re Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect*, CLIMATEFILES, at 5 (Dec. 18, 1980), https://www.climatefiles.com/exxonmobil/1980-exxon-memo-on-the-co2-greenhouse-effect-and-current-programs-studying-the-issue/.

[196] M.B. Glaser, *Memorandum to Exxon re CO2 "Greenhouse" Effect*, EXXON RSCH. AND ENGINEERING CO., at 17-18 (Apr. 1, 1982), https://www.climatefiles.com/exxonmobil/1982-memo-to-exxon-management-about-co2-greenhouse-effect/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

Executive for BP America, at Stanford University, Mr. Browne described Defendants' and the entire fossil fuel industry's responsibility and opportunity to reduce the use of fossil fuel products, reduce global $CO_2$ emissions, and mitigate the harms associated with the use and consumption of such products:

> [W]e need to go beyond analysis and to take action. It is a moment for change and for a rethinking of corporate responsibility.
>
> . . . .
>
> [T]here is now an effective consensus among the world's leading scientists and serious and well informed people outside the scientific community that there is a discernible human influence on the climate, and a link between the concentration of carbon dioxide and the increase in temperature.
>
> . . . .
>
> [The fossil fuel industry] ha[s] a responsibility to act, and I hope that through our actions we can contribute to the much wider process which is desirable and necessary.
>
> BP accepts that responsibility and we're therefore taking some specific steps.
>
> To control our own emissions.
>
> To fund continuing scientific research.
>
> To take initiatives for joint implementation.
>
> To develop alternative fuels for the long term.
>
> And to contribute to the public policy debate in search of the wider global answers to the problem.[197]

148.    Despite Defendants' knowledge of the foreseeable, measurable, and significant harms associated with the unrestrained consumption and use of fossil fuel products, in Chicago as elsewhere, and despite Defendants' knowledge of technologies and practices that could have

---

[197] John Browne, *BP Climate Change Speech to Stanford*, EXXON RSCH. AND ENGINEERING CO. (May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

helped to reduce the foreseeable dangers associated with their fossil fuel products, Defendants continued to promote heavy fossil fuel use, and mounted a campaign to obscure the connection between fossil fuel products and the climate crisis, thus dramatically adding to the costs of abatement. This campaign was intended to, and did, reach and influence Chicago consumers, along with consumers elsewhere.

149.    For example, in 2006, Exxon wrote a letter to the Royal Society recognizing that "the accumulation of greenhouse gases in the Earth's atmosphere poses risks that may prove significant for society and ecosystems." "Yet behind closed doors, Exxon took a very different tack: Its executives strategized over how to diminish concerns about warming temperatures, and they sought to muddle scientific findings that might hurt its oil-and-gas business."[198]

150.    At all relevant times, Defendants were deeply familiar with opportunities to reduce the use of fossil fuel products and associated GHG emissions, mitigate the harms associated with the use and consumption of these products, and promote development of alternative, clean energy sources. Examples of that recognition date back to the 1960s, and include, but are not limited to, the following:

a.    In 1980, Imperial Oil (Exxon) wrote in its "Review of Environmental Protection Activities for 1978–79": "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere. Technology exists to remove $CO_2$ from stack gases but removal of only 50 percent of the $CO_2$ would double the cost of power generation."[199]

---

[198] Matthews & Eaton, *supra* note 186.

[199] *Review of Environmental Protection Activities for 1978–1979*, IMPERIAL OIL LTD., at 2 (Aug. 6, 1980), https://www.climatefiles.com/exxonmobil/1980-imperial-oil-review-of-environmental-protection-activities-for-1978-1979/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

b.    A 1987 company briefing produced by Shell on "Synthetic Fuels and Renewable Energy" emphasized the importance of immediate research and development of alternative fuel sources, noting that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop clean, convenient alternatives. . . . New energy sources take decades to make a major global contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[200]

c.    A 1989 article in a publication from Exxon Corporate Research for company use only stated:

> $CO_2$ emissions contribute about half the forcing leading to a potential enhancement of the Greenhouse Effect. Since energy generation from fossil fuels dominates modern $CO_2$ emissions, strategies to limit $CO_2$ growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems.[201]

151.    Despite these repeated recognitions of opportunities to reduce emissions and mitigate corresponding harms from climate change, Defendants continued to sow doubt and disinformation in the minds of the public, including to Chicago residents, regarding the causes and effects of climate change, and methods of reducing emissions. Examples of those efforts include, but are not limited to, the following:

---

[200] *Synthetic Fuels and Renewable Energy*, SHELL BRIEFING SERVICE (1987) https://www.climatefiles.com/shell/1987-shell-synthetic-fuels-renewable-energy-briefing/.

[201] Brian Flannery, *Greenhouse Science, Connections: Corporate Research*, EXXON RSCH. AND ENGINEERING CO. (1989), https://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place-marketing-mix/.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

a.      In 1996, more than 30 years after API's president told petroleum industry leaders that carbon emissions from fossil fuels could "cause marked changes in climate" by the year 2000 if not abated,[202] API published the book *Reinventing Energy: Making the Right Choices* to refute this very conclusion. Contradicting the scientific consensus of which its members had been aware for decades, the book claims: "Currently, no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures, or the intensity and frequency of storms."[203] The book also suggested that even if some warming does occur, such warming "would present few if any problems" because, for example, farmers could be "smart enough to change their crop plans" and low-lying areas would "likely adapt" to sea level rise.[204]

b.      In the publication, API also contended that "[t]he state of the environment does not justify the call for the radical lifestyle changes Americans would have to make to substantially reduce the use of oil and other fossil fuels" and that the "benefits of alternatives aren't worth the cost of forcing their use." "Some jobs definitely will be created in making, distributing and selling alternatives. But they will come at the expense of lost jobs in the traditional automobile and petroleum industries," the authors continued. "[A]lternatives will likely be more expensive than conventional fuel/vehicle technology. Consumers, obviously, will bear these increased

---

[202] Frank Ikard, *Meeting the Challenges of 1966, in Proceedings of the American Petroleum Institute*, at 13 (1965), https://www.documentcloud.org/documents/5348130-1965-API-Proceedings.

[203] *Reinventing Energy: Making the Right Choices*, AM. PETROLEUM INST., at 79 (1996), https://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy/ (emphasis in original).

[204] *Id.* at 85-87.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

expenses, which means they will have less to spend on other products. This in turn will . . . cost jobs."[205]

        c.      API published this book to ensure its members could continue to produce and sell fossil fuels in massive quantities that it knew would devastate the planet. The book's final section reveals this purpose. API concluded: "[S]evere reductions in greenhouse gas emissions by the United States, or even all developed countries, would impose large costs on those countries but yield little in the way of benefits—even under drastic climate change scenarios."[206]

    152.    The Fossil Fuel Defendants could have made major inroads towards mitigating the harms they caused, and in particular, the City's injuries, by developing and employing technologies to capture and sequester GHG emissions associated with conventional use of their fossil fuel products. The Fossil Fuel Defendants had knowledge of these technologies dating back at least to the 1960s, and, had indeed, internally researched many such technologies.

    153.    Even if the Fossil Fuel Defendants did not adopt technological or energy source alternatives that would have reduced the use of fossil fuel products, reduced global GHG pollution, and/or mitigated the harms associated with the use and consumption of such products, the Fossil Fuel Defendants could have taken other practical, cost-effective steps to mitigate the harms caused by their fossil fuel products. Those alternatives could have included, among other measures, the following:

        a.      Refraining from affirmative efforts, whether directly, through coalitions, or through front groups, to distort public perception and cause many consumers and businesses to think the relevant science is far less certain than it actually is;

---

[205] *Id.* at 59, 68, 69.

[206] *Id.* at 89.

101

b. Acknowledging the validity of scientific evidence on anthropogenic climate change and the damages it will cause people, communities (including the City), and the environment, thereby contributing to an earlier and quicker transition to cleaner energy sources that could help minimize catastrophic climatic consequences;

c. Forthrightly communicating with consumers and the general public about the global warming hazards of fossil fuel products that were known to Defendants, which would have enabled those groups to make informed decisions about whether to curb the use of these products—including whether and to what extent to invest in alternative clean energy sources instead of in fossil fuels;

d. Sharing their internal scientific research with consumers, lawmakers, and the public, including with Chicago and its residents, as well as with other scientists and business leaders, to increase public understanding of the scientific underpinnings of climate change and its relation to fossil fuel products; and

e. Prioritizing development of alternative sources of energy through sustained investment and research on renewable energy sources to replace dependence on hazardous fossil fuel products.

154. Despite their knowledge of the foreseeable harms associated with the consumption of fossil fuel products, and despite the existence of, and the fossil fuel industry's knowledge of, opportunities to reduce the foreseeable dangers associated with those products, Defendants wrongfully promoted and concealed the hazards of using fossil fuel products, delaying meaningful development of alternative energy sources and exacerbating the costs of adapting to and mitigating the adverse impacts of the climate crisis, including the climate crisis in Chicago.

102

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

**G.      Defendants Continue to Deceive Chicago Consumers Through Misleading Advertisements That Portray Defendants as Climate-Friendly Energy Companies and Obscure Their Role in Causing Climate Change.**

155.      Defendants' deceptive conduct continues to the present day, albeit through updated messaging. Now, rather than engaging solely in outright denials of the existence of climate change, Defendants deflect attention from their role in causing climate change by falsely portraying fossil fuel products as environmentally friendly, climate-friendly, or otherwise less environmentally damaging than those products really are.

156.      Defendants have continued to mislead the public about the impact of fossil fuel products on climate change through "greenwashing." Through recent advertising campaigns and public statements in Chicago and Illinois and/or intended to reach Chicago and Illinois, including but not limited to online advertisements and social media posts, Defendants falsely and misleadingly portray these products as "green," "clean," "cleaner," and/or "environmentally friendly," and the Fossil Fuel Defendants portray themselves as climate-friendly energy companies that are deeply engaged in finding solutions to climate change. By advertising fossil fuel products and their businesses as environmentally friendly, and with words, phrases, colors, and imagery that evoke positive environmental attributes, Defendants seek to convince consumers that their industry is beneficial to the environment. Reasonable consumers—*i.e.*, a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances— are likely to be misled by Defendants' advertisements into believing that their products do not contribute to substantial injury to the environment. In reality, Fossil Fuel Defendants continue to primarily invest in, develop, promote, and profit from fossil fuel products and heavily market those products to consumers, including to consumers in Chicago, with full knowledge that those products will continue to exacerbate climate change harms.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

157.     Defendants' greenwashing exploits Chicago and Illinois consumers' concerns about climate change and their desire to purchase "green" products and spend their consumer dollars on products and businesses that are taking substantial and effective measures to combat climate change. By deceptively portraying themselves and their products as part of the climate solution, rather than as the problem, Defendants' advertisements induce consumers to purchase fossil fuel products and develop brand affinity under the misimpression that purchasing and using fossil fuel products supports genuine, substantial, and effective measures to mitigate climate change, rather than contributing to climate change. Defendants' false advertisements are thus likely to mislead Chicago and Illinois consumers.

158.     At all times relevant to this complaint, Defendants have attempted to deceive consumers by promoting certain of the Fossil Fuel Defendants' fossil fuel products as environmentally beneficial, when in fact Defendants knew that those products would continue to contribute to climate change, and thus imperil the environment, if used as intended. These products, which Defendants tout, in fact result in the increase of GHG emissions, despite Defendants' knowledge that, when used as designed and intended, these products lead to climate change.

159.     Defendants' marketing of fossil fuel products as environmentally beneficial follows in the footsteps of the tobacco industry's advertising campaigns to de-emphasize, and confuse the public, including in Chicago, about the deadly effects of smoking cigarettes. Just as tobacco companies promoted "low-tar" and "light" cigarettes, inducing consumers to think of them as healthy alternatives to quitting smoking, while knowing that smoking "healthy" cigarettes was still harmful to human health, so too do Defendants peddle "low-carbon" and "emissions-reducing" fossil fuel products to persuade consumers that those products are climate-friendly alternatives to

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

traditional fossil fuels. In reality, the fossil fuel products they describe as "low-carbon," "clean" and/or "cleaner," "green," and "emissions-reducing" in fact contribute to climate change and are harmful to the health of the planet and its people.

160.    Below are representative examples of Defendants' advertisements to Chicago and Illinois consumers that misleadingly portray fossil fuels as environmentally beneficial or benign and fail to mention the products' role in causing environmentally injurious climate change. The emphasis on lower emissions, "cleaning" terminology, and positive environmental imagery and messaging—individually and together—in Defendants' advertisements are likely to mislead reasonable consumers by suggesting that Defendants' fuels are environmentally beneficial or benign when they contribute to climate change like any other fossil fuel product. The examples are representative of Defendants' other advertisements and public statements in Defendants' greater greenwashing strategy to confuse consumers about the consequences of using fossil fuel products and consequently to increase demand for those fossil fuel products.

a.    BP advertises Invigorate—one of its gasoline additives—as better than "ordinary fuels" that produce "increased emissions." BP advertises that "gasoline with invigorate helps clean & protect."[207] The company omits any mention of its products' leading role in causing climate change. In 2020, BP launched a new campaign focused on fuel efficiency. The campaign also includes significant investment in both digital advertising and on signage at BP and Amoco stations.

b.    Since at least 2016, Exxon has offered for sale and marketed its Synergy fossil fuels, including, since at least 2020, at a substantial number of Exxon-branded gas stations in Chicago and Illinois. In Exxon's advertisements for its Synergy fuels, including those on or

---

[207] BP PROD. N. AM. INC., CHICAGO TRIBUNE, at 1 (Nov. 2, 2008).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

near the gas pumps at Exxon-branded gas stations in Chicago and Illinois, Exxon makes several claims that a reasonable consumer would understand to mean that the Synergy fuels are beneficial or benign, and not harmful, to the environment. For example, Exxon consistently promotes Synergy fuels as "clean" or "cleaner," and the company's climate strategy mentions its Synergy fuel, claiming it can help reduce GHG emissions. Exxon also cites Synergy's alleged reduction of $CO_2$ emissions in Exxon's advertisement of the company's improved environmental performance. An advertisement on Exxon's website, which is reproduced on the following page, includes an image featuring a bright sunrise in a clear sky over hills of green grass, green trees, and little to no industrial or urban development.

