# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| CITY OF CHICAGO, | No. 1:24-cv-02496 |
| Plaintiff, | Hon. Franklin U. Valderrama |
| v. |  |
| BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; CONOCOPHILLIPS COMPANY; CONOCOPHILLIPS; PHILLIPS 66 COMPANY; PHILLIPS 66; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL OIL PRODUCTS COMPANY LLC; SHELL PLC; SHELL USA, INC.; and AMERICAN PETROLEUM INSTITUTE, |  |
| Defendants. |  |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO REMAND

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................ 3

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.   Defendants Do Not Satisfy the Elements of Federal-Officer Removal ...................... 5

    A.   The City Has Disclaimed Any Injuries Arising from Sales of Specialized Fuels to the United States for Military and National Defense Purposes ............................... 6

    B.   Defendants Have Not Acted Under a Federal Superior ................................................ 8

    C.   Defendants' Conduct Under Federal Officials' Authority, If Any, Is Insufficiently Related to Their Charged Conduct ....................................................... 17

    D.   Defendants Have Not Alleged a Colorable Federal Defense ...................................... 19

II.  Federal Common Law Does Not Confer Jurisdiction Over the City's Claims ......... 19

    A.   Defendants Misportray the City's Quintessentially State-Law Claims ..................... 20

    B.   Defendants' Federal-Common-Law Arguments Do Not Satisfy *Grable* or the Complete Preemption Doctrine ................................................................................... 22

    C.   The Court Should Reject Defendants' Invitation to Create a Novel Exception to the Well-Pleaded Complaint Rule .......................................................................... 23

        1.   Defunct Federal Common Law Cannot Support Removal ...................... 24

        2.   The Foreign Affairs Doctrine Cannot Support Removal ......................... 27

        3.   Defendants Do Not Justify Creating New Federal Common Law .......... 28

        4.   Defendants' Other Citations Do Not Alter the Analysis ......................... 28

REQUEST FOR FEES ...................................................................................................... 30

CONCLUSION ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**CASES**

*Al Shimari v. CACI Int'l, Inc.*,
   679 F.3d 205 (4th Cir. 2012) ............................................................................. 28, 29

*Am. Elec. Power Co. v. Connecticut* (AEP),
   564 U.S. 410 (2011) ......................................................................... 22, 24, 25, 28

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) .......................................................................................... 27

*Anne Arundel Cnty. v. BP P.L.C.*,
   94 F.4th 343 (4th Cir. 2024) .................................................................... *passim*

*Appert v. Morgan Stanley Dean Witter, Inc.*,
   673 F.3d 609 (7th Cir. 2012) .............................................................................. 4

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) .......................................................................................... 19

*Baker v. Atl. Richfield Co.*,
   962 F.3d 937 (7th Cir. 2020) ............................................................. 7, 8, 16, 17

*Ballenger v. Agco Corp.*,
   2007 WL 1813821 (N.D. Cal. June 22, 2007) .................................................. 8

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) .................................................................................... 27, 29

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
   25 F.4th 1238 (10th Cir. 2022) ............................................................... *passim*

*Beneficial Nat'l Bank v. Anderson*,
   539 U.S. 1 (2003) .............................................................................................. 23

*Bernhard v. Whitney Nat'l Bank*,
   523 F.3d 546 (5th Cir. 2008) ............................................................................ 30

*Betzner v. Boeing Co.*,
   910 F.3d 1010 (7th Cir. 2018) ........................................................................... 4

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) .......................................................................................... 29

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988) .......................................................................................... 19

*BP P.L.C. v. Mayor & City Council of Baltimore*,
   593 U.S. 230 (2021) ........................................................................................ 20

*Buljic v. Tyson Foods, Inc.*,
   22 F.4th 730 (8th Cir. 2021) ......................................................................... 17

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015) ......................................................................... 15

*California v. ARC Am. Corp.*,
   490 U.S. 93 (1989) .......................................................................................... 20

*Caterpillar Inc. v. Williams*,
   482 U.S. 386 (1987) .................................................................................. 5, 22

*Caudill v. Blue Cross & Blue Shield of N.C.*,
   999 F.2d 74 (4th Cir. 1993) ........................................................................... 29

*Club Comanche, Inc. v. Virgin Islands*,
   278 F.3d 250 (3d Cir. 2002) ........................................................................... 29

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
   140 S. Ct. 1649 (2020) ................................................................................... 25

*City & Cnty. of Honolulu v. Sunoco LP*,
   39 F.4th 1101 (9th Cir. 2022) ................................................................ *passim*

*City & Cnty. of Honolulu v. Sunoco LP*,
   537 P.3d 1173 (Haw. 2023) ....................................................... 21, 24, 26, 27

*City of Annapolis v. BP P.L.C.*,
   2022 WL 4548226 (D. Md. Sept. 29, 2022) .................................................. 6

*City of Hoboken v. Chevron Corp.*,
   45 F.4th 699 (3d Cir. 2022) ................................................................... *passim*

*City of Milwaukee v. Illinois* (*Milwaukee II*),
   451 U.S. 304 (1981) ......................................................................... 24, 25, 29

*City of New York v. Chevron Corp.* (*City of New York I*),
   993 F.3d 81 (2d Cir. 2021) ............................................................................ 26

*City of New York v. Exxon Mobil Corp.* (*City of New York II*),
   2024 WL 2091994 (S.D.N.Y. May 8, 2024) ........................................... *passim*

*City of Oakland v. BP PLC*,
   969 F.3d 895 (9th Cir. 2020) ................................................................ *passim*

iii

*City of Oakland v. BP PLC,*
    2022 WL 14151421 (N.D. Cal. Oct. 24, 2022) ...................................................... 16

*City of Oakland v. BP PLC,*
    2023 WL 8179286 (9th Cir. Nov. 27, 2023) ............................................. 1, 5, 8, 16

*Cnty. of Multnomah v. Exxon Mobil Corp.,*
    2024 WL 1991554 (D. Or. Apr. 10, 2024) ............................................................... 1

*Cnty. of San Mateo v. Chevron Corp.,*
    32 F.4th 733 (9th Cir. 2022) .................................................................... *passim*

*Connecticut v. Exxon Mobil Corp.,*
    83 F.4th 122 (2d Cir. 2023) ....................................................................... *passim*

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ............................................................................................. 27

*Def. Ass'n of Phila. v. Johnson,*
    790 F.3d 457, 472 (3d Cir. 2015) ....................................................................... 18

*Delaware v. BP Am., Inc.,*
    578 F. Supp. 3d 618 (D. Del. 2022) .................................................... *passim*

*District of Columbia v. Exxon Mobil Corp.,*
    89 F.4th 144 (D.C. Cir. 2023) ................................................................... *passim*

*Doe v. Allied-Signal, Inc.,*
    985 F.2d 908 (7th Cir. 1993) ................................................................................ 4

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ............................................................................................. 20

*Federated Dep't Stores, Inc. v. Moitie,*
    452 U.S. 394 (1981) ............................................................................................. 30

*Fedor v. Cingular Wireless Corp.,*
    355 F.3d 1069 (7th Cir. 2004) .............................................................................. 4

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963) ............................................................................................. 20

*Georgia v. Tenn. Copper Co.,*
    206 U.S. 230 (1907) ............................................................................................. 26

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing* (*Grable*),
    545 U.S. 308 (2005) ............................................................................................... 2

*Gunn v. Minton*,
  568 U.S. 251 (2013) ................................................................................................ 2

*Hartland Lakeside Jt. No. 3 Sch. Dist. v. WEA Ins. Corp.*,
  756 F.3d 1032 (7th Cir. 2014) ............................................................................. 22

*Illinois v. City of Milwaukee* (*Milwaukee I*),
  406 U.S. 91 (1972) ................................................................................. 24, 25, 29

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ........................................................................................ 25, 29

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999) ............................................................................................. 18

*Kelleher v. A.W. Chesterton Co.*,
  2015 WL 7422756 (S.D. Ill. Nov. 23, 2015) ..................................................... 6, 7

*Kelly v. Martin & Bayley, Inc.*,
  503 F.3d 584 (7th Cir. 2007) ................................................................................. 8

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ............................................................................................. 20

*Lu Junhong v. Boeing Co.*,
  792 F.3d 805 (7th Cir. 2015) ................................................................................. 8

*Martin v. Franklin Capital Corp.*,
  546 U.S. 132 (2005) ............................................................................................. 30

*Massachusetts v. Exxon Mobil Corp.*,
  462 F. Supp. 3d 31 (D. Mass. 2020) ................................................................. 1, 28

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  952 F.3d 452 (4th Cir. 2020) ........................................................................... 20, 26

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  31 F.4th 178 (4th Cir. 2022) ......................................................................... *passim*

*McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc.*,
  124 F.3d 471 (3d Cir. 1997) ................................................................................. 29

*Minnesota v. Am. Petroleum Inst.*,
  2021 WL 1215656 (D. Minn. Mar. 31, 2021) ................................................... 6, 21

*Minnesota v. Am. Petroleum Inst.*,
  63 F.4th 703 (8th Cir. 2023) ........................................................................ *passim*

