**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO,<br><br>        Plaintiff,<br><br>        v.<br><br>BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORPORATION; CHEVRON U.S.A. INC.; CONOCOPHILLIPS COMPANY; CONOCOPHILLIPS; PHILLIPS 66 COMPANY; PHILLIPS 66; EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION; SHELL OIL PRODUCTS COMPANY LLC; SHELL PLC; SHELL USA, INC.; and AMERICAN PETROLEUM INSTITUTE,<br><br>        Defendants. | Civil Action No. 1:24-cv-02496<br><br>Hon. Franklin U. Valderrama<br><br>**Oral Argument Requested** |

<u>**OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     LEGAL STANDARD...........................................................................................3

III.    ARGUMENT .......................................................................................................3

        A.      Defendants Properly Removed This Case Under The Federal Officer
                Removal Statute. ......................................................................................3

                1.      Defendants "Acted Under" Federal Officers And Agencies. ..........6

                        a.      Defendants Acted Under Federal Officers During World
                                War II And The Korean War. ................................................8

                        b.      Defendants Continue To Act Under Federal Officers By
                                Producing And Supplying Large Quantities Of Specialized
                                Fuels Under Military Direction...........................................12

                        c.      Defendants Acted Under Federal Officers By Operating
                                The Elk Hills Reserve "In the Employ" Of The U.S. Navy.
                                ............................................................................................16

                        d.      Defendants Have Acted Under Federal Officers By
                                Developing Mineral Resources On The Outer Continental
                                Shelf And Federal Lands. ...................................................17

                        e.      Defendants Acted Under Federal Officers By Supplying
                                And Managing The Strategic Petroleum Reserve.............19

                2.      Defendants' Activities At The Direction Of Federal Officers Are
                        Related To Plaintiff's Claims.........................................................20

                3.      Defendants Raise "Colorable Federal Defenses." ........................25

                4.      Any Attempt To Disclaim Injury Arising From The Sales Of
                        Specialized Fuels To The United States Military Is Ineffective. ...27

        B.      Defendants' Grounds For Removal Are Not Objectively Unreasonable,
                And Plaintiff Is Not Entitled To Fees And Expenses. ..............................29

IV.     CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004)...................................................................................23

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011)...............................................................................12, 27

*Arizona v. Manypenny*,
  451 U.S. 232 (1981).....................................................................................4

*Baker v. Atl. Richfield Co.*,
  421 F. Supp. 3d 634, No. 2:17-cv-00429 (N.D. IN. 2019)....................................26

*Baker v. Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020)
  ...........................................................2, 3, 5, 6, 7, 11, 12, 13, 14, 16, 20, 21, 22, 23, 26, 27, 28

*Barrientos v. Williams-Sonoma, Inc.*,
  2023 WL 5720855 (N.D. Ill. Sept. 1, 2023) ....................................................29

*Betzner v. Boeing Co.*,
  910 F.3d 1010 (7th Cir. 2018) .................................................................3, 24

*Boyle v. United Technologies Corp.*,
  487 U.S. 500 (1988)...............................................................................24, 25

*Buljic v. Tyson Foods, Inc.*,
  22 F.4th 730 (8th Cir. 2021) ........................................................................15

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016)...................................................................................25

*City of New York v. Chevron Corp.*, 993 F.3d 81(2d Cir. 2021) .....................21, 23, 24

*City of Charleston v. Brabham Oil Co., Inc.*,
  No. 2:20-CV-03579, slip op. (D.S.C. July 24, 2023) ............................................30

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
  996 F.3d 243 (4th Cir. 2021) ................................................................14, 23, 25

*Cnty. of Multnomah v. Exxon Mobil Corp.*,
  2024 WL 1991554 (D. Or. Apr. 10, 2024), *report and recommendation
  adopted*, 2024 WL 2938473 (D. Or. June 10, 2024) ............................................30

*In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n
  of Phila.*,
  790 F.3d 457 (3d Cir. 2015).......................................................................4, 21

*EEOC v. Chicago Club*,
    86 F.3d 1423 (7th Cir. 1996) ................................................................23

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ...........................................................................3

*Exxon Mobil Corp. v. United States*,
    2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .........................................9, 10

*Fry v. Napoleon Cmty. Sch.*,
    137 S. Ct. 743 (2017) ....................................................................21, 22

*Goncalves v. Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) ...............................................................25

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) ...........................................................................2

*Jarbough v. Att'y Gen. of U.S.*,
    483 F.3d 184 (3d Cir. 2007) .................................................................23

*Jefferson County, Ala. v. Acker*,
    527 U.S. 423 (1999) ..........................................................................4

*State ex rel. Jennings v. BP America Inc.*,
    2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) .........................................25

*Kelleher v. A.W. Chesterton Co.*,
    2015 WL 7422756 (S.D. Ill. Nov. 23, 2015) ............................................28

*Kelly v. Martin & Bayley Inc.*,
    503 F.3d 584 (7th Cir. 2007) .................................................................7

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) ............................................................15, 21

*Lott v. Pfizer, Inc.*,
    492 F.3d 789 (7th Cir. 2007) ................................................................29

*Lu Junhong v. Boeing Co.*,
    792 F.3d 805 (7th Cir. 2015) ..............................................................7, 8

*Martin v. Franklin Capital Corp.*,
    546 U.S. 132 (2005) .........................................................................29

*Mitchell v. Maurer*,
    293 U.S. 237 (1934) .........................................................................23

*Nessel v. Chemguard, Inc.*,
    2021 WL 744683 (W.D. Mich. Jan. 6, 2021) ...........................................28

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ..........................................................................21

*Reinbold v. Advanced Auto Parts, Inc.*,
   2018 WL 3036026 (S.D. Ill. June 19, 2018)................................................28

*Roberts v. Smith & Wesson Brands, Inc.*,
   98 F.4th 810 (7th Cir. 2024) .................................................................14, 24

*Ruppel v. CBS Corp.*,
   701 F.3d 1176 (7th Cir. 2012) .............................................................4, 6, 26

*Schmitt v. War Emergency Pipelines, Inc.*,
   175 F.2d 335 (8th Cir. 1949) ...................................................................11

*Shell Oil Co. v. United States*,
   751 F.3d 1282 (Fed. Cir. 2014).................................................................10

*Tenner v. Zurek*,
   168 F.3d 328 (7th Cir. 1999) ...................................................................30

*Treiber & Straub, Inc. v. U.P.S., Inc.*,
   474 F.3d 379 (7th Cir. 2007) ....................................................................2

*United States v. Pink*,
   315 U.S. 203 (1942)...............................................................................25

*United States v. Shell Oil Co.*,
   294 F.3d 1045 (9th Cir. 2002) ...................................................................9

*USA Satellite & Cable, Inc. v. Glen Health & Home Mgmt., Inc.*,
   2015 WL 1185478 (N.D. Ill. Mar. 11, 2015)...............................................29

*Valles v. Pleasant*,
   2023 WL 4999845 (N.D. Ill. Aug. 4, 2023) ................................................29

*Watson v. Philip Morris Cos., Inc.*,
   551 U.S. 142 (2007)..............................6, 8, 11, 13, 16, 17, 18, 19, 20

*Wecker v. Nat'l Enameling & Stamping Co.*,
   204 U.S. 176 (1907)................................................................................3

*Willingham v. Morgan*,
   395 U.S. 402 (1969)...........................................................................4, 26

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) ..................................................................14

*Wisconsin v. Amgen, Inc.*,
   516 F.3d 530 (7th Cir. 2008) ..................................................................29

## Statutes

28 U.S.C. § 1331 .....................................................................................2, 3

28 U.S.C. § 1441(a) ....................................................................................3

28 U.S.C. § 1442(a)(1) ................................................................................ 1, 3, 4, 7, 21, 26

28 U.S.C. § 1447(c) ................................................................................................ 29

42 U.S.C. § 6231 ..................................................................................................... 19