106

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

ExxonMobil | Fuels

Find Station · Our fuel · Rewards and payment · Commercial · Get help · About us

Home > Environmental performance

Important Additional Information Regarding Proxy Solicitations:
This website contains information on a variety of topics that may be of interest to shareholders, some of which may be related to the Company's solicitation materials.
Click here for more information.

Environmental performance

Conscientious practices. Rigorous standards.

Continually improving environmental performance while pursuing reliable and affordable energy

Ten years ago, we introduced Protect Tomorrow. Today. – a set of expectations that serves as the foundation for our environmental performance. Guided by a scientific understanding of the environmental impacts and related risks of our operations, these rigorous standards and good practices have become an integral part of our day-to-day operations in every country in which we do business including those with minimal regulations in place.

As well, we consider the long-term social and economic needs of the communities in which we work and continually engage stakeholders in the process.

The following are the three major areas in which we've concentrated our efforts to reduce environmental impacts.

Improve the efficiency of our operations

ExxonMobil invested more than $1.5 billion over the last six years to improve efficiency and reduce greenhouse gas emissions from our operating facilities, such as refineries and chemical plants. In the past ten years we have reduced greenhouse gas emissions in our operations by more than 7 million metric tons, which is the equivalent of taking about 1.4 million cars off the road.

Improve efficiency in consumer use of fuels

We're continually innovating to develop products that enable customers to reduce their energy use and CO2 emissions. For example, we have:

- Developed specially formulated synthetic lubricants for cars, trucks and industrial equipment that last longer and help end-users reduce their energy consumption
- Created tire liners that retain air better than their predecessors, thereby improving vehicle fuel efficiency
- Developed a technology to improve the separator films used in lithium-ion batteries, which are used in laptops, cell phones and, increasingly, hybrid vehicles
- Engineered Fuel Technology Synergy™ fuels to help improve fuel economy and reduce CO2 emissions**

**Figure 10: ExxonMobil Fuels "Environmental Performance" website**

c. In addition to its Synergy fuels, Exxon offers for sale, and has marketed, Mobil 1™ ESP x2 motor oil to Chicago and Illinois consumers. From 2016 through at least 2022,

Exxon promoted Mobil 1™ ESP x2 on the website Energy Factor—effectively a corporate blog for Exxon, in which Exxon claims to discuss developing safe and reliable energy sources for the future—in a post titled, "Green motor oil? ExxonMobil scientists deliver an unexpected solution."[208] According to its advertisement of Mobil 1™ ESP x2, Exxon specially formulated the green oil to "contribute to [] carbon-emission reduction efforts." Exxon's advertising suggests to the consumer that purchase and use of this motor oil conveys an environmental benefit, when in fact the opposite is true.

        d.     Shell also describes its products as "cleaning" and that their use "produces fewer emissions."[209] Shell's repeated claim that its products are clean, and its frequent use of green and environmentally positive imagery in its marketing materials, individually and together, are likely to mislead reasonable consumers into believing that Shell's fuels are environmentally beneficial or benign, when in fact they are fossil fuels which, when used as designed and intended, contribute to climate change.

        e.     Similarly, Chevron's gasoline offered for sale and marketed throughout the country, is marketed as having "cleaning power" that minimizes emissions. Chevron's repeated emphasis on "cleaning" terminology, its focus in its marketing materials on "advancing a lower carbon future," and its express solicitation of consumers who "care for the environment," are

---

[208] *Green motor oil? ExxonMobil scientists deliver an unexpected solution*, EXXONMOBIL (Jul. 19, 2016) https://web.archive.org/web/20220221083851/https://energyfactor.exxonmobil.com/energy-innovation/transportation/green-motor-oil-exxonmobil-scientists-deliver-unexpected-solution/.

[209] *Shell Gasoline*, SHELL https://web.archive.org/web/20231213183548/https://www.shell.us/motorist/shell-fuels/shell-gasoline.html (last visited Dec. 13, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

likely to mislead reasonable consumers by suggesting that Chevron's fuels are environmentally beneficial or benign, when they are not.[210]

       f.    ConocoPhillips, through its 76-branded gas stations in Chicago and Illinois, offers for sale and markets its 76-brand fossil fuels. In ConocoPhillips's advertisements for its 76-brand fuels, including advertisements on or near the pumps at 76-branded gas stations in Chicago and Illinois, ConocoPhillips claims that its fuels "clean" a car's engine, resulting in "lower emissions," and that deposits left from other gasolines "can increase emissions." ConocoPhillips advertises that 76's fossil fuels are "better for the environment."[211] The 76 website for 76's fuels contains the marketing materials shown below, in which ConocoPhillips makes the claim—superimposed on an image of a bluebird standing on a car's side mirror and looking at the viewer, with silhouetted trees in the background—that 76 and its fossil fuels align with the values of environmentally conscious consumers: "We're on the driver's side®. And the environment's."

---

[210]    Chevron, *Corporate Sustainability Report: The Energy Transition*, LINKEDIN https://web.archive.org/web/20231213184101/https://www.linkedin.com/posts/chevron_corporate-sustainability-report-the-energy-activity-7061799648075657217-fa21/ (last visited Dec. 13, 2023).

[211]    *TOP TIER® Gas*, 76 GAS STATIONS https://web.archive.org/web/20231213204301/https://www.76.com/top-tier-gas/ (last visited Dec. 13, 2023).

FILED DATE: 2/20/2024 12:34 PM   2024CH01024



**Figure 11: ConocoPhillips 76 Fuels Website: Top Tier Gas**

161.    Defendants also misleadingly portray natural gas as environmentally beneficial or benign, failing to mention the products' role in causing environmentally injurious climate change. Defendants' misleading messaging regarding the alleged environmental benefits of natural gas is likely to mislead reasonable consumers by suggesting that fossil fuels, in particular natural gas, are environmentally beneficial and not harmful to the climate. In reality, the majority of natural gas is derived from fossil fuels, and its primary constituent is methane, a potent greenhouse gas which plays a significant role in accelerating climate change. Methane has a relatively short lifespan, but its "global warming potential" is approximately 28 times greater than an equivalent weight of carbon dioxide over a 100-year time period, and approximately 84 times greater than carbon dioxide over a 20-year timeframe. Accounting for methane leaks, flaring, and venting in production and supply chains, the net GHG emissions of natural gas are on par with—and sometimes higher than—the GHG emissions from coal combustion. Moreover, combustion of methane for use as a fuel emits carbon dioxide.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

162.    In 2005, Exxon Mobil advertised in the *Chicago Tribune*, stating, "We are making significant investments in the future supply of clean-burning natural gas."[212]

163.    ConocoPhillips has released advertisements on Facebook stating, "Natural Gas: efficient, affordable, environmentally-friendly. Find out how natural gas is meeting global energy demand while reducing climate-related risks," and linking to a page on their website.[213]

164.    In advertisements in *The New York Times* and *The Washington Post*, Shell touts its investments in "lower-carbon transport fuels," including natural gas. In "The Mobility Quandary," under a "Finding Sustainable Solutions" banner, Shell singles out natural gas as "a critical component of a sustainable energy mix" and a "cleaner-burning fossil fuel."[214] In "The Making of Sustainable Mobility," Shell describes natural gas as "a cleaner fossil fuel" with a "lighter carbon footprint."

165.    In 2017, the Dutch Advertising Code Authority censured Shell and Exxon for advertising natural gas as the "cleanest fossil fuel." The Advertising Code Authority reasoned that the claim "suggested that fossil fuels can be clean in that they do not cause environmental damage. It is firm . . . that that suggestion is not correct."[215] Yet Shell, along with other Defendants, continues to make the same representations in the United States, including in Chicago.

---

[212] *Tomorrow's Energy, Today's Investments*, CHICAGO TRIBUNE (Nov. 6, 2005), https://www.newspapers.com/image/231451774/?terms=%22ExxonMobil%22&match=1.

[213] ConocoPhillips, *Natural gas makes renewables possible*, FACEBOOK AD LIBRARY, https://www.facebook.com/ads/library/?id=222072331979534 (last visited Dec. 13, 2023).

[214] *The Mobility Quandary*, WASH. POST CREATIVE GROUP https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary/ (last visited Dec. 13, 2023).

[215] Arthur Neslen, *Shell and Exxon Face Censure Over Claim Gas Was 'Cleanest Fossil Fuel'*, THE GUARDIAN (Aug. 14, 2017, 12:14 PM EDT), https://www.theguardian.com/environment/2017/aug/14/shell-and-exxon-face-censure-over-claim-gas-was-cleanest-fossil-fuel.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

166.    The Fossil Fuel Defendants also collectively promote their fossil fuel products through Defendant API, which makes public statements and claims about oil and natural gas. These include advertisements and promotional campaign websites that have been directed at and/or reached Chicago and Illinois, which reasonable consumers would understand to mean that the Fossil Fuel Defendants' fossil fuels are beneficial or benign and not harmful to the environment. In particular, API's marketing material falsely promotes the narrative that natural gas is an environmentally friendly fuel. A Facebook advertisement by API states, "Cleaner burning natural gas reduces $CO_2$ emissions at home and bolsters energy security abroad."[216]

167.    In several advertisements in *The Washington Post*—*e.g.*, "Why natural gas will thrive in the age of renewables," "Real climate solutions won't happen without natural gas and oil," and "Low- and no-carbon future starts with natural gas"—API has misleadingly touted natural gas as "part of the solution" to climate change. API claims natural gas is "clean."[217] API also promotes natural gas's purported benefits through a campaign titled "Energy for a Cleaner Environment."

168.    API further claims, falsely, that, "[n]atural gas is an economical, environmentally friendly complement to renewable energy. The sooner green activists realize that, the more effective they'll be at continuing to slash emissions."[218]

---

[216] American Petroleum Institute, *LNG is pro-environment and pro-energy security*, FACEBOOK AD LIBRARY https://www.facebook.com/ads/library/?id=321331956671661 (last visited Dec. 13, 2023).

[217] *Why natural gas with thrive in the age of renewables*, WASH. POST CREATIVE GROUP https://www.washingtonpost.com/brand-studio/api-why-natural-gas-will-thrive-in-the-age-of-renewables/ (last visited Dec. 13, 2023); Mike Sommers, *Real climate solutions won't happen without natural gas and oil*, WASH. POST (Dec. 14, 2020) https://www.washingtonpost.com/brand-studio/wp/2020/12/14/real-climate-solutions-wont-happen-without-natural-gas-and-oil/.

[218] WP Brand Studio Content from API, *Low- and no-carbon future starts with natural gas*, WASH. POST CREATIVE GROUP (Feb. 15, 2019) https://www.washingtonpost.com/brand-studio/wp/2019/02/15/low-and-no-carbon-future-starts-with-natural-gas/.

169.    Additionally, Defendants often represent hydrogen fuel as "clean," "renewable," or "zero / low carbon." These representations omit that the vast majority of hydrogen fuel is produced from fossil gas.[219] For example, ExxonMobil issued an advertisement on Twitter stating, "Hydrogen is the most abundant element on earth. And because hydrogen fuel is versatile - and produces no emissions at point-of-use, #hydrogen can play a big role helping society meet its net-zero goals."[220] In another example, Shell has posted on Twitter, "A car that only emits water and heat? Learn more about #hydrogen, a fuel for the future that can help clean up transport today #makethefuture."[221]

170.    Defendants also misrepresent the characteristics of biofuels. These misrepresentations fail to disclose that biofuels created from bioethanol and used in gasoline engines are typically still majority fossil fuel, and Fossil Fuel Defendants' production of biofuels is insignificant compared to fossil fuel production and fuel demand. For example, Chevron has a Renewable Energy Group that produces "EnDura Fuels," which it advertises as "A Simple Lower Carbon Solution Now."[222] The front page of Chevron's website, as of September 8, 2023, features

---

[219] *See Hydrogen Production: Natural Gas Reforming*, U.S. DEP'T OF ENERGY EFFICIENCY & RENEWABLE ENERGY, https://www.energy.gov/eere/fuelcells/hydrogen-production-natural-gas-reforming (last visited Nov. 15, 2023).

[220] ExxonMobil (@ExxonMobil), TWITTER (Aug. 3, 2023, 10:00 AM), https://twitter.com/exxonmobil/status/1687116317302870016 (The advertisement also includes a video where an Exxon employee touts hydrogen as "decarbonizing." The advertisement later shows a diagram (but nothing spoken) showing that hydrogen comes from natural gas.).

[221] Shell USA (@Shell USA), TWITTER (Dec. 20, 2017, 2:45 AM), https://twitter.com/Shell_USA/status/943401985193242625.

[222] *Endura Fuels: A Simple Lower Carbon*, CHEVRON RENEWABLE ENERGY GROUP https://www.regi.com/ (last visited Nov. 15, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"renewable diesel,"[223] and another page on its website touts biofuels used on ships[224] and an ad campaign linking to that page.[225] The page says, "Biofuels can quickly change transportation sectors for the better. When used as a marine fuel, biofuels can reduce greenhouse gas (GHG) emissions on a lifecycle analysis." Similarly, BP claims in ads that "We're making motor oil that's 25 [percent] sugarcane based" to "make energy cleaner and better."[226]

171.    ExxonMobil has numerous advertisements, including in the *Chicago Tribune*, touting its biofuel development while omitting the fact that the company spent only 0.2 percent of its capital investments on bioenergy from 2010 to 2018.[227] Exxon's investment in potential renewable fuels, such as biofuels, has been miniscule compared to its overall profits and to its investments in developing and expanding its fossil fuels business. One analysis comparing Exxon's advertised goal of producing 10,000 barrels of biofuels per day by 2025 to Exxon's fossil fuel refinery operations found that the goal for biofuel production would amount to only 0.2 percent of Exxon's refinery capacity, as reported in 2019—in essence, a rounding error. Also, Exxon's advertisements touting the development of biofuels from plant waste substantially overplayed the likely environmental benefits by failing to acknowledge the intensive energy

---

[223] *advancing energy progress*, CHEVRON, https://www.chevron.com/ (last visited Nov. 15, 2023); *see also* Chevron, *Energy Everywhere: Renewable Diesel – Episode 2*, YOUTUBE https://www.youtube.com/watch?v=8VToz7w4uRg&t=6s (last visited Nov. 15, 2023) (video embedded on front page).