*Missouri v. Illinois*,
    200 U.S. 496 (1906) ............................................................................................ 26

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
    471 U.S. 845 (1985) ............................................................................................ 28

*Nessel v. Chemguard, Inc.*,
    2021 WL 744683 (W.D. Mich. Jan. 6, 2021) .......................................................... 7

*New Hampshire v. 3M Co.*,
    665 F. Supp. 3d 215 (D.N.H. 2023) ........................................................................ 7

*New Jersey v. City of New York*,
    283 U.S. 473 (1931) ............................................................................................ 25

*New Jersey v. Exxon Mobil Corp.*,
    2023 WL 4086353 (D.N.J. June 20, 2023) ............................................................. 1

*New York v. New Jersey*,
    256 U.S. 296 (1921) ............................................................................................ 25

*North Dakota v. Minnesota*,
    263 U.S. 365 (1923) ............................................................................................ 26

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,
    451 U.S. 77 (1981) ............................................................................................. 24

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994) ............................................................................................. 28

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida*,
    414 U.S. 661 (1974) ............................................................................................ 23

*Panther Brands, LLC v. Indy Racing League, LLC*,
    827 F.3d 586 (7th Cir. 2016) ................................................................................. 9

*Papp v. Fore-Kast Sales Co.*,
    842 F.3d 805 (3d Cir. 2016) ................................................................................. 17

*Reinbold v. Advanced Auto Parts, Inc.*,
    2018 WL 3036026 (S.D. Ill. June 19, 2018) ......................................................... 6, 7

*Republic of Philippines v. Marcos*,
    806 F.2d 344 (2d Cir. 1986) ............................................................................ 27, 29

*Rhode Island v. Shell Oil Prods. Co.*,
    979 F.3d 50 (1st Cir. 2020) .............................................................................. 5, 18

*Rhode Island v. Shell Oil Prods. Co.*,
    35 F.4th 44 (1st Cir. 2022) ............................................................................ *passim*

*Rhodes v. MCIC, Inc.*,
    210 F. Supp. 3d 778 (D. Md. 2016) ......................................................................... 7

*Rice v. Panchal*,
    65 F.3d 637 (7th Cir. 1995) ............................................................................... 5, 21

*Rivet v. Regions Bank of La.*,
    522 U.S. 470 (1998) ........................................................................................... 30

*Roberts v. Smith & Wesson Brands, Inc.*,
    98 F.4th 810 (7th Cir. 2024) ......................................................................... 2, 9, 18

*Robinson v. Avanquest N. Am.*,
    2015 WL 196343 (N.D. Ill. Jan. 13, 2015) ............................................................ 22

*Rodriguez v. FDIC*,
    589 U.S. 132 (2020) ........................................................................................... 28

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) .............................................................................. 4

*Sam L. Majors Jewelers v. ABX, Inc.*,
    117 F.3d 922 (5th Cir. 1997) .............................................................................. 30

*Tenner v. Zurek*,
    168 F.3d 328 (7th Cir. 1999) .............................................................................. 30

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ........................................................................................... 29

*Treiber & Straub, Inc. v. United Parcel Serv., Inc.*,
    2005 WL 2108081 (E.D. Wis. Aug. 31, 2005) ....................................................... 29

*United States v. Little Lake Misere Land Co.*,
    412 U.S. 580 (1973) ........................................................................................... 29

*United States v. Shell Oil Co.*,
    294 F.3d 1045 (9th Cir. 2002) ...................................................................... 14, 15

*United States v. Standard Oil Co. of Cal.*,
    332 U.S. 301 (1947) ........................................................................................... 29

*United States v. Swiss Am. Bank, Ltd.*,
    191 F.3d 30 (1st Cir. 1999) ................................................................................ 29

*Vermont v. Exxon Mobil Corp.*,
   2024 WL 446086 (D. Vt. Feb. 6, 2024) ........................................................................ 1

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ........................................................................ 8, 9, 14

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999) ........................................................................ 29

**STATUTES**

28 U.S.C. § 1331 ........................................................................ 4, 20

28 U.S.C. § 1441 ........................................................................ 4, 19

28 U.S.C. § 1442 ........................................................................ 2, 4, 6

28 U.S.C. § 1447 ........................................................................ 30

42 U.S.C. § 6241 ........................................................................ 13

**INTRODUCTION**

The City of Chicago brought this state-law action in Illinois state court. The City alleges that Defendants—key fossil fuel industry players—have known for decades about the direct link between fossil fuel use and climate change, but coordinated to conceal their knowledge and deceive consumers and the public. Defendants removed to federal court, and the City now moves to remand. While the Seventh Circuit has not weighed in, eight courts of appeals and more district courts have overwhelmingly rejected Defendants' removal attempts in very similar cases.[1] The Fourth Circuit recently described this consensus:

> [Defendants] in these cases display a real commitment to the maxim, "If at first you don't succeed, try, try, try again." In recent years, state and local governments have brought state-court lawsuits against energy companies, alleging they misrepresented and concealed information about their fossil fuel products in violation of state tort and consumer protection laws. The companies have sought—over and over and over—to remove the cases to federal court. By our count, that gambit has failed in at least ten cases already. The eleventh time is not the charm.

*Anne Arundel*, 94 F.4th at 346.

This attempt fares no better. Reusing previously unsuccessful arguments and exhibits in their notice of removal (NOR, ECF No. 1), Defendants assert this case is removable under the

---

[1] *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 1796 (2023); *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122 (2d Cir. 2023); *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2483 (2023); *Anne Arundel Cnty. v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 620 (2024); *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2776 (2021); *City of Oakland v. BP PLC*, 2023 WL 8179286 (9th Cir. Nov. 27, 2023) (unpublished); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1797 (2023); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144 (D.C. Cir. 2023); *see City of Charleston v. Brabham Oil Co.*, No. 2:20-cv-03579-RMG, ECF No. 154 (D.S.C. filed July 5, 2023); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020); *Cnty. of Multnomah v. Exxon Mobil Corp.*, 2024 WL 1991554 (D. Or. Apr. 10, 2024); *New Jersey v. Exxon Mobil Corp.*, 2023 WL 4086353 (D.N.J. June 20, 2023); *City of New York v. Exxon Mobil Corp.* (*City of New York II*), 2024 WL 2091994 (S.D.N.Y. May 8, 2024); *Vermont v. Exxon Mobil Corp.*, 2024 WL 446086 (D. Vt. Feb. 6, 2024).

federal-officer removal statute, 28 U.S.C. § 1442(a)(1), because they acted under federal officers by "performing operations on the Outer Continental Shelf," "operating the Elk Hill[s] [R]eserve," supplying military fuels during "World War II and the Korean War," "producing specialized fuels for the military," and purportedly being subject to "pervasive federal control." *Compare Anne Arundel*, 94 F.4th at 349, *with* NOR ¶¶ 25–127. Among other reasons, this argument fails because no federal officer ever directed Defendants to deceive. As the Fourth Circuit put it, "[T]he companies do not argue the federal government required them to market or describe their products in a certain way. We thus join the First, Second, Eighth, and D.C. Circuits in holding that allegations like those here do not support federal officer removal." *Anne Arundel*, 94 F.4th at 350; *accord Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 814 (7th Cir. 2024) (rejecting federal-officer removal because defendant gun manufacturer did not "contend that ATF directed it to advertise [an AR-15 rifle] in the way it did").

Also, Defendants insist the City's claims arise under federal common law, making this case removable on the basis that it presents a federal question. Under the well-pleaded complaint rule, however, "a case arises under federal law when federal law creates the cause of action asserted" in the complaint. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). The City's Complaint pleads only state-law claims that do not "arise under" federal law. And federal common law cannot justify removal under either of the well-pleaded complaint rule's two relevant exceptions: the exception recognized in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing* (*Grable*), 545 U.S. 308 (2005), or complete preemption. Defendants do not try to—and cannot—satisfy *Grable* because "federal law is not a necessary element to any of [the City's] claims." *See Minnesota*, 63 F.4th at 711–12 ("To date, none of our sister circuits have found that argument persuasive [in climate-deception cases]."). Judge-made federal common law

2

"cannot *completely* preempt" the City's claims because "complete preemption requires congressional intent." *Boulder*, 25 F.4th at 1261–62. Even when properly invoked, "the presence of federal common law" on a subject "does not express Congressional intent of any kind—much less intent to completely displace any particular state-law claim." *Minnesota*, 63 F.4th at 710.

Because Defendants cannot satisfy any recognized exception to the well-pleaded complaint rule, they ask the Court to create a new one. They assert vaguely that "federal common law" converts the City's state-law claims into federal ones as a matter of "federal constitutional law and structure." NOR ¶ 151. But the referenced body of federal common law does not supply a constitutional rule. And in any event, the law "*no longer exists* due to Congress's displacement of that law" with the Clean Air Act (CAA). *See Boulder*, 25 F.4th at 1260. Defendants are equally wrong to assert that the foreign affairs doctrine or the Foreign Commerce Clause supplies a novel exception. *Cf. Baltimore*, 31 F.4th at 212–13.