43 U.S.C. § 1332(3) ................................................................................................ 18

## Regulations

19 Fed. Reg. 90 (May 8, 1954) .............................................................................. 18

## Constitutional Provisions

U.S. Const. amend. V ............................................................................................. 25

U.S. Const. amend. XIV, § 1 ................................................................................. 25

U.S. Const. art. I, § 8, cl. 3 ................................................................................... 25

U.S. Const. art. VI, cl. 2 ........................................................................................ 25

## I.       INTRODUCTION

Plaintiff, the City of Chicago, seeks to impose liability for global climate change on a select group of energy companies that, it alleges, supply the world with a small fraction of the oil and gas products that governments, businesses, and consumers have demanded and used over many decades.  Plaintiff seeks damages for harms allegedly caused by global greenhouse gas emissions. Its claims, therefore, depend on Defendants' production, promotion, and/or sale of oil and gas that create greenhouse gas emissions when combusted by end users, including entities like the U.S. government and military.  In fact, Plaintiff alleges at the very beginning of its Complaint that because Defendants "*extracted and sold* fossil fuel products," there has been an increase in greenhouse gas emissions, which has "brought about devastating climate change impacts to the City of Chicago."  Compl. ¶¶ 1, 4 (emphasis added).[1]

Plaintiff's claims and alleged injuries depend on Defendants' extraction, production, and sales of fuel products.  Although Plaintiff contends that its lawsuit is based on Defendants' alleged deception, its claims all rest on what it deems "Climate-Related Harms," which are based on the "release of greenhouse gases into the atmosphere" from the sale and use of fossil fuel products. Compl. ¶ 262.  And there can be no real dispute that a significant portion of Defendants' production and sales activities were undertaken under the direction, supervision, and control of the U.S. government, which is the single largest consumer of energy in the United States, and one of the world's largest consumers of petroleum fuels.

Accordingly, this case is removable under the federal officer removal statute.  28 U.S.C. § 1442(a)(1).  Congress has provided defendants with a right to remove a suit against any person

---

[1]   Many Defendants contend that they are not subject to personal jurisdiction in Illinois. Defendants submit this Opposition subject to, and without waiver of, these jurisdictional objections.

acting under a federal officer when the suit is related to acts under color of federal office. *Id.* Here, Defendants have presented substantial evidence that the federal government directed Defendants to engage in petroleum production activities related to Plaintiff's claims and alleged injuries. For example, Defendants have worked under the direction of federal officers for decades to provide the government with specialized fuels and services that are essential to the operations of the U.S. military, national security, and economy. And it is precisely the alleged effects of emissions from the use of fossil fuel products, including those supplied by Defendants to the federal government under federal direction, that Plaintiff contends caused its injuries. While Plaintiff protests that the federal government did not direct any purported deception connected with its supply of these products, Defendants do "not need to allege that the complained-of conduct *itself* was at the behest of a federal agency"; it is enough that Plaintiff's claims are connected to or associated with acts Defendants took under color of office. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020) (cleaned up). Put simply, because Plaintiff's claims and alleged injuries are based on Defendants' oil and gas production and sales activities, and many of those activities were performed under the direction of federal officers, this court has federal officer removal jurisdiction.

Plaintiff devotes much of its remand motion to discussing case law from *other* circuits. But it is the law of the Seventh Circuit, not any other circuit, that governs whether this Court has jurisdiction. And, as explained below, the Seventh Circuit's precedent, including its decision in *Baker*, is dispositive and establishes—consistent with the text of the statute and Supreme Court precedent—that removal under the federal officer removal statue is proper. The Court should deny Plaintiff's motion to remand.[2]

---

[2] Defendants also properly removed this action (*see* NOR ¶¶ 151–65) because where, as here, Plaintiff's claims "arise under federal common law"—not state law—federal courts have "jurisdiction based on a federal question," pursuant to Section 1331. *Treiber & Straub, Inc. v.*

## II.    LEGAL STANDARD

Removal from state court is proper if the federal court would have had original jurisdiction of the action.  28 U.S.C. § 1441(a).  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331. Federal courts must be "vigilant to protect the right" of defendants "to proceed in . . . Federal court." *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907).  The removing party need show only that there is federal jurisdiction over a single claim.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005).

## III.    ARGUMENT

### A.    Defendants Properly Removed This Case Under The Federal Officer Removal Statute.

Defendants properly removed this action because the federal government directed Defendants to engage in activities relating to Plaintiff's claims and alleged injuries.  *See* 28 U.S.C. § 1442(a)(1).  The federal officer removal statute authorizes removal where, as here, (1) Defendants "act[ed] under a federal officer or agency"; (2) the suit is "connected or associated[] with acts under color of federal office"; and (3) Defendants have a "colorable federal defense."  *Baker*, 962 F.3d at 942–45 (cleaned up).[3]  So long as federal officer jurisdiction can be exercised as to one claim against one Defendant, the entire action is properly removed.  *Id.* at 945.

"'[T]he Supreme Court has made clear that courts must liberally construe § 1442(a).'" *Baker*, 962 F.3d at 941 (alteration in original) (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014

---

*U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007); *see also Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*") ("[A] cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law[.]"). Defendants maintain this continues to provide a proper basis for removal in the alternative, but this Court need not decide this issue given that removal under federal-officer jurisdiction is appropriate under binding Seventh Circuit precedent.

[3]    Defendants must also be "person[s] within the meaning of the statute," which includes corporations.  *Baker*, 962 F.3d at 941. Plaintiff does not contest that this prong is satisfied here.

(7th Cir. 2018). "[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466–67 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*") (cited approvingly in *Baker*). A federal court must "credit [the defendant's] theory of the case for purposes of [removal]," *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 432 (1999), and "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466.

By, among other things, producing and supplying highly specialized fuels pursuant to detailed federal specifications to the U.S. military, producing oil and gas on federal lands subject to federal direction and control, operating federal oil reserves, and supplying and managing the federal Strategic Petroleum Reserve, Defendants "acted under" federal officers to support the U.S. military and to assist the federal government in fulfilling critical national security and other government objectives. A clear "connection or association," *Baker*, 962 F.3d at 994 (quotation marks omitted), exists between Defendants' operations on behalf of the federal government and Plaintiff's attempt to impose liability on Defendants for the very same conduct: that is, Plaintiff's claims against Defendants arise from or relate to Defendants' production and sale of fossil fuels—including activities performed under the direction, supervision, and control of the U.S. government. And because Defendants produced and supplied oil and gas for the U.S. military under detailed federal specifications and implemented the government's policies and decisions to promote the production of oil and gas, Defendants have several colorable federal defenses to Plaintiff's claims.

Plaintiff's arguments to the contrary disregard the Supreme Court's admonition that "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham v. Morgan*,

395 U.S. 402, 407 (1969)); *see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (noting the federal officer removal statute is "not narrow or limited"). Although Plaintiff peppers its brief with citations to decisions of *other* circuits—which are inconsistent with both the text of the statute and Supreme Court precedent—Plaintiff largely ignores the controlling decision from *this* circuit: *Baker v. Atlantic Richfield Co.* And under *Baker*, federal jurisdiction is proper here. In *Baker*, residents of a housing complex sued nearby chemical manufacturing companies for alleged contamination of soil with hazardous substances like lead and arsenic. 962 F.3d at 939–40. The chemical companies removed the case to federal court on the grounds that, during World War II, "the United States government directed them to produce certain materials [including lead] for the military, supervised distribution of these goods, and controlled their ultimate usage." *Id.* The Seventh Circuit held that removal was proper, because the companies acted under federal authority by "provid[ing] the federal government with materials that it needed to stay in the fight at home and abroad," without which "the government would have had to manufacture the relevant items on its own." *Id.* at 942. The Seventh Circuit affirmed that defendants' allegations "in support of removal" need only be "facially plausible," and that the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Id.* at 941, 945. Where both the plaintiffs and the defendants have "reasonable theories of [the] case," the court's role is to "credit only the [defendants'] theory" so long as the theory is "plausible." *Id.* at 941, 947.