[224] *biofuels steer into maritime sector*, CHEVRON (July 5, 2023), https://www.chevron.com/newsroom/2023/q3/biofuels-steer-into-maritime-sector?utm_source=facebook&utm_medium=social&utm_campaign=corporate.

[225] Chevron, *Biofuels Steer into Maritime Sector*, FACEBOOK AD LIBRARY https://www.facebook.com/ads/library/?id=1241282153250811 (last visited Nov. 15, 2023).

[226] BP America, *Possibilities Everywhere*, FACEBOOK AD LIBRARY, https://www.facebook.com/ads/library/?id=353302112007843 (last visited Nov. 15, 2023).

[227] Anjli Raval & Leslie Hook, *Oil and Gas Advertising Spree Signals Industry's Dilemma*, FINANCIAL TIMES, (March 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

required to process that plant waste, which would create substantial additional GHG emissions. In recent years, Exxon has quietly abandoned its investments in developing algae as a biofuel, but Exxon continues to invest in its development of fossil fuels, as it has done for decades.

172.    Exxon regularly advertises its efforts to capture and store carbon, leaving consumers, including those in Chicago, with the impression that Exxon does this to benefit the climate. Exxon does not disclose that the massive energy required to capture that carbon is powered by fossil fuels emitting more greenhouse gasses into the air.[228] Further, nearly all the carbon Exxon has captured was not simply stored, but used to drill for more oil.

173.    Defendants also regularly portray themselves and their businesses as sustainable, healthy, or compatible with a low carbon economy, and style themselves as corporate leaders in developing and providing non-fossil energy systems, such as solar, wind, and biofuels, and in lowering greenhouse gas emissions. But in reality, these companies' capital investments in non-fossil energy systems are extremely low compared to their investments in fossil fuel production—and are much lower than implied to consumers in advertisements. For example, from 2010 to 2018,

- BP spent only 2.3 percent of its capital investments on low-carbon energy sources;

- Chevron 0.2 percent (0.1 percent of which was in carbon capture, utilization, and storage);

- ConocoPhillips 0.0 percent;

- ExxonMobil 0.2 percent; and

---

[228] Nicholas Kusnetz, *Exxon's Long-Shot Embrace of Carbon Capture in the Houston Area Just Got Massive Support from Congress*, INSIDE CLIMATE NEWS (Sept. 25, 2022), https://insideclimatenews.org/news/25092022/exxon-houston-ship-channel-carbon-capture/.

- Shell 1.2 percent (0.3 percent of which was in carbon capture, utilization, and storage).[229]

174.  There is little evidence that those figures have increased since 2018.[230] On the contrary, Defendants are ramping up fossil fuel production. Exxon is projected to increase oil production by more than 35 percent between 2018 and 2030—a sharper rise than over the previous 12 years.[231] Shell is forecast to increase output by 38 percent by 2030, by increasing its crude oil production by more than half and its gas production by over a quarter.[232] BP is projected to increase production of oil and gas by 20 percent by 2030.[233] Chevron set an oil production record in 2018 of 2.93 million barrels per day.[234] A 2019 investor report touted Chevron's "significant reserve additions in 2018" in the multiple regions in North America and around the world, as well as significant capital projects involving construction of refineries worldwide.[235]

175.  Moreover, revenue and other business data from non-fossil energy systems are typically absent from fossil fuel companies' annual reports—an implicit admission that these

---

[229] Raval & Hook, *supra* note 227.

[230] Stuart Braun, *Shell, BP boost profit, sink investment in renewable energy*, DW (Feb. 10, 2023), https://www.dw.com/en/shell-bp-boost-profit-sink-investment-in-renewable-energy/a-64656800; Lauren Kent, *Big oil companies are spending millions to appear 'green.' Their investments tell a different story, report shows*, CNN (updated Sept. 8, 2022, 11:09 AM EDT), https://www.cnn.com/2022/09/07/energy/big-oil-green-claims-report-climate-intl/index.html.

[231] Jonathan Watts et al., *Oil firms to pour extra 7m barrels per day into markets, data shows*, THE GUARDIAN (Oct. 10, 2019, 7:00 EDT), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets.

[232] *Id.*

[233] *Id.*

[234] Kevin Crowley & Eric Roston, *Chevron Aligns Strategy With Paris Deal But Won't Cap Output*, BLOOMBERG (updated Feb. 7, 2019, 12:29 PM CST), https://www.bloomberg.com/news/articles/2019-02-07/chevron-pledges-alignment-with-paris-accord-but-won-t-cap-output.

[235] *Chevron 2019 Investor Presentation*, CHEVRON (Feb. 2019), https://chevroncorp.gcs-web.com/static-files/c3815b42-4deb-4604-8c51-bde9026f6e45.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

companies do not view non-fossil energy systems as material to their business or company value. In contrast, advertisements often misleadingly portray non-fossil energy systems as a significant or predominant part of company business.

176.    As part of their greenwashing efforts, Defendants have cast their businesses as committed to addressing environmental challenges like climate change, and even as leaders in efforts to mitigate climate change. In so doing, Defendants have cast their businesses— overwhelmingly dedicated to the further development, production, and sale of fossil fuels—as environmentally sustainable.

177.    BP has misleadingly portrayed itself, and continues to misleadingly portray itself, as a climate leader, claiming that it aims to be a net-zero company by 2050 or sooner. Beginning in 2000, BP began a $200 million campaign claiming it was moving "beyond petroleum" with advertisements portraying BP as predominantly invested in clean energy sources. Messages from that campaign included some projects, plans, and an overall theme that BP was going to materially reduce its emissions and transition away from petroleum. These advertisements used phrases such as, "It's time to go on a low carbon diet," "It's time to pull the plug on carbon emissions," and "It's time to think outside the barrel," and "New energy solutions require new schools of thought" for "finding new sources of clean and renewable energy."[236]

---

[236] BP PROD. N. AM. INC., NEWSWEEK (June 18, 2007).

117

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 12: BP Products North America Inc. in *Newsweek***

178.    In 2000, BP published a full-page advertisement in the *Chicago Tribune*, describing itself as "a new company able to offer global energy solutions," "a company that makes gasoline and diesel that produces lower emissions," and "the world's leading producer of solar power;" the advertisement also used BP's "beyond petroleum" slogan.[237] In another full-page advertisement in the *Chicago Tribune* in 2001, BP touted that it is "more than halfway" to

---

[237] BP, CHI. TRIBUNE at 13 (Aug. 9, 2000).

"reduc[ing its] own greenhouse gas emissions to 10 [percent] below 1990 levels by 2010." In the same advertisement, BP described itself as "one of the largest producers, as well as consumers of solar power in the world," and wrote, "We are in the oil business. But we are also in the natural gas business, the solar business, the technology business, the yet-to-be-discovered-energy business." [238] In another advertisement in the *Chicago Tribune* the following year, BP said it was "the first in [its] industry to recognize the risks of global climate change and set a target to reduce [its] own greenhouse gas emissions. [BP] just reached that target, [eight] years ahead of schedule. It's a start."[239] In another full-page advertisement in the *Chicago Tribune* in 2015, BP described its developments of "cleaner-burning fuels" in Chicagoland, as shown by the figure below.[240]

---

[238] BP, CHI. TRIBUNE at 11 (Sept. 5, 2001).

[239] BP, CHI. TRIBUNE Section at 14 (Aug. 8, 2002).

[240] BP PROD. N. AM. INC., CHI. TRIBUNE at 5 (Oct. 1, 2015).



**Figure 13: BP Products North America Inc. advertisement in the *Chicago Tribune***

179.    BP's "Possibilities Everywhere" campaign portrayed the company as a leader in

clean energy. In its "Blade Runner" advertisement, BP claims that it is "one of the major wind

120

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

energy businesses in the US."[241] BP's recent Facebook advertising campaigns targeted Illinois Facebook users, claiming: "To help the US meet its climate goals, federal methane rules are critical. All natural gas production needs to emit less;"[242] "Why advocate for carbon pricing? Because it's good for the people of Illinois, good for business, and good for the planet;"[243] and "We agree – the world needs fewer emissions. That's why we're working to make all forms of energy cleaner and better."[244]

180.    BP's representations contain substantial omissions about the company's commitment to combatting climate change. At the time of its "Blade Runner" advertisement touting itself as "one of the major wind energy businesses in the US," BP only owned about one percent of the installed wind capacity in the U.S. Moreover, at a time of record-breaking profits, BP is scaling back its plan to lower emissions by 2030, and BP continues to make significant investments in fossil fuel production, refining, and sales.

---

[241] BP's installed wind capacity in the US is only about one percent of the market.

[242] BP America, *BP Supports Methane Regulation*, FACEBOOK AD LIBRARY (July 2021), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=216888343522285&view_all_page_id=97279934919&search_type=page&media_type=all.

[243] BP America, *Bring Carbon Pricing to Illinois*, FACEBOOK AD LIBRARY (Sept.-Oct. 2020), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=327792575094720&view_all_page_id=97279934919&search_type=page&media_type=all.

[244] BP America, *Possibilities to Realities*, FACEBOOK AD LIBRARY (Nov. 2019), https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=435441174014180&view_all_page_id=97279934919&search_type=page&media_type=all.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

181.   In 2008, ConocoPhillips published this full-page advertisement in *The Atlantic:*



**Figure 14: ConocoPhillips advertisement in *The Atlantic***

182.   ConocoPhillips claims that its "actions for our oil and gas operations are aligned with the aims of the Paris Agreement" and touts its actions and achievements toward the net-zero energy transition. ConocoPhillips also touts its "Net-Zero Roadmap," which it describes as a "Paris-Aligned Climate Risk Strategy" and "a comprehensive framework with an ambition to

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

become a net-zero company for operational emissions by 2050."[245] ConocoPhillips thus focuses on its "operational" emissions while ignoring that combustion of its product continues to emit large amounts of greenhouse gases.

183.    In June 2023, ConocoPhillips published a profile on its Methane Measurement Manager Milind Bhatte, who it claims is helping move the company toward its goal of "net-zero."[246]

184.    ConocoPhillips' claims are contradicted by the company's substantial investments in expanding its fossil fuel production and sales. For example, the company's new Willow Project in Alaska is expected to produce approximately 576 million barrels of oil, with associated indirect GHG emissions equivalent to 239 million tons of $CO_2$.

185.    Exxon has announced its ambition to achieve net-zero GHG emissions by 2050 and touts its commitment to helping society reach a lower-emissions future. Exxon has heavily promoted its investment in developing algae for use as a biofuel to reduce emissions and combat climate change. Exxon's advertising tells consumers that Exxon is working to decrease its carbon footprint and that its research is leading toward "A Greener Energy Future. Literally."[247]

186.    Chevron claims that it "is committed to addressing climate change" and touts its intentions to invest billions of dollars in carbon reduction projects, as well as its net-zero

---

[245] *Paris-Aligned Climate Risk Strategy*, CONOCOPHILLIPS, https://www.conocophillips.com/ (last visited Nov. 15, 2023); *Operational Net-Zero Roadmap*, CONOCOPHILLIPS https://www.conocophillips.com/sustainability/low-carbon-technologies/operational-net-zero-roadmap/ (last visited Nov. 15, 2023).

[246] Gus Morgan, *Milind Bhatte: Progressing toward net-zero*, CONOCOPHILLIPS (June 27, 2023) https://www.conocophillips.com/spiritnow/story/milind-bhatte-progressing-toward-net-zero/?utm_medium=osocial&utm_source=Twitter&utm_content=image&utm_term=post:16665 04399403316370&utm_campaign=campaign:1601648882546323569.

[247] ExxonMobil, *The Future of Energy? It May Come From Where You Least Expect*, NEW YORK TIMES https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html (last visited Dec. 13, 2023).

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

"aspirations." And Chevron's director states in a 2021 report, "We believe the future of energy will be lower carbon, and we intend to be a leader in that future."[248] Its CEO claims that Chevron's "work to create fuels of the future—like hydrogen, renewable diesel, and sustainable aviation fuel—seeks to lower the carbon intensity of these products and support our customers' efforts to reduce their greenhouse gas emissions."[249] Chevron representatives have even delivered public seminars at top educational institutions, deceptively claiming Chevron uses its "unique capabilities, assets and expertise to deliver progress" toward the global ambition of achieving net-zero carbon emissions.

187.    Chevron's website contains a page titled, "explainer: what is carbon intensity?"[250] The page states that "Chevron's upstream carbon intensity (UCI) metric is used to measure the emission intensity of oil and gas production.," and, "To date, [Chevron] ha[s] identified nearly 100 potential projects to further lower [its] greenhouse gas intensity." This page is misleading because it suggests that Chevron is working to lower the greenhouse gas emissions associated with production of its products, while ignoring that post-production, the combustion of oil and gas in its intended uses creates huge amounts of greenhouse gas emissions.

188.    Chevron's minimal efforts in the area of renewable and lower-carbon energy, coupled with its expansion of its fossil fuel business, belie its statements suggesting that it is part of the climate change solution. Chevron in fact sold its only renewable energy holding in 2018. Moreover, from 2010 to 2018, according to one analysis, Chevron's investments in low-carbon

---

[248]    Roderick Green, *Energy Transition Spotlight*, CHEVRON (Sept. 14, 2021) https://chevroncorp.gcs-web.com/static-files/1ba3162e-f798-444b-9368-fc7b4ab7842a#page=5.

[249]    *Climate change resilience: Advancing a lower carbon future*, CHEVRON, at 1 (2021), https://www.chevron.com/-/media/chevron/sustainability/documents/2021-climate-change-resilience-report.pdf#page=3.

[250]    *Explainer: What is Carbon Intensity*, CHEVRON (Nov. 22, 2022) https://www.chevron.com/newsroom/2022/q4/explainer-what-is-carbon-intensity.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

energy sources were only 0.2 percent of Chevron's capital spending, compared to 99.8 percent in continuing its fossil fuel exploration and development.[251] Chevron to this day continues to prioritize capital expenditures in its traditional fossil fuel business over its investments in renewable and low-carbon energy.

189.    Shell also falsely portrays itself to consumers, including in Chicago, as part of the climate solution. For example, in 2006, Shell issued a full-page advertisement in the *Chicago Tribune* stating "The world needs to tackle $CO_2$ emissions" and touting the company's investment in carbon capture and storage as part of that project.

190.    Shell published another advertisement in the *Chicago Tribune* casting Shell as a corporate leader in responding to climate change.