The Court should remand this action and award to the City its costs and fees incurred because of Defendants' objectively baseless removal arguments. *See City of New York II*, 2024 WL 2091994, at *12 (awarding costs and fees because Defendants' federal-common-law and federal-officer-removal theories "can no longer be considered a good faith litigation strategy").

## FACTS

The City asserts claims under Illinois common law for strict and negligent products liability for failure to warn, negligence, public and private nuisance, civil conspiracy, and unjust enrichment, as well as claims under the Municipal Code of Chicago (MCC) for nuisance, consumer fraud, misrepresentations in connection with the sale or advertisement of merchandise, and recovery of costs of providing City services. Compl. ¶¶ 258–416.

The City's state-law claims rest on Defendants' efforts to deceive and failures to warn

consumers and the public about the devastating impacts of climate change and its link to fossil fuels, which have caused the profligate consumption of fossil-fuel products and resulting climate-related injuries to the City. *Id.* ¶¶ 1–11. Defendants have known for more than fifty years that the regular use of fossil-fuel products releases greenhouse-gas pollution that triggers climatic injuries to communities like the City. *Id.* ¶¶ 47–86. Despite this knowledge, Defendants carried out a massive, decades-long campaign of denial and disinformation about the existence of climate change and their products' contribution to it. *Id.* ¶¶ 87–134, 155–213.

## **LEGAL STANDARD**

Federal courts have limited jurisdiction, and "[t]he party invoking federal jurisdiction bears the burden of demonstrating its existence." *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 617 (7th Cir. 2012).

Defendants invoke the federal-officer removal statute. NOR ¶ 16. Under that law, a removing defendant must plausibly allege four elements: that they are "a (1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180–81 (7th Cir. 2012) (quoting 28 U.S.C. § 1442(a)(1)); *see Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (plausibility pleading).

Separately, Defendants invoke the general removal statute, 28 U.S.C. § 1441(a), asserting there is federal-question jurisdiction under 28 U.S.C. § 1331. NOR ¶ 166. Removal jurisdiction based on a federal question is "narrow[]," and "[a]ny doubt regarding jurisdiction should be resolved in favor of the states." *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993). Courts assess federal-question jurisdiction by applying the cardinal "well-pleaded complaint rule" and its "exceptions." *See Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1071 (7th Cir.

2004). Under the rule, "[g]enerally, 'federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Minnesota*, 63 F.4th at 709 (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). A defendant "cannot recharacterize a plaintiff's claim in order to create federal question jurisdiction, for if [it] did so, then the plaintiff would be master of nothing." *Rice v. Panchal*, 65 F.3d 637, 646 (7th Cir. 1995) (cleaned up); *accord Honolulu*, 39 F.4th at 1111. As a corollary, federal question jurisdiction cannot rest on "a federal defense, including the defense of [ordinary] preemption, even if the defense is anticipated in the plaintiff's complaint." *Oakland*, 969 F.3d at 904 (quoting *Caterpillar*, 482 U.S. at 393).

## <u>ARGUMENT</u>

## I.     **Defendants Do Not Satisfy the Elements of Federal-Officer Removal.**

Courts of appeals addressing materially identical climate-deception cases have ruled against Defendants on the second through fourth elements of federal-officer removal,[2] based on essentially the same body of allegations and exhibits that Defendants provide here. Notably, Defendants have previously relied on every one of the 96 exhibits to their NOR in one or more of their previously unsuccessful bids for federal-officer removal.

<u>First</u>, most of Defendants' arguments are irrelevant because the City has disclaimed relief for injuries arising from Defendants' supplying specialized fuels to the federal government for military and national defense purposes. Compl. ¶ 11 n.6. <u>Second</u>, Defendants were not "acting

---

[2] *See Rhode Island*, 35 F.4th at 53 n.6 (third element) (reaffirming earlier analysis in *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 59–60 (1st Cir. 2020), *vacated*, 141 S. Ct. 2666 (2021)); *Connecticut*, 83 F.4th at 142–45 (second and third elements); *Hoboken*, 45 F.4th at 712–13 (second and third elements); *Anne Arundel*, 94 F.4th at 347–50 (second and third elements); *Baltimore*, 31 F.4th at 228–38 (second and third elements); *Minnesota*, 63 F.4th at 714–16 (third element); *San Mateo*, 32 F.4th at 755–60 (second element); *Honolulu*, 39 F.4th at 1106–10 (second and fourth elements); *Oakland*, 2023 WL 8179286, at *2 (second element); *Boulder*, 25 F.4th at 1250–54 (second element); *District of Columbia*, 89 F.4th at 155–57 (third element).

under" the direction or control of federal officers during any of the activities they cite as grounds for removal. *E.g.*, *San Mateo*, 32 F.4th at 757–60. Third, the City does not seek to hold Defendants liable "for or relating to any act" that they allegedly took at the behest of a federal officer. *See* 28 U.S.C. § 1442(a)(1). Notably, Defendants do not contend they "engaged in [] misrepresentations" or failed to warn "at the behest of or in coordination with federal officers." *See, e.g.*, *District of Columbia*, 89 F.4th at 156. Fourth, Defendants have not pleaded a colorable federal defense. *See Honolulu*, 39 F.4th at 1110.

### A.  The City Has Disclaimed Any Injuries Arising from Sales of Specialized Fuels to the United States for Military and National Defense Purposes.

Many of Defendants' removal arguments are irrelevant because the Complaint expressly "disclaims injuries . . . arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes." Compl. ¶ 11 n.6. "[F]ederal courts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which the federal officer removal was based . . . ," *Kelleher v. A.W. Chesterton Co.*, 2015 WL 7422756, at *2 (S.D. Ill. Nov. 23, 2015), including in other climate-deception cases, *e.g.*, *Hoboken*, 45 F.4th at 713 (disclaimers materially identical to the City's "[we]re no ruse").[3] Courts credit such disclaimers that "explicitly renounce[] claims of a specific nature" because they are not "merely an attempt to circumvent federal jurisdiction." *Reinbold v. Advanced Auto Parts, Inc.*, 2018 WL 3036026, at *2 (S.D. Ill. June 19, 2018). Put differently, as the City does not place Defendants' sales of specialized military fuels at issue, "deny[ing] remand of this case" based on those sales would incorrectly "affirm [Defendants'] right to assert

---

[3] *Accord City of Annapolis v. BP P.L.C.*, 2022 WL 4548226, at *8 (D. Md. Sept. 29, 2022); *Delaware v. BP Am., Inc.*, 578 F. Supp. 3d 618, 635 (D. Del. 2022); *Minnesota v. Am. Petroleum Inst.*, 2021 WL 1215656, at *11 (D. Minn. Mar. 31, 2021); *cf. Boulder*, 25 F.4th at 1272 (accepting disclaimer of "damages or abatement relief for injuries to or occurring on federal lands" as basis for remand); *Baltimore*, 31 F.4th at 218–19 (similar).

a defense against a claim that does not exist." *See Kelleher*, 2015 WL 7422756, at *2.

None of Defendants' case citations, NOR ¶ 138, undermines the City's disclaimer. In *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 945 n.3 (7th Cir. 2020), the plaintiffs' disclaimer was ineffective because it contradicted their theory of liability. *Cf. Reinbold*, 2018 WL 3036026, at *2 (disclaimers may be disregarded if a plaintiff pursues claims "in contravention to the language of the disclaimer"). There is no such contradiction here. No disclaimer was at issue in *Nessel v. Chemguard, Inc.*, where the plaintiffs "surgically divide[d]" their case into two complaints in an attempt to have their claims relating to *commercial* formulations of a harmful chemical adjudicated in state court, and claims relating to *military* formulations adjudicated in federal court. 2021 WL 744683, at *1, *3 (W.D. Mich. Jan. 6, 2021). The City has not sought to sever any claims, but rather has disclaimed them entirely. *Compare New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215, 228 (D.N.H. 2023) (similarly distinguishing *Nessel* and remanding).

In *Rhodes v. MCIC, Inc.*, the plaintiff asserted a *jurisdictional* disclaimer that attempted to waive "any cause of action or claim for recovery that could give rise to federal subject matter jurisdiction" under the federal-officer removal statute. 210 F. Supp. 3d 778, 785–86 (D. Md. 2016). The City's disclaimer "is not a jurisdictional disclaimer that categorically disclaims jurisdiction conferred by the federal officer removal statute, but is instead a claim disclaimer that expressly disclaims the claims upon which federal officer removal was based." *Delaware*, 578 F. Supp. 3d at 635 (cleaned up). "[F]ederal courts have consistently granted motions to remand based on claim disclaimers," including in other climate-deception cases, and "Defendants have provided no persuasive basis for the Court to depart from that general principle here." *Id.* (cleaned up). Similarly, in *Ballenger v. Agco Corp.*, the asbestos plaintiff asserted directly in the complaint that "[t]he Federal Courts lack jurisdiction over this action" and disclaimed "any claim

. . . based on an act that was performed under specific direction of . . . any Officer of the United States." 2007 WL 1813821, at *1 (N.D. Cal. June 22, 2007). The plaintiff did not, however, disclaim "claims arising out of work done on U.S. Navy vessels" at the shipyard where the asbestos exposure occurred, and the record showed "that a federal officer had 'direct and detailed control' over" the shipyard's use of asbestos. *Id.* at *2 & n.2. The City's disclaimer here is a proper claim disclaimer, not an improper jurisdictional one.