Crucially, *Baker* made clear that removing defendants do "not need to allege that the complained-of conduct *itself* was at the behest of a federal agency," nor is it necessary that the "removing defendant[s] must operate under government orders for most of the relevant time frame," so long as "the allegations are directed at the relationship" between the companies and the federal

5

government. *Id.* at 944–45 (cleaned up). As discussed below, *Baker* is on all fours with the facts of this case—indeed, the facts here may be more compelling still.

### 1. Defendants "Acted Under" Federal Officers And Agencies.

The United States Supreme Court has held that courts must "liberally construe" the "acting under" requirement in favor of the entity seeking removal. *Ruppel*, 701 F.3d at 1181 (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). For example, it suffices where Defendants "perform[] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154; *see also Ruppel*, 701 F.3d at 1181 ("'Acting under' covers situations" "where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."). So too where the government enlists a private party in "'an effort to *assist*, or to help *carry out*, the federal superior's duties or tasks.'" *Ruppel*, 701 F.3d at 1181 (quoting *Watson*, 551 U.S. at 152). The requirement is also satisfied where there is an "unusually close [relationship] involving detailed regulation, monitoring, or supervision"—as Plaintiff itself concedes. *Watson*, 551 U.S. at 151, 153; *see* Mot. at 9. The Seventh Circuit affirmed in *Baker* that when the government supplies "detailed specifications" for a private company's production of materials, under "compulsion to provide the product to the government's specifications" and with "continuous federal supervision," this creates the "necessary relationship" between the private company and the government to meet the acting-under standard. 962 F.3d at 943 (internal quotation omitted).

Defendants have presented a robust evidentiary record that clearly and unequivocally establishes that Defendants acted under federal officers in connection with their fuel production and sales activities. This evidence includes the unrebutted declarations of two prominent historians, Professor Mark Wilson of the University of North Carolina at Charlotte and Professor Tyler Priest of the University of Iowa, that detail how Defendants acted under the direction, guidance,

supervision, and control of federal officers. Professor Wilson explains how "the U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime," by employing "direct orders, government ownership, and national controls." Declaration of Joshua D. Dick in Support of Notice of Removal ("Dick Decl."), Ex. 1 (Decl. of Prof. Mark R. Wilson), ¶ 2. Professor Priest explains that for "more than six decades, the U.S. federal program [under which Defendants developed mineral resources in the Outer Continental Shelf] filled a national government need," Dick Decl. Ex. 70 (Decl. of Prof. Richard Tyler Priest), ¶ 7(1), and federal officials "supervised, directed, and controlled the rate of oil and gas production," *id.* ¶ 48. Defendants' evidence also includes amicus briefs from two former Chairmen of the Joint Chiefs of Staff that explain how "the Federal Government has both incentivized, directed, and contracted with Defendants to obtain oil and gas products . . . under the oversight and direction of military officials." Dick Decl. Ex. 15 (*Amicus Curiae* Brief of Gen. (Ret.) Richard B. Myers and Adm. (Ret.) Michael G. Mullen), at 6; *see also id.* Ex. 14. In other words, Defendants provided products to the U.S. government according to "detailed specifications," under federal "compulsion," and subject to "continuous federal supervision"—which, under *Baker*, suffices to meet the acting-under standard. 962 F.3d at 943 (internal quotation omitted).

To be sure, a defendant does not act under a federal officer merely by "compl[ying] with regulatory obligations" or supplying the federal government with "widely available commercial products," Mot. at 8, 9—and Defendants do *not* contend otherwise. Accordingly, the cases Plaintiff relies on readily distinguishable and are inapposite. *Id.* at 8 (citing *Kelly v. Martin & Bayley Inc.*, 503 F.3d 584, 588 (7th Cir. 2007); *Lu Junhong v. Boeing Co.*, 792 F.3d 805 (7th Cir. 2015)). In *Lu Junhong*, the defendant aircraft manufacturer removed personal injury actions arising from an

accident to federal court under § 1442(a)(1), contending that it acted under the Federal Aviation Administration in analyzing and testing its aircraft systems. 792 F.3d at 808. The Seventh Circuit concluded that, in carrying out those functions, the defendant merely certified its compliance with federal regulations, which was insufficient to satisfy the "acting under" requirement. *Id.* at 809 (observing that "[e]very regulated firm must use its own staff to learn whether it has satisfied federal regulations"). In *Kelly*, the Seventh Circuit, rejected a cigarette manufacturer's argument that it "acted under" a federal officer by testing its cigarettes for tar and nicotine in compliance with the Federal Trade Commission's regulations. Unlike here, the defendants in *Lu Junhong* and *Kelly* did not "help" or "assist" the government in any way*, see Watson*, 551 U.S. at 152, and the ordinary regulatory oversight described in those cases is nothing like the level of control the government exerted over Defendants' activities.

Defendants' relationship with the government is far more intertwined than the conduct at issue in Plaintiff's cited cases. Defendants have worked under the direction of federal officers for decades to provide the government with specialized, non-commercial grade fuels and services that are essential to the national economy and security. Defendants detail below five categories of activities they undertook pursuant to the direction of federal officers. Any one of these categories is independently sufficient to support federal jurisdiction, but considered together leave no doubt that removal was proper.

### a. Defendants Acted Under Federal Officers During World War II And The Korean War.

The U.S. Department of Defense ("DOD") is the single largest consumer of energy in the United States, and one of the world's largest consumers of petroleum fuels. *See* Dick Decl. Ex. 10. As the two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that

the military is 'deployment-ready'" spans "more than a century"; during the tenures of these former Chairmen of the Joint Chiefs of Staff, petroleum products were indeed "crucial to the success of the armed forces." *Id.* Ex. 14 at 2–3. "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." *Id.* Ex. 1 ¶ 2. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.*

During World War II, the United States pursued full production of its oil reserves and created agencies to *control* the petroleum industry, including Defendants' predecessors and affiliates.[4] The federal government built refineries and directed the production of certain products, and it managed scarce resources for the war effort. As Senator O'Mahoney, Chairman of the Special Committee Investigating Petroleum Resources, put it in 1945: "No one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms of this Government* . . . in bringing about a victory." Dick Decl. Ex. 3 at 1 (emphasis added).

Multiple courts have found that the federal government exerted extraordinary control over Defendants during wartime to guarantee the supply of oil and petroleum fuels for wartime efforts, such as high-octane aviation gasoline ("avgas"). "Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002). Put simply,

---

[4] The Complaint conflates the activities of Defendants with those of their predecessors, subsidiaries, and affiliates. Defendants reject these attributions, but describe the conduct of certain predecessors, subsidiaries, and affiliates to show that the Complaint, as pleaded, should remain in federal court.

"[t]he government . . . used [its] authority to control many aspects of the refining process and operations." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *14 (S.D. Tex. Sept. 16, 2020). These cases recognize the nature and extent of federal control exerted through agencies such as the Petroleum Administration for War ("PAW"), which directed oil exploration activities, the construction of refining facilities, allocation of raw materials, as well as issued production orders, entered into contracts giving extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies." *See* NOR ¶ 33.

As Professor Wilson explains, "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." Dick Decl. Ex. 1 ¶ 11; *see also* Dick. Decl. Ex. 6 at 171, 177–78, 184. "PAW told the refiners what to make, how much of it to make, and what quality." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014). PAW's directives to Defendants were mandatory and enforceable by law. *Exxon Mobil*, 2020 WL 5573048, at *11 (rejecting argument that private refiners "voluntarily cooperated," and instead finding they had "no choice" but to comply with the federal officers' direction). Its message to the energy industry was clear: the government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." Dick. Decl. Ex. 7 at 8. PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." *Id.* Ex. 8. Later, during the Korean War, the Petroleum Administration for Defense performed much the same function as PAW. *See* NOR ¶ 38; *see also Exxon Mobil*, 2020 WL 5573048, at *15.