---

[251] *Greenwashing Files: Chevron*, CLIENTEARTH, https://www.clientearth.org/projects/the-greenwashing-files/chevron/ (last visited Dec. 7, 2023).

126



Figure 15: Shell advertisement in the *Chicago Tribune*

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

191.    Shell claims that it aims to become a net-zero emissions[252] energy business by 2050, and that it is "tackling climate change." Shell has a webpage, and a report co-written by Deloitte, on "Decarbonizing Construction."[253]

192.    One of Shell's public relations firms described the intent of Shell's Make The Future campaign, stating: "As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about 'big oil' and think differently about Shell."[254]

193.    Shell's 2016 #makethefuture advertising campaign targets young people and misleadingly portrays the company as heavily engaged in developing and selling clean energy sources.[255]

194.    In reality, however, Shell spent only 1.3 percent of its capital investments in low carbon energy systems from 2010 to 2018.[256] Shell planned to spend four times more money on oil and gas development than on renewable technology in 2022.[257] In the first half of 2023, Shell

---

[252] "Net-zero" means achieving a balance between the carbon emitted into the atmosphere, and the carbon removed from it.

[253] *Decarbonizing    Construction:    Building    a    Low-Carbon    Future*,    SHELL https://www.shell.com/business-customers/construction-and-road/decarbonising-construction.html (last visited Nov. 15, 2023).

[254] *Shell: South Pole Energy Challenge*, EDELMAN, https://archive.ph/IZ8Qz (last visited Nov. 16, 2023).

[255] *See* Graham Readfearn, *Hey millennials, don't fall for Shell's pop star PR*, THE GUARDIAN (April    25,    2018),    https://www.theguardian.com/environment/planet-oz/2018/apr/25/hey-millennials-dont-fall-for-shells-pop-star-pr.

[256] Raval & Hook, *supra* note 227.

[257] Simon Jack, *Oil giant Shell says it needs oil to pay for green shift*, BBC NEWS (Nov. 3, 2021, 2:51 PM CDT), https://www.bbc.com/news/business-59154930.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

reported $11.6 billion in total spending, of which less than one billion went to renewables and "energy solutions"—a category that also includes fossil fuel investments, such as marketing and trading of pipeline gas. Independent analysis of Shell's spending plans shows that the company will be emitting *more* greenhouse gas by 2030 than it currently emits.[258] On its current trajectory, Shell is projected to miss its emissions reduction targets for both 2030 and 2050.[259]

195.    In June 2023, the U.K.'s Advertising Standards Authority banned Shell's marketing campaign describing Shell as providing renewable energy, installing electric vehicle charging, and driving the energy transition. The Advertising Standards Authority found consumers were likely to interpret the marketing materials as making a "broader claim about Shell as a whole providing cleaner energy." Since the "vast majority" of its operations was not clean energy, the campaign was misleading.[260]

196.    API markets itself as being an environmental steward, committed to helping reduce GHG emissions. API's 2021 Climate Action Framework portrays the organization as a partner in moving towards a climate solution, stating: "Our industry is essential to supplying energy that makes life modern, healthier and better while doing so in ways that tackle the climate challenge: lowering emissions, increasing efficiency, advancing technological innovation, building modern infrastructure and more."[261] As part of this campaign, API has offered on its website, in social media posts, and in other advertisements that have reached residents of Chicago and Illinois, the image on the following page, of lush greenery and a message that "88 [percent] of Americans favor

---

[258] *Id.*

[259] *Id.*

[260] Ed Davey, *Shell's clean energy advertising campaign is misleading, UK watchdog says*, AP NEWS (June 7, 2023, 10:50 AM CST), https://apnews.com/article/shell-climate-ad-ban-clean-energy-a1322233e3ba7e8fa7760367f13dd58c.

[261] *API Climate Action Framework*, AM. PETROLEUM INST. at 5 (2021) https://www.api.org/-/media/files/ehs/climate-change/2021/api-climate-action-framework.pdf#page=3.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

energy companies helping meet environmental challenges." API elaborates within the advertisement that "natural gas and oil [] powers and supports modern living . . . with lower emissions."



**Figure 16: API, We Are America's Generation Energy**

197.    In 2017, API launched an advertising campaign called "Power Past Impossible," which portrayed the oil and gas industry as a sustainable, healthy, and an essential part of societal progress.[262] API President and CEO Jack Gerrard misleadingly stated that "greenhouse gas emissions . . . are near 25 year lows," when greenhouse gas emissions globally were in fact

---

[262] *See* American Petroleum Institute, *API launches Power Past Impossible campaign during Super Bowl showing natural gas and oil benefit to consumers in everyday life*, PR NEWSWIRE (Feb. 5, 2017, 6:32 PM ET) https://www.prnewswire.com/news-releases/api-launches-power-past-impossible-campaign-during-super-bowl-showing-natural-gas-and-oil-benefit-to-consumers-in-everyday-life-300402321.html.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

increasing, and total greenhouse gas emissions in the U.S. (including methane, not just carbon dioxide) had not been shown to decline as claimed.[263] The campaign's opening advertisement, which aired nationally during the Superbowl, stated: "Oil pumps life. Oil runs cleaner." The advertisement ignored, however, the climate and public health harms caused by oil.[264] And as of July 21, 2020, the Power Past Impossible website described oil as "Energy for a Cleaner Environment." In touting the environmental benefits of oil, the website also made the following false or misleading assertions: "This is Energy for a Cleaner Environment," "99 [percent] Fewer Vehicle Emissions," and "Cleanest Air in More Than a Decade."[265] In 2020 API launched a nationwide advertising campaign called "Energy for Progress," which portrays the oil and gas industry as a leader in reducing greenhouse gas emissions.[266] The opening advertisement for the campaign states that "natural gas and oil companies have . . . reduced carbon emission levels to the lowest in a generation."[267] Similarly, in a September 2023 Twitter post, API stated "American natural gas & oil is committed to creating climate solutions."[268]

198.    The Energy for Progress website also contains advertisements such as "Five Ways We're Helping to Cut Greenhouse Gas Emissions," which misleadingly portrays the oil and gas

---

[263] *Id.*

[264] American Petroleum Institute, *Oil: Power Past Impossible*, YOUTUBE (Feb. 4, 2017), https://www.youtube.com/watch?v=w4KvOJlu5Xo.

[265] *See Energy for a Cleaner Environment,* POWER PAST IMPOSSIBLE https://web.archive.org/web/20200602111024/https://powerpastimpossible.org/state-of-american-energy/energy-for-a-cleaner-environment/ (last visited Nov. 15, 2023).

[266] *See API Launches New National Campaign 'Energy for Progress', Highlights U.S. Energy Leadership in Annual State of American Energy Event*, AM. PETROLEUM INST. (Jan. 7, 2010),
https://www.api.org/news-policy-and-issues/news/2020/01/07/soae-2020-release.

[267] *See* API, *Solving Big Challenges Requires Energy*, YOUTUBE (Jan. 7, 2020), https://www.youtube.com/watch?v=87ObTFn68ic&feature=youtu.be.

[268] American Petroleum Institute (@APIenergy), TWITTER (Sept. 5, 2023, 12:25 PM) https://twitter.com/APIenergy/status/1699111447593210289.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

industry as an environmental leader by focusing on marginal improvements in operational emissions while ignoring the much greater emissions from the industry's products.[269]



**Figure 17: API advertisement from its Energy for Progress campaign, used as the campaign's Facebook banner.**

199.    Tellingly, however, API's strategy does not advocate for or even mention reduction in fossil fuel production as a strategy to protect the climate. Rather, it focuses on potential technical advances and shifting to heavier reliance on natural gas as a "clean fuel." And an internal API email shows that its Climate Action Framework was in fact organized around the purpose of "the continued promotion of natural gas in a carbon constrained economy."[270] As discussed above, natural gas is far from a "clean" fuel, as API misleadingly claims, as natural gas production and use contributes substantially to climate change through the release of methane, an extremely potent greenhouse gas.

---

[269] *See Five Ways We're Helping to Cut Greenhouse Gas Emissions*, ENERGY FOR PROGRESS (Apr. 17, 2020), https://energyforprogress.org/article/five-ways-were-helping-to-cut-greenhouse-gas-emissions/.

[270] *See Oversight Committee Releases New Documents Showing Big Oil's Greenwashing Campaign and Failure to Reduce Emissions*, U.S. HOUSE COMM. ON OVERSIGHT & ACCOUNTABILITY: DEMOCRATS (Dec. 9, 2022), https://oversightdemocrats.house.gov/news/press-releases/oversight-committee-releases-new-documents-showing-big-oil-s-greenwashing#:~:text=Ro%20Khanna%2C%20Chairman%20of%20the,failure%20to%20meaningfully%20reduce%20emissions.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

**H.  Defendants' Concealments and Misrepresentations Regarding the Dangers of Fossil Fuel Products Encouraged Continued Use of Fossil Fuels and Discouraged Concerted Action on Greenhouse Gas Emissions.**

200.    Consumer use of fossil fuel products is a significant contributor to climate change. As a result of Defendants' sustained and widespread campaign of disinformation, many Chicago and Illinois consumers have been unaware of the magnitude of the threat posed by their use of fossil fuels, or of the relationship between their purchasing behavior and climate change.

201.    For example, Edelman, the PR firm hired by Shell to carry out its #makethefuture campaign, found that as a result of the campaign, "Audience members are 31 [percent] more likely to believe Shell is committed to cleaner fuels" and "Positive attitudes towards the brand increased by 12 [percent]."[271]

202.    As a result of Defendants' efforts to deny and undermine climate science and conceal the dangers of fossil fuel consumption, Defendants encouraged consumers to continue to use fossil fuels. As a result of Defendants' sustained and widespread campaign of disinformation, many Chicago and Illinois consumers have been unaware of the strength of the scientific consensus about the relationship between consumption of fossil fuels and climate change, the magnitude of the threat posed by their own use of fossil fuels, or of the contribution their purchasing behavior makes to aggravating the effects of climate change.

203.    In addition to Defendants misleading Chicago consumers by affirmatively misrepresenting the state of their and the scientific community's knowledge of climate change and by failing to disclose the dangerous effects of using their products, Defendants have sought to mislead consumers, and induce purchases and brand affinity, with greenwashing advertisements designed to represent Defendants as environmentally responsible companies developing

---

[271] *Shell: South Pole Energy Challenge*, EDELMAN, https://archive.ph/lZ8Qz (last visited Nov. 16, 2023).

innovative green technologies and products. In reality, however, Defendants' business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change.

204. By misleading Chicago consumers about the climate impacts of using fossil fuel products, and by failing to disclose the climate risks associated with their purchase and use of those products, Defendants deprived consumers, including those in Chicago, of information about the consequences of their purchasing decisions. This led to consumers using more fossil fuels, and using fossil fuels less efficiently, than they otherwise would have done in the absence of Defendants' deception.

205. Defendants intended for Chicago consumers to rely on their omissions and concealments and to continue purchasing Defendants' fossil fuel products without regard for the damage such products cause.

206. Knowledge of the risks associated with the routine use of fossil fuel products is material to Chicago and Illinois consumers' decisions to purchase and use those products. Recent studies and surveys have found that consumers with substantial awareness of climate change are "concerned about climate change, and a majority expect fellow Americans to be willing to change their consumption habits as a result."[272] Similarly, informed consumers often attempt to contribute toward solving environmental problems by supporting companies that they perceive to be developing "green" or more environmentally friendly products.[273] These studies demonstrate that

---

[272] *Changes in Consumers' Habits Related to Climate Change May Require New Marketing and Business Models*, THE CONFERENCE BD. (Oct. 26, 2022), https://www.conference-board.org/topics/consumers-attitudes-sustainability/changes-in-consumer-habits-related-to-climate-change.

[273] *See* Anthony Leiserowitz et al., *Consumer Activism on Global Warming*, YALE PROGRAM ON CLIMATE CHANGE COMMC'N, at 3 (2021), https://climatecommunication.yale.edu/wp-content/uploads/2021/12/consumer-activism-on-global-warming-september-2021.pdf (about a third of American consumers surveyed report "reward[ing] companies that are taking steps to

some Chicago consumers who received accurate information that fossil fuel use was a primary driver of climate change, and about the resultant dangers to the environment and to public health, would have decreased their use of fossil fuel products and/or demanded lower-carbon transportation and product options.

207.    As described herein, by casting doubt upon the scientific consensus on climate change, Defendants deceived Chicago consumers about the relationship between consumption of fossil fuels and climate change, and the magnitude of the threat posed by fossil fuel use. Chicago consumers equipped with complete and accurate knowledge about the climate and the public health effects of continued consumption of fossil fuels would have likely formed a receptive customer base for clean energy alternatives decades before such demand in fact developed. Instead, Defendants' campaign of deception allowed them to exploit public uncertainty to reap substantial profits.

**I.    The Effects of Defendants' Deceit Are Ongoing.**

208.    The consequences of Defendants' tortious misconduct—in the form of misrepresentations, omissions, and deceit—began decades ago, and continue to be felt to this day. As described above, Defendants, directly and/or through membership in other organizations, misrepresented their own activities, the fact that their products cause climate change, and the danger presented by climate change.

209.    Defendants' collective goal was to ensure that "[a] majority of the American public, including industry leadership, recognizes that significant uncertainties exist in climate science, and therefore raises questions among those (e.g. Congress) who chart the future U.S. course on global

---

reduce global warming by buying their products" and "punish[ing] companies that are opposing steps to reduce global warming by not buying their products.").

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

climate change."[274] In 2023, only 20 percent of Americans understand how strong the level of consensus is among scientists that human-caused global warming is happening, and 28 percent think climate change is caused mostly by natural changes in the environment.[275]

210. Defendants' misrepresentations, omissions, and deceit had a significant and long-lasting effect on how the public views climate change and the dangers of fossil fuel use that continues to the present day. By sowing doubt in the minds of the public, Defendants substantially altered the public discourse on climate change, and intentionally delayed action on climate change.

211. If Defendants had been forthcoming about their own climate research and understanding of the dangers of fossil fuel products, consumers and the public could have made substantial progress in transitioning to a lower-carbon economy, at a much earlier time, potentially averting some of the effects of the climate crisis that Chicago is experiencing today.