### B. Defendants Have Not Acted Under a Federal Superior.

Six courts of appeals have rejected Defendants' efforts to show an "acting under" relationship in analogous cases based on essentially the same allegations and exhibits provided here.[4] At most, some Defendants show they sometimes have (a) complied with regulatory obligations or (b) entered arm's-length business transactions with federal agencies to drill on federal land or sell products to the government. Neither type of relationship supports removal.

"[P]recedent and statutory purpose make clear that [a] private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007). The statute requires a "special relationship" that usually "involves subjection, guidance, or control" by a federal superior. *Baker*, 962 F.3d at 941, 942 (quotation omitted). Mere "compliance (or noncompliance) with federal laws, rules, and regulations" is not "acting under" a federal officer, even when a firm is "highly supervised and monitored" with "highly detailed" regulations. *Kelly v. Martin & Bayley, Inc.*, 503 F.3d 584, 588 (7th Cir. 2007) (quoting *Watson*, 551 U.S. at 143); *see Lu Junhong v. Boeing Co.*, 792 F.3d 805, 809–10 (7th Cir. 2015) (rejecting "acting under" status even where Boeing argued the FAA had "conscripted [Boeing] staff to perform" the FAA's regulatory

---

[4] *Connecticut*, 83 F.4th at 142–45; *Hoboken*, 45 F.4th at 712–13; *Anne Arundel*, 94 F.4th at 347–50; *Baltimore*, 31 F.4th at 228–37; *San Mateo*, 32 F.4th at 755–60; *Honolulu*, 39 F.4th at 1106–10; *Oakland*, 2023 WL 8179286, at *2; *Boulder*, 25 F.4th at 1250–54.

functions). Even federal contractors can meet the requirement only "when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153; *accord Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016) (contractors are only "sometimes covered"). Similarly, "a person is not 'acting under' a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services." *San Mateo*, 32 F.4th at 757; *accord Roberts*, 98 F.4th at 814 ("[A] business *might be* 'acting under' a federal officer if the officer commanded it or contracted with it to produce *a particular item in a specified way*." (emphasis added)).

As other courts have held, Defendants' various "business connections to the federal government," *e.g.*, *Hoboken*, 45 F.4th at 712–13, do not support "acting-under" status here.

**Federal Mineral Leases.** Many courts have rejected Defendants' argument that they act under federal officers when they drill for oil and gas on the outer continental shelf (OCS) and other federal lands. *Compare* NOR ¶¶ 82–109, *with Connecticut*, 83 F.4th at 143 ("Exxon Mobil has made this very argument to five of our sister circuits, all of which have squarely rejected it.") (collecting cases). Defendants bid for, and pay royalties on, leased mineral rights on federal property through a public process defined by statutes and regulations. "Though the federal government grants the leases, oil produced under them is produced to sell on the open market, not specifically for the government." *Hoboken*, 45 F.4th at 713 (cleaned up); *accord Connecticut*, 83 F.4th at 143–44. The leases do not "impose close federal control," and require only "compl[iance] with run-of-the-mill regulations on oil and gas production," which "is not enough for federal jurisdiction." *Hoboken*, 45 F.4th at 713 (citing *Watson*, 551 U.S. at 152–53).[5]

---

[5] *Accord Connecticut*, 83 F.4th at 143 (ExxonMobil "agreed to certain terms" as a lease condition

"By winning bids for leases to extract fossil fuels from federal land in exchange for royalty payments, [Defendants are] not assisting the government with essential duties or tasks." *Boulder*, 25 F.4th at 1253; *accord San Mateo*, 32 F.4th at 760 (The "willingness to lease federal property or minimal rights to a private entity for that entity's commercial purposes does not, without more, constitute . . . 'acting under' a federal officer."); *Delaware*, 578 F. Supp. 3d at 638.

The specific lease and program terms Defendants cite, and the exact declaration they rely on, have been considered and rejected by multiple courts in analogous cases. *See* NOR ¶¶ 82–84. In fact, Defendants' declaration from Professor Richard Priest is recycled from *Anne Arundel*, submitted three years ago in an unsuccessful removal attempt. *See* Declaration of Joshua D. Dick ("Dick Decl.") ¶ 74; *Anne Arundel*, 96 F.4th 343. The Ninth Circuit in *Honolulu* easily disposed of these same materials:

> The professor chronicles offshore oil leases and government control over such operations, which Defendants contend show a high degree of supervision. But the government orders show only a general regulation applicable to all offshore oil leases. Indeed, Defendants' expert portrays the "OCS orders" as "directions and clarifications to all operators on how to meet the requirements in the C.F.R." General government orders telling Defendants how to comply are not specific direction and supervision . . . .
>
> Defendants also argue that government "regional supervisor[s] still had to make adaptive and discretionary decisions" pertaining to individual operations. But these were decisions like approving certain actions on a well or giving specific waivers to excuse compliance with regulations, not directing or supervising operations generally. The government also set overall production levels for wells. Yet the orders were general regulations that applied to everyone rather than "unusually close" direction or supervision.

*Honolulu*, 39 F.4th at 1109; *compare* NOR ¶ 83 (discussing regional supervisors); *id.* ¶ 84 (discussing OCS orders); Dick Decl. Ex. 70, Decl. of Professor Richard Tyler Priest.

The courts also have rejected Defendants' speculation that "[i]f not for the[] activities of

---

(quotations omitted)); *Baltimore*, 31 F.4th at 232 ("[M]any of the lease terms are mere iterations of the OCSLA's regulatory requirements."); *San Mateo*, 32 F.4th at 760 (similar); *Delaware*, 578 F. Supp. 3d at 637 (similar).

lessees . . . the federal government would have needed to perform those activities itself" to produce and sell commodity oil and gas from the OCS, NOR ¶ 108, and might have "create[ed] a national oil corporation . . . as many other countries . . . have done," *id.* ¶ 92. The United States has never had a national oil company, and Defendants' leasing mineral rights on the OCS and other federal property is not remotely akin to one. Defendants cite a handful of bills introduced in response to the 1970s OPEC oil embargo to suggest that when the government leases mineral rights, it is "contract[ing] with private energy companies to perform these essential tasks on its behalf." NOR ¶¶ 90–95. Those bills, none of which became law, "provide no basis to find a congressional intent to create, directly or indirectly, a 'national oil company.'" *Delaware*, 578 F. Supp. 3d at 639; *cf. Honolulu*, 39 F.4th at 1108 (that Congress "studied creating" or "considered making a national oil company" does not support acting-under status). The "contention that [Defendants] are 'acting as agents' to achieve the same 'federal objective' . . . as would a speculative, non-existent 'national oil company' lacks merit." *Delaware*, 578 F. Supp. 3d at 639.

***Operation of the Elk Hills Reserve*.** Standard Oil of California's status as operator of the Elk Hills petroleum reserve does not satisfy the "acting under" element. The record confirms that Standard's activities under the Elk Hills Operating Agreement were *not* closely controlled and amounted to the minimum work needed to maintain the reserve's usable capacity. This was another "arm's-length business arrangement" that does not show subjection, guidance, or control. *San Mateo*, 32 F.4th at 759; *accord Baltimore*, 31 F.4th at 236–38.

Indeed, Defendants' exhibits tell the story of a narrow business relationship. In 1976, the Navy was in the "[f]inal steps to de-mothball more than 160 oil wells" at Elk Hills after President Ford "battled Congress for authority to give commercial producers access to the oil," under the "rationale . . . that it was no longer needed as a national security reserve." Dick Decl.

Ex. 64 at 3.[6] "Except for a period during World War II," the field "ha[d] been virtually untouched" since 1927; Standard had recently "tak[en] 2,000 to 3,000 barrels of oil annually" as a maintenance measure to prevent "water seepage." *Id.* at 5. Defendants emphasize that in the run-up to opening the reserve, "in November 1974, the Navy directed Standard to increase production to 400,000 barrels per day [at Elk Hills] to meet the unfolding energy crisis." NOR ¶ 70 (citing Dick Decl. Ex. 62 at 3). But in January 1975, instead of complying with what Defendants characterize as an order from the Navy, Standard demurred, terminating the contract. Dick Decl. Ex. 63 (January 7, 1975, letter "advis[ing] Navy that Standard wishes to terminate its position as Operator of the Elk Hills Reserve"). When production restarted in 1976, it was done by Williams Brothers Engineering Company, Standard's successor to the contract. *See* Dick Decl. Ex. 65 at 10, 14, 16, 17.