Obeying strict government instructions—covering everything from exploration, facilities, and allocation, to production to "meet new demands, changed conditions, and emergencies," while subject to "disciplinary measures" for noncompliance—is hardly mere "compli[ance] with

regulatory obligations" or "arm's length-business transactions" to "sell products to the government," Mot. at 8. Rather, it is the type of "'special relationship' that . . . 'involves subjection, guidance, or control' by a federal superior" and thus satisfies the acting-under standard. *Id.* (quoting *Baker*, 962 F.3d at 941, 942).

Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities. During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*." Dick Decl. Ex. 1 ¶ 14 (emphasis added). "The U.S. government enlisted oil companies," including Defendants' predecessors, "to operate government-owned industrial equipment . . . [in order] to comply with urgent government orders." *Id.* ¶ 15. These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities. *Id.* ¶ 19. And Defendants also acted under federal officers in constructing and operating the Inch Lines (pipelines extending from Texas to New Jersey) "under contracts" and "as agent[s]" for the federal government, bringing hundreds of millions of barrels of oil and refined products for use and combustion in the cross-Atlantic fronts during World War II. *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949). Without Defendants as contractors and agents (via War Emergency Pipelines, Inc.), "the Government itself would have had to perform" these wartime activities. *Watson*, 551 U.S. at 154.

Plaintiff would rewrite decades of wartime history, dismissing these activities as generic regulatory compliance or arms-length transactions. Mot. at 8–9, 14–15. But Defendants' evidence makes clear that the relationship between Defendants and the federal government went far beyond that, involving detailed directives for production, under federal supervision and backed by

11

government coercion, not to mention the operation and management of government-owned facilities under government direction. These are precisely the circumstances recognized by *Baker* as meeting the acting-under standard. *See* 962 F.3d at 942–43.

Implicitly recognizing the substantial control and direction exerted over Defendants' activities during the World Wars and the Korean War, Plaintiff urges the Court to simply ignore these activities because they would predate the alleged disinformation campaigns. Mot. at 14. But Plaintiff alleges its injuries result from the cumulative impact of *all* global emissions, including those released from oil and gas produced by Defendants during these times of conflict. Indeed, Plaintiff cites the rapid rise in fossil fuel emissions "since the mid-twentieth century" as causing "a correspondingly sharp rise in atmospheric concentration of $CO_2$." Compl. ¶¶ 35–36; *see also id.* ¶ 39 (alleging "greenhouse gases accumulate in the atmosphere" and an "associated disruption of the Earth's energy balance hav[ing] a myriad of environmental and physical consequences"). And because greenhouse gases "become well mixed in the atmosphere" once emitted, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("*AEP*"), and cannot be traced to any particular source, the emissions from these wartime periods are indistinguishable from and cumulative with all later emissions. Moreover, as the Seventh Circuit held in *Baker*, there is simply "*no support* in the statute or precedent" for the proposition that a "defendant must operate under government orders for most of the relevant time frame" to succeed in removing under the federal officer removal statute. *Baker*, 962 F.3d at 945 (emphasis added).

      **b.**    **Defendants Continue To Act Under Federal Officers By Producing And Supplying Large Quantities Of Specialized Fuels Under Military Direction.**

To this day, Defendants continue to produce and supply large quantities of highly specialized fuels that are required to conform to exact DOD specifications to meet the unique operational needs of the U.S. military. U.S. Navy Captain Matthew D. Holman recently explained

12

that "[f]uel is truly the lifeblood of the full range of Department of Defense (DoD) capabilities, and, as such, must be available on specification, on demand, on time, every time. In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat." Dick Decl. Ex. 17 (emphasis added). "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." *Id.* Ex. 1 ¶ 40. "[I]n the absence of . . . [these] contract[s] with [the Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 154).

For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the SR-71 Blackbird and its predecessor, the OXCART program.[5] NOR ¶ 46. These fuels involved special processes, testing and inspection requirements, facilities, and security restrictions to support these unique and highly specialized military airframes. *See id.* Similarly, BP entities have contracted with the Defense Logistics Agency ("DLA") to provide a significant quantity of specialized military fuels over decades. BP entities entered into approximately 25 contracts with the DLA to provide approximately 1.5 billion gallons of specialized military fuels, such as JP-5, JP-8, and F-76. Dick Decl. Ex. 41 at 6. The DOD exerted significant control over the BP entities in fulfilling these contracts, seeking to ensure that these fuels met specific performance requirements. *See* NOR ¶ 49. To meet these unique operational needs, DLA required that the fuels contain express amounts of

---

[5] The contract examples in this section are only illustrative. They are by no means an exhaustive collection of the contracts that Defendants executed with the federal government to supply specialized military fuels during the relevant time period.

"military unique additives that are required by military weapon systems." *Id.* ¶¶ 50–54. These fuel contracts are far more specialized and prescriptive than contractual requirements for fuel intended for consumer-type vehicles. *Id.* ¶ 50. DOD specifications also required the BP entities to conform the fuels to other specific chemical and physical requirements that are essential to the performance of the military function. *Id.* ¶ 55.

The DOD's detailed specifications for the makeup of the military jet fuels—fuels whose use results in greenhouse gas emissions and which thus, according to Plaintiff, contribute to climate change and Plaintiff's asserted harms, *see* Compl. ¶¶ 4, 13, 33—and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government in each of these examples. *See Baker*, 962 F.3d at 943. These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction. *See id.* As in *Baker*, these specialized fuels have "detailed federal specifications" pursuant to government contracts, and must be produced "in accordance with those specifications." *Id.* at 940–41, 43; *see also, e.g.*, *Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 814 (7th Cir. 2024) (recognizing that, under *Watson*, the acting-under standard may be met if the federal officer "commanded [a business] or contracted with it to produce a particular item in a specified way"); *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 252 (4th Cir. 2021) (affirming federal officer removal for DOD contracts fixing "[p]ricing, . . . shipping, payment, and many other specifications" for opioids); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998) (noting "the government's detailed

specifications concerning the make-up, packaging, and delivery of Agent Orange" and holding that "the defendants acted pursuant to federal direction").[6]

Plaintiff, citing *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021), also argues that "'[i]t cannot be that the federal government's mere designation of an industry as important—or even critical—is sufficient to federalize an entity's operations and confer federal jurisdiction.'" Mot. at 17 (quoting *Buljic*, 22 F.4th at 740). But Defendants do not argue that being an "important" industry is sufficient. More importantly, the court in *Buljic* acknowledged that federal jurisdiction may exist "*where a private contractor provided the government with a product that it needed or performed a job that the government would otherwise have to perform*," but held that the defendant had made no such showing. 22 F.4th at 739 (emphasis added). In contrast, here, federal officers have directed Defendants for decades to help the government by providing specialized, non-commercial grade fuels and services that are essential to the national economy and security—functions the government would have needed to perform itself absent the assistance of Defendants.

Contrary to Plaintiff's arguments (Mot. at 15–16), Defendants' provision of specialized fuels are hardly arm's-length transactions of widely available commercial products; rather, they are highly specific products manufactured and supplied under federal oversight and control—indeed, these specialized military grade fuels have *no commercial purpose or use at all*. An amicus brief filed in the Ninth Circuit by the former Chairmen of the Joint Chiefs of Staff confirms this point: "For more than a century, petroleum products have been essential for fueling the United States military around the world." Dick Decl. Ex. 15 at 3. To ensure a steady supply, "the Federal

---

[6]  *Winters* found that the requirements of the federal officer removal statute were satisfied despite being decided under a more demanding standard that was subsequently relaxed by Congress when it amended the statute in 2011. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc).