212. The fact that Defendants and their proxies knowingly provided incomplete and misleading information to the public, including to Chicago consumers, only recently became discoverable due to, among other things:

a. Defendants' above-described campaign of deception, which continues to this day;

b. Defendants' efforts to discredit climate change science and create the appearance that such science is uncertain;

c. Defendants' concealment and misrepresentations regarding the fact that their products cause catastrophic harms; and

---

[274] Joe Walker, *Email to Global Climate Science Team re Draft Global Climate Science Communications Plan* (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[275] Leiserowitz et al., *supra* note 178.

135

d.  Defendants' use of front groups such as API, the Global Climate Coalition, and the National Mining Association to obscure their involvement in these actions.

213.  By concealing the very fact of their campaign of deception, including by using front groups to obscure their own involvement in the deception, Defendants concealed their unlawful conduct from the public and the City, thereby preventing it from discovering the facts underlying the claims alleged herein.

### J.  The City Has Suffered, Is Suffering, and Will Continue to Suffer Injuries from Defendants' Wrongful Conduct.

214.  The City of Chicago has already suffered negative environmental and physical consequences of climate change. Chicago has incurred, and will incur, significant costs to withstand increased hot weather events, effects of increased winter temperatures, increased precipitation and flooding, and negative impacts on Lake Michigan. "Heat waves cause heat-related deaths and illness, worse air quality, and increased reliance on costly electricity for fans and air conditioning. More frequent heavy downpours cause basement flooding and property damage, sewage overflows, contamination of local waterways, and transit disruptions. Warmer spring temperatures lengthen the pollen season and increase exposure to allergens. Changing Lake Michigan water levels and temperature increase shoreline erosion, property damage, and the potential for toxic algae blooms."[276]

215.  The City is committed to protecting Chicagoans from the damaging effects that climate change has, and will continue to have, on the City and its residents. "While all Chicagoans

---

[276]  CITY OF CHICAGO, CHICAGO CLIMATE ACTION PLAN at 14 (2022), https://www.chicago.gov/content/dam/city/sites/climate-action-plan/documents/Chicago-CAP-071822.pdf [hereinafter "Chicago Climate Action Plan"].

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

directly experience climate change impacts, frontline communities experience the most immediate and worst effects."[277]

<div align="center"><em>Increased Heat Events</em></div>

216.    Climate change has already resulted in (and will continue to result in) an increase in average summer temperatures and the frequency of extreme heat in Chicago.

217.    2023 was the hottest year on record. Heat waves and high-heat days will continue to be an increasing problem in Chicago.[278]

218.    Heat waves and high-heat days dramatically increase the risk that Chicagoans will suffer from heat-related illnesses that can often be fatal.

219.    In 1995, for example, 739 Chicagoans tragically died as a result of a four-day heat wave. Many of the victims of the 1995 heat wave were elderly, low-income, and Black, living in areas that experience urban heat island effects, apartments without ventilation or air conditioning, and in neighborhoods lacking social infrastructure and critical resources to withstand extreme heat events.

220.    Low-income communities and communities of color are disproportionately impacted by heat waves and high heat days. For example, the maps below depict the average summer surface temperature and the environmental justice areas in the City.

---

[277] *Id.*

[278] Tara Molina, *With 2023 set to be the warmest year on record, experts have warning for Chicago*, CBS NEWS CHICAGO (updated Nov. 9, 2023, 6:34 PM CST), https://www.cbsnews.com/chicago/news/2023-warmest-year-on-record-experts-warning-chicago/.

FILED DATE: 2/20/2024 12:34 PM  2024CH01024



**Figure 18: Chicago Heat and Environmental Justice Index Maps**[279]

221. By mid-century, scientists expect heat waves as intense as the 1995 heat waves to occur between two and five times a decade. By the end of the century, scientists project that heat waves like the 1995 heat wave could occur multiple times each year.[280]

222. Without implementing costly heat resiliency measures, such as cooling centers and green infrastructure that reduces urban heat islands, the effects of increased heat waves and high-heat days could be catastrophic.

---

[279] Chicago Climate Action Plan, *supra* note 276, at 14; Sarah Macaraeg, *Mapping a threat: Read the investigation on disparities in Chicago's summer heat*, CHICAGO TRIBUNE (May 25, 2023, 5:00 AM), https://www.chicagotribune.com/investigations/chicago-heat-disparities-20230526-2owgm4dyubfbpbby2fchm35zmi-list.html.

[280] CHICAGO METROPOLITAN AGENCY FOR PLANNING, APPENDIX A: PRIMARY IMPACTS OF CLIMATE CHANGE IN THE CHICAGO REGION at 12 (June 2013), https://www.cmap.illinois.gov/documents/10180/14193/Appendix+A+-+Primary+Impacts+of+Climate+Change+in+the+Chicago+Region.pdf/2a85b021-f3bd-4b98-81d1-f64890adc5a7.

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

223. Historically, the high temperature in the Chicago region reaches 95°F only three days each year. By mid-century, the high temperature is expected to reach 95°F at least ten to 15 days annually.[281] By 2090, the number of very hot days is projected to increase to between ten and 90 per year.[282] Overnight average temperatures have historically topped 70°F just 13.5 nights per year. The number of nights with an average temperature over 70°F is expected to increase to 30 to 40 nights per year.[283] Historically, the heat index in Chicago has surpassed 105°F one time per year. By mid-century, Chicago is expected to have between nine and 14 days with a heat index of 105°F or more, and by late century, between 12 and 34 days with a heat index of 105°F or more, depending on whether action is taken to address climate change.[284]

---

[281] CHICAGO METROPOLITAN AGENCY FOR PLANNING, ON TO 2050 STRATEGY PAPER CLIMATE RESILIENCE at 8 (2016), https://www.cmap.illinois.gov/documents/10180/517388/Climate+Resilience+Strategy+Paper.pdf/dd610883-d00f-407d-808b-484f9800a3f6 [hereinafter "Chicago Climate Resiliency Strategy Paper"].

[282] *Climate Change in Illinois*, IL. STATE CLIMATOLOGIST, https://stateclimatologist.web.illinois.edu/climate-change-in-illinois/ (last visited Nov. 15, 2023).

[283] *Id.*

[284] Kristina Dahl et. al, *Killer Heat in the United States Climate Choices and the Future of Dangerously Hot Days*, UNION OF CONCERNED SCIENTISTS (July 2, 2019), https://www.ucsusa.org/resources/killer-heat-united-states-0.

139

FILED DATE: 2/20/2024 12:34 PM    2024CH01024



**Figure 19: Monthly High and Low Temperatures for Chicago**[285]

*Increased Seasonal Temperature*

224.    Climate change is also causing an increase in seasonal temperatures, which creates several problems that Chicago will have to address through resiliency measures.

225.    Since 1970, Chicago's winters have warmed an average of 3.2°F. By mid-century, Chicago is projected to have 22 fewer days per year with a minimum temperature below 32°F. One study of the Chicago region estimates a 50 to 90 percent decline in days below 0°F by the end of the 21st century.[286]

---

[285] *Chicago, IL Top Climate Change Risks: Precipitation, Heat, Drought*, CLIMATE CHECK, https://climatecheck.com/illinois/chicago (last visited Nov. 15, 2023).

[286] *Id.* at 13.; Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 9;  Steve Varus & Jeff Van Dorn, *Projected future temperature and precipitation extremes in Chicago*, J. OF GREAT LAKES RSCH.,                    at                    22-32                    (2010), https://www.sciencedirect.com/science/article/abs/pii/S0380133009001841.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

226.    Increasing winter temperatures causes an increase in freeze-thaw events (the cycle of moving from below to above freezing conditions). Freeze-thaw cycles lead to wear-and-tear on the built environment, causing more rapid buckling and deterioration of roadways and of other built infrastructure.[287]

227.    Increased winter temperatures have also caused ice cover to diminish in the Great Lakes by 63 percent since the 1970s.[288] Diminished ice cover exposes coastal areas of Lake Michigan to a greater number of storm events each year, increasing the vulnerability of beaches, shorelines, and waterfront infrastructure to large storm surges. "[T]he effect is heightened by the fact that this additional open water occurs during a period of the year when storm intensity is generally greatest."[289] Reduced ice cover is also associated with warmer summer months.

228.    Increased winter temperatures also result in an increased retention of humidity in the atmosphere, which results in more winter rain precipitation rather than snowfall. Although overall snowfall may decrease, snowstorms will be more intense.[290] An increase in intense heavy snowfall accumulation will result in additional risks and damage to both built and green infrastructure, such as downed power lines and tree damage.

*Increased Precipitation and Flooding*

229.    Climate change has increased, and will continue to increase, the number of extreme precipitation events and flooding in Chicago.

---

[287] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 16.

[288] *Id.* at 9; *What Climate Change Means for Wisconsin*, EPA (Aug. 2016) https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-wi.pdf.

[289] *An Assessment of the Impacts of Climate Change on the Great Lakes*, ENV'T LAW & POL'Y CENTER, at 38 (2019), https://elpc.org/wp-content/uploads/2020/04/2019-ELPCPublication-Great-Lakes-Climate-Change-Report.pdf [hereinafter "ELPC Report"].

[290] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 15.

141

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

230.     Warmer air holds more water vapor, which results in more precipitation. Between 1979 and 2009, the Chicago region experienced 40 percent more precipitation than the prior 30-year period.[291]

231.     The severity of precipitation events has also increased. In recent years, the ten rainiest days resulted in nearly 40 percent of the total annual precipitation.[292]

232.     As the name indicates, 24-hour, 100-year storm events have historically occurred in Chicago, on average, once every 100 years. Since the 1980s, however, Chicago has experienced three of these storm events—a more than eight-fold increase.[293]

233.     Historically, Chicago experienced approximately 11 storms annually, which generated 15.3 inches of precipitation. By 2050, experts project that Chicago will experience approximately 13 storms annually, which will generate 17.5 inches of precipitation.[294]

234.     Increasingly frequent and severe storms will lead to major road, rail, and utility outages, mold in basements, severe erosion, sewer overflows, increased nutrient loading in Lake Michigan and other surface waters from roadway, agricultural, and landscape runoff, closures of local businesses, and increased flooding.

235.     Chicago is among the nearly 860 cities across the United States with combined sewer systems. Combined sewer systems carry both sewage and stormwater. During periods of intense precipitation or snowmelt, Chicago's wastewater treatment systems can become

---

[291] *Id.* at 12.

[292] *Id.*

[293] *Id.*

[294] *Chicago, IL Top Climate Change Risks*, *supra* note 285.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

overwhelmed, and Chicago's combined sewer system discharges untreated sewage and stormwater into surface waters.[295]

236. "If just two-thirds of an inch of rain falls in 24 hours, the Chicago River can become so swollen with sewage and stormwater that the river changes course and flows into Lake Michigan instead of away from it."[296]

237. In an attempt to mitigate combined sewer overflow events, the Tunnel and Reservoir Plan ("TARP"), commonly referred to as the Deep Tunnel, was designed to hold 2.3 billion gallons of combined, untreated wastewater until storm events subside. Rather than discharging the untreated wastewater into surface waters and Lake Michigan, the Deep Tunnel is designed to hold the wastewater until it can be treated and discharged.[297]

238. On July 2, 2023, Chicago experienced a rain event that overwhelmed the Deep Tunnel. Untreated wastewater overflowed at 19 locations across Chicagoland, and the Chicago River, which contained untreated wastewater from some of these overflow locations, was reversed, causing untreated wastewater to flow directly into Lake Michigan.[298]

239. Untreated wastewater contains harmful bacteria. The July 2023 event caused "poor water quality conditions," which closed nearly all of Chicago's beaches.[299]

---

[295] NATURAL RESOURCES DEFENSE COUNCIL, CLIMATE CHANGE AND HEALTH IN ILLINOIS 4-5 (Sept. 2019), https://www.nrdc.org/sites/default/files/climate-change-health-impacts-illinois-ib.pdf.

[296] *Id.* at 4.

[297] Michael Hawthorne & Adriana Perez, *Costly Deep Tunnel flooding project can't handle Chicago area's severe storms fueled by climate change*, CHICAGO TRIBUNE (Jul. 16, 2023, 5:00 AM), https://www.chicagotribune.com/news/environment/ct-rain-deep-tunnel-overwhelmed-20230716-argrp2ruafadbhu4jrov5iplt4-story.html.

[298] *Id.*; *see also* James Neveau, *Chicago officials reverse flow of river into Lake Michigan to ease flooding from heavy rain*, NBC CHICAGO (updated Jul. 2, 2023, 4:25 PM), https://www.nbcchicago.com/weather/chicago-officials-reverse-flow-of-river-into-lake-michigan-to-ease-flooding-from-heavy-rain/3178728/.

[299] Neveau, *supra* note 298.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

240.     Storms like the one that occurred on July 2, 2023 illustrate that precipitation events are becoming so severe that they overwhelm stormwater tunnels and result in "sewage overflows and basement backups in the 252 square miles of Chicago and [Cook] County served by the main part of the [Deep Tunnel] system."[300]

241.     Professor Don Wuebbles, an emeritus professor of atmospheric sciences at the University of Illinois, noted that "[e]ssentially we find that every storm is now being affected by climate change."[301]

242.     Rains of more than 2.5 inches a day, the amount that can trigger sewage dumping into Lake Michigan, were expected to increase by 50 percent by 2039, and by the end of the century, the number of big storms could increase by 160 percent.[302]

243.     Since 2008, "nearly 40 billion gallons of runoff and waste have been released into Lake Michigan – three times more than during the previous two decades."[303]

244.     Chicago is located in a historically low-lying, swampy area, which makes the City susceptible to flooding caused by increasingly extreme precipitation. From 1969 to 2009, flooding accounted for 41 percent of disaster losses in Illinois.[304]

245.     "Flood losses in the city and suburbs cost taxpayers $1.8 billion in subsidized grants, loans, and insurance payments between 2004 and 2014, according to a 2019 report from the National Academy of Sciences. Only hurricane-ravaged areas of coastal Louisiana, New York and Texas received more federal flood aid during the decade."[305]

---

[300] Hawthorne & Perez, *supra* note 297.

[301] *Id.*

[302] *Id.*

[303] *Id.*

[304] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 23.

[305] Hawthorne & Perez, *supra* note 297.