Defendants say "Standard Oil and later Chevron were still actively involved in the operations" at Elk Hills after it reopened, citing a contract with Williams Brothers to process natural gas. NOR ¶ 76 & n.56. But their cited source states that Chevron "balked at sharing the costs" of constructing new gas processing plants at Elk Hills, because Chevron intended to process *its* share of gas recovered from the field at facilities off-site. Dick Decl. Ex. 65 at 16. Ultimately, "the Government and Chevron reached a compromise" that reduced new construction at Elk Hills and allowed some gas to be processed off-site. *Id.* None of the above facts reasonably shows federal subjection, guidance, or control over Standard or Chevron. *See Honolulu*, 39 F.4th at 1109 (rejecting removal based on Elk Hills Operating Agreement because it "gave Standard Oil general direction—not 'unusually close' supervision").

***Strategic Petroleum Reserve***. Defendants' argument that they acted under federal

---

[6] Pincites to exhibits are made either to the blue Bates-stamped page numbers added by the CM/ECF system or to paragraph numbers within the exhibit.

officers by "supplying fuel for and managing the Strategic Petroleum Reserve" (SPR), NOR ¶ 22, is wrong on the facts and the law. Defendants' various interactions with the SPR fall within the scope of the City's disclaimer and therefore would not provide a basis for jurisdiction even if fully credited. *See Hoboken*, 45 F.4th at 713. And those interactions also fail to show an "acting under" relationship on the merits.[7]

Some Defendants have supplied oil to the SPR, but they have done so either by selling oil to the government or making in-kind royalty payments on OCS leases. Defendants provide a letter from the Department of the Interior to OCS operators, for example, describing a "program to use royalties in kind (RIK) to replenish the [SPR]," which notes that "[d]elivery of the accurate volume of Royalty Oil . . . in accordance with the terms of this letter will satisfy in full the Lessee's royalty obligation" under their respective OCS leases. Dick Decl. Ex. 86 at 2–3. But "extract[ing] fossil fuels from federal land in exchange for royalty payments" does not create an "'acting under' relationship." *Boulder*, 25 F.4th at 1253 (quotations omitted). It makes no difference that some Defendants have made some royalty payments in kind, or that the United States has independently used those "Royalty Oil" payments to replenish the SPR.

Defendants imply that they act under the government when "the President[] call[s] for an emergency drawdown" from the SPR, NOR ¶¶ 121–22, but that obligation is imposed on all lessees by statute. The Secretary of Energy may "drawdown and sell petroleum products in the Reserve" if the President makes certain findings, 42 U.S.C. § 6241(a), (d), and some Defendants' leases apparently provide that certain facilities must operate "as a sales and distribution point in the event of an SPR drawdown," NOR ¶ 121 (emphasis removed). The Ninth Circuit in *San Mateo* rejected similar reliance on OCS lease terms giving the President a right of first refusal on

---

[7] *See Connecticut*, 83 F.4th at 143–44; *Hoboken*, 45 F.4th at 712–13; *Anne Arundel*, 94 F.4th at 349; *Honolulu*, 39 F.4th at 1108.

OCS production in wartime, because those "lease requirements largely track statutory requirements" that are not specific to Defendants. *See San Mateo*, 32 F.4th at 760. The SPR drawdown provisions are no different.

Finally, Defendants' activities under the Emergency Petroleum Allocation Act (EPAA), *see* NOR ¶ 127 n.126, "are irrelevant here because the EPAA only controlled the allocation and distribution of *available* gasoline supplies" and it "did not require fossil fuel companies to increase production levels." *Delaware*, 578 F. Supp. 3d at 636 n.22 (cleaned up).

***World War II and Korean War.*** Defendants contend they acted under federal officers when they produced aviation fuel or "avgas" and operated petroleum infrastructure, particularly during World War II and the Korean War. NOR ¶¶ 31–43, 77–81. Those activities are within the City's disclaimer, and none of Defendants' wartime activities constitute "acting under."

First, Defendants' activities during World War II and the Korean War predate the deceptive conduct alleged in the Complaint by multiple decades, so they cannot justify federal-officer removal. *See Anne Arundel*, 94 F.4th at 349; *Connecticut*, 83 F.4th at 144.

Second, Defendants' compliance with directives from the Petroleum Administration for War (PAW) and under the Defense Production Act (DPA) does not demonstrate federal control because "'simply *complying* with the law' . . . no matter how detailed the government regulation or how intensely the entity's activities are supervised and monitored," does not show an acting-under relationship. *Baltimore*, 31 F.4th at 229 (quoting *Watson*, 551 U.S. at 143). Contrary to Defendants' assertions, avgas production during World War II was a largely cooperative endeavor, under which Defendants "designed and built their facilities, maintained private ownership of the facilities, and managed their own refinery operations." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002). The PAW "relied almost exclusively on

contractual agreements to ensure avgas production," and companies like Defendants "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war." *Id.* at 1049–50. Avgas production was "more like an arm's-length business deal" that does not support federal-officer jurisdiction. *Cf. Honolulu*, 39 F.4th at 1108. Likewise, "Defendants' compliance with the DPA was only lawful obedience" because "DPA directives are basically regulations." *Id*. None of this constitutes "acting under" federal officers.

Third, Defendants' reliance on their purported role in constructing and operating the Inch pipelines misses the mark. *See* NOR ¶¶ 123–27. Defendants offer no facts showing the government closely controlled those projects. Defendants' declarant opines that oil companies "provided the government" with "know-how in the areas of pipeline construction and operation." Dick Decl. Ex. 1 ¶ 13. But a contractor is not "under federal supervision or control" when "the government [is] relying on the expertise of [the contractor] and not vice versa." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015) (cleaned up).

Fourth, Defendants' operation of government-owned petroleum infrastructure during World War II also fails to satisfy the "acting under" standard. NOR ¶¶ 77–81. Defendants' own declarant states this infrastructure was managed under the same "government-owned, contractor-operated" relationship as Standard Oil's operation of the Elk Hills Reserve. Dick Decl. Ex. 1 ¶ 14. As noted, the Elk Hills Operating Agreement was a mere "arm's-length business arrangement with the Navy" that did not demonstrate subjection, guidance, or control, *San Mateo*, 32 F.4th at 759, just like the operation of wartime petroleum infrastructure.

***Specialized Military Fuels.*** The City has disclaimed relief arising from Defendants' sales of "specialized" fuels to the military. *Cf.* NOR ¶¶ 43–57, 79. Regardless, those too are arm's-length sales without close government control or supervision. It is insufficient to show that the

15

government "set forth detailed [product] specifications" for an item being purchased. *Baltimore*, 31 F.4th at 231. The government must have "close[ly] supervis[ed]" production, by for example "exercis[ing] intense direction and control over all written documentation" accompanying the product, or "maintain[ing] strict control over the [product's] development." *Id.* (cleaned up); *see Baker*, 962 F.3d at 942–43 (looking for more than following detailed specifications).

Defendants' own documents show that the design and production of military fuels has principally been in Defendants' hands, not the government's. An account of the Blackbird spy plane project, for example, states the government adopted a "management philosophy" of giving maximal "free[dom]" to its private contractors: officials refrained from "substituting their judgment for that of the contractors," and the "[r]equirements for Government approval as a prerequisite to action were minimal." Dick Decl. Ex. 19 at 27–28. Similarly, Shell Oil's contracts relating to the OXCART program simply gave the government generic rights to inspect the final deliverables, as would any commercial contract. *E.g.*, Dick Decl. Ex. 25 at 15–16. Nothing in the contracts suggests the government oversaw the manufacturing process itself. Instead, Shell was fully tasked with providing "technical supervision," "[e]ngineering," "general administration," and "laboratory support necessary to make the facility operational." *Id.* at 3–4. Shell's contracts for JP-5 and JP-8 jet fuel are also unremarkable commercial agreements, secured by Shell's winning bid and negotiated at arm's length. *E.g.*, Dick Decl. Ex. 34 at 2–3. None of Defendants' sales to the military satisfy the "acting under" requirement, as "[a]rm's length business agreements with the federal government for highly specialized products remain arm's length business agreements." *City of Oakland v. BP PLC*, 2022 WL 14151421, at *8 (N.D. Cal. Oct. 24, 2022), *aff'd*, 2023 WL 8179286, at *2 (9th Cir. Nov. 27, 2023) (unpublished).

***Economic and National Security Policy.*** Finally, Defendants argue that their businesses

are important to general federal policy objectives like "securing domestic energy independence and meeting the requirements of the U.S. military and . . . economy." NOR ¶ 29. Even if that were true, the government's belief that an industry's activities are important does not mean that every business activity of every industry member constitutes "act[ing] under the close supervision, subjection, guidance, or control of federal officers." *Connecticut*, 83 F.4th at 144 (cleaned up). *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021), *cert. denied*, 143 S. Ct. 773 (2023), is instructive. That case involved wrongful death claims on behalf of workers who had died after contracting the COVID-19 virus at a Tyson pork processing facility. 22 F.4th at 734. Citing federal policy statements and guidelines reflecting the importance of the food supply, Tyson argued it had acted under federal authority by keeping its factories open during the pandemic. *Id.* at 734–40. The Eighth Circuit rejected that position: "It cannot be that the federal government's mere designation of an industry as important—or even critical—is sufficient to federalize an entity's operations and confer federal jurisdiction." *Id.* at 740. Here, Defendants' broad policy arguments are unavailing for the same reasons.