15

Government has both incentivized, directed, and contracted with Defendants to obtain oil and gas products," and "[a] substantial portion of the oil and gas used by the United States military are non-commercial grade fuels that are developed and produced by private parties, including many of the Defendants here, under the oversight and direction of military officials." *Id.* at 6. The contracts to produce these specialized fuels "were not typical commercial agreements"; rather, they required Defendants "to supply fuels with unique additives to achieve important objectives." *Id.* at 20. This in turn "provid[ed] the Government with a product that it use[s] to help conduct a war," *Watson*, 551 U.S. at 154, and "that it need[s] to stay in the fight at home and abroad," *Baker*, 962 F.3d at 942. The supply of specialized jet fuels to the federal government to help it fight wars and protect national security is an archetypal example of acting under federal officer jurisdiction.

> **c.      Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy.**

Another basis for acting-under jurisdiction is the role of Standard Oil of California, a Chevron predecessor, in operating the Elk Hills Reserve in California under federal direction. *See* NOR ¶¶ 58–76. The Elk Hills Reserve was a petroleum reserve created by President Taft in 1912, intended to preserve oil in the ground for national emergencies. *Id.* ¶ 58. Standard Oil operated the U.S. Navy's portion of the oil reserve according to an Operating Agreement which specified that Standard Oil was "*in the employ*" of the Navy and "responsible to the Secretary thereof" during this period. Dick Decl. Ex. 61 at 3 (emphasis added).

The Navy had the right to operate the reserve, but could decide whether it wanted to produce oil on its own or hire a contractor for the job. "*The 'Navy chose to operate the reserve through a contractor rather than with its own personnel*.'" NOR ¶ 69 (emphasis added). Standard Oil "was awarded the contract, and continued to operate [Elk Hills] [for the Navy] for the next 31 years." *Id.* Standard's operation and production at Elk Hills for the Navy were subject to substantial

supervision by Navy officers. *Id.* ¶¶ 71–74. Naval officers directed Standard Oil to conduct operations to further national policy. For example, the reserve produced up to 65,000 barrels per day in 1945 "to address fuel shortages and World War II military needs." *Id.* ¶ 70. And in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "*you are in the employ of the Navy* and *have been tasked with performing a function which is within the exclusive control of the Secretary of the Navy*." Dick Decl. Ex. 62 at 3 (emphases added); *see* NOR. ¶ 70.

Plaintiff emphasizes Standard Oil's decision to withdraw from operating Elk Hills in 1975, Mot. at 12; *see* NOR ¶ 73, but this decision does not alter the fact that, during the 31-year period in which Standard Oil *did* operate the reserve (and even thereafter, *see* NOR ¶ 76), it was subject to federal direction and control. Even Plaintiff admits the reserve was active during World War II. *See* Mot. at 12. "[I]n the absence of [its] contract with [Standard], the Government itself would have had to perform" these tasks. *Watson*, 551 U.S. at 154. Standard Oil's operation of Elk Hills at the Navy's direction is quintessential "acting under" activity: "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphases added).

> ### d.   Defendants Have Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf And Federal Lands.

Defendants also acted under federal officers by producing oil and gas pursuant to the federal mineral exploitation and production regime in the Outer Continental Shelf ("OCS"), as well as on federal lands onshore. *See* NOR ¶¶ 82–116. Defendants acted on behalf of the federal government to extract federally owned mineral resources under the federal government's close direction and supervision to assist the government in fulfilling the basic (and critical) government objectives of ensuring sufficient domestic supplies of oil and gas to protect the nation's economic, security, and foreign policy interests. As Professor Priest explains in his declaration (and contrary to Plaintiff's

arguments, *see* Mot. at 9–11), these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time." Dick Decl. Ex. 70 ¶ 7(1) (emphasis added). Under federal law, the OCS "is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3).

The oil and gas resources on the OCS are owned by the United States. Accordingly, when Congress determined that the government had a policy need to extract those resources, its only options were to assign that task to federal employees or else obtain the services of private parties in order to achieve the same governmental goals. It chose the second option, "procur[ing] the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.* ¶ 7(1). But it was the federal government, not the oil companies, that "dictated the terms, locations, methods, and rates of hydrocarbon production on the OCS" in order to advance federal interests. *Id.* ¶ 7(2). Federal "supervisors" exerted substantial control and oversight over Defendants' operations on the OCS, with complete authority to control and dictate the rate of production from OCS wells, and additional powers to direct how oil and gas resources would be extracted and sold. *Id.* ¶¶ 19–28 (citing C.F.R. provisions in 19 Fed. Reg. 90 (May 8, 1954)).

This evidence confirms that the federal government uses OCS lessees to meet a "basic governmental task[.]" *Watson*, 551 U.S. at 153. The federal government "viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." Dick Decl. Ex. 70 ¶ 7(2). The federal government has enlisted Defendants as its agents to extract the federal government's oil and gas out of the ground and supply the domestic market to serve a U.S.

interest. Put differently, the federal government controls substantial amounts of oil and gas that are contained in the OCS. The government could either extract and sell (or use) the oil and gas itself or hire third parties to perform that task on its behalf, and it chose the second option. This is the definition of "acting under": "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to" extract and produce oil and gas from the OCS. *Watson*, 551 U.S. at 147, 154.

The same analysis applies for Bureau of Land Management ("BLM") leases to develop mineral resources on federal lands onshore. For these leases, the United States "reserves right to specify rates of development and production in the *public interest*." Dick Decl. Ex. 82 § 4 (emphasis added). BLM leases permit the federal government "'to ensure that production is sold at reasonable prices and to prevent monopoly,'" to determine the value of production, and to otherwise exercise extensive supervision and control over the lessees. NOR ¶¶ 112–16 (quoting Dick Decl. Ex. 82 § 10).

### e. Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve.

In response to the 1970s oil embargoes, Congress created the Strategic Petroleum Reserve "to reduce the impact of disruptions in supplies of petroleum products." 42 U.S.C. § 6231; *see also* NOR ¶ 117. Defendants "acted under" federal officers by supplying federally owned oil for and managing the Strategic Petroleum Reserve for the government. *See* NOR ¶¶ 119–20. The Strategic Petroleum Reserve subjects Defendants to the federal government's supervision and control, including in the event the President calls for an emergency drawdown, under which the reserve oil can be used to address national crises. *Id.* ¶ 122. The United States exercised this emergency control to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to oil supply in Libya in 2011. *Id.*; Dick Decl. Ex. 89. Thus, the hundreds of millions of barrels of oil

flowing through these facilities were subject to federal control and supervision, and Defendants engaged in "an effort to *assist*, or to help *carry out*," the federal government's task of ensuring energy security. *Watson*, 551 U.S. at 152 (emphasis added).

*     *     *

The Seventh Circuit has explained that, "where a private contractor helps the Government to produce an item that it needs, the assistance that private contractors provide federal officers goes beyond simple compliance with the law" and satisfies the acting-under standard. *Baker*, 962 F.3d at 942. Defendants, under government supervision and control, took the government's place and performed what would have otherwise been essential government functions: they supplied the federal government and U.S. military with *billions of gallons* of highly specialized fuels under detailed contracts subject to federal control, supervision, and compulsion; produced oil and gas on federal lands subject to federal direction and control; operated federal oil reserves; supplied and managed the Strategic Petroleum Reserve; and produced oil and gas, operated government-owned facilities and equipment, and constructed pipelines as agents for the federal government and military during wartime. In short, Defendants acted in an "effort to assist, or to help carry out, the duties or tasks of the federal superior" and "in the absence of . . . contract[s] with . . . [these] private firm[s], the Government itself would have had to perform" such tasks. *Watson*, 551 U.S. at 152, 154. The "acting under" prong is satisfied.