246. Of 1,200 census tracts in Chicago, there are 361 where more than half of buildings have significant risk from surface (pluvial) flooding and riverine (fluvial) flooding.[306]

247. Low-income communities and communities of color are disproportionately impacted by severe precipitation events and flooding. Minority communities accounted for eighty-seven percent of flood damage insurance claims between 2007 and 2016.

248. The maps below compare the areas of the City with the highest susceptibility to flooding with the environmental justice areas in the City. The map on the left ranks flooding susceptibility on a scale of one (low susceptibility depicted in blue) to ten (high susceptibility depicted in red).



**Figure 20: Chicago Flooding Frequency and Environmental Justice Index Maps[307]**

---

[306] *Chicago, IL Top Climate Change Risks*, *supra* note 285.

[307] Chicago Climate Action Plan, *supra* note 276, at 14; Brett Chase, *Flooding hits poorest communities hardest as climate change intensifies storms*, CRAIN'S CHI. BUS. (Sept. 26, 2019, 1:54 PM), https://www.chicagobusiness.com/crains-forum-water/flooding-hits-poorest-chicago-area-communities-hardest-climate-change.

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

249.     Widespread and chronic flooding has damaged homes—sometimes irreparably—causing evacuations, mold-related health issues, emotional distress, and significant costs. A Center for Neighborhood Technology survey in Cook County found that a majority of respondents reported increased stress (84 percent), lost hours of work to clean up (74 percent), and lost valuables (63 percent) as a result of flooding.[308]

250.     The Federal Reserve Bank of Chicago estimates that the transportation and utility outages and other effects of extreme weather conditions have contributed to Chicago's slow rate of growth, including declines in sales and manufacturing production."[309]

### *Lake Michigan*

251.     The Great Lakes, including Lake Michigan, "are extremely important both to humans and to wildlife—they are an abundant freshwater resource for water supplies, industry, shipping, fishing, and recreation, as well as a rich and diverse ecosystem."[310]

252.     As set forth above, climate change has negatively impacted, and will continue to negatively impact, Lake Michigan's water quality, ice cover, and shoreline. Extreme precipitation events and increased temperatures also negatively impact mixing and oxygenation in Lake Michigan. Vertical mixing of Lake Michigan typically occurs twice a year—once in the spring and once in the fall as the surface water temperature increases and decreases, respectively. When the surface water temperature stays above a certain point, mixing is less likely to fully occur. "That vertical mixing brings nutrients up from the sediment at the bottom of the lake, and oxygen down from the surface, so it is crucial for ecosystems."[311]

---

[308] Chicago Climate Resiliency Strategy Paper, *supra* note 281, at 28.

[309] *Id.*

[310] ELPC Report, *supra* note 289, at 5.

[311] *Id.* at 27.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

253.    Water stagnation from reduced mixing and nutrient loading from extreme precipitation events also increases the risk of harmful algal blooms, which would threaten the drinking water source for the vast majority of Chicagoans, require the City to close public access to beaches, and caution the public against water recreation.[312]

254.    The change to the Lake Michigan ecosystem as a result of the increased nutrient load and lack of water column mixing has resulted in documented impacts to many fish species, including shifts in geographic range, changes in demographics (abundance, growth, recruitment), increased occurrence of diseases, phenological shifts (earlier migration, spawning), extirpation (especially of cold-water species), and hybridization resulting from novel species interaction.[313] These changes negatively impact the City's recreational fishing industry and, in turn, the City's revenue from fishing activities.

255.    Lower water levels and higher summer water temperatures are also affecting some species of Great Lakes birds by encouraging the spread of disease and altering migration patterns. Bird populations in the Chicago area have been impacted by "the increased frequency of botulism outbreaks in Lake Michigan from 1963 to 2008 . . . related to higher summer water temperatures and lower water levels."[314] "[A] large share of the population engages in bird and wildlife viewing, with 30 to 35 percent of the population engaged in this activity within a mile of their home in the Great Lakes States, and eight to 12 percent engaged in this activity further than a mile from their home in the Great Lakes States."[315]

---

[312] *Id.* at 29-30.

[313] *Id.* at 31-32.

[314] *Id.* at 36.

[315] *Id.* at 45.

*Chicago's Climate Resiliency Measures*

256.     The City has committed to invest "$188,000,000 in meaningful, substantive, and justice-oriented climate projects that will provide the City's underserved communities with resilient infrastructure and green workforce development opportunities" to combat the direct results of climate change.[316]

257.     Chicago has and will continue to incur substantial costs to adapt to the impacts of climate change. These resiliency measures include, but are not limited to:

a.     Building critical infrastructure like cooling centers and buses and retrofitting existing buildings with air conditioning or other cooling capabilities;

b.     Recalibrating transportation infrastructure design standards to withstand new thresholds of heat, freeze-thaw cycles, and buckling from changing temperature and precipitation patterns;

c.     Upgrading infrastructure to reduce road and rail network outages during extreme weather events;

d.     Developing critical infrastructure and flood mitigation measures to withstand severe precipitation events;

e.     Providing increased maintenance for roads, transit, and emergency vehicles to withstand infrastructure damage from severe weather events;

f.     Preparing for increased building capital and maintenance costs to repair damage from severe weather events;

---

[316] *Environmental Justice Climate Investments*, CITY OF CHICAGO (July 18, 2022) https://www.chicago.gov/content/dam/city/sites/climate-action-plan/2022-Climate-Bond-Info.pdf.

148

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

g.      Increasing landscaping and urban park maintenance costs related to the maintenance of trees, plants, and flowers as a result of the changing seasonal trends and severe weather events;

h.      Increasing harbor dredging and treatment costs;

i.      Increasing water treatment, cooling, and other municipal operations;

j.      Fortifying the electrical grid to accommodate the increase in demand for heating and cooling; and

k.      Deploying wellness checks for vulnerable residents.[317]

**CAUSES OF ACTION**

**COUNT I**
**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
**(Against Fossil Fuel Defendants)**

258.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

259.    At all relevant times, the Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, promoting, and/or selling fossil fuel products and their derivatives. The Fossil Fuel Defendants placed these fossil fuel products and their derivatives into the stream of commerce.

260.    As advertisers, promoters, and/or sellers of fossil fuel products and their derivatives, Defendants had a duty to warn the consumers, the public, and the City of the reasonably foreseeable environmental and health risks posed by fossil fuel products and their derivatives.

---

[317] *Climate Change and Chicago: Projections and Potential Impacts*, CHICAGO CLIMATE ACTION PLAN, at 1-4 (Nov. 7, 2007), https://www.chicago.gov/content/dam/city/progs/env/CCAP/Chicago_climate_impacts_report_C hapter_6_Infrastructure.pdf.

149

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

261.     Fossil fuel products and their derivatives are defective and unreasonably dangerous products and pose significant risks to human health and the environment.

262.     Fossil fuel products and their derivatives release greenhouse gases into the atmosphere, causing global warming, more frequent and extreme precipitation events and flooding, more frequent and extreme drought, more frequent and severe heat waves and extreme temperatures, more frequent and extreme other weather events, and the consequences and injuries associated with those physical and environmental changes ("Climate-Related Harms") result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

263.     Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products and derivatives, including the Climate-Related Harms and any other harms and injuries sustained by the City as described herein.

264.     At all times relevant to this action, Fossil Fuel Defendants' fossil fuel products and their derivatives were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold, including but not limited to being combusted for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

265.     Fossil Fuel Defendants and their affiliates and subsidiaries knew, or should have known, that these fossil fuel products and their derivatives would be used by the City, its residents, and others within the City's limits, amongst others, in the manner reasonably foreseeably intended.

FILED DATE: 2/20/2024 12:34 PM 2024CH01024

266. Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the Climate-Related Harms described herein rendered their fossil fuel products and their derivatives dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

267. The fossil fuel products and derivatives that Fossil Fuel Defendants refined, formulated, designed, manufactured, merchandised, advertised, promoted, and/or sold—whether used as intended or used in a reasonably foreseeable manner—were not reasonably safe at the time they left Fossil Fuel Defendants' control because they lacked adequate warnings and instructions.

268. The fossil fuel products and their derivatives reached consumers and the environment substantially unchanged from that in which they left the Fossil Fuel Defendants' control.

269. Without adequate warnings, Fossil Fuel Defendants' fossil fuel products and their derivatives were unsafe to an extent beyond that which would be contemplated by an ordinary person.

270. Fossil Fuel Defendants knew that by failing to warn consumers, the City, and the public of the risks posed by fossil fuels, their products would be purchased, transported, stored, handled, and used without users and consumers being aware of the hazards fossil fuels pose to human health and the environment.

271. At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products and their derivatives posed because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

272. Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products and their derivatives, the Fossil Fuel Defendants failed to adequately warn consumers, the City, and the public of the known and foreseeable risks of climate change, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

273. Not only did Fossil Fuel Defendants fail to adequately warn, but the Fossil Fuel Defendants also represented, asserted, claimed, and warranted that their fossil fuel products and derivatives were safe for their intended and foreseeable uses.

274. Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products and their derivatives were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

275. Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and their derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have also disseminated.

276. Accordingly, the ordinary consumer would not recognize that the use of fossil fuel products and their derivatives causes global and localized changes in climate, and would result in injuries to the City, its communities, and its resources, as described herein.

277.    Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the City, the public, consumers, and users of fossil fuel products and their derivatives with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel Defendants' vast amounts of knowledge and research demonstrating fossil fuels and their derivatives presented threats to human health and the environment.

278.    Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products and their derivatives would not have earned widespread acceptance in the marketplace, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be more used in greater amounts.

279.    Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment that results from the intended and reasonably foreseeable use of fossil fuel products and their derivatives, the City and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

280.    As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and their derivatives, Fossil Fuel Defendants are strictly liable to Plaintiff.

281.    The Fossil Fuel Defendants' conduct was heinous, deceitful, and fraudulent. Fossil Fuel Defendants undertook such conduct with conscious disregard for the health, safety, property, and rights of others.

282. As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and derivatives, the City has incurred and will continue to incur costs and damages related to physical damage to City property, City infrastructure, human health, and natural resources.

283. As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the City and its residents have suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a. finding that Fossil Fuel Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b. holding Fossil Fuel Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Fossil Fuel Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c. awarding any other damages as permitted by law;

d. awarding litigation costs and attorneys' fees permitted by law;

e. awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f. granting such other and further relief as this Court deems appropriate and just.

154

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

## COUNT II
## NEGLIGENT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against Fossil Fuel Defendants)

284. The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

285. At all relevant times, the Fossil Fuel Defendants and their affiliates and subsidiaries were engaged in the business of advertising, promoting, and/or selling fossil fuel products and their derivatives.

286. As advertisers, promoters, and/or sellers of fossil fuel products and their derivatives, Fossil Fuel Defendants had a duty to warn the public, consumers, and users of such products, including the City, of the reasonably foreseeable environmental and health risks posed by fossil fuel products and their derivatives.

287. Fossil fuel products and their derivatives release greenhouse gases into the atmosphere, causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

288. Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of their fossil fuel products and derivatives, including the Climate-Related Harms and any other harms and injuries sustained by the City as described herein.

289. At all times relevant to this action, Fossil Fuel Defendants' fossil fuel products and their derivatives were used, distributed, and sold in a manner in which they were reasonably foreseeably intended to be used, distributed, and sold, including but not limited to being combusted

155

for energy, combusted to power automobiles, refined into petrochemicals, and refined and/or incorporated into petrochemical products including, but not limited to, fuels and plastics.

290. Fossil Fuel Defendants and their affiliates and subsidiaries knew, or should have known, that these fossil fuel products and their derivatives would be used by the City, its residents, and others within the City's limits, amongst others, in the manner reasonably foreseeably intended.

291. Fossil Fuel Defendants knew, or should have known, based on information passed to them from their internal research divisions and affiliates, from the non-party trade associations and entities, and/or from the international scientific community, that the climate effects described herein rendered their fossil fuel products and their derivatives dangerous, or likely to be dangerous, when used in the manner reasonably foreseeably intended.

292. Fossil Fuel Defendants knew that by failing to warn the City, the public, consumers, and users of fossil fuels and their derivatives of the risks posed by fossil fuels, their products would be purchased, transported, stored, handled, and used without users and consumers being aware of the hazards fossil fuels pose to human health and the environment.

293. At the time of manufacture, merchandising, advertising, promotion, or sale, Fossil Fuel Defendants could have provided warnings or instructions regarding the full and complete risks fossil fuel products and their derivatives posed because they knew and/or should have known of the unreasonable risks of harm associated with the use of these products, as described herein.

294. Despite the Fossil Fuel Defendants' superior and unequal knowledge of the risks posed by fossil fuel products and their derivatives, the Fossil Fuel Defendants failed to adequately warn consumers, the City, and the general public of the known and foreseeable risks of climate

change, Climate-Related Harms, and other dangers that would inevitably follow from the intended or reasonably foreseeable use of these products.

295. Not only did Fossil Fuel Defendants fail to adequately warn consumers, but the Fossil Fuel Defendants also represented, asserted, claimed, and warranted that their fossil fuel products and derivatives were safe for their intended and foreseeable uses.

296. Any warnings the Fossil Fuel Defendants may have issued as to the risks of their fossil fuel products and their derivatives were rendered ineffective and inadequate by Fossil Fuel Defendants' false and misleading public relations campaigns and statements about fossil fuel products and their derivatives, and their years-long efforts to conceal and misrepresent the dangers that follow from the intended or reasonably foreseeable use of such products.

297. Fossil Fuel Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Fossil Fuel Defendants' fossil fuel products and derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Fossil Fuel Defendants may have also disseminated.

298. Accordingly, the ordinary consumer would not recognize that the use of fossil fuel products and their derivatives causes global and localized changes in climate, and would result in injuries to the City, its communities, and its resources, as described herein.

299. Fossil Fuel Defendants breached their duty to warn by unreasonably failing to provide the City, the public, consumers, and users of fossil fuel products and their derivatives with warnings regarding the potential and/or actual threat to human health and the environment caused by pollution released from the manufacturing and consumption of fossil fuels, despite Fossil Fuel

Defendants' vast amounts of knowledge and research demonstrating fossil fuels and their derivatives presented threats to human health and the environment.

300.     Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, their fossil fuel products and their derivatives would not have earned widespread acceptance in the marketplace.