### C. Defendants' Conduct Under Federal Officials' Authority, If Any, Is Insufficiently Related to Their Charged Conduct.

Even if Defendants acted under federal officers, those acts "are insufficiently related to [the City's] claims." *See Baltimore*, 31 F.4th at 230. Federal-officer removal requires a "connect[ion] or associat[ion]" between a defendant's "charged conduct" and federal authority. *Baker*, 962 F.3d at 943–44 (quotations omitted). If the "connection is too tenuous," it will not support removal. *Honolulu*, 39 F.4th at 1112; *accord Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (requiring "a direct connection or association between the federal government and the failure to warn" alleged in the plaintiff's complaint; cited in Defendants' NOR).

As many federal courts have held in materially identical suits, Defendants' charged

conduct does not relate to federal authority, as Defendants do not contend that their deception was directed or even influenced by federal officers. As the First Circuit put it:

> At first glance, these agreements may have the flavor of federal officer involvement in the oil companies' business, but that mirage only lasts until one remembers what Rhode Island is alleging in its lawsuit. Rhode Island is alleging the oil companies produced and sold oil and gas products in Rhode Island that were damaging the environment and engaged in a misinformation campaign about the harmful effects of their products on the earth's climate. . . . There is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer.

*Rhode Island*, 979 F.3d at 59–60; *accord Anne Arundel*, 94 F.4th at 350 ("[T]he companies do not argue the federal government required them to market or describe their products in a certain way."). So too here. "[T]his case presents a total mismatch between the business practices that [Defendants] assert[] were subject to federal control . . . and the business practices of which [the City] complains." *Connecticut*, 83 F.4th at 145.

The Seventh Circuit's recent decision in *Roberts* is instructive. There, the court rejected federal-officer removal partly because the removing defendant's alleged acting-under conduct did not relate to the grounds for its liability: "Smith & Wesson d[id] not contend that ATF directed it to make any AR-15 style weapon or compelled it to include in the M&P15 the rapid-fire features that [the] victims call wrongful. Nor does Smith & Wesson contend that ATF directed it to advertise the M&P15 in the way that it did." *See* 98 F.4th at 814. Likewise, here, Defendants do not assert that the federal government directed them to deceive and fail to warn.

Attempting to sidestep this mismatch, Defendants assert the Court "must credit" their theory of the case, which ignores that the City's claims focus on deception and failure to warn. *See* NOR ¶ 136. That argument violates the well-pleaded complaint rule and is unsupported by Defendants' citations, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999) (requiring defendants to make a "showing" that is something less than "airtight"); *Def. Ass'n of Phila. v. Johnson*, 790

F.3d 457, 472 (3d Cir. 2015) (affirming denial of remand where the "acts complained of undoubtedly 'relate to' acts taken under color of federal office").

### D. Defendants Have Not Alleged a Colorable Federal Defense.

Defendants did not act under a federal official, nor is any of the conduct at issue in the Complaint related in any way to the alleged federal-officer conduct identified by Defendants in their NOR. So, the Court need not address whether Defendants have a colorable federal defense. *See Boulder*, 25 F.4th at 1254; *San Mateo*, 32 F.4th at 760. That said, their defenses "fail to stem from official duties or are not colorable" anyway. *Honolulu*, 39 F.4th at 1110 (citing *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)).

Defendants' anticipated preemption defenses based on the Due Process Clause, the Commerce Clause, the foreign affairs doctrine, and the CAA, *see* NOR ¶¶ 141–50, have nothing to do with the actions Defendants claim they took under federal direction like operations at the Elk Hills Reserve, fuel sales to the military, or leasing OCS mineral rights. *See Honolulu*, 39 F.4th at 1110. Their federal contractor defense, meanwhile, *see* NOR ¶¶ 141–43, has nothing to do with the Complaint. Defendants assert that "liability related to alleged defects in military equipment" cannot be imposed because Defendants satisfy the elements of the government-contractor defense. NOR ¶ 141 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–14 (1988)). But the City has not brought product defect causes of action, does not premise liability on any "defects in military equipment," and has expressly disclaimed injuries relating to military sales of specialized fuels. So, the federal contractor defense will *never* be at issue in this case.

## II. Federal Common Law Does Not Confer Jurisdiction Over the City's Claims.

In addition to the federal-officer removal statute, Defendants invoke the general removal statute, 28 U.S.C. § 1441, which makes cases removable if they "aris[e] under" federal law and

thus support federal-question jurisdiction, *see id.* § 1331. But the City's well-pleaded Complaint alleges only state-law claims, and Defendants fail to show that either of the relevant exceptions to the well-pleaded complaint rule—*Grable* and complete preemption—authorizes removal. Instead, Defendants seek a novel exception: they vaguely assert that "federal common law" can convert the City's state-law claims to federal ones as a matter of "federal constitutional law and structure." *E.g.* NOR ¶ 151. A robust body of law confirms that Defendants' federal-common-law removal arguments are wrong. *E.g.*, *Baltimore*, 31 F.4th at 199 ("[W]e resoundingly agree with Baltimore and reject Defendants' attempts to invoke federal common law.").[8]

### A. Defendants Misportray the City's Quintessentially State-Law Claims.

The City asserts only state-law claims. Compl. ¶¶ 258–416. Just like in analogous cases, the Complaint makes clear that the "source of tort liability" is Defendants' "concealment and misrepresentation of [fossil fuel] products' known dangers." *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 467 (4th Cir. 2020), *vacated sub nom.*, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021). So, the City's claims address traditional areas of state concern like consumer protection, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 150 (1963); "advertising," *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541–42 (2001); "unfair business practices," *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); and "the accuracy of commercial information," *Edenfield v. Fane*, 507 U.S. 761, 769 (1993).

Instead of accepting the City's well-pleaded state-law claims, Defendants distort them in an attempt to bolster their bid for federal-question jurisdiction. Defendants assert, for example, that the City "seeks to hold Defendants liable as companies that have extracted, sold, and promoted fossil fuel products," NOR ¶ 2, rather than as companies that have tortiously deceived.

---

[8] *Accord Rhode Island*, 35 F.4th at 53–56; *Connecticut*, 83 F.4th at 135–38; *Hoboken*, 45 F.4th at 707–08; *Minnesota*, 63 F.4th at 708–12; *Oakland*, 969 F.3d at 906–07; *San Mateo*, 32 F.4th at 747–48; *Boulder*, 25 F.4th at 1257–62; *District of Columbia*, 89 F.4th at 150–54.

But "[n]umerous courts have rejected similar attempts by oil and gas companies to reframe complaints." *City & Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1201 (Haw. 2023): *accord City of New York II*, 2024 WL 2091994, at *4 & n.4. The Court should do the same: a defendant "cannot recharacterize a plaintiff's claim in order to create federal question jurisdiction." *Rice*, 65 F.3d at 645–46 (quotations omitted); *accord City of Chicago v. Monsanto Co.*, No. 23-15357, ECF No. 29, slip op. at 3 (N.D. Ill. filed Feb. 12, 2024) (rejecting attempt to remove an action by "mak[ing] [it] into something that it's not"). This case is about Defendants' *deception*, and the Court must take the City "at its word . . . that it does not seek to impose liability on Defendants for their direct emissions of greenhouse gases," *Baltimore*, 31 F.4th at 217, or their lawful "production and supply of fossil fuels," *Anne Arundel*, 94 F.4th at 349.

Defendants likewise distort the relief the City seeks. Defendants exaggerate that the City's suit tries to limit Defendants from producing and selling fossil fuels, "regulate global energy policy and production," "call[] into question" federal government decisions, and "determine[e] how best to address global climate change." NOR ¶¶ 4, 5, 11. But the City's requests for relief are tied to Defendants' deception: "[t]his lawsuit seeks to hold [Defendants] accountable for the lies they have told and the damage they have caused." Compl. ¶ 11. "None of [the City's] claims concern emission standards, federal regulations about those standards, or pollution permits." *Baltimore*, 31 F.4th at 217; *accord Boulder*, 25 F.4th at 1264; *Rhode Island*, 35 F.4th at 55 n.8. "[S]o long as Defendants start warning of their products' climate impacts and stop spreading climate disinformation, they can sell as much fossil fuel as they wish without fear of incurring further liability." *Honolulu*, 537 P.3d at 1186; *accord Baltimore*, 31 F.4th at 217. Thus, "the State's action here is far more modest than the caricature Defendants present," *Minnesota*, 2021 WL 1215656, at *13, and the City's Complaint raises only state-law claims.

21

**B. Defendants' Federal-Common-Law Arguments Do Not Satisfy *Grable* or the Complete Preemption Doctrine.**

The City's "exclusive reliance on state law" deprives this Court of federal-question jurisdiction absent an exception to the well-pleaded complaint rule, *Oakland*, 969 F.3d at 904 (quoting *Caterpillar*, 482 U.S. at 392); *accord Minnesota*, 63 F.4th at 709. Neither of the two relevant exceptions—*Grable* and complete preemption—is satisfied here.