### 2. Defendants' Activities At The Direction Of Federal Officers Are Related To Plaintiff's Claims.

Plaintiff devotes little more than a page to the relatedness prong of the federal officer removal statute, arguing that because "Defendants do not contend that their deception was directed" by federal officers, Defendants' activities under the direction of federal officers are insufficiently related to Plaintiff's claims. Mot. at 18. But this argument misapprehends the standard to be applied

20

in evaluating federal officer jurisdiction and contravenes the statutory text, the Seventh Circuit's holding in *Baker*, and Supreme Court precedent.

The federal officer removal statute provides that a defendant may remove a lawsuit from state to federal court if the "civil action" "relat[es] to any act under color of [federal] office." 28 U.S.C. 1442(a)(1). In other words, all that is required is that the plaintiff's *lawsuit* be connected or associated with acts under color of federal office. This was recently affirmed in *Baker*, in which the Seventh Circuit *rejected* any requirement "that the complained-of conduct *itself* was at the behest of a federal agency'" to invoke federal officer removal. 962 F.3d at 944 (quoting *Def. Ass'n of Philadelphia*, 790 F.3d at 470). In doing so, it acknowledged that several other circuits have reached similar conclusions. *See id.* at 943–44 (citing *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc) (holding that "any civil action that is connected or associated with an act under color of federal office may be removed"); *Def. Ass'n of Philadelphia*, 790 F.3d at 470–71). Thus, in *Baker*, the defendants did not need to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather, it was "enough for the present purposes of removal that *at least some* of the pollution arose from the federal acts." 962 F.3d at 945 (emphasis added). So, too, here. According to the Complaint, "the City identifies no 'environmental harms' . . . other than those caused by emissions." *City of New York v. Chevron Corp.*, 993 F.3d 81, 97 n.8 (2d Cir. 2021); *see, e.g.*, Compl. ¶ 143. It is enough for removal purposes that some of the alleged emissions forming the basis of Plaintiff's lawsuit arose from Defendants' acts undertaken at the direction of federal officers. *Baker's* controlling precedent is dispositive on this issue.

In any event, in assessing the nature of the case for jurisdictional purposes, this Court should examine the "gravamen" of the Complaint. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35

(2015) (evaluating jurisdiction in the context of the Foreign Sovereign Immunities Act). To do so, courts are to "zero[] in on the core of [the] suit," and, in particular, what "actually injured" the plaintiff. *Id.* "What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017). In both *Sachs* and *Fry*, the Supreme Court "worr[ied]" that any other approach would make it "too easy" for plaintiffs to manipulate their complaint to "bypass" the rules governing federal jurisdiction by using the right "magic words." *Id.*

Under this standard as well, Defendants more than satisfy the relatedness prong. The federal government's policy choices to produce significant amounts of oil and gas to fulfill national interests, and its direct supervision of Defendants' activities to advance those goals, go to the core of Plaintiff's alleged injuries, which arise from the alleged impacts of the *cumulative production and use* of petroleum products among many sources of emissions. Production and consumption are integral components of Plaintiff's alleged causal theory. Plaintiff alleges, for example, that because Defendants "*extracted and sold* fossil fuel products," this led to an increase in greenhouse gas emissions, the effects of which have "brought about devastating climate change impacts to the City of Chicago." Compl. ¶¶ 1, 4 (emphasis added). Indeed, it is the "negative impacts of fossil fuel *consumption*" that Plaintiff alleges have "warm[ed] the planet and change[d] our climate." *Id.* ¶ 5 (emphasis added). According to Plaintiff, Defendants' purported conduct "drove fossil fuel *consumption*," causing an "increase in anthropogenic GHG emissions and accelerated global warming" that have resulted in "devastating consequences to the City and its people." *Id.* ¶ 9 (emphasis added). Plaintiff's allegations—which Defendants vigorously dispute—on their face demonstrate that an essential element of Plaintiff's claimed injuries is the emission of greenhouse gases resulting from the production and combustion of Defendants' petroleum products, including

22

those produced at the direction of the federal government and under its close federal supervision. Viewing it any other way would be inconsistent with the standard for federal officer removal, which gives Defendants the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 945.

To allow Plaintiff to evade federal jurisdiction by focusing on Defendants' alleged deception—*i.e..*, the "complained-of conduct," *Baker*, 962 F.3d at 944—and not the production, sale, and consumption of oil and gas producing emissions—*i.e.*, the alleged mechanism of injury— "would elevate form over substance and allow parties to evade" federal court. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004) (affirming removal under ERISA); *see also Jarbough v. Att'y Gen. of U.S.*, 483 F.3d 184, 189 (3d Cir. 2007) (noting that declining to "analyze the substance of a claim . . . would elevate form over substance and would put a premium on artful labeling"); *Arlington*, 996 F.3d at 256 (finding federal officer removal and concluding that the plaintiff's contrary "position would elevate form over substance"). After all, "[i]t is precisely because fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the City is seeking damages." *City of New York*, 993 F.3d at 91. Plaintiff's theory is that courts should blindly accept the descriptions that a plaintiff uses to explain its claims and ignore the substance of those claims. That approach contravenes Supreme Court precedent, and this Court's "duty" to "'satisfy itself . . . of its own jurisdiction.'" *EEOC v. Chicago Club*, 86 F.3d 1423, 1428 (7th Cir. 1996) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

Plaintiff's attempts to evade a federal forum—by focusing on alleged misrepresentations to the exclusion of the rest of its Complaint—are precisely the sort of "artful pleading" the Supreme Court rejected in *Sachs* and *Fry*. Plaintiff places Defendants' production and sale of oil and gas *directly in its alleged causal chain*: Under Plaintiff's theory, Defendants' alleged

misrepresentations increased demand for Defendants' products, which led to increased production and consumption of those products, which led to increased emissions, which contributed to global climate change, ultimately causing Plaintiff's alleged injuries. *See, e.g.*, Compl. ¶¶ 1–9. Alleged misrepresentations only matter under Plaintiff's damages and causation theories insofar as they allegedly increased greenhouse gas emissions. Accordingly, Plaintiff's suit is plainly "related to" Defendants' production of oil and gas.

Plaintiff's citation to the Seventh Circuit's recent decision in *Roberts v. Smith & Wesson Brands* is inapposite. *See* Mot. at 18. To the contrary, *Roberts* actually demonstrates why removal is proper here. In *Roberts*, the Seventh Circuit determined that federal officer removal was improper because Smith & Wesson had not "acted under" a federal officer in manufacturing the assault rifle involved in the shooting that led to the lawsuit. 98 F.4th at 814. Notably, the Seventh Circuit did *not* address the relatedness prong, which is the prong for which Plaintiff cites *Roberts*. Rather, the Seventh Circuit found that Smith & Wesson's mere compliance with federal firearms regulations was not sufficient to satisfy the acting under prong and, therefore, removal under the federal officer removal statute was not proper. But the Seventh Circuit explicitly noted that "a business might be 'acting under' a federal officer if the officer commanded it or contracted with it to produce a particular item in a specified way." *Id.* at 814. In *Roberts*, however, not only did the federal government not direct Smith & Wesson to advertise the rifle in a particular way, the federal government did not "direct[]" the company to manufacture the rifle at all, or to include any specific features. *Id.* Here, conversely, and as Defendants have extensively detailed above, the federal government has directed Defendants to, among other activities, produce specialized military fuels under exacting specifications and federal supervision—and the use of these fuels have contributed to the emissions and climate change that is the alleged source of Plaintiff's injuries.