301.     Had the Fossil Fuel Defendants provided adequate warnings and not waged a deceptive campaign against climate science, fossil fuel alternatives could have been developed faster, investment in fossil fuel alternatives would be greater, and/or fossil fuel alternatives would be more used in greater amounts.

302.     Moreover, had the Fossil Fuel Defendants provided adequate warnings about the adverse impacts to public health and the environment that results from the intended and reasonably foreseeable use of fossil fuel products and their derivatives, the City and its residents would have taken measures to decrease fossil fuel dependency in order to avoid or lessen the Climate-Related Harms and property damage that would inevitably follow.

303.     As a result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and their derivatives, Fossil Fuel Defendants are liable to Plaintiff.

304.     The Fossil Fuel Defendants' conduct was heinous, deceitful, and fraudulent. Defendants undertook such conduct with conscious disregard for the health, safety, property, and rights of others.

305.     As a direct and proximate result of the Fossil Fuel Defendants' failure to warn about the unreasonably dangerous conditions of their fossil fuel products and derivatives, the City has

incurred and will continue to incur costs and damages related to physical damage to City property, City infrastructure, human health, and natural resources.

306.    As a direct and proximate result of Fossil Fuel Defendants' acts and omissions as alleged herein, the City and its residents have suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.    finding that Fossil Fuel Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b.    holding Fossil Fuel Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Fossil Fuel Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.    awarding any other damages as permitted by law;

d.    awarding litigation costs and attorneys' fees permitted by law;

e.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.    granting such other and further relief as this Court deems appropriate and just.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

**COUNT III**
**NEGLIGENCE**
**(Against All Defendants)**

307.     The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

308.     For years, Defendants possessed knowledge that fossil fuels are the primary cause of climate change and that, if unabated, climate change would cause Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

309.     Given the scientific evidence available to and conducted by the Defendants, as referenced herein, such injury was likely and reasonably foreseeable.

310.     Under Illinois law, Defendants had a duty to the City and its residents to exercise due care in the marketing, sale, and/or labeling of their products and to act reasonably for the protection of the City and its residents and to avoid inflicting the injuries described herein.

311.     Under Illinois law, Defendants also had a duty to honestly communicate their knowledge about the hazards of their products, and a duty not to make false and misleading statements about the hazards of their products.

312.     Defendants also had a duty under the City's Consumer Protection Law, as alleged herein *infra*, to provide disclosures of the hazardous impacts of their products to prevent risks to human life and/or human health.

313.     The Chicago Consumer Protection Law acts to protect human life, and the injuries the City and its residents have and will continue to suffer are a type of injury this law sought to prevent.

314.     Defendants had superior knowledge of the risk posed by fossil fuel products at all times relevant to this Complaint.

160

315.    Defendants breached their duty of care when they advertised, promoted, and/or sold fossil fuel products and their derivatives, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives, in a manner that they knew or should have known would result in injury to human health and safety, damage to City property and infrastructure, loss of use of City services, and other damages to the City.

316.    Defendants further breached their duty of care by waging a years-long deceptive marketing and public relations campaign to discredit climate science.

317.    Any warnings provided by Defendants were rendered ineffective by the years-long deceptive marketing practices and public relations campaign which promulgated false and misleading statements, casted doubt on the consensus of climate scientists, and advanced pseudo-scientific theories.

318.    Defendants individually and in concert widely disseminated marketing materials, refuted the scientific knowledge generally accepted at the time, advanced and promoted pseudo-scientific theories of their own, and developed public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes, undermining and rendering ineffective any warnings that Defendants may have also disseminated.

319.    A reasonably careful company would not engage in a years-long deceptive marketing practices and public relations campaign to promulgate such false and misleading statements, would not manufacture or distribute fossil fuel products and their derivatives without warning, would warn of these products' hazardous properties, and/or would take steps to enhance the safety and/or reduce the risk of the products.

320. Defendants were grossly negligent because they failed to exercise even slight care, placing revenue and profit generation above the health and safety of humans and the environment.

321. Defendants' conduct was wanton, willful, and showed a reckless disregard or conscious indifference towards human health and safety, the rights of the City's residents, City property and infrastructure, and City services. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City suffered monetary losses and damages in amounts to be proven at trial.

322. Defendants' conduct caused injury to the lives and health of the City's residents, and to the City's property and natural resources, including by causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a. finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b. holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c. awarding any other damages as permitted by law;

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

d.      awarding litigation costs and attorneys' fees permitted by law;

e.      awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.      granting such other and further relief as this Court deems appropriate and just.

<div align="center">

**COUNT IV**
**PUBLIC NUISANCE**
**(Against All Defendants)**

</div>

323.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

324.    Under Illinois law, the general public has a right to public health, public safety, public peace, public comfort, and public convenience.

325.    The Illinois Constitution also provides the People of the State of Illinois have a common right to a healthful environment. ILL. CONST. art. XI, § 1 (1970).

326.    Defendants, individually and in concert with each other, through their affirmative promotion, sale, and/or distribution of their fossil fuel products and their derivatives in the City have created, caused, contributed to, and assisted in creating Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

327.    Defendants were substantially certain that their promotion, sale, and/or distribution of fossil fuel products and their derivatives would cause Climate-Related Harms to occur, when those products and derivatives were used exactly as intended.

328.    These Climate-Related Harms are injurious to health, indecent and offensive to the senses, interfere with the comfortable enjoyment of life and property, and constitute a substantial and unreasonable interference with rights enjoyed by the public, including rights under Article XI of the Illinois Constitution.

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

329.     Defendants created, caused, contributed to, and assisted in the creation of these and other Climate-Related Harms in the City by, among other things, affirmatively promoting the sale and use of fossil fuel products and their derivatives in the City, which Defendants knew would cause or exacerbate Climate-Related Harms, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives.

330.     The Climate-Related Harms obstruct and interfere with rights common to the public, including the right guaranteed by the Illinois State Constitution to a healthful environment, the public health, the public safety, the public peace, the public comfort, and the public convenience. These interferences with public rights include, among other things:

a.     Extreme heat events, which increase the risk of injury or death from dehydration, heat stroke, heart attack, and respiratory problems;

b.     Frequent and severe droughts, which can result in drinking water shortages and land subsidence due to groundwater depletion;

c.     Increased smog from hotter temperatures, which damages lungs and increases rates of childhood asthma, respiratory and heart disease, and death, and which reduces visibility and obstructs scenic views;

d.     Extreme winter storms, which cause flooding that can damage public infrastructure, obstructing the free passage and use of property;

e.     Flooding and groundwater changes, which obstruct the free passage and use of roads and property, impair water quality in groundwater aquifers, damage critical public infrastructure, and lead to unprecedented levels of water surge into communities that can cause injury or even death; and

f.  Significant disruptions to the City's ecosystems and biodiversity, including the spread of invasive species.

331.  These Climate-Related Harms obstruct the public's free use and comfortable enjoyment of property and natural resources, and an ordinary person would be reasonably annoyed or disturbed by these Climate-Related Harms.

332.  The Climate-Related Harms caused by Defendants' nuisance-creating conduct are extremely grave, and far outweigh the social utility of that conduct.

333.  As a consequence of their actions, as alleged herein, Defendants have created and maintained, and continue to create and maintain, a public nuisance at common law.

334.  Defendants' conduct caused and will continue to cause harm to the City and its residents many years into the future.

335.  As a direct and proximate result of the Defendants' acts and omissions, the City will be required to expend significant public resources to mitigate the impacts of Climate-Related Harms throughout the City.

336.  The Climate-Related Harms are severe and greater than the City and the public should bear without compensation, and outweigh any utility of the Defendants' conduct.

337.  As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.  finding that the Defendants' actions alleged herein constituted a common law public nuisance;

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

165

FILED DATE: 2/20/2024 12:34 PM  2024CH01024

b.      holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.      awarding any other damages as permitted by law;

d.      awarding litigation costs and attorneys' fees permitted by law;

e.      awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.      granting such other and further relief as this Court deems appropriate and just.

## COUNT V
## PRIVATE NUISANCE
### (Against All Defendants)

338.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

339.    The Defendants' affirmative promotion, sale, and/or distribution of their fossil fuel products and their derivatives in the City caused or exacerbated climate change and its impacts, causing Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

340.    Defendants were substantially certain that their promotion, sale, and/or distribution of fossil fuel products and their derivatives would cause Climate-Related Harms to occur, when those products and derivatives were used exactly as intended.

166

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

341.    Defendants created, caused, contributed to, and assisted in the creation of these and other Climate-Related Harms in the City by, among other things, affirmatively promoting the sale and use of fossil fuel products and their derivatives in the City, which Defendants knew would cause or exacerbate Climate-Related Harms, while failing to include warnings of the risk of harm associated with fossil fuel products and their derivatives.

342.    The City owns, leases, occupies, and manages extensive real property which has been and will be injured by Climate-Related Harms, which result in risks to human health and safety, damage to property and infrastructure, and loss of use of City services in the City.

343.    Defendants, by their acts and omissions, have caused, created, and contributed to conditions on the City's properties, and permitted those conditions to persist, which substantially and unreasonably interfere with the City's use and enjoyment of such property for the public benefit and welfare, and which materially diminishes the values of such property for its public purposes.

344.    The City has not consented to the Defendants' conduct in creating the substantial and unreasonable conditions on its real property or to the associated harms of that conduct.

345.    These substantial and unreasonable conditions affecting real property include, among other things:

a.      Extreme heat events, which increase the risk of injury or death from dehydration, heat stroke, heart attack, and respiratory problems;

b.      Frequent and severe droughts, which can result in drinking water shortages and land subsidence due to groundwater depletion;

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

c.      Increased smog from hotter temperatures, which damages lungs and increases rates of childhood asthma, respiratory and heart disease, and death, and which reduces visibility and obstructs scenic views;

d.      Extreme winter storms, which cause flooding that can damage public infrastructure, obstructing the free passage and use of property;

e.      Flooding and groundwater changes, which obstruct the free passage and use of roads and property, impair water quality in groundwater aquifers, damage critical public infrastructure, and lead to unprecedented levels of water surge into communities that can cause injury or even death; and

f.      Significant disruptions to the City's ecosystems and biodiversity, including the spread of invasive species.

346.    The seriousness of more frequent and extreme precipitation events, more frequent and extreme drought, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of the Defendants' conduct.

347.    An ordinary person would be reasonably annoyed or disturbed by these Climate-Related Harms.

348.    Defendants' conduct caused and will continue to cause harm to the City's properties many years into the future.

349.    As a direct and proximate result of the Defendants' acts and omissions, the City will be required to expend significant public resources to mitigate the impacts of Climate-Related Harms to its properties throughout the City.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

350.     The Climate-Related Harms are severe and greater than the City and the public should bear without compensation, and outweigh any utility of the Defendants' conduct.

351.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, the City has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.     finding that the Defendants' actions alleged herein constituted a common law private nuisance;

b.     enjoining Defendants from further acts constituting a common law private nuisance;

c.     ordering Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the common law private nuisance;

d.     holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

e.     awarding any other damages as permitted by law;

f.     awarding litigation costs and attorneys' fees permitted by law;

g.     awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

169

h.      granting such other and further relief as this Court deems appropriate and just.

<div align="center">

**COUNT VI**
**NUISANCE VIOLATIONS OF MCC § 7-28-030**
**(Against All Defendants)**

</div>

352.     The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, 323-337, and 338-351 as though fully set forth herein.

353.     Under Municipal Code of Chicago ("MCC") Chapter 7-28, nuisance offenses are described in Article I titled "Nuisance in General" as follows:

> [T]hose offenses which are known to the common law of the land and the statutes of Illinois as nuisances may, in case the same exist within the city limits or within one mile thereof, be treated as such, and proceeded against as is provided in this Code, or in accordance with any other provision of law.

§ 7-28-030.

354.     As set forth in Counts IV and V above, Defendants' conduct caused offenses which are known to the common law of the land as nuisances within the city limits or within one mile thereof.

355.     As a result, Defendants have violated MCC Chapter 7-28 for both public and private nuisances and are liable to the City for those violations.

356.     For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 7-28-030.

WHEREFORE, Plaintiff, the CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.      finding that the Defendants' actions alleged herein constituted a nuisance in violation of MCC § 7-28-030;

b.      enjoining Defendants from further acts constituting a violation of MCC § 7-28-030;

<div align="center">170</div>

c.  ordering Defendants to immediately undertake the necessary action that will result in a final and permanent abatement of the violation under MCC § 7-28-030;

d.  holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

e.  assessing Defendants fine for each violation of MCC § 7-28-030, in the amount of $500 for each offense in accordance with MCC § 7-28-800;

f.  awarding any other damages as permitted by law;

g.  awarding litigation costs and attorneys' fees permitted by law;

h.  awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

i.  granting such other and further relief as this Court deems appropriate and just.

<div align="center">

**COUNT VII**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

</div>

357.  The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

358.  As alleged herein, Defendants entered into agreements with and joined organized groups, such as API, to promote their commercial interests in maximizing profits from their fossil fuel products and their derivatives.

359. In furtherance of the agreements and organized groups entered into by various Defendants, Defendants committed the tortious acts described in Counts I-VI set forth herein.

360. By participating in agreements and organized groups, such as API, Defendants planned, assisted, or encouraged the tortious acts described in Counts I-VI set forth herein.

361. The collective activities of the API and the Defendants were designed knowingly and purposefully for API's and Fossil Fuel Defendants' economic and pecuniary benefit and were performed in furtherance of API's and Fossil Fuel Defendants' respective and joint business interests, including but not limited to ensuring the public's continued reliance on fossil fuels.

362. API and Fossil Fuel Defendants engaged in a civil conspiracy to conceal from potential purchasers, consumers, and users in and around the City, including the City, data and information demonstrating the risk that their fossil fuel products and derivatives would cause grave climate changes.

363. API and Fossil Fuel Defendants further conspired to mislead potential purchasers, consumers, and users in and around the City, including the City, about such data and information by widely disseminating marketing materials, refuting the scientific knowledge generally accepted at the time, advancing and promoting pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes.

364. As a proximate result of Defendants' civil conspiracy, the City suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

a.    finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

b.    holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.    awarding any other damages as permitted by law;

d.    awarding litigation costs and attorneys' fees permitted by law;

e.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.    granting such other and further relief as this Court deems appropriate and just.