Defendants do not refer to *Grable* in their NOR. That omission constitutes a waiver. *See Robinson v. Avanquest N. Am.*, 2015 WL 196343, at *3 (N.D. Ill. Jan. 13, 2015). In any event, *Grable* cannot be satisfied, as every court to consider the question has held. *See Minnesota*, 63 F.4th at 711 ("To date, none of our sister circuits have found [a *Grable*] argument persuasive [in climate-deception cases].").[9] Among other shortcomings, Defendants cannot satisfy *Grable*'s requirement to show that the City's claims "necessarily raise [an] issue of federal law." *Hartland Lakeside Jt. No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014). To borrow the First Circuit's words, "none of [the City's] claims has as an element a violation of federal law; [Defendants] pinpoint no specific federal issue that must necessarily be decided for [the City] to win its case; and their speaking about federal law or federal concerns in the most generalized way is not enough for *Grable* purposes." *Rhode Island*, 35 F.4th at 57.

Meanwhile, Defendants' complete preemption argument based on federal common law—which they relegate to a footnote—is frivolous. NOR ¶ 151 n.128. Initially, Defendants are wrong that any claims relating to greenhouse gas pollution are "exclusively the province of federal [common] law." *See id.* As discussed next in Section II.C.1, any such federal common law "*no longer exists.*" *Boulder*, 25 F.4th at 1260 (citing *Am. Elec. Power Co. v. Connecticut*

---

[9] *Accord Rhode Island*, 35 F.4th at 56–57; *Hoboken*, 45 F.4th at 708–09; *Baltimore*, 31 F.4th at 212; *Anne Arundel*, 94 F.4th at 350–52; *Oakland*, 969 F.3d at 906–07; *San Mateo*, 32 F.4th at 746–48; *Boulder*, 25 F.4th at 1266.

(*AEP*), 564 U.S. 410, 422–24 (2011)). Even if that law still exists, federal common law is incapable of completely preempting state law. Complete preemption occurs only when "Congress intended a federal statute to provide 'the exclusive cause of action for the claim asserted.'" *Minnesota*, 63 F.4th at 710 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)). Because complete preemption requires congressional intent, "the Supreme Court has only applied complete preemption in the context of federal statutes, not federal common law," *Baltimore*, 31 F.4th at 205 n.8. "Therefore, the federal common law for transboundary pollution cannot *completely* preempt" state law. *Boulder*, 25 F.4th at 1262.

*Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661 (1974), changes nothing. *See* NOR ¶ 151 n.128. There, an Indian tribe sued a county in federal court, "assert[ing] a current right to possession [to land] conferred by federal law, wholly independent of state law." *Oneida Indian Nation*, 414 U.S. at 666. *Oneida* only confirms the vital role of the well-pleaded complaint rule, which supported federal-question jurisdiction over the claims because "the right to possession itself [wa]s claimed to arise under federal law in the first instance." *Id.* at 676.

## C. The Court Should Reject Defendants' Invitation to Create a Novel Exception to the Well-Pleaded Complaint Rule.

Unable to satisfy *Grable* or complete preemption, Defendants push the Court to recognize a novel exception to the well-pleaded complaint rule. Defendants first insist that "federal common law" authorizes the Court to exercise federal-question jurisdiction over the City's state-law claims "as a matter of federal constitutional law and structure," then point to the now-defunct federal common law of transboundary pollution and the foreign affairs doctrine. NOR ¶¶ 151–64. But the City's claims simply do not implicate federal common law or the foreign affairs doctrine, and both—at most—support only an ordinary federal preemption defense and thus cannot justify removal. *Cf. Baltimore*, 31 F.4th at 204–07, 212–15 (climate-

23

deception claims did not "entail foreign relations," and removal arguments based on defunct federal common law "defie[d] logic"). The Court also should reject Defendants' invitation to create new federal common law that makes the City's claims removable.

### 1. Defunct Federal Common Law Cannot Support Removal.

Defendants primarily assert that the City's claims are removable because "federal [common] law exclusively governs claims for interstate and international [air] pollution." NOR ¶ 14 (citing *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 93 (1972); *City of Milwaukee v. Illinois* (*Milwaukee II*), 451 U.S. 304, 310 (1981); *AEP*, 564 U.S. 410 (2011)). But the U.S. Supreme Court held in *AEP*, 564 U.S. at 424, 429, and multiple courts of appeals have since agreed, that this body of federal common law has been "displaced, extinguished, and rendered null" by the CAA, *see Baltimore*, 31 F.4th at 206.[10] It "defies logic," *id.*, for Defendants to assert that federal common law that "*no longer exists*" can justify removing the City's state-law claims to federal court, *Boulder*, 25 F.4th at 1260.

Instead, because Congress displaced this federal common law with the CAA, any preemption analysis turns on the statute, not some defunct body of judge-made law. *E.g.*, *Nw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 95 n.34 (1981) ("[Following displacement,] the task of the federal courts is to interpret and apply statutory law . . . ."). *AEP* itself makes that clear. After holding that the CAA displaced the plaintiffs' federal-common-law claims, the Court remanded their state-law claims for further consideration, noting that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the [CAA]." *AEP*, 564 U.S. at 429; *accord Honolulu*, 537 P.3d at 1202–07 (rejecting Defendants' preemption defense on the merits by relying on the CAA); *District of Columbia*, 89 F.4th at 152–53.

---

[10] *Accord Rhode Island*, 35 F.4th at 55; *Hoboken*, 45 F.4th at 707–08; *San Mateo*, 32 F.4th at 748; *Boulder*, 25 F.4th at 1260; *District of Columbia*, 89 F.4th at 150–51.

Defendants' NOR ignores that Congress eliminated the former federal common law of transboundary pollution. Instead, Defendants assert it continues to exist as a background constitutional rule. *E.g.*, NOR ¶ 151. But the U.S. Supreme Court has never conflated federal common law rules with constitutional ones. Far from it, the Court "ha[s] always recognized that federal common law is subject to the paramount authority of Congress." *Milwaukee II*, 451 U.S. at 313 (quotation omitted). Nor did the Court announce any new constitutional rules *sub silentio* in its cases addressing this defunct body of federal common law. In fact, none of those cases references or analyzes any specific constitutional text or provision—the starting point of any constitutional analysis. *Cf. Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658–59 (2020) (relying on "text," "structure," and "history").

Moreover, even if the federal common law of transboundary pollution had not been displaced by the CAA, it would not apply to the City's claims. *See Minnesota*, 63 F.4th at 710 ("Even if federal common law still exists in this space . . . , that remedy doesn't occupy the same substantive realm as state-law . . . claims."). That federal common law has only ever been applied to cases that have the purpose and effect of abating out-of-state pollution, which the City's claims—as discussed—cannot do. *E.g.*, *AEP*, 564 U.S. at 421 (defunct federal common law governed "suits brought by one State to abate pollution emanating from another State"); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) ("[T]he regulation of interstate water pollution is a matter of federal, not state, law . . . ."); *Milwaukee II*, 451 U.S. at 311 (seeking an order requiring "petitioners to eliminate all overflows and to achieve specified effluent limitations on treated sewage"); *Milwaukee I*, 406 U.S. at 93 (similar).[11]

---

[11] *Accord New Jersey v. City of New York*, 283 U.S. 473, 476–77 (1931) (seeking "an injunction" that would "restrain[] the city from dumping garbage into the ocean or waters of the United States . . . and from otherwise polluting its waters and beaches"); *New York v. New Jersey*, 256 U.S. 296, 298 (1921)

Nor can Defendants justify removal with *City of New York v. Chevron Corp.* (*City of New York I*), 993 F.3d 81 (2d Cir. 2021), which is distinguishable, *e.g.*, *Hoboken*, 45 F.4th at 708; *Rhode Island*, 35 F.4th at 55. There, the plaintiff sought to hold the defendants liable for "admittedly legal commercial conduct in producing and selling fossil fuels," such that they could not "avoid all liability" unless they "cease[d] global production altogether." *City of New York I*, 993 F.3d at 86, 93. Here, the "source of tort liability" is Defendants' deception rather than their lawful commercial conduct, *see Baltimore*, 952 F.3d at 467, and the relief the City seeks cannot regulate emissions or production, *see Honolulu*, 39 F.4th at 1106. There, the plaintiff "filed suit in federal court" on diversity jurisdiction grounds, and the court assessed an ordinary preemption defense based on federal common law "on its own terms, not under the heightened standard unique to the removability inquiry." *City of New York I*, 993 F.3d at 94. Here, in the removal context, Defendants bear the burden of showing an exception to the well-pleaded complaint rule.