### 3. Defendants Raise "Colorable Federal Defenses."

Because Defendants acted under federal officers to implement the government's policies and decisions to promote the production of oil and gas, they have several colorable federal defenses to raise, including the government contractor defense, *see Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988); *Betzner*, 910 F.3d at 1016; preemption, *see City of New York*, 993 F.3d at 94 (affirming dismissal of another climate-change case as "beyond the limits of state law" and subject to "preemption defense"); *State ex rel. Jennings v. BP America Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) (holding climate-change claims "pre-empted" and "beyond the limits of [state] common law"); *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249 (9th Cir. 2017); and federal immunity, *see Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). For example, in *Boyle*, the Supreme Court applied a federal common law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest because it "ar[ose] out of performance of the contract," and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. The *Boyle* elements are met here. In addition, as the Supreme Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" "'there is no liability on the part of a contractor' who simply performed as the Government directed." 577 U.S. at 167 (citation omitted). Here, Defendants produced oil and gas at the direction of the federal government and thus have a colorable argument that they are immune from liability for any alleged injuries resulting therefrom. Additionally, Plaintiff's claims are barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3; the Supremacy Clause, *id.* art. VI, cl. 2; the First Amendment, *id.* amend I; the Due Process Clauses, *id.* amend. V and XIV, § 1; and the foreign affairs doctrine, *see United States v. Pink*, 315 U.S. 203, 230–31 (1942).

In a cursory argument, Plaintiff contends that Defendants' colorable federal defenses will not ultimately be successful. Mot. at 19. Defendants disagree but, in any event, are required to show only that a defense is "plausible" to warrant removal. *Arlington*, 996 F.3d at 254. Defendants' detailed and comprehensive discussion of its federal defenses in the Notice of Removal, *see* NOR ¶¶ 141–50, is more than enough to clear that bar. A defendant invoking § 1442(a)(1) "need not win his case before he can have it removed," as "[o]ne of the primary purposes of the removal statute . . . was to have such defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407. Or, as the Seventh Circuit has made clear, at this stage "'we are concerned with who makes the ultimate determination, not what that determination will be.'" *Baker*, 962 F.3d at 947 (quoting *Ruppel*, 701 F.3d at 1182).

Indeed, *Baker* affirmed that a government contractor defense was colorable when the defendant's predecessor "adhered to detailed specifications . . . promulgated by the federal government for manufacturing certain materials in wartime." *Id.* at 946. Given the analogous facts discussed *supra*, *Baker* demonstrates that the government contractor defense is likewise colorable here. *Baker* distinguished two climate change cases rejecting the defense because the defense in those cases was invoked with respect to the sale of fuel to Navy Exchange Service Command ("NEXCOM") for resale on Navy bases, and this fuel was a "'standardized consumer product,' undifferentiated from that supplied to civilians." *Id.* at 946–47. But Defendants do not invoke the sales of any standardized consumer product to NEXCOM in this case. Instead, they seek to apply the government contractor defense to, *inter alia*, the sale of "specialty items according to precise specifications" under federal direction in wartime—the precise scenario for which *Baker* found the defense colorable. *Id.* at 947. Moreover, many of the reasons offered by Plaintiff as to why the government contractor defense is not colorable here would have applied in *Baker* as well. *See* Mot.

at 19. For example, the plaintiffs in *Baker* did not premise liability on "defects in military equipment," and did not bring a product liability claim. *See Baker v. Atl. Richfield Co.*, 421 F. Supp. 3d 634, No. 2:17-cv-00429 (N.D. IN. 2019), Dkt. 12 (complaint), Dkt. 13 (amended complaint).

### 4. Any Attempt To Disclaim Injury Arising From The Sales Of Specialized Fuels To The United States Military Is Ineffective.

Finally, Plaintiff contends that its disclaimer of injuries "arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes" is valid and makes removal improper. Mot. at 6–8. But that argument is foreclosed by *Baker*, and Plaintiff's attempt to distinguish *Baker* is unconvincing. In *Baker*, plaintiffs sought redress for alleged contamination by lead and arsenic from defendants' manufacturing facilities. 962 F.3d at 939. However, the plaintiffs in *Baker* purported to disclaim claims related to the manufacture of Freon-12 by one of the defendants, DuPont, for the federal government. *Id.* at 945 n.3. When DuPont premised removal on its manufacture of Freon-12 for the federal government and plaintiffs invoked their disclaimer, the Seventh Circuit sided with DuPont. As the court stated: "DuPont alleges that its Freon-12 production resulted in waste streams that contained lead and arsenic. Those are the two main toxins the Residents claim harmed them. The Residents cannot have it both ways." *Id.* In other words, the Seventh Circuit held that the plaintiffs could not have it "both ways" by seeking damages for certain types of pollution, while at the same time disclaiming those types of pollution for purposes of jurisdiction.

The situation here is analogous. Plaintiff alleges that its harms are the result of the consumption and use of fossil fuels and resulting emissions. *See, e.g.*, Compl. ¶¶ 1–9. Defendants maintain that the specialized fossil fuels they have supplied to the military fall into this category and would likewise have contributed to climate change under Plaintiff's theory. NOR ¶¶ 135, 138.

27

Plaintiff does not contend, because it cannot, that it can distinguish between injuries caused by greenhouse gases related to fossil fuels it seeks to disclaim versus those it seeks to include.  *See AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere; emissions in New Jersey may contribute no more to flooding in New York than emissions in China.") (citations and internal quotation marks omitted).  Indeed, Plaintiff cannot "have it both ways" by attempting to carve out an indistinguishable source of greenhouse gas emissions merely to evade federal jurisdiction.  Plaintiff dismisses *Baker* because plaintiffs' disclaimer there "contradicted their theory of liability," Mot. at 7, but Plaintiff's disclaimer here does precisely the same thing as in *Baker*.

Nor does Plaintiff's citation to *Kelleher v. A.W. Chesterton Co.*, 2015 WL 7422756, at *2 (S.D. Ill. Nov. 23, 2015) and *Reinbold v. Advanced Auto Parts, Inc.*, 2018 WL 3036026 (S.D. Ill. June 19, 2018), district court decisions which predate *Baker*, help Plaintiff here.  As an initial matter, the court in *Reinbold* rejected the plaintiff's argument that its disclaimer defeated federal jurisdiction.  *See Reinbold*, 2018 WL 3036026, at *3.  And *Kelleher* is readily distinguishable.  There, the plaintiff alleged exposure to asbestos from his employment from 1958 until 2006, but he only disclaimed causes of action caused by asbestos exposure while he was enlisted in the Army for two years.  *Kelleher*, 2015 WL 7422756, at *2.  Here, however, Defendants' activities performed under the direction of federal officers span virtually the entire relevant period, all of which contributed to Plaintiff's alleged injuries.  And, in any event, under *Baker*, it is not necessary that the "removing defendant must operate under government orders for most of the relevant time frame."  962 F.3d at 945.  As in *Baker*, the Court should discount Plaintiff's disclaimer.  *See also Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (court retained federal officer jurisdiction over complaints for both military and commercial chemicals, even

applying the stricter "causal connection" standard, because, like Plaintiff here, plaintiff provided "no evidence" that injuries from the two categories "will be distinguishable").

**B.** **Defendants' Grounds For Removal Are Not Objectively Unreasonable, And Plaintiff Is Not Entitled To Fees And Expenses.**

Plaintiff's request for fee-shifting under 28 U.S.C. § 1447(c) should be denied because Defendants raise numerous meritorious grounds for removal. "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005); *see also Lott v. Pfizer, Inc.*, 492 F.3d 789, 794 (7th Cir. 2007) ("Because Pfizer had an objectively reasonable basis for seeking removal, the district court erred by awarding the plaintiffs their attorneys' fees under § 1447(c).").