<div align="center">

**COUNT VII**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

</div>

365.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

366.    Defendants have knowingly and unjustly retained a benefit to the City's detriment.

367.    Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

368.    Defendants had abundant knowledge that fossil fuel products and their derivatives caused and continue to cause Climate-Related Harms, and actively campaigned to keep that knowledge from becoming open and obvious.

369.     Defendants had a duty to warn consumers, the public, and users of such products about the devastating Climate-Related Harms that they knew would flow from using their fossil fuel products and their derivatives, yet they failed to give adequate warning.

370.     Instead, Defendants concealed from potential purchasers, consumers, and users in and around the City, including the City, data and information demonstrating the risk that their fossil fuel products and derivatives would cause grave climate changes.

371.     Defendants also misled potential purchasers, consumers, and users in and around the City, including the City, about such data and information by widely disseminating marketing materials, refuting the scientific knowledge generally accepted at the time, advancing and promoting pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing or discovering the latent risk that Defendants' fossil fuel products and derivatives would cause grave climate changes.

372.     Defendants' actions caused the precise Climate-Related Harms that the fossil fuel industry had foreseen.

373.     By engaging in these actions, Defendants have and continue to reap monetary benefits as a direct result of Defendants' deceptive marketing campaign to promote, inflate, and sustain the consumption of and reliance on fossil fuels that they would not have otherwise obtained.

374.     The City suffered and continues to suffer the detriment of the Defendants' deceptive marketing campaign as the City must now incur substantial costs to reduce and withstand the effects of Climate-Related Harms.

375.     Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

174

376. Defendants have received a benefit from the City's response activities because Defendants should bear the cost of reducing and withstanding the effects of Climate-Related Harms.

377. The City has incurred expenditures for relief over and above the City's ordinary services.

378. Defendants' enrichment was without justification and the City lacks a remedy provided by law.

379. Defendants' ability to amass massive earnings by knowingly and intentionally introducing fossil fuels to the stream of commerce as described above without disclosing the devastating impacts and risks posed by such products, at the City's expense, violates the fundamental principles of justice, equity, and good conscience.

380. Placing the financial burden of Defendants' deceptive practices on taxpayers is against the fundamental principles of justice, equity, and good conscience.

381. Under Illinois law, the principles of justice and established common law require Defendants to reimburse the City for performing a duty properly owed by Defendants as a result of their conduct, as alleged herein.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

  a.  finding that Defendants failed to warn Plaintiff about the unreasonably dangerous conditions of the fossil fuel products and their derivatives;

  b.  holding Defendants jointly and severally liable for all past damages the City has incurred, and future damages the City will incur as a result of Defendants' conduct, including but not limited to loss-of-use damages, the costs of enhancing

175

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

infrastructure, damage to property, any other compensatory and exemplary damages available under Illinois law, interest on the damages according to law, and any other relief necessary to remedy climate change-related harms that the City will face;

c.    awarding any other damages as permitted by law;

d.    awarding litigation costs and attorneys' fees permitted by law;

e.    awarding pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

f.    granting such other and further relief as this Court deems appropriate and just.

## COUNT IX
## CONSUMER FRAUD—MISLEADING, UNFAIR, AND DECEPTIVE PRACTICES IN VIOLATION OF MCC § 2-25-090
## (Against All Defendants)

382.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

383.    Subsection 2-25-090(a) of the MCC provides that:

No person shall engage in any act of consumer fraud, unfair method of competition, or unfair or deceptive act or practice while conducting any trade or business in the city. Any conduct constituting an unlawful act or practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or any other section of this Code relating to business operations or consumer protection, shall be a violation of this section. In construing this section, consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practices Act, as amended. In construing this section, consideration shall also be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A., Section 45.

384.    The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 ILCS 505/2.

385.     Defendants had abundant knowledge that fossil fuel products and their derivatives caused and continue to cause Climate-Related Harms, and actively campaigned to keep that knowledge from becoming open and obvious.

386.     Defendants are each a "person" as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

387.     Defendants violated MCC § 2-25-090 by engaging in deceptive acts or practices. Defendants also violated MCC § 2-25-090 by engaging in unfair acts or practices because Defendants' conduct offends public policy, is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers in the City of Chicago.

388.     Specifically, Defendants violated and continue to violate MCC § 2-25-090 by:

a.     Affirmatively promoting the use of fossil fuels within the City of Chicago while knowing that fossil fuels would lead to devastating consequences on the climate, and affirmatively misleading the public and casting doubt on climate science;

b.     Marketing fossil fuels and their derivatives through misstatements and omissions of material facts in targeted and national campaigns aimed at reaching Chicago consumers regarding: (i) the reasonably foreseeable or knowable severe risks posed by their fossil fuel products and their derivatives; (ii) the purported environmental benefits of their fossil fuel products and their derivatives; (iii) the actions they have taken to reduce their carbon footprint, invest in more renewables, or lower their fossil fuel production; and/or (iv) their purportedly

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

diversified energy portfolio with meaningful renewable and low-carbon fuel components. For example, Defendants engaged in deceptive marketing and promotion of their products by, *inter alia*, disseminating misleading marketing materials and publications refuting the scientific knowledge generally accepted at the time, advancing pseudo-scientific theories of their own, and developing public relations materials that prevented reasonable consumers from recognizing the risk that fossil fuel products would cause grave climate changes, and undermining and rendering ineffective any warnings that Defendants may have separately disseminated.

        c.      Failing to include material facts regarding the risks and benefits of their fossil fuel products and their derivatives in their advertisements and promotional materials that targeted the City's consumers;

        d.      Knowingly or recklessly disregarding the Climate-Related Harms inherently caused by the normal use and operation of their fossil fuel products, which they were aware of based on information passed to them from their internal research divisions and affiliates, from trade associations and industry groups, and/or from the international scientific community, and failing to disclose this information to the City's consumers to prevent their advertising and marketing statements from being misleading; and

        e.      Engaging in misleading "greenwashing" advertisements within the City of Chicago, which deceitfully represented Defendants as leaders in renewable energy, made misleading claims that Defendants' businesses were substantially invested in lower carbon technologies and renewable energy sources, and misrepresented material facts about the environmental impacts of their products.

        389.    The MCC provides that any person "who violates any of the requirements of this section shall be subject to a fine of not less than $500 nor more than $10,000 for each offense.

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

Each day that a violation continues or occurred, and each violation committed per day, shall constitute a separate and distinct offense to which a separate fine shall apply." MCC § 2-25-090(h).

390.    The City is entitled to fines for each day that Defendants violated MCC § 2-25-090 and for each offense that Defendants committed.

391.    The MCC also authorizes "restitution, disgorgement, equitable, injunctive, declaratory relief, and attorney's fees and costs" for violations of Section 2-25-090. MCC § 2-25-090(g).

392.    The City is entitled to those remedies as described below.

393.    For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 2-25-090.

WHEREFORE, Plaintiff, THE CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.    finding that Defendants have violated Subsection § 2-25-090 of the MCC, by the unlawful acts and practices alleged herein;

b.    preliminarily and permanently enjoining the Defendants, their agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from engaging in the deceptive and unfair acts and practices alleged herein;

c.    assessing Defendants a fine for each violation of MCC § 2-25-090, in the amount of $10,000 for each violation and day such violation has existed and continues to exist;

d.    requiring Defendants to disgorge profits;

e.    awarding litigation costs and attorneys' fees; and

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

f.     granting such other and further relief as the Court deems equitable and proper.

<div align="center">

**COUNT X**
**MISREPRESENTATIONS IN CONNECTION WITH**
**SALE OR ADVERTISEMENT OF MERCHANDISE**
**IN VIOLATION OF MCC §§ 4-276-470, _et seq._**
**(Against All Defendants)**

</div>

394.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

395.    MCC § 4-276-470 ("Sale or Advertisement of Merchandise Act") prohibits making and disseminating deceptions and misrepresentations to promote the sale and use of merchandise.

396.    Subsection § 4-276-470 of the MCC provides that it shall be a violation of this section, among others:

> (1) to act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, for cash or on credit, or advertisement of any merchandise, whether or not any person has in fact been misled;
>
> …
>
> (3) to represent that merchandise or services are of a particular standard, grade or quality, or to represent that merchandise is of a particular style or model, if it is not;
>
> …
>
> (6) to represent that merchandise or services are those of another, when in fact they are not;
>
> …
>
> (10) to fail to state a material fact, if such failure tends to deceive or mislead[.]

397.    Defendants are each a "person" as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

<div align="center">180</div>

398.     Defendants' practices, as described herein, violate MCC § 4-276-470(1), (3), (6), and (10) because the practices were intended to deceive and mislead Chicago consumers in connection with the marketing, advertisement, and sale of fossil fuels and their derivatives.

399.     Since at least as early as the 1970s, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, have and continue to (1) make and disseminate deceptions and misrepresentations to promote the sale and use of fossil fuels and their derivatives, and (2) cause untrue, false, and misleading statements about the foreseeable environmental and health risks posed by fossil fuel products and their derivatives in order to promote the sale and use of fossil fuel products and their derivatives.

400.     Defendants, collectively and individually, knew at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were untrue, false, or misleading, and failed to disclose material environmental and health risks posed by the use of fossil fuel products and their derivatives and were therefore likely to deceive Chicago consumers.

401.     Defendants, collectively and individually, intended that their deceptive and misrepresentative marketing and promotional efforts would create an untrue, false, and misleading impression of the environmental and health risks resulting from the use of fossil fuel products and their derivatives.

402.     Defendants, collectively and individually, repeatedly and intentionally made material omissions and misrepresentations by failing to disclose material facts about the environmental and health risks of fossil fuel products and their derivatives.

403.     In omitting and misrepresenting material facts about the environmental and health risks with respect to the use of fossil fuel products and their derivatives, Defendants, collectively

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

181

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

and individually, intended to cause Chicago consumers to rely on such material omissions and misrepresentations.

404. Defendants, collectively and individually, were aware and are aware of the misleading nature of the misrepresentations and material omissions made in connection with the sale or advertisement of fossil fuel products and their derivatives, and yet Defendants, collectively and individually, actively promoted dissemination of such misstatements and material omissions in campaigns targeting and reaching Chicago consumers.

405. Defendants engaged in, and continue to engage in, misleading acts and practices alleged herein, with the intent to deceive Chicago consumers who used or paid for fossil fuel products and their derivatives.

406. Defendants have received, or will receive, income, profits, and other benefits, which they received as a direct result of engaging in misleading acts and practices in violation of MCC § 4-276-470(1) and (10).

407. The MCC provides that any person who violates "any of the provisions of Section 4-276-470 shall be fined not less than $50.00 nor more than $2,000.00 for each offense." MCC § 4-276-480.

408. The City is entitled to fines for each violation of MCC § 4-276-470.

409. For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 4-276-470.

WHEREFORE, Plaintiff, THE CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a. finding that Defendants have violated Subsection §§ 4-276-470, *et seq.* of the MCC, by the unlawful acts and practices alleged herein;

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

b.     assessing Defendants a fine for each violation of MCC § 4-276-470, in the amount of $2,000 for each day such violation has existed and continues to exist; and

c.     granting such other and further relief as the Court deems equitable and proper.

<div align="center">

**COUNT XI**
**RECOVERY OF CITY COSTS OF PROVIDING SERVICES**
**IN VIOLATION OF MCC § 1-20-020**
**(Against All Defendants)**

</div>

410.    The City repeats, re-alleges, and incorporates by reference each and every allegation contained in paragraphs 1-257, as though fully set forth herein.

411.    Defendants' violations caused the City and/or its agents to incur costs in order to protect the City and residents caused by Climate-Related Harms and are therefore liable for the costs pursuant to the City's Cost Recovery Ordinance of the MCC. MCC §§ 1-20-020, *et seq.*

412.    Section 1-20-020 of the MCC provides:

> Any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any . . . state or local law, or such person's failure to correct conditions which violate any . . . state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability.

413.    Defendants committed the violations of state and local law described in Counts I through X. For the avoidance of doubt, the City does not allege any violation of federal law.

414.    These violations have caused and will continue to cause the City to incur costs reasonably related to these violations of law.

415.    These costs include the costs of all past damages the City has incurred, and future damages the City will incur, as a result of Defendants' conduct, including responding to and remedying Climate-Related Harms, such as the costs of enhancing infrastructure and property damage costs.

<div align="center">183</div>

FILED DATE: 2/20/2024 12:34 PM   2024CH01024

416.    For the avoidance of doubt, the City does not seek any extraterritorial application of MCC § 1-20-020.

WHEREFORE, Plaintiff, CITY OF CHICAGO, respectfully requests that this Court enter an Order:

a.    holding Defendants jointly and severally liable for any costs incurred by the City in response to all unlawful conduct described in Counts I-X in an amount to be proven at trial;

b.    litigation costs and attorneys' fees permitted by MCC § 1-20-060;

c.    pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

d.    granting such other and further relief as this Court deems appropriate and just.

## REQUEST FOR RELIEF

WHEREFORE, in addition to the relief requested in each individual Cause of Action listed above, Plaintiff, CITY OF CHICAGO, seeks judgment in its favor and against Defendants for:

A.    Compensatory damages in an amount according to proof;

B.    Equitable relief, including abatement of the nuisances complained of herein;

C.    Penalties and recovery for injury or loss sustained as the result of a practice prohibited by the Chicago Consumer Protection Act and other provisions of the Chicago Municipal Code as alleged herein;

D.    Disgorgement of profits;

E.    Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

F.    Pre-judgment interest; and

G.    Any other and further relief as the Court deems just, proper, and equitable.

184

FILED DATE: 2/20/2024 12:34 PM    2024CH01024

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Date: February 20, 2024

Respectfully submitted,

Mary R. Richardson-Lowry
**Corporation Counsel of the City of Chicago**

By:    /s/Stephen J. Kane
       Stephen J. Kane

Rebecca A. Hirsch
Chelsey Metcalf
**CITY OF CHICAGO DEPARTMENT OF LAW**
**AFFIRMATIVE LITIGATION DIVISION**
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (312) 744-6934
stephen.kane@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner*
Anna C. Laird*
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com
alaird@dicellolevitt.com

Victor M. Sher*
Matthew K. Edling*
Paul Stephan*
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Fracisco, California 94104
Tel: (628) 231-2500
vic@sheredling.com
matt@sheredling.com
paul@sheredling.com

*Motions for admission *pro hac vice* to be filed

185