Indeed, the Second Circuit in *Connecticut*—via a decision written by the judge who authored *City of New York I*—rejected federal-common-law removal arguments in a climate-deception case and warned against relying on *City of New York I* to "push the boundaries of" the well-pleaded complaint rule. *Connecticut*, 83 F.4th at 138. Likewise, in *City of New York II*, a separate climate-deception suit by the same plaintiff as *City of New York I*, the district court applied *Connecticut* to reject removal based on federal common law and remand the case. *See* 2024 WL 2091994, at *3–5. Finally, in addition to being distinguishable, *City of New York I* is "not persuasive" to the extent the court reasoned that defunct federal common law could preempt state law. *Honolulu*, 537 P.3d at 1200; *accord Baltimore*, 31 F.4th at 203 ("*City of New*

---

(seeking to "permanently enjoin[]" defendant from "discharging . . . sewage" into the New York harbor); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 236 (1907) (seeking "to enjoin the defendant copper companies from discharging noxious gas"); *Missouri v. Illinois*, 200 U.S. 496, 517 (1906) (seeking "to restrain the discharge of . . . sewage"); *North Dakota v. Minnesota*, 263 U.S. 365, 371–72 (1923) (seeking injunction to limit "the continued use of" overflowing ditches).

*York* essentially evades the careful analysis that the Supreme Court requires . . . .").

**2.     The Foreign Affairs Doctrine Cannot Support Removal.**

Defendants assert the Court should exercise federal-question jurisdiction based on "foreign affairs" and the "Foreign Commerce Clause." NOR ¶¶ 159–65. But the City's state-law claims that address consumer-facing deception and failure to warn do not "entail foreign relations" or amount to "an attempt [by the City] to establish its own foreign policy." *Baltimore*, 31 F.4th at 214.[12] And "Defendants do not identify any express foreign policy from the federal government that conflicts with [the City's] state-law claims," which rest solely on Defendants' consumer-facing deception and failures to warn. *See id.* at 213. At most, Defendants vaguely refer to "national and international interests, including treaty obligations and federal and international regulatory schemes." *See* NOR ¶ 161; *cf. Boulder*, 25 F.4th at 1266 (rejecting Defendants' reliance on a "miscellaneous patchwork" of purported federal policies).

Moreover, even if the foreign affairs doctrine or the Foreign Commerce Clause limited the City's claims, they would provide only an ordinary federal preemption defense that cannot justify removal. *See Baltimore*, 31 F.4th at 212–14; *cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Indeed, the cases Defendants cite neither resemble this case nor recognize removal based on foreign affairs considerations. For example, *City of New York I* is "irrelevant" because that court's analysis of foreign affairs concerned an ordinary preemption defense and had nothing to do with removal. *Connecticut*, 83 F.4th at 140 n.6; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 400–06 (1964) (applying a choice-of-law rule called the "act of state doctrine" to expropriation claims involving the Cuban government); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003) (addressing ordinary foreign affairs preemption); *Republic*

---

[12] *Accord Rhode Island*, 35 F.4th at 55, 57; *Oakland*, 969 F.3d at 907; *Boulder*, 25 F.4th at 1266; *Honolulu*, 537 P.3d at 1200 (rejecting Defendants' foreign affairs preemption arguments on the merits).

27

*of Philippines v. Marcos*, 806 F.2d 344, 354 (2d Cir. 1986) ("[A]n action brought by a foreign government against its former head of state arises under federal common law . . . ."); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 224 (4th Cir. 2012) (dismissing improper interlocutory appeals in cases involving Alien Tort Statute claims by Abu Ghraib detainees).

### 3. Defendants Do Not Justify Creating New Federal Common Law.

Defendants' suggestion that the Court should "create" a new body of federal common law, NOR ¶ 155, is meritless. "The cases in which federal courts may engage in common lawmaking are few and far between." *Rodriguez v. FDIC*, 589 U.S. 132, 133 (2020). Federal judges may create common law only where there is a "significant conflict" between a uniquely federal interest and the use of state law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994). Here, Defendants fail to identify a significant conflict between any federal interest and the City's deception-focused state-law claims. *See Rhode Island*, 35 F.4th at 54; *Baltimore*, 31 F.4th at 203–04; *Massachusetts*, 462 F. Supp. 3d at 43. Indeed, no significant conflict could exist because the City's claims fall comfortably within areas of traditional state concern. *See supra* Section II.A. In any event, Defendants do not show that judges can fashion federal common law that allows well-pleaded state-law claims to be removed.

### 4. Defendants' Other Citations Do Not Alter the Analysis.

Defendants' other case citations do not support their novel theory that the City's state-law "claims necessarily arise under federal [common] law" despite the well-pleaded complaint rule. NOR ¶¶ 151–65. Many of these cases were originally filed in federal court by plaintiffs who asserted federal-question jurisdiction. They do not illuminate whether claims pleaded under state law can be removed based on a defendant's argument that the claims are controlled by federal common law. *See AEP*, 564 U.S. at 418; *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of*

*Indians*, 471 U.S. 845, 850–51 & n.2 (1985); *Milwaukee II*, 451 U.S. at 310; *Milwaukee I*, 406 U.S. at 93; *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126, 130 (2d Cir. 1999); *Treiber & Straub, Inc. v. United Parcel Serv., Inc.*, 2005 WL 2108081, at *1 (E.D. Wis. Aug. 31, 2005), *aff'd in part, modified in part sub nom.*, *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379 (7th Cir. 2007); *cf. Club Comanche, Inc. v. Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (action started in federal Article I territorial court).

One case—which pre-dated *Grable* but relied on a test that resembled the later *Grable* framework—found federal jurisdiction only because the state-law claims necessarily raised "a substantial question of federal law." *See Marcos*, 806 F.2d at 352–354. Most of Defendants' remaining cases did not analyze federal-question jurisdiction at all, which indisputably existed for reasons unrelated to federal common law. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973) (United States was plaintiff); *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 303 (1947) (same); *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 39 (1st Cir. 1999) (same); *Ouellette*, 479 U.S. at 500 (diversity jurisdiction); *Sabbatino*, 376 U.S. at 421 & n.20 (same); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 632 (1981) (Sherman Act claims); *McGurl v. Trucking Emps. of N.J. Welfare Fund, Inc.*, 124 F.3d 471, 475–76 (3d Cir. 1997) (federal question existed because the "case involved a dispute over the disbursement of payments under ERISA"); *Al Shimari*, 679 F.3d at 209 (Alien Tort Statute).

Defendants also cite a case that lacks any relationship to the issues at hand, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 585–86 (1996) (on certiorari from state supreme court, addressing constitutionality of punitive damages award), and a decision that no longer is good law, *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74 (4th Cir. 1993), *abrogated by Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690–93 (2006).

Defendants' reliance on a footnote in *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981), is misguided. The U.S. Supreme Court has since called this footnote a "marginal comment," *Rivet v. Regions Bank of La.*, 522 U.S. 470, 477 (1998), and has "cabined it to its 'case-specific context.'" *Hoboken*, 45 F.4th at 708 (quoting *Rivet*, 522 U.S. at 477–78). Most importantly, "[t]he footnote did not change 'the rule' that 'a federal defense,' like ordinary preemption, does not justify removal." *Id.* (quoting *Rivet*, 522 U.S. at 478).

That leaves *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997). That case was "sui generis," and the court "took pains to 'emphasize' that its 'holding [was] necessarily limited' to [its] highly specific context." *Connecticut*, 83 F.4th at 137 (quoting *Sam L. Majors*, 117 F.3d at 929 n.16). Also, "most courts recognize" that the decision is "not good law" to the extent it endorsed a novel exception to the well-pleaded complaint rule based on federal common law. *Hoboken*, 45 F.4th at 708. The Fifth Circuit itself has abandoned that notion, holding that federal-question jurisdiction will lie over a state-law claim "only if" the claim satisfies *Grable* or is completely preempted. *Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 551 (5th Cir. 2008).

## REQUEST FOR FEES

Under 28 U.S.C. § 1447(c), the Court should award the City its costs and fees incurred because of Defendants' objectively baseless removal. *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005); *cf. Tenner v. Zurek*, 168 F.3d 328, 329 (7th Cir. 1999) (award does not require a showing of subjective bad faith). Defendants' removal arguments have been "universally rejected by federal courts across the country," as the Southern District of New York recently observed when it awarded fees in *City of New York II*, 2024 WL 2091994, at *11–12.

## CONCLUSION

The Court should remand this case forthwith and award the City its costs and fees.

Date: May 16, 2024              Respectfully submitted,

Mary B. Richardson-Lowry
**Corporation Counsel of the City of Chicago**

By:     */s/ Stephen J. Kane*
Stephen J. Kane
Rebecca A. Hirsch
Chelsea Metcalf
**CITY OF CHICAGO DEPARTMENT OF LAW**
**AFFIRMATIVE LITIGATION DIVISION**
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (312) 744-6934
stephen.kane@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner (*pro hac vice*)
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com

By:     */s/ Matthew K. Edling*
Matthew K. Edling (*pro hac vice*)
Victor M. Sher (*pro hac vice*)
Katie H. Jones (*pro hac vice forthcoming*)
Paul Stephan (*pro hac vice*)
**SHER EDLING LLP**
100 Montgomery Street, Suite 1410
San Francisco, California 94104
Tel: (628) 231-2500
matt@sheredling.com
vic@sheredling.com
katie@sheredling.com
paul@sheredling.com