"[I]f clearly established law did not foreclose a defendant's basis for removal, then a district court should not award attorneys' fees." *Lott*, 492 F.3d at 793 (drawing on qualified immunity jurisprudence). Defendants' legal arguments are well-supported by precedent, including the Seventh Circuit's decision in *Baker*. That other circuits have remanded other climate change cases, *see* Mot. at 30, does not foreclose removal or warrant an award of costs and fees here. Regardless, Plaintiff has not shown that the law was "clearly established" in the Seventh Circuit such that removal was obviously meritless, so the Court should exercise its discretion not to award costs and fees. *See, e.g.*, *USA Satellite & Cable, Inc. v. Glen Health & Home Mgmt., Inc.*, 2015 WL 1185478, at *5 (N.D. Ill. Mar. 11, 2015) ("Although there is ample precedent supporting the legal principles upon which the court has relied in concluding that remand is appropriate, the deficiency of [defendant's] basis for removal is not entirely obvious under existing Seventh Circuit law."); *see also Barrientos v. Williams-Sonoma, Inc.*, 2023 WL 5720855 (N.D. Ill. Sept. 1, 2023) (Valderrama, J.) (defendant's removal not objectively unreasonable in light of evolving law); *Valles v. Pleasant*,

2023 WL 4999845, *9-10 (N.D. Ill. Aug. 4, 2023) (Valderrama, J.) (defendant had objectively reasonable basis for removal despite decisions in two analogous cases rejecting defendant's removal arguments). Plaintiff cites a single Seventh Circuit case—*Tenner v. Zurek*, 168 F.3d 328, 329 (7th Cir. 1999)—in support of its fee request, arguing that it is not required to show subjective bad faith to recover an award. But subjective intent is irrelevant where, as here, there is at least one objectively reasonable basis for removal. *Valles*, 2023 WL 4999845, at *10 ("District courts . . . should determine 'whether the relevant case law clearly foreclosed the defendant's basis of removal, not whether the defendant had some special insight into the legislative process.'" (citation omitted)).

Indeed, two other courts in similar climate change cases recently rejected the plaintiffs' requests for fees because there was at least one objectively reasonable basis for removal. *See Cnty. of Multnomah v. Exxon Mobil Corp.*, 2024 WL 1991554, at *8 (D. Or. Apr. 10, 2024) (finding fee-shifting inappropriate when defendants raised issues "not present in previous cases originating in the Ninth Circuit"), *report and recommendation adopted*, 2024 WL 2938473 (D. Or. June 10, 2024); *City of Charleston v. Brabham Oil Co., Inc.*, No. 2:20-CV-03579, slip op. at 13 (D.S.C. July 24, 2023) (declining request for fees because "many of the removal grounds were contested issues at the time of removal because th[e] case was removed before the Fourth Circuit's *Baltimore IV* decision" and because defendants submitted grounds for removal not raised in that prior case). This Court should do the same.

## IV. CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Notice of Removal, the Court should deny Plaintiff's Motion to Remand. Defendants also respectfully request oral argument on Plaintiff's Motion.

Dated: July 1, 2024                  Respectfully submitted,

By:   s/ Patricia Brown Holmes

**RILEY SAFER HOLMES & CANCILA LLP**
Patricia Brown Holmes
Ronald S. Safer
Lauren E. Jaffe
Christopher L. Schaeffer
70 W. Madison St., Ste. 2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
pholmes@rshc-law.com
rsafer@rshc-law.com
ljaffe@rshc-law.com
cschaeffer@rshc-law.com
docketdept@rshc-law.com

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
  tboutrous@gibsondunn.com
William E. Thomson, *pro hac vice forthcoming*
  wthomason@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Joshua D. Dick, *pro hac vice forthcoming*
  jdick@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8451

Thomas G. Hungar, *pro hac vice forthcoming*
  thungar@gibsondunn.com
1050 Connecticut Ave., N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

**SUSMAN GODFREY L.L.P.**
Erica W. Harris, *pro hac vice forthcoming*
  eharris@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
Facsimile: 713.654.6666

31

**STERN, KILCULLEN & RUFOLO, LLC**
Herbert J. Stern, *pro hac vice forthcoming*
  hstern@sgklaw.com
Joel M. Silverstein, *pro hac vice forthcoming*
  jsilverstein@sgklaw.com
325 Columbia Turnpike, Suite 110
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Defendants Chevron Corporation and Chevron U.S.A. Inc.*

By:  s/ Stephanie A. Scharf

**SCHARF BANKS MARMOR LLC**
Stephanie A. Scharf
30 West Hubbard Street, Suite 500
Chicago, IL 60654
Tel: (312) 662-6999
Fax: (312) 726-6045
sscharf@scharfbanks.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
Jonathan W. Hughes
  (*pro hac vice forthcoming*)
3 Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Tel: (415) 471-3100
Fax: (415) 471-3400
jonathan.hughes@arnoldporter.com

John D. Lombardo (*pro hac vice forthcoming*)
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel: (213) 243-4000
Fax: (213) 243-4199
john.lombardo@arnoldporter.com

Nancy G. Milburn (*pro hac vice forthcoming*)
Diana E. Reiter (*pro hac vice forthcoming*)
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Fax: (212) 836-8689
nancy.milburn@arnoldporter.com

diana.reiter@arnoldporter.com

*Attorneys for Defendants BP America Inc. and BP Products North America Inc.*

By:    s/ Nicole C. Mueller

Nicole C. Mueller
Kenn Brotman
**K&L GATES LLP**
70 West Madison Street
Suite 3300
Chicago, Illinois 60602
Telephone: (312) 372-1211
Facsimile: (312) 345-9976
nicole.mueller@klgates.com
kenn.brotman@klgates.com

David C. Frederick (*pro hac vice*)
James M. Webster, III (*pro hac vice*)
Daniel S. Severson (*pro hac vice*)
**KELLOGG, HANSEN, TODD,**
    **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
Email: dfrederick@kellogghansen.com
Email: jwebster@kellogghansen.com
Email: dseverson@kellogghansen.com

*Attorneys for Defendants Shell plc, Shell USA, Inc., and Shell Oil Products Company LLC*

By:    s/ H. Patrick Morris

**JOHNSON & BELL, LTD.**
H. Patrick Morris
David F. Fanning
Danielle Austriaco
33 W. Monroe St., Suite 2700
Chicago, IL 60603
(312) 372-0770 (main)
(312) 372-9818 (Fax)
morrisp@jbltd.com
fanningd@jbltd.com
austriacod@jbltd.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Theodore V. Wells, Jr. (*pro hac vice* forthcoming)

33

Email: twells@paulweiss.com
Daniel J. Toal (*pro hac vice* forthcoming)
Email: dtoal@paulweiss.com
Yahonnes Cleary (*pro hac vice* forthcoming)
Email: ycleary@paulweiss.com
Caitlin Grusauskas (*pro hac vice* forthcoming)
Email: cgrusauskas@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000

*Attorneys for Defendants Exxon Mobil Corporation
and ExxonMobil Oil Corporation*

By:   s/ Patrick P. Clyder
_____

**McGuireWoods LLP**
Patrick P. Clyder #6292573
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Telephone: (312) 750-8668
pclyder@mcguirewoods.com

Jeremiah J. Anderson (*pro hac vice*
forthcoming)
845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
Telephone: (713) 571-9191
jjanderson@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*
forthcoming)
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Attorneys for Defendant American Petroleum
Institute*

By:   s/ Ryanne E. Perio
_____

Ryanne E. Perio
Hallie B. Levin (admission forthcoming)
**WILMER CUTLER PICKERING HALE
  AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

Facsimile: (212) 230-8888
E-mail: ryanne.perio@wilmerhale.com
E-mail: hallie.levin@wilmerhale.com

Matthew T. Martens (admission forthcoming)
**WILMER CUTLER PICKERING HALE
   AND DORR LLP**
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
E-mail: matthew.martens@wilmerhale.com

Robert Kingsley Smith (admission
forthcoming)
**WILMER CUTLER PICKERING HALE
   AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
E-mail: robert.smith@wilmerhale.com

*Attorneys for Defendants ConocoPhillips Company
and ConocoPhillips*

By:   _s/ Sean M. Berkowitz_

Sean M. Berkowitz
**LATHAM & WATKINS LLP**
330 N. Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: sean.berkowitz@lw.com

Nicole C. Valco (*pro hac vice* forthcoming)
Katherine A. Rouse (*pro hac vice* forthcoming)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: nicole.valco@lw.com
Email: katherine.rouse@lw.com

*Attorneys for Defendants Phillips 66 and Phillips 66
Company*

35